UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                Chapter 11
POC Properties, LLC, et al.[1]                       Case No. 15-33291-svk
                     Debtors.

## DECISION AND ORDER ESTIMATING CLAIMS OF MONTY TITLING TRUST 1 FOR PURPOSES OF VOTING AND DISTRIBUTION

The Debtors in these jointly-administered cases own commercial properties in New

Mexico.  M&I Marshall & Ilsley Bank ("M&I") made loans to enable the Debtors to purchase

the properties, and the Debtors' principals, Warren and Steven Blumenthal, personally

guaranteed the loans.  The lending relationship between the Blumenthals and M&I spanned

decades.  When several of the Debtors' notes came due on April 1, 2011, the notes enjoyed good

ratings in the M&I system.

Things changed when BMO Harris Bank ("BMO") acquired M&I in July 2011.[2]  The

notes were renewed for two 90-day periods ending on December 1, 2011.  A July 6, 2011 email

states that the Bank "will be looking at possible options for longer term renewals now that we

have received the projections for each property."  (Docket No. 301-2 at 8.)  Unbeknownst to the

Debtors, on July 16, 2011, the Bank downgraded the loans, put them on a watch list, and the

loans were under review by the Bank's Special Assets Management Unit.

Eventually, after months of protracted communications, BMO proposed forbearance

terms, but the parties never reached an agreement.  The Debtors contend that BMO misled them

---

[1] Jointly administered with SOP Academy, LLC (Case No. 15-33292-svk) and Academy Road Partners, LLC (Case No. 15-33293-svk).

[2] This decision will refer to M&I and BMO interchangeably as "the Bank," unless the particular entity or distinction between the banks is relevant.

as to its willingness to renew the notes while internally it had downgraded the Debtors' loans and sought to have the Debtors refinance elsewhere. BMO filed foreclosure actions against the properties and sued the Blumenthals as guarantors of the loans. The Blumenthals filed their own state court action against BMO alleging bad faith and misrepresentation, and BMO counterclaimed. Monty Titling Trust 1 ("Monty") then acquired the loans from BMO. After more litigation in the state court, the Debtors filed these bankruptcy cases and sought to enjoin the state court litigation. The Court granted a preliminary injunction, and the parties agreed to an extension of the injunction until the conclusion of the hearing on confirmation of the Debtors' plans. (Adv. No. 16-02054 at Docket No. 16.)

Monty filed proofs of claim for the amount due on the notes. The Debtors objected to the claims, asserting counterclaims including intentional misrepresentation, negligent misrepresentation, strict responsibility misrepresentation, and breach of the implied duty of good faith and fair dealing, all stemming from the Bank's conduct during the time the Debtors sought renewal of the notes. The Debtors also filed a motion asking the Court to estimate Monty's claims for purposes of voting on confirmation of a plan and distribution under the plan. While Monty did not object to estimation of its claims at the Debtors' proposed amounts for the purposes of voting, it did object to estimation for the purpose of distribution under a confirmed plan. After determining that the estimation decision would not be binding in the state court litigation and would be used only as a vehicle to enable the Debtors to proceed to confirmation for the benefit of their other creditors, the Court granted the Debtors' motion and conducted an extended hearing on estimating the claims.

The thrust of the Debtors' allegations is that despite having determined its strategy was to have the Debtors refinance with another institution, the Bank represented to the Debtors that it

2

would work with them to renew their loans on a long-term basis.  Had the Bank told the Blumenthals in late 2011 or early 2012 that it did not intend to proceed with a long-term renewal and wanted them to refinance with another lender, they would have paid the Bank in full.  Their strategy would have included borrowing against the Bank's collateral and selling other assets owned or controlled by the Blumenthals, and the Debtors' experts opined that these sales would have generated sufficient proceeds to repay the Bank in full.

I.    The Court Can Make a Non-Binding Estimate of Monty's Claims for the Purpose of Distribution under a Plan

Section 502(c) of the Bankruptcy Code provides that

> There shall be estimated for purpose of allowance under this section-
>> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
>> (2) any right to payment arising from a right to an equitable remedy for breach of performance.

Initially, Monty argued that despite the fact that 28 U.S.C. § 157(b)(2)(B) provides that bankruptcy courts may hear and determine the estimation of claims for the purposes of confirming a Chapter 11 plan, absent Monty's consent, the Court lacks the constitutional authority to enter a final order on state law counterclaims in light of *Stern v. Marshall*, 564 U.S. 462 (2011).  The Debtors agreed that a claims estimation would not provide a final determination on the merits and thus would not deny Monty the opportunity to have the matter finally adjudicated before a court with jurisdiction over the counterclaims.  The Debtors' disclosure statement provides that

> the state court proceedings will be reopened upon conclusion of these bankruptcy Cases to liquidate the claims.  Until resolution of the objections, the Debtors will pay Monty based upon the deemed amounts of its Claims stated in the Plan. The Debtors do not expect that these claims will need to be resolved (or that they will be timely resolved) prior to seeking confirmation of the Plan.

(Docket No. 91 at 15.)

3

The purpose of § 502(c) is to "allow estimation of claims in order to avoid undue delay in the administration of bankruptcy proceedings." *Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993). Estimation "avoid[s] the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions," and "promote[s] a fair distribution to creditors through a realistic assessment of uncertain claims." *In re Continental Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993). Courts have observed that it is "well established" that an estimation proceeding may be used to "determine the allowed amount for distribution purposes." *In re Trident Shipworks, Inc.*, 247 B.R. 513, 514 (Bankr. M.D. Fla. 2000); *see also In re Wallace's Bookstores, Inc.*, 317 B.R. 720, 725 (Bankr. E.D. Ky. 2004) (recognizing that § 502(c) permits estimation "for purpose of allowance" and does not contain a requirement that all parties consent to estimation for the purposes of distribution).

The Debtors sought an estimation of the amount of Monty's claims after accounting for their counterclaims, similar to the situation in *In re Loucheschi LLC*, 471 B.R. 777 (Bankr. D. Mass. 2012). In that case, the debtor objected to allowance of a lender's claim, incorporating claims, causes of action, defenses, and set-offs the debtor and its principals had asserted in an adversary proceeding against the lender, including counts for misrepresentation and breach of the covenant of good faith and fair dealing. *See Goldsmith v. LBM Fin., LLC (In re Loucheschi LLC)*, Ch. 7 Case No. 11-42578-MSH, Adv. No. 11-4122, 2013 Bankr. LEXIS 4811 (Bankr. D. Mass. Nov. 13, 2013). The bankruptcy court held an evidentiary hearing to consider the lender's motion to estimate its claim to determine its rights for the purposes of confirmation. After the evidentiary hearing, the court concluded the debtor met its burden as to one of the counts of its complaint.

4

This Court similarly can estimate Monty's claims in a non-binding manner for purposes of confirmation and distribution without running afoul of the jurisdictional implications of *Stern v. Marshall*. The Court held an evidentiary hearing over several days and heard testimony from the Blumenthals, and Bank officers Austin Mautz, Jon Dexter, and Joseph Gessner. Several expert witnesses testified for the Debtors. In briefing following the hearing, the Debtors argued that the Bank breached its duty of good faith through its conduct before the notes matured. They also argued that the Bank is liable for intentional, negligent, or strict responsibility misrepresentation. Because both the claim objections and the estimation motion asserted additional causes of action, Monty requested that the Court treat any other arguments as having been abandoned. (Brief, Docket No. 343 at 46-47.)

II.    The Court Will Estimate the Claims Using a Methodology that Determines the Likelihood that a Trier of Fact Would Accept Each Party's Version

Courts have discretion and flexibility in determining the best method to estimate a claim. Although some courts adopt an "all or nothing" approach to estimation, *see, e.g., Bittner v. Borne Chemical Co.*, 691 F.2d 134, 136 (3d Cir. 1982), others adopt a method that estimates the probability a claim will succeed and apply the probability to the damages, reasoning that they should take into account the likelihood that "each party's version might or might not be accepted by a trier of fact." *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994); *see also In re Farley, Inc.*, 146 B.R. 748, 753-54 (Bankr. N.D. Ill. 1992) (estimating personal injury claim by taking stipulated damages and discounting by the high probability that the debtor would not be found liable). Given the fact-intensive nature of the claims at issue here, the Court finds this method to be appropriate under the circumstances.

5

III.    The Economic Loss Doctrine Does Not Bar the Debtors' Tort Claims

In their initial briefing, the Debtors assumed that the economic loss doctrine would bar any tort claims based on conduct occurring before December 1, 2011, when several of the notes matured.  (*See* Docket No. 302 at 28.)  However, after reviewing the issue and conducting a hearing, the Court concluded that the economic loss doctrine did not apply to this matter.  The Debtors subsequently briefed the issue of whether any tort claims existed based on events that occurred before December 1, 2011, and Monty filed a response.

The economic loss doctrine as applied by Wisconsin courts extends to the sale of goods and real estate transactions but does not apply to service contracts.  *See Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc*., 148 Wis. 2d 910, 437 N.W.2d 213 (1989) (adopting doctrine and applying to goods); *Van Lare v. Vogt, Inc.*, 2004 WI 110, ¶ 21, 274 Wis. 2d 631, 642, 683 N.W.2d 46, 52 (applying the doctrine to a "written, bargained-for contract for the sale of commercial-use land between two sophisticated parties represented by counsel during the negotiation process"); *Below v. Norton*, 2008 WI 77, ¶ 23, 310 Wis. 2d 713, 726, 751 N.W.2d 351, 358, *superseded by* Wis. Stat. § 895.10 (extending the doctrine to "common-law claims for intentional misrepresentation that occur in the context of residential, or noncommercial, real estate transactions"); *Insurance Co. of North America v. Cease Elec. Inc.*, 2004 WI 139, ¶¶ 52-53, 276 Wis. 2d 361, 381, 688 N.W.2d 462, 472 (adopting a "bright line rule" that the "economic loss doctrine does not apply to contracts for services").

The genesis of the economic loss doctrine in Wisconsin, as in other states, was in cases involving defective products.  The Wisconsin Supreme Court first adopted the doctrine in *Sunnyslope*, 148 Wis. 2d 910 and determined that the buyer of a defective backhoe could not recover on a tort claim for economic losses (e.g., losses for replacement parts, labor, downtime

6

expenses, and lost profits) when a warranty existed that specifically excluded these damages. In explaining the propriety of the rule, the court observed that permitting tort actions for "economic losses arising out of commercial transactions would thwart the carefully constructed legislative framework governing sales and commercial relations in the Uniform Commercial Code." *Id.* at 919-20 (citing *Wisconsin Power & Light v. Westinghouse Elec.*, 830 F.2d 1405 (7th Cir. 1987)). Moreover, allowing tort theories to proceed would "make the seller of equipment potentially liable for unbargained for and unexpected risks." *Id.* at 920.

Following *Sunnyslope*, Wisconsin courts refined the economic loss doctrine. *See State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225 Wis. 2d 305, 592 N.W.2d 201 (1999) (extending to consumer transactions); *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 593 N.W.2d 445 (1999) (determining that the doctrine did not preclude claims for personal injury or damage to property other than a product itself). In *Cease Electric*, 2004 WI 139 at ¶ 35, the court determined that the doctrine did not apply to service contracts, recognizing that "the built-in warranty provisions that the U.C.C. may provide in a contract for the sale of products or goods would not apply to a contract for services." The court also approved of cases explaining that the basis for the doctrine is that "a recognition of tort actions in cases under the U.C.C. would upset the remedies contained in the U.C.C.; when the rationale is not applicable, i.e., when the U.C.C. does not apply, there is no reason" for the economic loss doctrine to apply. *Id.* at ¶ 36 (quoting *McCarthy Well Co. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312, 315 (Minn. 1987)). This case involves a contract for services between a bank and its customers, and the economic loss doctrine does not apply.

The Wisconsin Supreme Court has applied the economic loss doctrine to transactions outside of the scope of Article 2 of the U.C.C., *see Van Lare*, 2004 WI 110; *Below*, 2008 WI 77,

and the same policy supports applying the doctrine to real estate sale transactions. Ultimately, the doctrine recognizes that parties to a contract have allocated the risks of non-performance of the contract, and a "disappointed party to the contract is protected against non-performance by the benefit of the bargain." *Cease Elec. Inc.*, 2004 WI 139, ¶ 40; *see Grams v. Milk Prods., Inc.*, 2005 WI 112, ¶ 16, 283 Wis. 2d 511, 521, 699 N.W.2d 167, 172 (noting the doctrine prevents a party from circumventing the bargain with a tort claim).

The policy behind extending the economic loss doctrine beyond sales of defective products does not support an application of the doctrine in this case. This case does not involve the Debtors' failure to receive the benefit of their bargain. It is thus similar to *Bryant Manor, LLC v. Bank of America, N.A. (In re Bryant Manor, LLC)*, 434 B.R. 629 (Bankr. D. Kan. 2010). In that case, the debtor had a discussion with a representative of its lender's servicing agent about deferring a loan payment and restructuring the loan. The representative told the debtor that the only way it could have discussions about a restructure would be to default on the loan so that it would be assigned to the Special Assets department. The debtor asserted that it became delinquent in reliance on that statement so that it would be able to restructure the loan. After negotiations, the parties were unable to reach an agreement, and the lender eventually commenced a foreclosure action. The debtor asserted that the lender, through the servicer, "had negligently misrepresented that defaulting on the loan was a viable approach to restructuring the loan." *Id.* at 632. The court addressed the lender's claim that the economic loss doctrine barred the debtor's claims, determining that "the factual allegations in this case clearly fall outside the protective umbrella of the economic loss doctrine. This case does not involve the sale of goods or services, nor is it a case where Plaintiff is seeking to circumvent claims that could be brought under contract law by instead bringing them as tort claims." *Id.* at 635.

The same reasoning applies to this transaction. Although Wisconsin courts have applied it "to a broad array of relationships, both commercial and noncommercial," and the supreme court has "never suggested that the doctrine is limited to discrete categories of buyers and sellers," *Zimmerman v. Logemann*, No. 09-CV-210-SLC, 2009 U.S. Dist. LEXIS 111411, at *23 (W.D. Wis. Nov. 30, 2009), a review of the development of the economic loss doctrine suggests it is intended to apply in products liability cases and cases where a similar rationale supports barring tort claims. Admittedly, in *Wickenhauser v. Lehtinen*, 2007 WI 82, 302 Wis. 2d 41, 734 N.W.2d 855, the Wisconsin Supreme Court determined that a misrepresentation claim could proceed because the representation by the defendant that he would not record an option to purchase a parcel of land was "extraneous" to a contract to secure a loan, and an exception to the doctrine applied. However, the court did not discuss the application of the doctrine itself to a contract to lend money.

Another court applied the doctrine to a claim by consumer borrowers against a lender for negligence in processing a loan modification. *See Srok v. Bank of Am.*, No. 15-CV-239, 2015 U.S. Dist. LEXIS 151025 (E.D. Wis. Nov. 6, 2015). The borrowers argued the economic loss doctrine did not apply because the lender's actions were in the nature of services to modify an existing loan. The court disagreed, reasoning that the "processing of the paperwork for a loan modification is a necessary step to obtaining the modified product—the mortgage loan." *Id.* at *17-18. The opinion distinguished only between contracts for services and "products," without discussion of how a mortgage loan is a "product" to which the doctrine is meant to apply in Wisconsin. This Court respectfully disagrees that the transaction at issue here involves a product, triggering application of the economic loss doctrine. Other courts have construed contracts between banks and their customers as service contracts. *See Midland Mortg. Corp. v.*

9

*Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 780, 793 n.2 (D.S.C. 2013). Either because this claim involves a services contract that would not be subject to Wisconsin's economic loss doctrine, or because the policy behind the doctrine does not appear to apply to this situation, the Debtors' claims in this case are not limited by the economic loss doctrine.[3]

IV.    The Debtors' Breach of Good Faith Claim is Unlikely to Succeed

The Debtors assert a claim for breach of the implied duty of good faith and fair dealing, but the success of such a claim is questionable in the absence of an assertion that the Debtors did not receive the benefit of their bargain with the Bank. The Debtors allege that the Bank knew by August 2011 that it would not renew or refinance the loans at maturity but misrepresented its position and caused the Debtors to believe it would, which interfered with the Debtors' performance in paying the notes before they came due. (Brief, Docket No. 357 at 16.)

Under Wisconsin law, every contract imposes a duty of good faith in its performance. *In re Estate of Chayka*, 47 Wis. 2d 102, 107 n.7, 176 N.W.2d 561, 564 (1970). Wisconsin courts have adopted the definition of "bad faith" in the Restatement (Second) of Contracts:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 796-97, 541 N.W.2d 203, 213 (Ct. App. 1995) (quoting Restatement (Second) of Contracts § 205 cmt. d). Thus, the main question is whether conduct constitutes a subterfuge or evasion of the spirit of the bargain. *See Foseid*, 197

---

[3] A court also could accept the Debtors' initial theory that most of their claims arose after the loans had matured and there was no contract governing the parties' respective rights.

Wis. 2d at 796-98; *see also* Wis JI-Civil § 3044 ("in deciding whether the defendant breached the duty of good faith . . . you should determine the purpose of the agreement; that is, the benefits the parties expected at the time the agreement was made").  Here the Debtors received the benefit of their bargain when the Bank made the loans and the short term renewals of the loans.  The Debtors recognize that the Bank was not obligated to renew or refinance the loans. ("The Debtors do not argue the bank made a firm commitment to renew and then abandoned that commitment."  (Debtors' Brief, Docket No. 357 at 2.))  The benefit the Debtors expected was the use of the money at a certain interest rate for a certain term, and the Debtors received that benefit.  Accordingly, the Court rejects the Debtors' breach of good faith argument, and Monty's claim should not be reduced under this legal theory.

V.      The Debtors' Misrepresentation Claims Have a Chance of Success

To succeed on an intentional, strict liability, or negligent misrepresentation claim, the Debtors would need to establish that the Bank made a false representation of fact.  *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 25, 288 N.W.2d 95, 99 (1980).  Generally, the statement must relate to "present or pre-existing events or facts and cannot be merely unfulfilled promises or statements of future events," unless either the promisor intends not to perform, or someone who states an opinion is aware of present facts incompatible with the opinion.  *Hartwig v. Bitter*, 29 Wis. 2d 653, 656-58, 139 N.W.2d 644, 646-47 (1966).  Alternatively, in intentional misrepresentation cases, a failure to disclose a fact is treated as a representation of the non-existence of the fact, if the party has a duty to disclose.  *Kaloti Enters. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 13, 283 Wis. 2d 555, 570, 699 N.W.2d 205, 211-12.  All three causes of action also

11

require a showing that the plaintiff believed the representation and justifiably relied on it to the plaintiff's detriment.

A.    Failure to Disclose or Untrue Representation

The Debtors assert several theories to show the Bank made a false statement of fact. First, the Debtors point to an internal Bank memorandum from August 2011 stating that the Bank's "Long term strategy [was] to renew for a period of time sufficient to allow the borrowers to restabilize the properties and to refinance or sell." (Exhibit 158, Docket No. 285-58.)  In light of this memo, the Debtors contend that the Bank made misrepresentations when it told the Debtors that it was considering renewing the loans on a long term basis or that the relationship would continue as "business as usual."  Second, the Debtors assert the Bank had a duty to correct statements it made before August 2011 that became untrue as a result of the Bank's position as summarized in the memorandum.  Finally, they claim the Bank had a duty to disclose that it planned to end its relationship with the Debtors.

A factfinder could reasonably determine that the Bank made untrue representations of fact on which the Debtors justifiably relied to their detriment.  In their testimony, the Blumenthals described a scenario in which the Bank strung the Debtors along.  Representatives repeatedly and expressly stated that the Bank was simply transitioning the Debtors' notes to different loan officers who were responsible for handling the renewal.  When pressed, Bank officers justified the delay by the transition to BMO procedures following BMO's acquisition of M&I.  In reality, according to the Debtors, the officers were aware the Bank was not contemplating the sort of long term renewal they sought at all.

Steven Blumenthal testified that before December 2011, he recalled discussions about renewing the notes for a minimum of twelve months, but that the Bank was going to work on

longer-term renewals.  (Transcript, Docket No. 335 at 17:1-5.)  The Blumenthals had "repeatedly

been told that the bank was working on renewals, that in great part the issue had to do with new

processes, new procedures, and so due to the acquisition by BMO."  (*Id.* at 17:11-14.)  Steven

Blumenthal described why the Debtors did not refinance:

> [T]hey were telling us that they were working on a long-term renewal, longer-term
> renewal, and that the problem was not us or the properties.  The problem was internal
> processes and procedures. So for that reason, it's different from experience where you
> would hear nothing from the bank, which would cause me pause. . . During the course of
> 2011 and particularly from that period of July through December, we had repeatedly been
> told, you know, you're good customers, the intention is to renew on a longer-term basis.

(*Id.* at 18:13 – 19:4.)  Warren Blumenthal's account was similar.  He stated that the Debtors had

asked for a three year renewal because "[t]he properties were doing well and three years was

what we had always done."  (Transcript, Docket No. 329 at 66:11-12.)  Austin Mautz, who had

been the Debtors' main contact at M&I, stated he needed to work through the BMO process, and

the reason for the shorter renewal from September to December was for Mr. Mautz to collect

additional information for the internal approval process.  (*Id.* at 66:2-8.)  By October 2011, new

appraisals on the Debtors' properties were completed, and the valuations were lower than

expected.  However, Mr. Blumenthal testified Mr. Mautz said the appraisals were "good enough"

and were "not an issue at this point in the renewals.  So you know, don't be concerned about it."

(*Id.* at 72:10-18.)  In discussing a one-year term as opposed to the three-year term the Debtors

sought, Mr. Mautz said that it was "what the bank is doing right now and until things get

stabilized in Milwaukee," and it was "a good renewal."  (*Id.* at 73:2-8.)

   Strengthening the case, a factfinder reasonably could conclude that Bank officers

misrepresented their roles.  In November 2011, Mr. Mautz suggested setting up a meeting with

Ed Roessl.  Mr. Roessl was a member of the Bank's Special Assets Management Unit, or

"SAMU," but Mr. Mautz did not disclose that connection to the Debtors.  (Transcript, Docket

13

No. 331 at 110:9-14; Exhibit 34, Docket No. 301-33 at 85.)  Warren Blumenthal did not recall

meeting Mr. Roessl, and Steven Blumenthal testified that he met Mr. Roessl only once, in

January 2012.  (Transcript, Docket No. 329 at 83:5-8; Transcript, Docket No. 335 at 23:25 –

24:13.)  Warren Blumenthal remembered Mr. Mautz telling him that Mr. Roessl was a senior

loan officer he had worked with for a long time, and that he was going to help Mr. Mautz get the

renewal approved.  (Transcript, Docket No. 329 at 82:6-13.)  Mr. Blumenthal testified that it was

not unusual for Mr. Mautz to bring in a more senior person to work on a deal.  (*Id.* at 82:16 –

83:4.)  Mr. Blumenthal said he definitely would have remembered if Mr. Mautz had said Mr.

Roessl was involved with special assets or workout, because that would have signaled problems

with the loans, which would have caused him concern.  (*Id.* at 88:7-15.)

     The Blumenthals received a V-Card for Mr. Roessl indicating he was a "CRE Market

Manager," or a commercial real estate market manager.  (Exhibit 43, Docket No. 301-42;

Transcript, Docket No. 329 at 97:6-13.)  When the Blumenthals later met with Jon Dexter and

Joseph Gessner, both part of SAMU, Mr. Dexter was described as an analyst, and his business

card stated he was a vice president but did not mention workout or special assets.  Mr. Gessner

was introduced as a senior loan officer.  (Transcript, W. Blumenthal, Docket No. 329 at 95:4-9;

96:16 – 97:2; 97:16-20; Exhibit 25, Docket No. 301-24.)  Instead of suggesting that there was a

problem with the Debtors' loans, triggering the involvement of the SAMU officers, the Bank

represented and Warren Blumenthal observed that the delay in processing the renewals was a

personnel issue because each new person needed to get up to speed.  (Transcript, Docket No. 329

at 95:22 – 96:15.)  Although the Debtors' loans were transferred to SAMU around December 31,

2011, (Testimony of K. Jon Dexter, Transcript, Docket No. 332 at 13:11-16), Warren

Blumenthal credibly testified that he was unaware of the transfer to the troubled loan department,

14

and until July 2012, he did not have any understanding that the SAMU officers were anything other than bank officers working with Mr. Mautz, the Debtors' regular banker. (Transcript, Docket No. 330 at 19:12-20.)

      B.      <u>Justifiable Reliance to the Debtors' Detriment</u>

A factfinder could find that in reliance on the Bank's representations that the renewal process was proceeding as usual but taking longer than expected because of the transition to new loan officers and Bank procedures, the Debtors continued to work with the Bank rather than seeking financing elsewhere. Warren Blumenthal blamed Mr. Dexter for the process dragging out because he was always requesting more information. (Transcript, Docket No. 330 at 19:21 – 20:1.) Even though he was not happy with the delay, Mr. Blumenthal stated he did not go to another bank because he felt this was his bank, and he had a comfort level with his contacts because the Blumenthals had been with M&I for a number of years. He concluded the delays were caused by the merger process. (*Id.* at 20:11-23.)

Mr. Blumenthal said he was "dumbfounded" when, at a July 18, 2012 meeting, Mr. Gessner announced that the Bank wanted the Debtors out of the Bank as quickly as possible. (*Id.* at 22:3 – 23:13.) He was "scared" because the real estate business was his livelihood, having retired from his law firm to focus on growing the business. (*Id.* at 23:9 – 24:3.) Before the meeting, he had not heard the words "forbearance," "work-out," or "special assets" from anyone at the Bank, nor had anyone suggested that the Debtors start looking for other financing. (*Id.* at 27:1-14.)

Steven Blumenthal testified that in his experience as a real estate lawyer with some workout experience, once a borrower was transferred to the workout group, the borrower's contact with the prior bank officer ceased. (Transcript, Docket No. 335 at 45:7-19.) But in this

15

case, Mr. Mautz, the Blumenthals' initial banker, remained involved throughout the process. (*Id.*)  In light of Mr. Mautz not "handing off" the Debtors to the SAMU officers and the failure of the SAMU officers to disclose that they were part of the Bank's unit tasked with negotiating workouts of troubled loans, the Debtors have established justifiable reliance on the Bank's misrepresentations.

By July of 2012, the Debtors' loans had been due for seven months.  Because they relied on representations that the Bank was continuing with the renewal process, unbilled interest and late charges had accrued to the point where the Debtors were no longer able to catch up to the Bank's satisfaction.  Before the loans became due, the Bank had simply debited the Debtors' account for the payments.  But when the notes matured, the Bank stopped debiting the account, as it did not accept payments on loans that had become due.  (Transcript, W. Blumenthal, Docket No. 329 at 103:8-19; Transcript, K. Jon Dexter, Docket No. 332 at 33:5-19.)  Rather than parking the money in an account that was generating only a very small amount of interest, the Debtors used the funds to pay down some loans from other institutions taken out for leasing commissions, tenant improvements, and similar expenses for the Debtors' properties. (Transcript, W. Blumenthal, Docket No. 329 at 105:4-17; 106:5-15.)

Monty took great umbrage at the Debtors' use of the funds, but Mr. Dexter acknowledged that the Debtors were not told to track the cash flow generated by each property.  (Transcript, Docket No. 333 at 86:11 – 87:12.)  He also acknowledged in a May 2012 email in response to Warren Blumenthal that he understood "that this process has taken longer than anticipated with the transition of account officers."  (Exhibit 35, Docket No. 301-34 at 40.)  Moreover, the loan documents did not require the funds to be used or held in a certain manner, and no one from the

Bank directed the Debtors not to use cash flow generated by the Bank's collateral. (Transcript, Docket No. 333 at 92:21 – 93:13.)

Had the Debtors known earlier that there was a problem with the loans, their expert testified that they could have borrowed $16.3 million against the collateral. (Transcript, Docket No. 334 at 12:4 – 15:14.) To account for the other $4.1 million owed to the Bank, the Blumenthals could have sold other assets they owned, including four Whataburger stores, the Bradley Road office property and the Broadbent property, and contributed liquid assets to come up with up to $5.575 million. (Exhibit 11-1, Docket No. 301-10; Transcript, D. Hill, Docket No. 329 at 122:15 – 126:9; Transcript, J. Feeney, Docket No. 329 at 157:20 – 161:9; Transcript, C. Smith, Docket No. 333 at 124:4 – 128:15.) However, in reliance on the Bank's representations indicating it did not have an immediate plan to terminate the relationship, they did not.

C.    Monty's Position

Monty obviously paints a different factual picture. Rather than the "smoking gun" underlying the Bank's misrepresentations, Monty suggests a benign interpretation of the language in the internal Bank memorandum that the "Long term strategy [was] to renew for a period of time sufficient to allow the borrowers to restabilize the properties and to refinance or sell." (Exhibit 158, Docket No. 285-58.) According to Monty, this statement reflected the parties' intentions from the beginning of the transaction. M&I had financed a number of the Blumenthals' real estate transactions. Typically, when the Blumenthals approached the Bank about a loan, the term would depend on how long they thought it would take to get the property running and stabilized. Because the properties were usually fairly stabilized, the loans were "anywhere from three to five years -- five years was pretty unusual. Three years was more typical." (Transcript, W. Blumenthal, Docket No. 329 at 14:13-24.) Steven Blumenthal clarified

17

that the long-term financing the Blumenthals obtained would sometimes be with other institutions and sometimes with M&I. (Transcript, Docket No. 335 at 74:16 – 75:4.) Moreover, according to Monty, the Bank had sound business reasons for not renewing or refinancing the loans. Where the Blumenthals assert Bank representatives dragged out the process and ultimately proposed terms the Blumenthals asserted the Debtors could not meet, Monty asserts BMO worked "diligently with the Debtors for several months before delivering a term sheet that would allow the Debtors in excess of one year to refinance or sell the properties." (Brief, Docket No. 343 at 37.)

VI.     Estimating the Chance of Success

This is a close case. The Debtors presented credible testimony from the Blumenthals about their negotiation of the renewal and the Bank's lack of candor in disclosing that the Bank had downgraded the loans. By the time the Bank came clean with its intentions to terminate the relationship in a workout mode, it was too late for the Blumenthals to refinance elsewhere. The Bank's pronouncement of "business as usual" to the Blumenthals' faces while hiding the transfer of the loans to SAMU certainly bolsters the Debtors' case for misrepresentation.

On the other hand, a factfinder could interpret the internal memo as Monty does: merely establishing the Bank's strategy to renew the loans for enough time to stabilize the properties to permit the properties to be refinanced or sold. The alleged misrepresentation was ambiguous, as the Blumenthals' history with the Bank suggests that the Bank did not traditionally extend long term financing to their projects. Monty points out that the internal memo could have contemplated a three-year renewal period, (Brief, Docket 388 at 3), although the eventual forbearance terms were not for three years. A factfinder also could credit Monty's claims that Austin Mautz did not have the authority to make long-term renewal promises, and the Debtors

18

therefore could not have relied on any such promises to their detriment. And Monty has a persuasive argument that the Debtors could not justifiably rely on any oral promises outside the terms of the written loan documents.

The Court is struck by the length of the parties' relationship and the contrast between the M&I and BMO treatment of the Debtors' loans. The failure of any of the Bank officers to disclose the involvement of SAMU is critical. By the time the Blumenthals became aware that BMO's intentions were to secure a forbearance agreement, not a "business as usual" renewal, the ability to refinance elsewhere had been lost. But as sophisticated borrowers, the Blumenthals bear some responsibility. Emails show that the Bank alerted the Debtors to what it considered "global cash flow stress," suggesting that the Debtors should have known that the Bank considered the loans troubled. And if the Bank had revealed to the Blumenthals earlier that the loans were in workout status, the Blumenthals presumably would have been required to disclose this fact to a new lender, damaging their chances of obtaining refinancing. (Transcript, W. Blumenthal, Docket No. 330 at 33:10-17, 46:17 – 47:7.) Additionally, the Debtors will have an uphill battle proving that the Bank possessed the requisite intent or stood to gain from the alleged misrepresentations. Given Monty's arguments about the ambiguity of the alleged promises made and Austin Mautz's lack of authority to renew the loans on his own, success on the negligent misrepresentation claims is certainly not a slam-dunk. After considering the testimony, evidence and arguments presented, the Court concludes that Monty has a slightly stronger case, and the Debtors have a 45% probability of prevailing on their misrepresentation claims against the Bank.

19

VII.    The Appropriate Measure of Damages

The Debtors summarize their alleged damages on the following chart at Docket No. 361:

| Description | Total Amounts | POC | SOP | Academy |
|---|---|---|---|---|
|  |  |  |  |  |
| 1. Late Fees - SOP/Academy | 32,200 |  | 19,320 | 12,880 |
| 2. Default Interest - SOP/Academy | 637,022 |  | 382,213 | 254,809 |
| 3. Late Fees - POC | 81,473 | 81,473 |  |  |
| 4. Default Interest - POC | 1,857,295 | 1,857,295 |  |  |
| 5. Chapter 11 Fees and Costs | 430,893 | 322,145 | 65,249 | 43,499 |
| 6. Legal/Consulting Fees | 506,856 | 378,936 | 76,752 | 51,168 |
| 7. Negotiation Fee | 75,000 | 56,072 | 11,357 | 7,571 |
| 8. Lang Damages | 950,000 | 710,240 | 239,760 |  |
| 9. Lost Property Values | 1,136,000 | 530,000 | 363,600 | 242,400 |
| Debtors' Damages | $5,706,739 | $3,936,161 | $1,158,251 | $612,327 |

The Debtors assert only consequential damages, acknowledging that benefit-of-the bargain damages do not apply in this case.  (Brief, Docket No. 302 at 34; *see Gyldenvand v. Schroeder*, 90 Wis. 2d 690, 280 N.W.2d 235 (1979) (consequential damages are available in both intentional and negligent misrepresentation cases).)  Consequential damages may "be limited to such damages which were proximately caused by the misrepresentation or by such damages as were within the contemplation of the parties at the time of the misrepresentation." *Gyldenvand*, 90 Wis. 2d at 698.

The Debtors' theory is that if the Bank had told them around August 2011 that it wanted them to refinance elsewhere or sell the properties within a year, there was a limited window in which they could have accomplished exactly that.  However, because they received this information too late, they could not succeed with a plan to refinance and/or sell.  The damages that have been proximately caused by the misrepresentations appropriately include the damages for default interest and late charges.  If the Bank's conduct discouraged the Debtors from paying off the notes when they otherwise could have, and they were unable to do so later, it is

20

foreseeable that the default would have these consequences. Moreover, it would also have potentially been foreseeable that the value of the Debtors' properties would decrease if uncertainty caused tenants to enter into shorter term leases that would adversely affect the value of the properties. Mr. Blumenthal testified that the foreclosure action and events subsequent to the foreclosure action hurt the Debtors' ability to lease the properties on a longer-term basis. (Transcript, Docket No. 330 at 70:25 – 71:11; 74:12-23.) The Debtors' expert testified that shorter-term leases would negatively affect the value of the properties. (Transcript, D. Hill, Docket No. 329 at 126 – 132.)

But the Debtors' theory as to how another entity's sale of the Lang property damaged the Debtors is convoluted. The Debtors and the entity that owned the Lang building were managed by the same manager, which also owned the entity that owned the Lang building. The Debtors assert the POC and Academy operating agreements required the manager to sell the Lang building to protect the Debtors' assets, and under the operating agreement, the Debtors were required to indemnify the manager for its loss. As Monty observes, no proof of claim based on liability for indemnification has been filed. And it is not clear why the manager would be required to sell the property of another entity at a loss to that entity for the benefit of the Debtors, or why the Debtors would be required to indemnify for such a loss. The Debtors assert the entity sold the property in reliance on an indication from the Bank that this would lead to a renewal of the Debtors' notes. However, Steven Blumenthal conceded that although the Bank expressed concern about the Lang building's drain on the Blumenthals' global cash flow, the Bank did not mandate a sale. (Transcript, Docket No. 335 at 27:13 – 29:3.)

The Debtors also do not adequately explain how attorneys' fees are properly included as a measure of damages. Under the American Rule, parties to litigation typically are responsible

21

for their own attorneys' fees unless a statute or contract provides otherwise. *See Estate of Kriefall v. Sizzler USA Franchise, Inc.*, 2012 WI 70, ¶¶ 72-74, 342 Wis. 2d 29, 69-70, 816 N.W.2d 853, 872. The cases cited by the Debtors are distinguishable. *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 547 N.W.2d 592 (1996) applies only in cases involving insurance companies denying benefits in bad faith. *Weinhagen v. Hayes*, 179 Wis. 62, 190 N.W. 1002 (1922) states a limited exception for third-party litigation in which the wrongful act of the defendant involves the plaintiff in litigation with others. *See Bank One, Wis. v. Koch*, 2002 WI App 176, 256 Wis. 2d 618, 649 N.W.2d 339 (contrasting claims in foreclosure action related to bank employee's notarization of forged signature with action where father was sued by a third party after a bank employee notarized a signature forged by his son). This case offers no exception from the American Rule.

The Debtors offered little support for including Monty's $75,000 "negotiation fee" as damages incurred as a proximate result of the Bank's misrepresentations. Similarly, the Debtors did not show how the Chapter 11 fees and costs were proximately caused by misrepresentations, and the bulk of the Chapter 11 expenses are attorneys' fees which are not properly includable in the damages calculations. Accordingly, the attorneys' fees, the negotiation fee, and the Chapter 11 fees and costs have been removed from the claim for damages.

Finally, the Debtors seek punitive damages. Punitive damages are available if a defendant acts maliciously toward a plaintiff, meaning the acts are a "result of hatred, ill will, a desire for revenge, or inflicted under circumstances where insult or injury is intended." *Strenke v. Hogner*, 2005 WI 25, ¶ 26, 279 Wis. 2d 52, 65, 694 N.W.2d 296, 302 (internal quotation marks and citations omitted); *see also* Wis. Stat. § 895.043(3); Wis JI-Civil 1707.1. Punitive damages are also available if the defendant acts in an intentional disregard of the plaintiff's

22

rights, such that the defendant acts "with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded." *Strenke*, 2005 WI 25, ¶ 3; *see also* Wis. Stat. § 895.043(3); Wis JI-Civil 1707.1. Punitive damages are capped at twice the amount of compensatory damages, or $200,000, whichever is greater. Wis. Stat. § 895.043(6).

The jury instructions direct a jury to consider the grievousness of the defendant's acts, the degree of malice involved, the potential damage which might have been done by such acts as well as the actual damage, and the defendant's ability to pay in determining the amount of punitive damages to be awarded. Wis JI-Civil § 1707.1. A jury could find that (1) the Bank's representations that the renewal process was ongoing, when it had concerns about the Debtors' loans serious enough to warrant moving them to a watch list and then transferring them to SAMU; (2) the Bank's failure to disclose the role of the SAMU officers which would have alerted the Blumenthals to the Bank's concerns with the loans in time to pay the Bank; and (3) the Bank's protracted delay in revealing that there were problems with the loans until the Debtors could no longer obtain alternate financing, all evidence willful disregard of the Debtors' rights. Accordingly, the Court finds a 25% chance that the jury would determine that the Bank's actions justified an award of punitive damages of twice the amount of compensatory damages.

VIII.   Conclusion

Assessing the Debtors' misrepresentation claims, the Court concludes that the Debtors have a 45% chance of success, and accordingly, their damages are calculated at 45% of the claimed damages for late fees, interest, and lost property value. Legal fees are barred by the American Rule, and the alleged tortious conduct was not a proximate cause of the negotiation fee the Debtors paid to Monty or expenses related to the Chapter 11 case. Any loss related to

23

another entity's sale of the Lang building does not constitute damages suffered by the Debtors.

The estimated consequential damages are as follows:

| Description | Total Amounts | POC | SOP | Academy |
|---|---|---|---|---|
| 1. Late Fees - SOP/Academy | 14,490 | | 8,694 | 5,796 |
| 2. Default Interest - SOP/Academy | 286,660 | | 171,996 | 114,664 |
| 3. Late Fees - POC | 36,663 | 36,663 | | |
| 4. Default Interest - POC | 835,783 | 835,783 | | |
| 9. Lost Property Values | 511,200 | 238,500 | 163,620 | 109,080 |
| Debtors' Damages | $1,684,796 | $1,110,946 | $344,310 | $229,540 |

Including the estimated punitive damages results in the following estimated claim amounts:

| Proof of Claim | Claim Amount | Compensatory Damages | Punitive Damages | Estimated Claim Amount |
|---|---|---|---|---|
| POC Properties Claim No. 8 | 20,273,384.98 | (1,110,946) | (555,473) | 18,606,965.98 |
| SOP Academy Claim No. 1 | 7,059,598.16 | (344,310) | (172,155) | 6,543,133.16 |
| Academy Road Partners Claim No. 9 | 7,059,598.16 | (229,540) | (114,770) | 6,715,288.16 |

Since Monty has overlapping claims against SOP and Academy on the same note, the

duplication is eliminated as follows:

| | |
|---|---|
| Claim Amount | 7,059,598.16 |
| Compensatory Damages | (573,850) |
| Punitive Damages | (286,925) |
| Net Claim Amount | $6,198,823.16 |

IT IS THEREFORE ORDERED: for purposes of voting to accept or reject the plan and

for purposes of distribution under a confirmed plan, Monty's Claim No. 8 against POC

Properties is estimated to be $18,606,965.98; Monty's Claim No. 1 against SOP Academy is

estimated to be $6,198,823.16; and Monty's Claim No. 9 against Academy Road Partners is

estimated to be $6,198,823.16. This estimation is not a final determination on the merits of the

Debtors' counterclaims against Monty, and does not affect the parties' ability to have the matter finally adjudicated before a court with jurisdiction over the counterclaims.

Dated: December 5, 2017

By the Court:

Susan V. Kelley
Chief U.S. Bankruptcy Judge