# EXPERT REPORT OF FRANKLIND LEA, CIRA

*Opinions Regarding Interest Rates, Feasibility, Plan Value, and Issues Affecting the Fair and Equitable Nature of the Debtors' Joint Plan of Reorganization*

*&*

*Accompanying Risk Assessment Report*

PREPARED FOR: The Honorable Susan V. Kelley

IN THE MATTER OF: POC Properties, LLC ("POC"), SOP Academy, LLC ("SOP") and Academy Road Partners, LLC ("ARP"), jointly administered

PENDING IN: U.S. Bankruptcy Court
Eastern District of Wisconsin
Case Number: 15-33291-SVK

REPORT DATE: June 5, 2018

CLIENT: Mr. Timothy H. Posnanski, Esquire
Husch Blackwell LLP

AS COUNSEL FOR: Monty Titling Trust 1 (Primary Secured Creditor)


TacticalFinancial Consulting



**TACTICAL FINANCIAL CONSULTING**

FINANCIAL STRUCTURING AND RESTRUCTURING
OPERATING COMPANIES, FINANCIAL INVESTMENTS AND REAL ESTATE

June 5, 2018

Mr. Timothy H. Posnanski, Partner
Husch Blackwell LLP
555 East Wells Street
Suite 1900

RE:  Opinions Regarding Interest Rates, Feasibility, Plan Value, and Issues Affecting the Fair and Equitable Nature of the Debtors' Plan of Reorganization in the U.S. Bankruptcy Court for the Eastern District of Wisconsin for the Chapter 11 Debtor: POC Properties, LLC, SOP Academy, LLC and Academy Road Partners, LLC, a jointly administered; Case Number 15-33291-SVK

Dear Mr. Posnanski,

At your request, I have reviewed and analyzed the Joint Plan of Reorganization filed on May 15, 2018 ("Plan") and the corresponding Disclosure Statement on behalf of POC Properties, LLC ("POC"), SOP Academy, LLC ("SOP") and Academy Road Partners, LLC ("ARP") ("Debtors").  Collectively, POC, SOP, and ARP are the Debtors in a jointly administered Chapter 11 case filed in the U.S. Bankruptcy Court for the Eastern District of Wisconsin on December 11, 2015 ("Petition Date").

You have asked that I analyze the Debtors' Plan's treatment of the allowed claims of Monty Titling Trust 1 ("Lender") related to a series of commercial loans secured by the properties located at 4900 Alameda Boulevard NE, 6700 Jefferson Street NE, 9210 San Diego, Boulevard NE, 5120 Masthead Street NE, and 10400 Academy Road in the Greater Albuquerque area of New Mexico that are more commonly known as the Otoño, Conejos, Verano, Masthead, and Tanoan properties ("Property" or "Properties").

In particular, you have requested that I determine the appropriate rate of interest that should be paid by the reorganized Debtors as related to the Lender's claims in the context of the U.S. Bankruptcy Code and the U.S. Supreme Court case of Till vs. SCS



Credit Corp. ("Till"). In that regard, I have sought to determine the rate of interest that, when applied as a discount rate to the payments to a class of claims, will provide the Lender with the present value of its security interest in its collateral. In addition, I determined the financial feasibility of the Debtors' proposed Plan. Lastly, I sought to determine the present value of the proposed payments to the Lender as provided by the Debtors' proposed Plan and, from a financial and investment perspective, the fairness and equitableness of the Plan. My Opinions and Report are based on the Plan's estimated effective date of July 1, 2018 ("Effective Date").

**Determination of the Petition Date Claim Amounts Prior to Any Petition Period Payments** — I understand the Bankruptcy Code, subject to court review and various exceptions, requires a debtor to treat a claim or interest that has been filed as an allowed claim unless it or another party in interest objects (§ 502(a) and (b)).

The Debtor and the Lender litigated over the amount owed under the loan contracts described in this Report. The Court rendered a *Decision and Order Estimating Claims of Monty Titling Trust 1 For Purposes of Voting and Distribution* on December 5, 2017. Per the Order, on the Petition Date, the POC Allowed Claim was estimated at $18,606,966 and the SOP/ ARP Allowed Claim was estimated at $6,198,823.

**Determination of the Value of the Lender's Security Interest in the Debtor's Property**

I also understand the Bankruptcy Code requires the value of the property used in determining the amount of a creditor's secured claim to be determined in light of the purpose of the valuation and the proposed disposition or use of the property, or plan affecting the creditor's interest (Code § 506).

In this instance, the value of the Lender's security interest in its collateral is comprised of the value of the real property of the Debtor(s) and the amount of the cash collateral collected through the Lender's assignment of rents less any higher priority security interests (such as tax liens, if any).

The *Petition Date* values of the Debtors' property and the value of the Lender's interest in the Debtors property are shown in the following charts.[1]

---

[1] At your instruction, I have utilized the values within the recent appraisal reports of CBRE (Albuquerque) for the real estate and the May 2018 balance sheet provided by the Debtor to ascertain the Debtor's cash balances.


TACTICALFINANCIAL
CONSULTING

The POC claim is secured by the Otoño, Conejos, Verano, and Masthead properties and comprises Plan Class 3A.

| Class | Property | Debtor's Property Value | Lender's Interest in Debtor's Property | Value of Lender's Interest |
|-------|----------|------------------------|----------------------------------------|---------------------------|
| 3A | Conejos | 4,300,000 | 100% | 4,300,000 |
| 3A | Otoño | 3,700,000 | 100% | 3,700,000 |
| 3A | Masthead | 1,660,000 | 100% | 1,660,000 |
| 3A | Verano | 420,000 | 100% | 420,000 |
| Real Estate Collateral Subtotal | | 10,080,000 | | 10,080,000 |
| Cash Securing Claims | | 645,605 | 100% | 645,605 |
| **Total Value of Security** | | | | $ **10,725,605** |

The SOP/ ARP claim is secured by the Tanoan property and comprises Plan Class 3B.

| Class | Property | Debtor's Property Value | Lender's Interest in Debtor's Property | Value of Lender's Interest |
|-------|----------|------------------------|----------------------------------------|---------------------------|
| 3B | Tanoan | 4,100,000 | 100% | 4,100,000 |
| Real Estate Collateral Subtotal | | 4,100,000 | | 4,100,000 |
| Cash Securing Claims | | 480,407 | 100% | 480,407 |
| **Total Value of Security** | | | | $ **4,580,407** |

In contrast, the *Effective Date* values of these Debtors property and the value of the Lender's interest in the Debtors property is shown in the following charts.

| Class | Property | Debtor's Property Value | Lender's Interest in Debtor's Property | Value of Lender's Interest |
|-------|----------|------------------------|----------------------------------------|---------------------------|
| 3A | Conejos | 3,700,000 | 100% | 3,700,000 |
| 3A | Otoño | 4,210,000 | 100% | 4,210,000 |
| 3A | Masthead | 1,400,000 | 100% | 1,400,000 |
| 3A | Verano | 260,000 | 100% | 260,000 |
| Real Estate Collateral Subtotal | | 9,570,000 | | 9,570,000 |
| Cash Securing Claims | | 37,100 | 100% | 37,100 |
| **Total Value of Security** | | | | $ **9,607,100** |



| Class | Property | Value of Debtor's Property | Lender's Interest in Debtor's Property | Value of Lender's Interest in Collateral |
|-------|----------|---------------------------|----------------------------------------|------------------------------------------|
| 3B | Tanoan | 3,550,000 | 100% | 3,550,000 |
| | Real Estate Collateral Subtotal | 3,550,000 | | 3,550,000 |
| | Cash Securing Claims | 144,412 | 100% | 144,412 |
| | **Total Value of Security** | | $ | **3,694,412** |

Class 3A comprises approximately 73% and Class 3B comprises approximately 27% of the total secured claim on the Effective Date.

**Determination of the Lender's Secured Status** — I understand the Bankruptcy Code requires a debtor to treat a creditor's (allowed) claim as secured to the extent of the value of its security interest in the debtor's property (§ 506(a)). During the instance where a creditor is fully secured, the Bankruptcy Code also requires the payment of interest and reasonable fees and costs under the agreement(§ 506(b)).

In this Case, the POC had a Petition Date Allowed Claim of $18,606,966 and Petition Date collateral of $10,725,605. The SOP/ARP had a Petition Date Allowed Claim of $6,198,823 and collateral of $4,580,407. Based on a comparison of the Petition Date's Allowed Claims and collateral values the Lender's POC and SOP/ARP Allowed Claims were undersecured and, as of the petition date, the Lender was not entitled to interest on account of its claims.

I also recognize that collateral values may change during the petition period and that a creditor who is secured on the petition date may become undersecured during the petition period, or vice versa. A change in the collateral value during the petition period may trigger the need for interest payments or one of the adequate protection remedies available under the Bankruptcy Code to prevent further loss to the creditor (§ 361).

**Determination of the Application of Adequate Protection Payments Made by the Debtor to the Lender**

I understand the Bankruptcy Code requires a debtor to provide adequate protection to protect a creditor from loss resulting from the use, sale or lease of property including the diminution in value of its security interest during the petition. This protection



extends to both fully secured and undersecured creditors.[2]  The Code allows the adequate protection to be in the form of cash payments, additional or replacement liens or other such relief that will result in the realization of the indubitable equivalent of the creditor's foregone security interest (§ 361)[3].  Should the adequate protection fail to fully protect the creditor, Bankruptcy Code provides for a first-priority administrative expense claim to the extent the protection has not been adequate to protect the value of the creditor's security interest (§ 507(b)).[4]

Generally, this administrative expense claim is only available when adequate protection was a contested issue was determined by the Court, and not when the parties have stipulated to the adequate protection payment.[5]  When the parties have entered into a negotiated or stipulated settlement regarding adequate protection of a claim's collateral, payments are applied to the allowed claim without regard to any change in collateral value.

When protection is court ordered and during any period that a creditor is undersecured, adequate protection payments are first applied to the balance of the outstanding secured claim (as if the Debtor had not utilized the cash collateral) and then to the unsecured claim with any remainder then applied to the secured claim; and when (fully) secured creditor, payments are first applied to fees and expenses, then accrued interest with any remainder then applied to the principal balance of the secured claim.

In this Case, the Court approved a stipulation between the Debtor and Lender for cash adequate protection payments to the Lender beginning on in March 2016 in the amount of $122,000 per month for use of the Lender's cash collateral and cash arising from its

---

[2] A fully secured creditor may seek adequate protection for an anticipated future decline in value of its security interest.

[3] Courts appear to be mixed if adequate protection should begin upon the bankruptcy petition or later after a creditor's motion for relief from the automatic stay or adequate protection.  However, it is generally agreed that the post-petition actions, after review by the Bankruptcy Court, give rise to a creditor's entitlement to protection from diminution in the value of its security interest.

[4] Upon the receipt of the cash payment, the creditor's allowed claim and secured claim are equivalently reduced, and the automatic creation of the administrative claim the use of the property is eliminated.

[5] "The consensual nature of the agreement in this case differentiates the case from the situation where adequate protection is determined by the court after a full evidentiary hearing. In such cases, the court, rather than the parties, determines what protection is "adequate" and therefore it would be inequitable to tax the creditor with the burden of the court's error if the judicially determined adequate protection later proves to be "inadequate." In situations involving the determination of adequate protection by the consent of the parties, the parties themselves, and especially the creditor who is in the dominant position, assumes the risk that adequate protection will later turn out to be "inadequate."; Cheatham, 91 B.R. 382 (E.D.N.C. 1988), further cited in Ford Motor Credit Company v. Rayfeal C. Dobbins, 35 F.3d 860 (4th Cir. 1994);



assignment of future rents. The amount is to be applied to the two estates based on the pro-rata amount of their final secured values. Presuming the Debtor makes its June 2018 payment, the Debtor will have paid $3,417,098 of adequate protection payments since the Court's Order on began. Based on the final secured claim values, POC is to receive $2,492,502 and SOP/ARP is to receive $924,596.

## The Decline in Collateral Value and Creation of Administrative Claim Due to Lender

As shown in the following chart, the Lender's security interests in its collateral in Classes 3A and 3B suffered significant declines in value during the Petition Period from the Debtor's use of cash collateral and changes in real property values.

### Change in Value of Security Interest By Class

| Class | Property | Petition Date Collateral Value | Effective Date Collateral Value | Difference |
|---|---|---|---|---|
| 3A | Conejos | 4,300,000 | 3,700,000 | (600,000) |
| 3A | Otoño | 3,700,000 | 4,210,000 | 510,000 |
| 3A | Masthead | 1,660,000 | 1,400,000 | (260,000) |
| 3A | Verano | 420,000 | 260,000 | (160,000) |
| Real Estate Collateral Subtotal | | 10,080,000 | 9,570,000 | (510,000) |
| Cash Securing Claims | | 645,605 | 37,100 | (608,505) |
| **Total Value of Security** | | $ **10,725,605** | $ **9,607,100** | $ **(1,118,505)** |

| Class | Property | Petition Date Collateral Value | Effective Date Collateral Value | Difference |
|---|---|---|---|---|
| 3B | Tanoan | 4,100,000 | 3,550,000 | (550,000) |
| Real Estate Collateral Subtotal | | 4,100,000 | 3,550,000 | (550,000) |
| Cash Securing Claims | | 480,407 | 144,412 | (335,995) |
| **Total Value of Security** | | $ **4,580,407** | $ **3,694,412** | $ **(885,995)** |

| | |
|---|---|
| Net Change in Real Estate Collateral Value | (1,060,000) |
| Net Change in Cash Collateral Value | (944,500) |
| **Net Change in Value of Security Interest in Collateral** | (2,004,500) |

However, the Debtor paid monthly adequate protection payments to the Lender in exchange for use of the cash and the rents collected and used during the petition period. These adequate protection payments were negotiated to offset the decline in value of the cash and net rents. Since the Lender is undersecured and not entitled to interest these payments are applied as a deduction to the Lender's Allowed Claims.



During the petition period, in part due to the Debtors lease activity and terms of the Plan, the real estate collateral fell in value by $1,060,000. The Debtor paid no adequate protection to the Lender for use of the real estate collateral. Because the Lender's collateral value was not protected during the petition period, an administrative claim equal in amount to the decline is created in each estate and due on the Effective Date if the Debtor is to fulfill the Bankruptcy Code's confirmation requirements of § 1129.[6,7] An administrative claim of $510,000 is due in the POC estate and $550,000 is due in the ARP estate.

*The Debtors' Joint Plan has not scheduled these claims and provides no mechanism to deal with these administrative claims — they hold no cash not included in the Lender's security interest and an insufficient pledge of cash from the Plan's sponsors ($305,000) as compared to the collective amount of the administrative claims ($1,060,000), and an insufficient amount of cash on hand to retire the Lender's Allowed Claims in full. As a result, without amendment, the Plan appears to be fatally flawed and not confirmable.* (Nevertheless, I have continued my analysis presuming the Debtor or Court otherwise resolves this issue.)

**Determination of the Allowed, Secured and Unsecured Claim Amounts**

I understand, for purposes of a debtor's plan confirmation, a creditor's allowed, secured and unsecured claim amounts are based on the effective date's allowed claim amount, the value of its security interest, and any administrative claims or other liens preceding a creditor's security interest. This calculation requires close consideration of the terms of any adequate protection agreement and order, the amount of interest and/or adequate protection payments paid, the collateral value consumed by the estate during the petition period, and the petition date and the effective date value of the creditor's security interest in the debtor's property ("collateral").

Based on a comparison of the Petition Date values and Effective Date values, it is my conclusion the Lender was undersecured on its first mortgages on the Petition Date, during the Petition Period and on the Effective Date, and as a result, the Lender is not

---

[6] Any adequate protection payments made after the publication of the Joint Plan of Reorganization need to be applied to the final claim amounts.

[7] Because of the Debtor's ongoing business operations, cash receipts and expenditures, the final value of the Lender's Secured Claims may differ somewhat from the amounts used in my analysis – it may increase or decrease – based on the Debtor's assets at, and payments to the Lender by, the Plan's Effective Date.


TACTICALFINANCIAL
CONSULTING

entitled to interest during the Petition Period. The unsecured claims arising from these Allowed Claims comprise Plan Classes 4A and 4B, respectively.[8]

The values of these Properties and the total adequate protection payments are shown in the following chart from which the Allowed Claim, Secured Claim and Unsecured Claim amounts for Class 3A and 4A can be determined.[9,10]

| | Class 3A and Class 4A | | | |
|---|---|---|---|---|
| | **Adequate Protection** | | | |
| | **Petition Date** | **Payments** | | **Effective Date** |
| Administrative Claim | $ - | | $ | 510,000 |
| Real Estate | $ 10,080,000 | | $ | 9,570,000 |
| Cash | $ 645,605 | | $ | 37,100 |
| Unsecured Claim | $ 7,881,361 | | $ | 5,997,364 |
| Total Claim | $ 18,606,966 | $ 2,492,502 | $ | 16,114,464 |

The Class 3A amount, net of the ceded property (Masthead) to the Lender, is shown in the following chart.

| | | |
|---|---|---|
| Effective Date Secured Claim (Real Estate plus Cash) | $ | 9,607,100 |
| Ceding of Masthead Property | | 1,400,000 |
| Net Secured Claim for Plan | $ | 8,207,100 |

Presuming the Lender gives its consent, or the Court directs, the Debtor to repay the administrative claim over the term of the bankruptcy.

| | | |
|---|---|---|
| Effective Date Secured Claim plus Administrative Claim | $ | 10,117,100 |
| Ceding of Masthead Property | | 1,400,000 |
| Net Secured Claim for Plan | $ | 8,717,100 |

---

[8] I recognize these Allowed Claim balances may be affected by adequate protection payments, sale or relinquishment of collateral, principal payments, interest and tax accruals and the like and when information was available I have adjusted them accordingly in my analysis.

[9] These compare to amounts of $10,970,000 and $8,112,486 in the Debtor's Joint Plan for the secured and unsecured claims.

[10] The secured claim amounts are based on April 2018 appraisals by CBRE. The cash balances are based on the Debtors March 2018 operating statements. The adequate protection payments are based on a reconciliation, through April 9, 2018 provided by the Lender.


TACTICALFINANCIAL
CONSULTING

The Allowed Claim, Secured Claim and Unsecured Claim amounts for Class 3B and 4B are shown in the following chart.

**Class 3B and Class 4B**

| | Petition Date | Adequate Protection Payments | Effective Date |
|---|---|---|---|
| Administrative Claim | $ - | | $ 550,000 |
| Real Estate | $ 4,100,000 | | $ 3,550,000 |
| Cash | $ 480,407 | | $ 144,412 |
| Unsecured Claim | $ 1,618,417 | | $ 1,029,815 |
| Total Claim | $ 6,198,823 | $ 924,596 | $ 5,274,227 |
| | | | |
| Effective Date Secured Claim (Real Estate plus Cash) | | | $ 3,694,412 |
| Effective Date Secured Claim plus Administrative Claim | | | $ 4,244,412 |

**Property Risk** — I found the Debtors' Properties to have certain risk factors that raise its risk as compared to the typical or average national market risk for these types of properties. As described within the Plan, the Debtor owns five real estate properties — four office buildings and one warehouse building. Of these properties, one office building is ceded to the Lender post-confirmation, leaving the interest rate to be determined on the three remaining office buildings and the warehouse building.[11]

The remaining buildings:

- are generally well-located within the Albuquerque area with good roadway access and in suitable configurations to be attractive to tenants, except for Tanoan which has a somewhat inferior location on the eastern border of the city

- are in average to good condition, with few (if any) immediate repair items

- contain the necessary amenities (parking, access, etc.) to effectively compete for tenants at market rates

- have a remaining life expectancy that should not distract from the Debtors' ability to repay the Lender's Secured Claims

- are under sound property management

---

[11] The Plan provides for a reduction in the Class 3A claims for liquidation value of the ceded property of $1,400,000.



The Properties hold the typical real estate investment risk of operating a suburban office building, whose risk is lower than many other property types, however these properties have additional risks including:

- the Albuquerque and New Mexico economies have failed to rebound like most of the country since the 2008 recession

- the area's rental rates and occupancies are depressed with no expectation of any significant improvement

- the anticipated low operating cash flow amount compared to their operating costs and Plan payment obligations

- the buildings are aging and will require over one million dollars of capital expenses during the next seven years to maintain their condition and ability to retain and attract tenants

- the Otoño Property has significant tenant risk. It is a two-unit/two-tenant building, the loss of a single tenant creates a situation whereby the building is immediately unable to pay for its basic operating cost and upkeep. Most of its space is leased to a tenant at an above market rate which would not likely be replaceable if leased to a new tenant. In comparison, Conejos and Tanoan benefit from multiple tenants (revenue diversification). To reconfigure the property into a multi-tenant office building would require substantial expense by the Debtor or a large rent concession to tenants willing to fund their own improvements, and its leases also provide for a 90-day notice of cancellation from the tenants.

  However, both of its tenants are a variant of the State of New Mexico government that provide necessary state services regardless of the economic climate. As such, these entities require space, and importantly the building was a build-to-suit for the larger tenant and contain several unique aspects favorable for the tenant and in my opinion, helps to offset the risk of the property and lease negatives

- the Conejos Property lies in the most competitive area of Albuquerque, generally referred to as the larger North Interstate-25 market and the submarket known as the Journal Center, which contains over 3.6 million and one million square feet of competitive office space, respectively. However, the property lies at the



intersection of two main thoroughfares giving it better exposure than most properties in this area. For this reason, its ability to attract and retain leases is superior to most properties in the area and in my opinion, this generally offsets the highly competitive nature of the property's location in the Journal Center. *The Conejos Property contains an additional risk factor that cannot be easily quantified and is not addressed by the Plan as it will require approximately $700,000 of reconstruction/ tenant improvement cost to reconfigure approximately one-third of its space into a marketable condition or locate a tenant willing to invest a similar amount of money into its tenant improvements or accept a very oddly and inefficiently configured space*

- the Tanoan Property sits to the far east of the City's core economy, population and major transportation corridors (bordering the Sandia Mountain Range) and because of its location, it excludes many potential tenants. This is somewhat offset by the Property's location in the new growth, upper-income area of Tanoan. However, its distance from much of the Albuquerque population, coupled with a competitive neighborhood of properties adds a modest risk component to this property above the average property

- the Verano Property has recently entered a lease with a new tenant who according to the property manager has only recently come to understand the properties physical deficiencies including a serious parking issue and the inability for large delivery trucks, such as tractor-trailers, to effectively enter the property.

**Plan Risk —** I found the Debtors' Plan to have certain risk factors, repayment terms and conditions, that raise its risk above the average market risk for these types of properties. The Plan contains terms extending beyond the typical operating and financial risk of an office building. The Debtors' Plan suffers from three major problems including:

- the financial leverage is too high

- the business has essentially no equity

- the business lacks the necessary (cash) working capital

- the Plan's payments require more cash payments than the Debtors' assets can produce

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 12 of 182


TACTICALFINANCIAL
CONSULTING

The Debtors' Plan crams down the original debts to the current values of the properties to become secured claims, but by leaving the full remainder as unsecured claims does nothing to reduce the amount of the pre-petition liabilities that caused the initial insolvency. Without a reduction in these liabilities – either through a further equity investment or court-ordered reduction in claim amounts – the Debtors are doomed.

Since the restructured entity continues to have no equity or any equity buildup during the Plan, the likelihood that the Debtors' sponsors will invest their own capital if the Debtor struggles with its Plan is greatly reduced and largely unrealistic given their past actions.

Typically a loan has mandatory payments on only approximately 75% of its capital structure and payments to equity are optional and based on availability, however, the restructured loans require mandatory debt payments on 100% entire secured capital structure plus payments on the entire unsecured capital structure of the reorganized Debtors.

- this lack of an equity "cushion" greatly increases the probability of default and a loss for the creditors.

- due to the overall high amount of debt the Debtor is attempting to retire through the Plan, the Debtors' cash flow from operations is inadequate to service the required Plan payments for the entire term.

- the lack of equity in the entities at the beginning of the Plan, the slower pace of principal repayment by the long-term thirty year amortization, and the lack of any significant cash investment by the Debtors sponsors eliminates the buildup of any equity in the Debtors by the end of the seven-year Plan Term and precludes a successful payoff of the outstanding secured and unsecured claims at the end of the Plan

The starting cash balances are too low; the Debtor begins the Plan undercapitalized with only $486,512 (assuming the Debtors sponsor contribute the full amount of their cash contribution on the Effective Date and not later in the Plan Term). A business of this type should hold (or have access to) cash equivalent to about three months of operating expenses plus escrows and reserves for real estate taxes, tenant improvements, leasing commissions and capital expenses.



- in this case, all of the cash invested by the Plan's sponsors will likely be consumed by the payment of administrative expenses for its legal counsel and add no value to the businesses operations.

- the Debtors are obligated to pay $100,000 to Class 6 on the Effective Date

- the Debtors are also obligated to pay $191,783 in general unsecured claims within 30 days of the Effective Date and to begin making payments on most of the other Plan Classes immediately.

These payments quickly consumes the majority of the Debtors cash creating a situation where the Debtors cannot pay for any tenant improvements or leasing commissions to obtain new tenants, or alternatively are forced to seek tenants on far less favorable terms (e.g., free rent, discounted pricing). Thus, it appears very likely the Debtor will run out of cash and require further reorganization.

**Till Analysis** — I have considered the Debtors' obligations found within the Bankruptcy Code, considered the risk factors expressed in the Till decision (*Circumstances of the Estate, Nature of the Security, Duration of the Reorganization Plan, and Feasibility of the Reorganization Plan)* and examined the availability of credit for the terms of the Plan in the credit market (*Efficient Market Test*).

*Efficient Market Analysis* — Based on these claim amounts and Effective Date values, I analyzed the credit markets and considered the characteristics and risk factors of the Debtor, its Property and the proposed Plan terms to determine if an efficient market exists for repayment of the Lender's Claims in an amount equaling or exceeding the amount of its Secured Interest.

*Risk-Based Interest Rate Determination* — As described in more detail in the attached Report, I found no efficient market to exist for repayment of Class 3A, 3B, 4A, or 4B based on the Plan terms. Finding no market, I then utilized the formula approach to determine the appropriate risk-based interest rate for the repayment of the Lender's Secured Claims based on the Plan terms. I selected the U.S. Prime Rate as the base rate and then adjusted it for the Till Risk Factors.

*Secured Claim Interest Rate* — These risk factors and others detailed in the Report raise the risk level and cause me to opine to an interest rate above the average interest



national rate of 5.56% and 6.36% for these types of properties and the approximate local rates of 5.80% and 6.60%. This also leads me to conclude that the Plan's proposed 5.75% interest rate is similar to both the national average interest rates and the local risk-based market rates for these types of property prior to any atypical risk adjustment factors. I have concluded the appropriate interest rates for repayment of the Lender's Secured Claims as of June 1, 2018, are

- Conejos Property: a fixed rate of 9.75%, the U.S. Prime Rate of 4.75% plus 5.0%

- Otoño Property: a fixed rate of 9.75%, the U.S. Prime Rate of 4.75% plus 5.0%

- Verano Property: a fixed rate of 9.75%, the U.S. Prime Rate of 4.75% plus 5.0%

- Tanoan Property: a fixed rate of 10.0%, the U.S. Prime Rate of 4.75% plus 5.25%

The weighted average interest rate for Class 3A is 9.87% and for Class 4A is 14.87%.

The Conejos, Otoño and Verano Properties constitute Class 3A in the Plan, the rate for this Class is 9.75%. The Tanoan Property is the only property in Class 3B, the rate for this Class is 10.00%.

A comparison of the key Plan terms to the national and local averages, as well as my opinion, is contained in the following charts. The Conejos, Otoño and Verano Properties are suburban office buildings and are shown below.

| | National Average | ALBQ Area | Plan Terms | TFC Opinion of Plan Terms | | |
|---|---|---|---|---|---|---|
| | | | | Otoño | Conejos | Tanoan |
| **Loan to Value (%)** | 75.00% | 75.00% | 100% | No Market | No Market | No Market |
| **Debt Service Coverage Ratio** | 1.53 | 1.50 | >1.0 | No Market | No Market | No Market |
| **Loan Term (Months)** | 60-84 | 60-84 | 84 | Available | Available | Available |
| **Amortization (Months)** | 336 | 300-360 | 360 | Available | Available | Available |
| **Interest Rate at Average LTV** | 5.56% | 5.80% | n/a | n/a | n/a | n/a |
| **Interest Rate at Plan Terms** | Not Available | Not Available | 5.75% | 9.75% | 9.75% | 9.75% |



The Tanoan Property is a flex-space industrial warehouse and is shown below.

| | National Average | ALBQ Area | Plan Terms | TFC Opinion of Plan Terms |
| --- | --- | --- | --- | --- |
| | | | | Verano |
| **Loan to Value (%)** | 63.00% | 63.00% | 100% | No Market |
| **Debt Service Coverage Ratio** | 1.73 | 1.75 | >1.0 | No Market |
| **Loan Term (Months)** | 60-84 | 60-84 | 84 | Available |
| **Amortization (Months)** | 276 | 240-360 | 360 | Available |
| **Interest Rate at Average LTV** | 6.36% | 6.60% | n/a | n/a |
| **Interest Rate at Plan Terms** | Not Available | Not Available | 5.75% | **10.00%** |

**Value Repaid to Class 3A and 3B by the Plan at the Risk-Based Interest Rate** — I understand the Debtors are obligated to provide a Plan payment(s) to the Lender in an amount equal to or greater than the present value of its interest in the Debtors' property (§1129(b)(2)). Based on my opinion of the appropriate risk-based interest rate, I then determined the value of the payments provided in the Plan to the Lender's secured Classes.

- For Class 3A, I have concluded that the Plan terms provide a present value of $7,030,028 versus the $8,717,000 secured claim. The lower interest rate coupled with a longer than typical Plan term creates a deficit of $1,687,072, well below the value of the Lender's Secured Claims on the Effective Date.

- For Class 3B, I have concluded that the Plan terms provide a present value of $3,378,266 versus the $4,244,412 secured claim. The lower interest rate coupled with a longer than typical Plan term creates a deficit of $866,146, well below the value of the Lender's Secured Claim on the Effective Date.

*Unsecured Claim Interest Rate* — With regard to the Debtors' Unsecured Classes (Claims), I evaluated the value promised within the Debtors Plans. When a reorganization plan promises to repay a stipulated, specific amount, the Bankruptcy Code requires the unsecured creditor receive payments of a value equivalent to the value promised by the plan on its effective date.[12] In other words, the value transferred

---

[12] 1129(b)(2)(B) With respect to a class of unsecured claims—



to the unsecured creditor should be the same as promised in the Plan whether paid on the effective date, at the end of the Plan term or through one or more payments during the Plan term (1129(b)(2)(B)).

When not paid on a plan's effective date, the payment of interest is required to maintain the Plan's pledged value with the interest rate compensating the unsecured creditor for the time value of money and the plan's risk of failure. The difference between a plan's secured and unsecured claims are the collateral liens accruing to the secured classes (claims). Without these liens, unsecured classes are exposed to a higher risk of loss if the plan fails since there is no collateral dedicated to their repayment. Thus, knowing the secured claims have (equal or) less risk they set the "floor" interest rate an unsecured claim arising from the remainder of an allowed claim.

The previously described risk factors and the lack of collateral raise the risk level or other credit enhancements, cause me to opine on an interest rate above the secured claim interest rates. Due to the higher potential for loss due to the lack of collateral and the high probability of default during and at the end of the Plan Term, I have concluded the appropriate interest rates for repayment of the Lender's Secured Claims as of June 1, 2018, are:

- Otoño Property: a fixed rate of 14.75%, the U.S. Prime Rate of 4.75% plus 10.0%

- Conejos Property: a fixed rate of 14.75%, the U.S. Prime Rate of 4.75% plus 10.0%

- Verano Property: a fixed rate of 14.75%, the U.S. Prime Rate of 4.75% plus 10.0%

- Tanoan Property: a fixed rate of 15.00%, the U.S. Prime Rate of 4.75% plus 10.25%

The unsecured claims arising from Conejos, Masthead, Otoño, and Verano Properties constitute Class 4A in the Plan, the rate for this Class is 14.75%. The unsecured claim arising from the Tanoan Property is the only property in Class 4B, the rate for this Class is 15.00%.

**Value Repaid to Class 4A and 4B by the Plan at the Risk-Based Interest Rate** — I understand a bankruptcy plan must provide that each creditor with an unsecured claim receive or retain on account of its claim property of a value equal to the allowed amount of such claim on the effective date (1129(a)(7)). A debtor is obligated to provide a Plan

---

(i)the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim;



payment(s) to the Lender in an amount equal to the value promised to the creditor in the Joint Plan of its interest in the Debtors' property (§1129(b)(2)). Based on my opinion of the appropriate risk-based interest rate, I then determined the value of the payments provided in the Plan to the Lender's Unsecured Classes.

- For Class 4A, I have concluded that the Plan terms provide a present value of $3,981,792 versus the $5,997,364 unsecured claim. The lower interest rate coupled with a longer than typical Plan term creates a deficit of $2,015,572, well below the value of the Lender's Unsecured Claims on the Effective Date.

- For Class 4B, I have concluded that the Plan terms provide a present value of $675,447 versus the $1,029,815 unsecured claim. The lower interest rate coupled with a longer than typical Plan term creates a deficit of $354,368 well below the value of the Lender's Unsecured Claim on the Effective Date.

**Feasibility** — I also considered the conditions described in the Bankruptcy Code for a plan to be deemed feasible (the plan must be workable, offer a reasonable assurance of plan performance and its implementation not be followed by an unanticipated financial reorganization or liquidation) and evaluated the Plan in the context of these conditions (§ 1129 (a)(11)).

The Debtor has inadequate cash resources and/or cash flow from its assets to successfully execute its Plan. In comparison to the obligations in the Plan and the nature of the Debtor's business, the sponsor's cash contribution and the Debtor's cash position at the beginning of the Plan term, are too low to sustain the Debtor throughout the Plan. Since a large portion of its space is leased with no material change anticipated in its leasing activity or lease rates, this renders the Debtor incapable of generating sufficient revenue to pay for the Plan's claim payments. In my opinion, if the Debtor believes it can make the Plan payments it has unreasonably estimated the net cash flow that the Property can generate.

The lack of any equity in the Debtors or their Properties, or any meaningful cash contribution to the Plan, increases the prospect of a loss upon default because there is no equity cushion for falling values or to support the unsecured claims retained in the Plan.

The Debtors' Plan simply attempts to pay off too much a debt load. (This is further complicated by the Debtor retaining only four of the five properties in its Plan, but



attempting to retire unsecured claims from all five properties.) My calculations indicate that even with the Debtors' proposed Plan terms the Debtors' cash flow is incapable of servicing the Plan payments in either the POC or ARP estate.

In fact, even with no adjustment to interest rates or terms in the Plan, the POC Debtor cannot pay the Plan payments for Class 3A and Class 3B renders the ARP Debtor woefully undercapitalized throughout the Plan term. Further, a one percent increase in the Class 3B interest rate makes the ARP Debtor run completely out of cash in its thirty-third month of operations. Under the much higher risk-based rates, which among other things, account for the 100% financing of the secured and unsecured Class/ claims of the Lender, neither Debtor has positive cash flow after the first month of operations.

Secondarily, the Debtor has no mechanism to pay off the outstanding secured and unsecured claims at the end of the Plan Term through a sale or refinance of its properties. Presuming the Debtor could somehow make its Plan payments, at the end of the Plan the combined payoff to the Lender for its secured and unsecured claims is $17,975,571 versus a collateral value of $$13,021,126 from an Effective Date value of $9,570,000 (based on my risk-based rates). The prospect that the properties will rise in value during the Plan Term above these amounts is purely speculative.

Based on my nearly thirty years of education and experience in appraising commercial real estate, providing credit and loan reviews, underwriting new loan requests, and dealing with troubled companies, my opinion is the Debtors' Plans are not feasible.

**Fair & Equitableness of the Plan** — I understand the Bankruptcy Code requires a plan not to discriminate unfairly, and to be fair and equitable, to each class of claims that has not accepted the plan (§ 1129 (b)).

From a financial and investment perspective, I found certain aspects of the Debtors' Plan troubling as they seem unfair and/or inequitable.

First, the Plan does not comply with the Bankruptcy Code requirement because:

- it fails to repay the decline in value of the Lender's security interest in its collateral during the Petition Period (as an administrative claim) on the Plan's Effective Date



- overstates the value of the Verano Property, basing the value on its "as is" sales comparison rather than the "leased fee" value consistent with the Debtor's use of this property in its plan. This is the cause of an administrative expense claim

- overstates the value of the Masthead Property, to be ceded to the Lender as part of the Plan, by using its going concern value of $1,945,000 instead of its liquidation value of $1,400,000, thereby incorrectly reducing Class 3A by an additional $545,000.

Second, the Plan terms remove all risk from the Debtors and their equity sponsors and place it solely on the Lender and other creditors because:

- during the seven-year Plan, the Debtors' sponsors have no capital at risk while retaining the prospect of receiving any and all equity dividend payments and all the Properties' appreciation. (Typically, an investor would provide approximately 25% to 30% of the investment instead of less than three percent to receive these benefits and a lender would have approximately 70% of the funds at risk instead of nearly 100%. )

Meanwhile:

- places nearly all of the operating and financial risk on the creditors who will be the only ones with a material amount of "skin in the game"

- the creditors return on their claims is capped at the amount of their monthly payments while the Debtors' sponsors may receive unlimited payments (from an entity with no equity value)

- places the seven-year payoff risk of the remaining claim balances due at the end of the Plan's term with no risk to the equity holders

- the Plan removes the cross-collateralization between the Lenders collateral eliminating this risk reduction method

Third, with respect to the Lender, the Plan:

- provides an interest rate at the Prime Rate, a low short-term rate generally reserved for a bank's low risk and most creditworthy customers, but Plan is for a long-term loan with high risk

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 20 of 182



- fails to make adjustment to the interest rate for the high risk of Plan failure due to the low cash balances, insufficient cash flow and a near complete lack of any equity cushion

- fails to account for the repayment's duration, the current rising interest rate environment, or the Plan's feasibility risk by repaying the Lender based on a seven-year, below market, fixed interest rate to the Lender that

- fails to generate equity in the Properties, which would have to rise in value by $6,255,571 during the seven years from a value of $11,720,000 to $17,975,571, nearly $5 million more than projected by CBRE making repayment of the Lender's claims completely speculative

Fourth, the Plan fails to seek recoveries from insiders who have testified under oath they transferred one and half million dollars from the estates to their personal use to reduce debts at Bank of America. Notably, the Debtors values would have almost certainly declined to a level during the Great Recession to have rendered the Debtor insolvent at the time of the transfer

Fifth, the Plan fails to maximize the value of the estates' property for the benefit of its creditors by not rejecting certain leases that would add value to the estates. For example, it appears the Debtor should be rejecting the lease on the Verano property which would essentially double the value of the property and provide approximately one-quarter of a million dollars to creditors. Instead, the Debtors are temporarily devaluing the property by retaining the lease and can sell it upon lease expiration in two years and reap the windfall

Lastly, this Case lacks complexity — the Debtors own five, independent single asset real estate assets (one that has no leases in place) and have presented a plan that could have been proposed on the first day of its Case. After a lengthy petition period of two and one-half years, the Debtors have present this plan after:

- spending over two million dollars of the Lender's cash collateral and reaching a point where they cannot timely make their adequate protection payments

- it was unable to provide an accurate accounting of the Debtors' insider transactions involving pre-petition cash transactions during a time of payment default with the Lender leaving a million and one-half dollars in question



- not materially repositioned any of the assets or their operations during their petition period nor suggest any future repositioning in its Plan

- filing a Plan seeking to retain the four properties but failing to identify how the Debtor will pay for hundreds of thousands (perhaps even exceeding one million) in reconstruction costs (tenant improvements) likely necessary to attract a tenant

- holding assets worth less today than when they filed their petition, but make no accounting for their diminution in value liabilities to the Lender

- proposing a Plan with no equity and little or no new cash investment to offset the risk to creditors and support the working capital needs of the Debtors, but asking the Court to approve a long-term plan based on an interest rate generally set aside for short-term borrowings of a bank's best customers

- seeking approval of a Plan that seeks a seven-year injunction of the Debtors sponsors guaranty obligations while the sponsors simultaneously ask to become stewards of the creditors' investments for the seven-year period and reap any upside that might occur

- The Debtors seek to have a Plan approved that allows them to continue to hold more debt than the value of their assets at the beginning of the Plan Term and whose assets cannot be sold at the end of the Plan to retire the Debtors liabilities therefore causing the need for the Debtors to further reorganize

I simply cannot see how, from a financial perspective, this Plan is a "fair trade" for the opportunity cost and risk the Plan's Lender and other creditors would experience with this Plan. My detailed Opinions, Risk Assessment Report and/ accompanying Exhibits are attached.

It has been a pleasure to serve you in this matter.

Kindest Regards,

*Franklind Lea*

Franklind Lea, CIRA

President and Managing Member


TacticalFinancial
Consulting

# CONTENTS

**TERMS AND CONDITIONS OF USE** .................................................................................................1

**PROFESSIONAL CERTIFICATION**...................................................................................................2

**RETENTION** ..................................................................................................................................3

**EXPRESSED OPINIONS AND LIMITING CONDITIONS** ....................................................................4

**QUALIFICATIONS TO PROVIDE THESE EXPERT OPINIONS** ............................................................5

**ACTIONS TAKEN TO FORM THE OPINIONS / DATA AND INFORMATION REVIEWED AND CONSIDERED**..................8

**RISK ASSESSMENT REPORT** .......................................................................................................12

INTRODUCTION......................................................................................................................12

LENDING HISTORY BETWEEN POC PROPERTIES, LLC ("POC"), SOP ACADEMY, LLC ("SOP") AND ACADEMY ROAD PARTNERS, LLC ("ARP"), JOINTLY ADMINISTERED AND MONTY........................................13

LENDER'S COLLATERAL....................................................................................................13

ECONOMIC & CAPITAL MARKET CONDITIONS..............................................................16

General Economic Conditions....................................................................................16

General Investor Interest Level...................................................................................16

General Office Investment Conditions........................................................................17

General Industrial Investment Conditions ..................................................................18

General Lending Conditions .......................................................................................18

Lending Sources..........................................................................................................18

Federal Reserve Intervention and Interest Rate Trends .............................................19

National Rates of Interest ...........................................................................................20

U.S. Prime Rate of Interest .........................................................................................20

U.S. Treasury Rates ....................................................................................................20

U.S. Treasury Yield Curve and the Anticipated Inflation Rate ..................................21

General Underwriting Criteria .....................................................................................21

National Average Loan Terms by Property Type ........................................................21

National Average Loan Terms By Property Subtype....................................................22

RISK/RETURN RELATIONSHIP.......................................................................................26

Property Discount Rates..............................................................................................26

Property Subtypes .......................................................................................................27

Relationship Between Interest Rates and Property Discount Rates ............................28

PLAN TERMS.................................................................................................................29

FINANCIAL ANALYSIS ...................................................................................................31

Projected Revenues and Expenses..............................................................................32

Repayment of Claims During the Plan Term ..............................................................33

Repayment of the Class 3A and 4A Classes Due to POC During the Plan Term (Verano, Conejos and Otoño Properties).....................................................................34

Working Capital Adequacy..........................................................................................44

Loan to Value/ Balance Sheet Solvency.....................................................................45

Repayment of Remaining Claims at the End of the Plan Term....................................46

RISK ASSESSMENT CONCLUSIONS.................................................................................48

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 23 of 182



DETERMINATION OF MARKET EFFICIENCY ....................................................................................................49

EFFICIENT MARKET EVALUATION ...........................................................................................................50

THE APPROPRIATE RATE OF INTEREST AS REQUIRED BY THE BANKRUPTCY CODE AND IN TILL VS. SCS CREDIT CORP. ......................51

ESTIMATE OF APPROPRIATE INTEREST RATE, I.E., DISCOUNT RATE....................................................................54

FORMULA APPROACH RESULTS FOR THE SECURED CLAIM – VERANO PROPERTY...................................................56

FORMULA APPROACH RESULTS FOR THE SECURED CLAIM – CONEJOS PROPERTY..................................................57

FORMULA APPROACH RESULTS FOR THE SECURED CLAIM – OTOÑO PROPERTY.....................................................58

FORMULA APPROACH RESULTS FOR THE SECURED CLAIM – TANOAN PROPERTY...................................................59

FEASIBILITY STANDARD..........................................................................................................................60

FEASIBILITY CONDITIONS AND REQUIREMENTS...........................................................................................60

FEASIBILITY ANALYSIS ...........................................................................................................................61

    *The (future) earning power of the business* ................................................................................61

    *The adequacy of the (reorganized) capital structure* ...............................................................61

    *The economic conditions of the business* ................................................................................62

    *The efficiency and effectiveness of management in control of the business after confirmation* ......................62

    *The reasonableness and impact of the Plan terms to the success of the Plan* ................................63

FEASIBILITY CONCLUSION........................................................................................................................63

PRESENT VALUE OF THE PLAN PAYMENTS AND, FROM A FINANCIAL PERSPECTIVE, IS THE PLAN COMPLIANT WITH 11 U.S.C. § 1129(B)(2)(A)(I)(II)? .......................................................................................................................64

**EXHIBITS** .........................................................................................................................................**66**

ANALYSIS ASSUMPTIONS .......................................................................................................................67

PLAN DESCRIPTION OF CLAIMS AND CLASSES.............................................................................................69

SCHEDULED CLAIMS AND CLAIM TREATMENTS...........................................................................................73

DEBTORS' SCHEDULED CLAIMS FOR SOP / ARP ESTATE – TANOAN PROPERTY ..................................................74

REPAYMENT TERMS AND CONDITIONS FOR CLASS 3A AND 3B........................................................................75

SECURITY INSTRUMENTS / SPECIAL PAYMENT PROVISIONS............................................................................75

OPERATING ACCOUNT BALANCE CALCULATIONS .........................................................................................76

REAL ESTATE TAXES..............................................................................................................................77

LENDER'S CLAIM CALCULATION ..............................................................................................................78

PETITION PERIOD PAYMENTS – ADEQUATE PROTECTION PAYMENTS................................................................81

OFFICE SECTOR REPORTS.......................................................................................................................82

INDUSTRIAL SECTOR REPORTS ................................................................................................................86

DEFAULT PROBABILITY BASED ON DEBT SERVICE COVERAGE AND LOAN TO VALUE RATIOS....................................88

CURRENT U.S. TREASURY YIELD CURVE AND INTEREST RATES........................................................................89

MARKET INTEREST RATES .......................................................................................................................90

LOAN TO VALUE RATIO .........................................................................................................................91

LOAN AMORTIZATION............................................................................................................................92

DEBT SERVICE COVERAGE RATIO..............................................................................................................93

DISCOUNT RATES..................................................................................................................................94

REAL ESTATE EQUITY DIVIDEND RATES.....................................................................................................95

REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) – SUMMARY TOTALS FOR VERANO, OTOÑO, CONEJOS AND TANOAN PROPERTIES...................................................................................96

PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES – CLASS 3B .............97

PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES – CLASS 3A AND 3B COMBINED...99

PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES – CLASS 4A...........100

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 24 of 182



PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES – CLASS 4B ...........................101

PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES – CLASS 4A AND 4B COMBINED.102

VERANO PROPERTY – PROPERTY PHOTOGRAPHS.................................................................................................103

VERANO PROPERTY – IMMEDIATE REPAIR ITEMS – F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) - MARCH 29, 2018 .................................................................................................................................................104

VERANO PROPERTY – REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT)–MARCH 29, 2018 .................................................................................................................................................105

VERANO PROPERTY – DEBTORS' OPERATING HISTORY ......................................................................................106

VERANO PROPERTY – RENT ROLL...................................................................................................................107

VERANO PROPERTY – DEBTORS' 2018 BUDGET ...............................................................................................108

VERANO PROPERTY – TEN-YEAR CASH FLOW PROJECTION OF CBRE .................................................................109

VERANO PROPERTY – CASH FLOWS AND PROJECTED RESALE VALUES..................................................................110

OTOÑO PROPERTY –PROPERTY PHOTOGRAPHS ...............................................................................................111

OTOÑO PROPERTY –IMMEDIATE REPAIR ITEMS – F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) - MARCH 28, 2018 .................................................................................................................................................114

OTOÑO PROPERTY –REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT)–MARCH 28, 2018 .................................................................................................................................................115

OTOÑO PROPERTY –DEBTORS' OPERATING HISTORY ......................................................................................116

OTOÑO PROPERTY –RENT ROLL....................................................................................................................117

OTOÑO PROPERTY –DEBTORS' 2018 BUDGET ...............................................................................................118

OTOÑO PROPERTY –TEN-YEAR CASH FLOW PROJECTION OF CBRE .................................................................119

OTOÑO PROPERTY –CASH FLOWS AND PROJECTED RESALE VALUES..................................................................120

CONEJOS PROPERTY – PROPERTY PHOTOGRAPHS.............................................................................................121

CONEJOS PROPERTY – IMMEDIATE REPAIR ITEMS –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) –MARCH 28, 2018 .................................................................................................................................................124

CONEJOS PROPERTY – REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) –MARCH 28, 2018 .................................................................................................................................................125

CONEJOS PROPERTY – DEBTORS' OPERATING HISTORY ...................................................................................126

CONEJOS PROPERTY – CASH FLOWS AND PROJECTED RESALE VALUES................................................................127

CONEJOS PROPERTY – RENT ROLL.................................................................................................................128

CONEJOS PROPERTY – DEBTORS' 2018 BUDGET.............................................................................................129

CONEJOS PROPERTY – TEN-YEAR CASH FLOW PROJECTION OF CBRE ..............................................................130

TANOAN PROPERTY – PROPERTY PHOTOGRAPHS – ACADEMY A/K/A/ TANOAN PROPERTY....................................131

TANOAN PROPERTY – IMMEDIATE REPAIR ITEMS –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) – ACADEMY A/KA/ MARCH 28, 2018 .................................................................................................................134

TANOAN PROPERTY – REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) – ACADEMY A/KA/ TANOAN PROPERTY – MARCH 28, 2018 ...............................................................................135

TANOAN PROPERTY – DEBTORS' OPERATING HISTORY ...................................................................................136

TANOAN PROPERTY – RENT ROLL .................................................................................................................137

TANOAN PROPERTY – DEBTORS' 2018 BUDGET .............................................................................................138

TANOAN PROPERTY – TEN-YEAR CASH FLOW PROJECTION OF CBRE ..............................................................139

TANOAN PROPERTY – CASH FLOWS AND PROJECTED RESALE VALUES ..............................................................140

CONSULTANT'S BIOGRAPHY ........................................................................................................................141

AMERICAN BANKRUPTCY INSTITUTE JOURNAL ARTICLE –JANUARY 2014 .........................................................151

AMERICAN BANKRUPTCY INSTITUTE JOURNAL ARTICLE – NOVEMBER 2015 ....................................................153



## TERMS AND CONDITIONS OF USE

This document is confidential and intended solely for use by Tactical Financial Consulting, LLC "TFC", its Client and the U.S. Bankruptcy Court of the Eastern District of Wisconsin. It was prepared by TFC with information provided to it from its Client and other third-party sources. It contains selected information pertaining to the Debtor and does not purport to be all-inclusive or to contain all the information utilized to draw my conclusions. The conclusions herein relate only to the Debtor. Market analyses and projections may be provided for general reference purposes and are based on assumptions relating to the general economy, competition and other factors beyond control and, therefore, are subject to variation

TFC or any of its respective affiliates, owners, investors, officers, employees, representing parties, advisors, agents and the like do not make any representations or warranty, expressed or implied, with respect to, and do not guaranty the accuracy, completeness, timeliness or current nature of the data that is provided herein. TFC expressly does not undertake any obligation to update, modify, revise or re-categorize the information provided herein, or to notify you or any third-party should the information be updated, modified, revised, re-categorized or expunged. In no event shall TFC be liable to you or any third-party for any direct, indirect, incidental, consequential or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against a client of TFC or damages to business reputation, lost business or lost profits), whether foreseeable or not, arising out of or caused in whole or in part by the inaccuracy or incomplete nature of the data or the acts, errors or omissions of TFC, whether negligent or otherwise, in procuring, compiling, collecting, interpreting, reporting, communicating or delivering the information contained in this Report or arising in any way out of your analysis of or otherwise however caused, even if TFC is advised of the possibility of such damages. No legal commitments or obligations shall arise or be terminated due to this Report or its contents

Certain documents and information may be described in summary form. The summaries do not purport to be complete or accurate descriptions of the full agreements or information involved, nor do they purport to constitute a legal or tax analysis of the specific provisions of the documents. All parties are expected to review independently this Report and all other such documents and rely solely on their own evaluation of such documents and this Report. This information may not be relied on as a substitute for financial, legal or other professional advice related to promoting, marketing or recommending to another party any transaction or matter addressed herein

Nothing herein shall be construed as a professional accounting, architectural, engineering, legal, or tax opinion. This Report is solely to be used be as a financial consultant's independent opinion



## PROFESSIONAL CERTIFICATION

I certify that to the best of my knowledge and belief:

· The analyses were performed on the basis of non-advocacy

· The statements of fact in this Report are true and correct

· I have no present or prospective interest in the matter that is the subject of this Report and have no personal interest with respect to the parties involved

· The reported analyses, conclusions, and opinions are limited only by the reported assumptions and limiting conditions and are my personal, impartial and unbiased professional analyses, opinions and conclusions

· No person provided significant professional assistance to me in preparing this Report

· My compensation is not contingent on any action or event resulting from the analyses, conclusions, opinions, the use of the Report, or testimony that may be given in this matter

· The analyses, conclusions, and opinions were developed, and this Report was prepared in conformity with the Code of Professional and Ethical Conduct of the Association of Insolvency and Restructuring Advisors in effect as of the date of this Report

· I was assisted in the preparation of various schedules and charts within this Report by William Lewis, III

· I am current with all recertification requirements as a Certified Insolvency and Restructuring Advisor (CIRA) as designated by of the Association of Insolvency and Restructuring Advisors

*Franklind Lea*

Franklind Lea, CIRA



## RETENTION

Mr. Timothy H. Posnanski, Esquire of Husch Blackwell LLP (Husch Blackwell) represents Monty Titling Trust 1 (Monty), a secured creditor in the Chapter 11 bankruptcy case of POC Properties, LLC ("POC"), SOP Academy, LLC ("SOP") and Academy Road Partners, LLC ("ARP"), a jointly administered case (Case).

This Case is currently pending in the U.S. Bankruptcy Court, Eastern District of Wisconsin before the Honorable Susan V. Kelley (Court). The Case No. is No. 15-33291-SVK. The Case arises from the insolvency of the Debtor, and in large part, is focused upon the proposed restructuring of a series of commercial loans made in Albuquerque, New Mexico, on suburban office buildings and a warehouse.

Husch Blackwell retained Tactical Financial Consulting, LLC (TFC) to review various documents and information filed in, produced, and/or related to the Case, conduct research issues related to their contents and conclusions, form opinions and potentially provide expert testimony.

TFC's compensation for all matters in this engagement (analysis, report writing, research, testimony, etc.) is based on an hourly compensation plus out of pocket expenses. Hourly compensation is based on a rate of $495 per hour for myself (Franklind Lea) and $300 for other TFC consultants. The compensation is not contingent upon any conclusion(s) or opinion(s). TFC received a retainer from Husch Blackwell in the amount of $10,000.

Specifically, TFC was asked to review and analyze the Debtors' Joint Plan of Reorganization, Disclosure Statement, and related filings and materials, and to conduct any research necessary to provide the Court with expert opinions regarding the Plan's compliance with the Bankruptcy Code requirements of the Debtor providing an interest rate that returns the present value of the Lender's security interest in the Debtors' property, the Plan's value, a feasible plan, and a plan that is fair and equitable to its creditors. TFC was also asked to provide these opinions in a written report (this Report), in sufficient form and content, to assist the Court in rendering its conclusions.

On behalf of TFC, I, Franklind Lea, CIRA reviewed the various documents and information, conducted research as necessary, and formed and composed opinions detailed in this Report. If requested, I will also provide testimony regarding these opinions.

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 28 of 182



## EXPRESSED OPINIONS AND LIMITING CONDITIONS

These Opinions and Report reflect my understanding of various legal concepts and statutes. Be advised that this Report and its Opinions contain my interpretation of these legal concepts and statutes from the perspective of a financial and real estate professional based on my experience, education, training and research. While these activities have provided me a general awareness of these legal issues, I am not qualified to render a legal opinion and in no way, does this Report intend or purport to be a legal opinion. In any instances where my client has expressly provided specific assumptions to be used in forming my opinion(s), whether legal or otherwise, the Report will provide an indication of those assumptions.

I reserve the right to amend these Opinions or alter the Report, including varying its conclusions, should I receive further information, or if I determine it contains any error(s) that would materially alter an Opinion(s) expressed herein.

My analysis may be affected by the following limiting conditions, stipulations between parties, and/or special instructions from Husch Blackwell:

· a final determination by the Court of the value of the Lender's Collateral
a final determination by the Court of the Lender's Claims (Allowed Claim, Secured, Unsecured and any possible administrative claim).



## QUALIFICATIONS TO PROVIDE THESE EXPERT OPINIONS

I, Franklind Lea, am qualified to provide the Court with this expert Opinion(s) based on my education and experience. My detailed resume is provided on page 141.

I am an experienced financial and real estate professional with nearly thirty years of direct experience and two post-graduate degrees in related subject areas.

I have direct experience in general business matters, commercial credit analysis, commercial lending, commercial real estate lending, commercial real estate appraisal and business consulting.

I hold an undergraduate degree in business management, a master's degree in Business Administration, and a master's degree in real estate valuation and urban analysis.

Because of my education and experience, the Association of Insolvency and Restructuring Advisors has certified me as one of only approximately 1,000 Certified Insolvency and Restructuring Advisors (CIRA) in the U.S.

I am a Member of the American Bankruptcy Institute's Board of Directors and I serve on its Education Committee. I am also a past Co-Chair of the Institute's Asset Sales Committee, past Co-Chair for its Financial Advisors and Investment Banking Committee, and past member of its Board of Directors Nominating Committee.

During my career, I have been involved with a wide variety of real estate property types, including residential apartments, condominiums, churches, planned unit developments, master planned communities, single family residential subdivisions, office, industrial and retail buildings; and hospitality and leisure properties including boatyards, golf courses, hotels, luxury resorts, marinas and timeshare resorts, as well as mixed-use and specialty properties.

I have provided appraisals, consulting, lending, litigation, or workout services for business and assets located in approximately twenty-five of the U.S. States and Canada whose value has ranged from a few hundred thousand to more than $250 million.

These experiences have given me the opportunity to develop the financial acumen necessary to develop expert level opinions supported by thorough identification of the relevant facts, accurate analysis of the situation, and appropriate research, business modeling and financial forecasting.

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 30 of 182


As a result, I am routinely consulted on issues regarding business insolvencies, bankruptcy cram down and plan confirmations, interest rates, lending, feasibility, real estate, and damage and valuation issues. With respect to these issues, I have provided written opinions and expert witness testimony on multiple occasions for various federal bankruptcy courts around the U.S. and Florida state court.

I am often requested to speak at industry conferences on business and financial issues, bankruptcy, insolvency, real estate, and lending and investment topics as a subject matter expert. Articles that I have written on these subjects have been published in professional journals. Two of these articles, relevant to the subject matter of this Report, begin on page 151 and 153.

Since late 2005, I have provided consulting services for TFC, where I am its President. My clients have included creditors, creditors' committees, debtors, defendants, investors, law firms, lenders, plaintiffs and mediators. Generally, but not exclusively, my clients request my involvement in matters that encompass some level of corporate distress, litigation and/or real estate. In conjunction with my work at TFC, I have provided numerous real estate oriented financial analyses for use to support or critique bankruptcy plans, business plan feasibility analysis, lender negotiations, loan applications, project assessments and the like. I have also conducted numerous reviews of economic valuation and analyses prepared by others.

Between 1994 and 2005, I was employed by Textron Financial Corporation, a multi-billion-dollar subsidiary of Textron, Inc. (a Fortune 125 Company). I began my employment with Textron in 1994 as specialty lender and completed the last five years as a senior workout officer. During my tenure at Textron, I served a wide variety of commercial and commercial real estate borrowers including developers and owners of country clubs and golf courses, hotels, residential real estate, vacation resorts, and fractional/timeshare properties. I also provided or managed the workout and collection of loans based on of aircraft, heavy equipment, media (radio and television stations), floor plan financing, golf courses, timeshare developments, and residential developments.

Between 1992 and 1994, I worked for a regionally oriented commercial real estate appraisal company in Jacksonville, Florida and a nationally oriented commercial real estate company in Atlanta, Georgia during which time I completed numerous appraisals on a wide variety of commercial real estate types. During this period, I also



completed my master's degree in real estate valuation and urban analysis and all of the necessary coursework for the Appraisal Institute's MAI designation.

In 1987, I joined First Florida Bank, N.A. (ultimately succeeded by Bank of America) as a credit analyst, progressed to Vice President of Lending, and then became the Bank's Regional Commercial Credit Manager for the Florida Panhandle.  In 1992, I left First Florida Bank to obtain my master's degree in real estate and urban analysis.

As part of these activities, I was routinely involved in risk assessment, loan pricing, loss reserve discussions, and valuation of physical and intangible assets through informal evaluation and formal analysis methods; collateral evaluation, estimation of collection of loan obligations through workouts, foreclosure, orderly sales, and collection through guarantees and indemnities.

Prior to 1987, I attended college receiving a bachelor's degree in management and a master's degree in business administration (MBA) with an emphasis in finance.

I believe these work and educational experiences uniquely qualify me as an expert in many facets of valuation, real estate, lending and dealing with distressed assets.



## ACTIONS TAKEN TO FORM THE OPINIONS / DATA AND INFORMATION REVIEWED AND CONSIDERED

To form my Opinions:

· I visited the Property and the surrounding competitive market area on April 1st and 2nd, 2018 making general observations of the area and several competitive properties

· I was led through the facilities by Dana Norris (Senior Portfolio Manager)

· I held discussions with Dana Norris (Senior Portfolio Manager) and Debbie Harms, CCIM (Receiver) regarding the past, current and future status of the Property

· I reviewed commonly available online internet maps and aerial photography of Debtors' Property and it surrounding area provided by Google and Bing

· I held discussions with Mr. Timothy H. Posnanski the Secured Creditor's legal counsel regarding the Case, the Property, the Plan, the Lender's loan balance and history, outstanding claims and claim repayment, and related legal and financial issues

· I held discussions with Mr. David Silverstein, the Secured Creditor's Vice President regarding the Case, the Property, the Plan, The Lender's loan balance and history, outstanding claims and claim repayment, and related legal and financial issues

· I held discussions with Mr. Stephen Wilson, MAI of CBRE who previously and recently appraised the Properties, the Lender's appraiser regarding the market area and the Properties

· I reviewed recent historical financial performance of the Debtor through review of its disclosures, monthly operating reports prepared for the U.S. Trustee, financial statements and information contained in the appraisal information

· I reviewed forecasts produced by the Debtor for the 2018 period of the Plan

· I reviewed various valuation, projected operating revenues and cash flow information and reports produced in the appraisal information provided to me

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 33 of 182



· I reviewed industry related market data regarding the potential sale and financing terms and conditions of the Debtors' Property to assess its ability to sell or refinance the Property at the end of the Plan Term

· I reviewed information such as industry newsletters and held discussions with lenders and consultants active in the finance industry

· I reviewed bank account information of the Debtor

· I reviewed relevant sections of United States Bankruptcy Code

· I reviewed various legal decisions related to subjects discussed in my Opinions

· I prepared a risk assessment including a cash flow including a financial analysis

· I routinely speak to capital market participants-brokers, consultants, lenders, and equity investors about the status of the capital markets

· I routinely review industry newsletters, published surveys and data collected and reported by several reputable trade organizations and commercial data sources and hold discussions with lenders and consultants active in the finance, real estate and restructuring industries. This includes information on interest rates, amortization periods, debt service coverage ratio requirements, debt availability, capitalization rates, discount rates, equity rates and equity availability, property sales and marketing materials as well as general market conditions and regional and local information

· I have reviewed and analyzed numerous documents and other related information in this matter. In addition to specifically footnoted items found within this Report, I referenced or relied upon the following data and information:

**Disclosure Statement of the Debtor**; May 2, 2016; Case No. 15-33291-SVK, Doc No. 91

**Joint Plan of Reorganization of the Debtor;** February 5, 2018; Case No. 15-33291-SVK, Doc No. 400-1

**Joint Plan of Reorganization of the Debtor**; May 15, 2018; Case No. 15-33291-SVK, Doc No. 436-2



**Proof of Claim(s), Monty Titling Trust 1**; Case No. 15-33291-SVK; Filed: March 31, 2016

**Order Approving Motion for Interim Authorization to Use Cash Collateral and to Provide Adequate Protection**, Case No. 15-33291-SVK; Filed: January 22, 2016, Doc. No. 39

**Stipulated Order Resolving the Debtors' Motions for a Preliminary Injunction and to Use Cash Collateral, and Monty's Motions for Relief from the Automatic Stay and to Dismiss the Debtors' Chapter 11 Cases**, Case No. 15-33291-SVK; Filed: January 22, 2016, Doc. No. 73

**Decision and Order Estimating Claims of Monty Titling Trust 1 for Purposes of Voting and Distribution**, Case No. 15-33291-SVK; Filed: December 5, 2017, Doc. No. 397

**Multifamily Notes, dated August 22, 2007 between Marshall & Isley Bank and POC Properties, LLC; SOP and ARP Property**

**Summary of Adequate Protection Payment Provided by Monty**, Undated, Unnumbered, May 2018

**Real Estate Appraisal Reports of CBRE (Albuquerque)**; **Otoño, Conejos, Verano, Masthead, and Tanoan Properties** April 2018, May 2018 and June 2018

**Handwritten Markups Containing Resale Values of Real Estate Appraisal Reports of CBRE (Albuquerque)**; **Otoño, Conejos, Verano, and Tanoan Properties** dated April 2018, May 2018 and June 2018

**Real Estate Appraisal Reports of CBRE (Albuquerque); Otoño, Conejos, Verano, Masthead, and Tanoan Properties** dated January 2016

**Otoño, Conejos, Verano, Masthead, and Tanoan Properties Engineering/Property Condition Assessment of F3, Inc.**; dated March 2018

**POC Properties, LLC ("POC"), SOP Academy, LLC ("SOP") and Academy Road Partners, LLC ("ARP"), jointly administered  Profit and Loss Statements,** unnumbered and undated document as provided in monthly operating reports

**Report of Debtor's Expert, Dale R. Faught**, Unsigned, Unfiled, dated April 28, 2018



**Broker Price Opinions of Dave Hill and Cole Flanagan, for the Otoño , Conejos, Verano, Masthead, and Tanoan properties,** Unfiled, dated April 2018

**Monthly Operating Statements of the Debtor** as filed with the U.S. Trustee's Office Case No. 15-33291-SVK; beginning in January 2016 through March 2018

**Otono, Conejos, Verano, Masthead, and Tanoan properties March 2018 Rent Rolls**; unnumbered and undated document from Property Management

**Otono, Conejos, Verano, Masthead, and Tanoan properties 2018 Budgets**; unnumbered and undated document from Property Management

**Otoño , Conejos, Verano, Masthead, and Tanoan properties 2018 to 2022 Forecasts;** unnumbered and undated document from Property Management

**RealtyRates Investment Surveys**, 2008-2018

**FitchRatings, Structured Finance, Commercial Mortgage Criteria Report, 2001**

**U.S. Department of Treasury**; Daily Treasury Yield Curve Rates, June 1, 2018

**Bernalillo County Tax Websites and City Websites,**

**https://www.bernco.gov/treasurer/newsevents.aspx?89a969d7691f4510a474d39a8dc 686e2blog PostId=0691f32430a749df96e41c192b9e00cb#/BlogContent**



## RISK ASSESSMENT REPORT

*I performed an Analysis of the Debtors' Plans, described in the following pages; it is supplemented by this Report's Exhibits.*

### INTRODUCTION

To determine the appropriate rates of interest, I conducted a risk assessment of the Plan, the Debtor, and the Property. My risk assessment considered the Debtor (the sponsor, management and its business/industry type); Property (including the property type, property subtype, asset quality class, investment market, physical condition, required capital investment and location), the current general economic climate, and the investment and lending climate for the Debtors' property types; and the Plan's Terms (including its general terms, the claim amounts and repayment terms). As part of this assessment, I performed a financial analysis of the Plan.

To do this, I considered the current capital market conditions by obtaining industry related market data of available debt and equity sources and their related criteria for potential financing. I then considered the time-honored "5 C's of Credit" and compared the Plan to a set of "Credit Risk Principles" similar to those promulgated by the Commercial Real Estate Finance Council. This comprehensive evaluation forms the basis for my opinions regarding the Plan.

To render my opinions, I have sought to determine if an efficient market exists for a loan to repay the Secured Claim with terms matching those in the Plan. To do this, I have considered the Debtors' credit profile, obtained industry related market data regarding the potential financing, and reviewed available credit sources and their related criteria for extending credit. In cases where an efficient market exists for the terms contained in the Plan, the interest rate provided by the capital markets may be considered. I analyzed the unsecured claim in a similar fashion.

In this case, I concluded there is no efficient market for a loan given the Plan's proposed terms for either secured claim or unsecured claim. Therefore, I applied the broadly accepted "formula approach" as described in the U.S. Supreme Court's opinions of Till vs. SCS Credit Corp. to develop the appropriate interest rate for repayment of the present value of the Lender's Secured Claim. This approach began with the Prime Rate of interest as its base rate and then applied adjustments to account for the various risks



present in this case to form the interest rate. I then rounded this rate to the nearest one-eighth of a percentage point to be consistent with typical lender and investor behavior.

I also calculated the present value of the proposed Plan payments by discounting the Plan payments by the risk-adjusted interest rates. I then compared this amount to the value of the Lender's Secured Claim to verify compliance with the present value requirements of U.S.C. 11 § 1129(b)(2)(A)(i)(II) and the value of the Lender's Unsecured Claim to verify compliance with U.S.C. 11 § 1129(b)(2)(B)(i).

Lastly, I reviewed the proposed plan and the results of my analysis to provide an assessment of the feasibility of the Plan and its compliance with the fair and equitable requirements of the Bankruptcy Code.

### LENDING HISTORY BETWEEN POC PROPERTIES, LLC ("POC"), SOP ACADEMY, LLC ("SOP") AND ACADEMY ROAD PARTNERS, LLC ("ARP"), JOINTLY ADMINISTERED AND MONTY

Monty Trust made a series of commercial loans to POC Properties, LLC ("POC"), SOP Academy, LLC ("SOP") on or about August 2007 and Academy Road Partners, LLC ("ARP") on or about March 2007 in an approximate amount of $8,400,000; $5,280,000; $2,640,000 and $4,800,000 (totaling $21,120,000). The original contract rates of interest on the loan were 7.25%, 7.25%, 5.75% and 7.15%.

### LENDER'S COLLATERAL

The Debtor operates four for-lease suburban office buildings and one warehouse in Albuquerque, New Mexico known as "Otono, Conejos, Verano, Masthead, and Tanoan properties". Albuquerque is the most populous city in the State of New Mexico with approximately 550 thousand residents in the city and 990 thousand in the Greater Albuquerque metropolitan statistical area. It ranks as the thirty-second largest city in the United States.[13] Albuquerque is an upper tertiary investment market having

---

[13] The racial makeup of the city was: 69.7% White (Non-Hispanic white 42.1%), 4.6% Native American 3.3% Black or African American, 2.6% Asian, 0.1% Native Hawaiian and Other Pacific Islander, 4.6% Multiracial (two or more races). The ethnic makeup of the city was 46.7% of the population were Hispanics or Latinos (of any race). There were 239,116 households out of which 33.3% had children under the age of 18 living with them, 43.6% were married couples living together, 12.9% had a female householder with no husband present, and 38.5% were non-families. 30.5% of all households were made up of individuals and 8.4% had someone living alone who was 65 years of age or older. The average household size was 2.40 and the average family size was 3.02.
The age distribution was 24.5% under 18, 10.6% from 18 to 24, 30.9% from 25 to 44, 21.9% from 45 to 64, and 12.0% who were 65 or older. The median age was 35 years. About 10.0% of families and 13.5% of the population were below the poverty line, including 17.4% of those under age 18 and 8.5% of those age 65 or over. Source: Wikipedia.com



somewhat higher investment risk as compared to most recognizable cities in the country.

The Albuquerque and New Mexico economies have failed to rebound like most of the country since the 2008 recession. The Albuquerque area continues to be plagued by economic troubles with its Mayor recently noting the city has an estimated $40 million shortfall and is cutting 200 city positions, while the State of New Mexico has struggled fiscally as well but is arguably in a better fiscal position.

The Otono, Conejos, Verano, Masthead, and Tanoan properties are all a Class B asset quality. The Properties were built between 1986 and 2005 and all have an estimated remaining life of thirty years or more. The Properties contain basic amenities such as parking, but do not have any atypical qualities for their property types.[14] Photographs of each of these properties can be seen in the Exhibits. Each is further described in the following table.

| Property | Address | Description |
| --- | --- | --- |
| Otoño | 4900 Alameda Boulevard NE | A two-unit, two-tenant, 28,343 square foot, three-story office building |
| Conejos | 6700 Jefferson Street NE | A multi-unit, multi-tenant, 48,287 square foot, office property with five single-story buildings located on 4.33 acres |
| Verano | 9210 San Mateo Boulevard NE | A single-unit, single-tenant, 5,514 square foot warehouse |
| Masthead | 5120 Masthead Street NE | A single-unit, single-tenant, 13,000 square foot single-story office building |
| Tanoan | 10400 Academy Road NE | A multi-unit, multi-tenant, 45,817 square foot, three-story office building |

All of the properties are generally located in the north, central and eastern, portions of Albuquerque near the Northern Interstate 25 which is a suburban area characterized by a mixture of residential, office and light industrial uses. The Properties locations are average crime areas whose elementary, middle and high schools are also generally rated average.[15]

The median income for a household in the city was $38,272, and the median income for a family was $46,979 (as compared to national averages of $57,617 and $71,062, respectively). Males had a median income of $34,208 versus $26,397 for females. The

---

[14] Except for Verano which has very poor access for a warehouse property.
[15] https://www.trulia.com Referenced sources are GreatSchools and CrimeReports.



per capita income for the city was $20,884. The Properties have a slight advantage from their locations than typical as they are more closely associated with the upper income areas of the city. This can be seen in the following U.S. Census Bureau map displaying the Median Household Income by Census Tract Block Group across Albuquerque.



Of note, I inspected the Debtors' Properties on April 1st and 2nd, 2018 and found each to be in average to good condition with no material issues, repairs or maintenance required.[16] The Properties were also inspected by an engineering company, F3, Inc., in March 2018 who produced reports detailing its findings regarding the Properties immediately necessary repairs, future capital improvements (including their cost and reserve requirements) and anticipated effective life of the assets under a proper maintenance program. Similarly, it found no immediate issues. The Properties' management company has also inspected the buildings and found only minor issues.

F3, Inc. also provided a detailed analysis of the properties components and estimated the ten-year capital improvements necessary to maintain the four buildings that are to be retained in the Plan. The total cost over ten years is substantial, totaling $1,036,838.

---

[16] I inspected the interiors and exteriors of Otono, Conejos and Tanoan and the exteriors only of Verano and Masthead.



The neighboring chart displays the relative market position of the Otono, Conejos, Verano, Masthead, and Tanoan properties in the investment community. Given their value, quality, and location, they would be considered speculative grade investment properties.

**ECONOMIC & CAPITAL MARKET CONDITIONS**

**General Economic Conditions**
During the last several years, the Properties and their related market have suffered from the well-publicized downturns in the national and local economies. Although technically the U.S. recession ended in June 2009, the local and state economies continue to suffer from lower than normal economic production and higher than normal unemployment while the overall U.S. economy has rebounded significantly. While most economic indicators in the U.S. now exceed (sometimes significantly) their measures from before and during the recession, the Albuquerque and New Mexico indicators continue to significantly lag most of the Country.

Although still economically challenged, weak positive economic change is occurring in the area. This long, slow recovery of New Mexico and Albuquerque has dramatically impacted the area and it suffers from a lack of investment interest from lenders and investors. It is generally just beginning to catch up to the pre-recession measures.

**General Investor Interest Level** Nationally, most commercial real estate investors continue to focus on investment grade and better performing institutional grade core properties (apartments, industrial, office, and retail) albeit there is occasional "talk" of investors seeking lesser investment grade quality in search of higher yields. While once extreme, the fall-off in investment and lending interest in lesser quality investment markets and some non-core properties has loosened considerably and secondary market opportunities are routinely sought even by the large funds who once allocated investments only to primary markets. Tertiary markets, such as Albuquerque, remain unattractive to most national and international investors.

Case 15-33291-beh   Doc 467-6   Filed 06/20/18   Page 41 of 182



Demand for suburban office buildings has significantly improved since the depth of the past recession and these properties are generating some interest in the investment and lending community.  This can be seen in this recent survey by RealtyRates, a well-regarded real estate investment research company.  In its Property Desirability Survey, RealtyRates has rated investment interest in the property subtype as "Cautionary - will consider".  The same is true for office-warehouse (Flex/Showroom) buildings.  Lender and investor interest in properties like the Debtors' is a realistic consideration, albeit more from local and regional investors, however.  Although the Properties are not new, Class A

| RealtyRates.com INVESTOR SURVEY - 2nd Quarter 2018* PROPERTY DESIRABILITY MATRIX | | |
| --- | --- | --- |
| **Preferred** agressively seeking | **Cautionary** will consider | **Rejecting but...** ...may consider under special circumstances |
| Apartments | All Types | | |
| Golf | | Private | Public - Privately Owned |
| | | Public - Municipal | |
| | | Semi-Private | |
| Health Care/Senior Housing | Independent Living | Congregate Care | Acute Care |
| | Assisted Living | | Nursing Homes |
| Industrial | Warehouse | Flex/Showroom | Heavy Manufacturing |
| | Bulk Distribution | | |
| Lodging | Limited Service | Full Service | |
| | | Golf/Gaming/Resort | |
| Mobile Home/RV Parks | Retirement & Family MH Parks | RV Parks/Campgrounds | |
| Office | Medical | CBD | |
| | | Suburban | |
| Restaurants | | All Types | |
| Retail | Grocery Anchored Centers | Unanchored Strip Centers | Malls/Outlet Malls |
| | Free Standing Credit/Franchised | Convenience Stores/Gas Stations | |
| | | Big Box/Power Centers | |
| Self-Storage | All Types | | |
| Special Purpose | | Schools/Daycare Centers | Churches |
| | | Public Assembly Facilities | Marinas/Recreational Facilities |
| | | Parking Garages | |

*1st Quarter 2018 Data*      Copyright 2018 RealtyRates.com™

or in a more desirable market are, they are well kept and located.  If purchased at the right price they could be a sound investment.   (This is less true with Otoño because of its two-tenant lack of diversification and Verano because of its access and parking issues.)

**General Office Investment Conditions**  According to REIS, Inc, a nationally recognized real estate data research company, market conditions in the office market softened again in the last few months, however most analysts believe there is a convergence of "headwinds" caused by increasing interest rates and new federal tax plans.  Most analysts also believe we have generally seen the highest activity and strongest rent growth of this economic cycle, but that the cycle will continue for at least the new couple of years.  "Fundamentals have been mostly flat for the last six quarters, but vacancies appear to be creeping upwards.  The national vacancy rate is now back to a level last seen two and a half years ago, in late 2015."  Evidence that recent construction permits have slowed considerably suggests that developers, and likely lenders, are concerned about leasing the plethora of new space in the coming year or so.  Although job growth has improved considerably in recent months, tenants may further delay leasing decisions until after improvement from the new tax plan shows itself.



Occupancy and vacancy rates are generally anticipated to be stable with no meaningful spikes or declines, and rent growth should stay muted.[17],[18]

**General Industrial Investment Conditions**  According to REIS, Inc, a nationally recognized real estate data research company, market conditions in the industrial market fell to its lowest level in three years, however construction remained relatively strong.  According to REIS, "The combination of these two measures pushed the Warehouse/ Distribution vacancy rate up to 9.1% from 9.0% at the end of 2017.  This was the first quarter to see an uptick in vacancy since 2010.  In Flex/R&D space, the vacancy rate climbed 10 basis points to 9.8% as net absorption dropped considerably while construction held steady.  Despite the rare occupancy setback, both subcategories saw modest rent growth in the quarter."  On a national basis, considerably more warehouse space is being utilized as traditional storefronts diminish in favor of online shopping.

Evidence that recent construction in this space continues is evidenced by the "soaring" construction of 1.3 million square feet of flex space in the first quarter of 2018 as compared to the fourth quarter 2017's creation of 60 thousand square feet.  Nationally, occupancy and vacancy rates are generally anticipated to vary by market but in general will be stable with no meaningful spikes or declines and rent growth should stay soft with a few markets experiencing a decline in market rents.[19],[20]

**General Lending Conditions**  Current financing terms for the industry are generally tighter than they were prior to the credit market crash in 2008, although credit extensions and lending conditions have loosened and improved considerably since the depth of the recent recession.  The further good news is that the quantity of available credit continues to be substantial albeit many lenders have begun to modestly tighten commercial credit availability.  Required yields, which fell from their peak due to the extraordinary levels of intervention by the Federal Reserve to some of their lowest levels in history, are now clearly on the rise as the Federal Reserve has reversed its trend.

**Lending Sources**  The Debtors' property types of an industrial warehouse (flex-space)

---

[17] Office First Glance, Pre-release analysis of Fourth Quarter 2017 and 1st Quarter 2018, Reis Findings in the Office Sector, REIS Inc.  A copy of these document is in the Exhibits.
[18] CBRE Real Estate Appraisal, April 2018.
[19] Office First Glance, Pre-release analysis of 1st Quarter 2018, Reis Findings in the Industrial Sector, REIS Inc.  A copy of this document is in the Exhibits.
[20] CBRE Real Estate Appraisal, April 2018.



and suburban office buildings have historically been largely financed by a mix of institutional and non-institutional investors. Large institutional investors such as pension funds and insurance companies gravitate toward larger loans with high credit qualities for a core property type (apartments, industrial warehouses, offices, and retail) that are newer, higher in physical and locational quality and in primary and large secondary markets. Commercial banks and commercial mortgage-backed securities finance a broader range of loan amounts, credit qualities and property types in most markets. Credit companies and private investment companies tend to finance smaller loans with lower credit qualities including the older, lower quality and less well-located properties.

Generally, the earnings for these lending companies is created by lending money at a higher rate of interest after borrowing it themselves. For example, banks rely on deposits, certificates of deposits and bonds for the funds they utilize to lend to their customers. The difference between the bank's borrowing cost and lending cost is referred to as the "spread". A bank's borrowing cost is based on its own creditworthiness which is fundamentally a result of its management quality, the amount of cash equity of the bank, the riskiness of its loan portfolio and the length of its borrowings.

**Federal Reserve Intervention and Interest Rate Trends** The Fed's belief that the national economy is on much firmer ground is made clear by its intervening into the capital markets by increasing the Federal Funds interest rate. The Fed has now increased the Fed Funds interest rate six times since the end of 2015 and has signaled an intention to speed up the pace of these increases to stave off potential inflation by the growing economy.[21, 22]

Most investors expect the Federal Reserve to become far more active in its increases as it monitors the effect of the recent federal tax cuts and the government spending bill which added an additional $300 billion in federal spending. The Fed's next policy meeting is scheduled for June 12-13, 2018 at which time it is widely anticipated to increase rates.[23] Markets are betting on a more hawkish Fed for the balance of the year, but many key investors anticipate three more rate hikes this year. Fed fund futures see

---

[21] At the beginning of the Great Recession, December 2007, the U.S. Prime Rate was 7.25%.
[22] From a target range of 0.00-0.25% to 1.50-1.75%.
[23] FXStreet, "Expect 3 more Federal Reserve rate hikes in 2018 – JP Morgan", May 24, 2018



an 80% chance of a rate hike at the July 31-August 1 policy meeting, and near 50% chances of increases at the last three meetings of 2018.[24]

**National Rates of Interest**  The results of this increase in the Federal Funds rate can also be seen in increases in the U.S. Prime Rate of Interest and the U.S. Treasury Rates.  The current quarter's National Rates, as of June 1, 2018 are:

| | |
|---|---|
| *U.S. Prime Rate* | *4.75%* |
| *5-Year U.S. Treasury Rate* | *2.74%* |
| *7-Year U.S. Treasury Rate* | *2.85%* |
| *10-Year U.S. Treasury Rate* | *2.89%* |
| *30-Year U.S. Treasury Rate* | *3.04%* |

**U.S. Prime Rate of Interest**  The long-term history of the U.S. Prime Rate of Interest is displayed in the following graph.  The Prime Rate of interest is trending upward.



**U.S. Treasury Rates**  A comparison of various U.S. Treasury interest rates over the last fifteen years, as well as their current rate is shown in the following graph.  The U.S. Treasury Rates are trending upward.

---

[24] The Street, "How the Federal Reserve Could Ruin the U.S. Economy Within 12 Months, May 29, 2018



Source: U.S. Federal Reserve Bank

**U.S. Treasury Yield Curve and the Anticipated Inflation Rate** The U.S. Treasury Yield Curve is displayed in the following graph. The top line represents the rate of interest of

these maturities (the nominal rate) and the bottom line represents the rate of interest with the anticipated inflation rate subtracted out (the real rate of interest). Note, the difference indicates the anticipated inflation rate is approximately two percent per year.



**General Underwriting Criteria** Underwriters for financing are fixated on proven historical cash flow, potential lease turnover from expiring leases and lease defaults, and upside potential from unleased space as compared to expenses and debt payments. Value along with invested cash equity also continues to be an important and dominant factor in evaluating risk.

**National Average Loan Terms by Property Type** The following chart is a summary of the recent national average loan terms for various property types. Suburban office buildings like the properties that are retained in the Plan are shown on the bottom line.



## SURVEY OF VARIOUS PROPERTY LOAN TERMS AND INTEREST RATES

| Property Type | Loan To Value | Debt Service Coverage Ratio | Amortization | Interest Rate |
|---|---|---|---|---|
| Apartments (All Types) | 73.3% | 1.43 | 26 | 5.52% |
| Industrial (All Types) | 70.2% | 1.46 | 25 | 5.84% |
| Retail (All Types) | 70.5% | 1.39 | 25 | 5.96% |
| Office (All Types) | 72.5% | 1.65 | 30 | 5.63% |
| Healthcare & Sr. Housing(All Types) | 70.7% | 1.50 | 25 | 6.13% |
| Lodging (All Types) | 66.9% | 1.53 | 22 | 6.43% |
| Mobile Home & RV Parks (All Types) | 69.9% | 1.36 | 25 | 6.79% |
| Self-Storage (All Types) | 70.2% | 1.62 | 28 | 6.94% |
| Restaurants (All Types) | 65.7% | 1.58 | 22 | 7.24% |
| Golf (All Types) | 67.0% | 1.56 | 22 | 7.81% |
| **SUBURBAN OFFICE BUILDINGS** | **75.0%** | **1.53** | **28** | **5.56%** |
| **FLEX AND R&D SPACE** | **63.0%** | **1.73** | **23** | **6.36%** |

*RealtyRates, Q2 2018, (Prior Quarter Data)*

**National Average Loan Terms By Property Subtype** The historical relationship between interest rates, loan to value ratios[25] and debt service coverage ratios[26] for suburban office building facilities is shown in the following charts.

*Suburban Office Buildings* **The current average interest rate of 5.56% compared to the ten-year average interest rate of 5.53%, while the ten-year low was 4.60% and the ten-**

---

[25] Loan to value ratio is the percentage of the loan payoff amount divided by the value of collateral.
[26] Debt service coverage ratio is defined as the amount of cash flow after all operating expenses and reserves that is available for paying principal and interest payments to creditors.



*year high was 6.55%.* (This compares to the Debtors' Plan interest rate of 5.75% for the Lender's secured claims.)[27]

The current average debt service coverage ratio is 1.53. The average debt service coverage ratio for the past ten years was 1.53, while the ten-year low was 1.28 and the ten-year high was 1.58. (The Debtors are incapable of sustaining a positive DSCR.)



The current average loan to value is 73.30%. The average loan to value for the past ten years was 73.30%, while the ten-year low was 70.00% and the ten-year high was 75.00%. (This compares to the Debtors' Plan LTV of 100%.)



---

[27] Without any adjustment for atypical lending terms or conditions.



*Flex-Space Warehouse Buildings* **The current average interest rate of 6.36% compared to the ten-year average interest rate of 6.23% while the ten-year low was 5.70% and the ten-year high was 7.17%.** (This compares to the Debtors' Plan interest rate of 5.75% for the Lender's secured claims.)[28]

The current average debt service coverage ratio is 1.73. (The Debtors are incapable of sustaining a positive DSCR.)



The average debt service coverage ratio for the past ten years was 1.74, while the ten-year low was 1.53 and the ten-year high was 1.80.

The average loan to value for the past ten years was 61.28%, while the ten-year low was 58.00% and the ten-year high was 63.00%.

The current average loan to value is 63.00%. (This compares to the Debtors' Plan LTV of 100%.)



---

[28] Without any adjustment for atypical lending terms or conditions.



**Local Lending Rates**  Based on my review, I believe the following for the Debtors' suburban office buildings on a local basis:[29,30]

·   The typical loan term is approximately 60 to 84 months

·   The current average interest rate for a property like these properties in this market is approximately one-quarter point higher than the national average, totaling 5.80%

·   The current average loan to value is approximately 75.00% given typical risks of the collateral devaluation

·   The current average amortization period is approximately 25 years (300 months) given an expected life of approximately 30 years

·   The current average debt service coverage ratio requirement is approximately 1.50 depending on tenant mix and quality

Based on my review, I believe the following for the Debtors' flex space building on a local basis:[31,32]

·   The typical loan term is approximately 60 to 84 months

·   The current average interest rate for a property like these properties in this market is approximately one-quarter point higher than the national average, totaling 6.8%.

·   The current average loan to value is approximately 63% given typical risks of the collateral devaluation

·   The current average amortization period is approximately 23 years (276 months) given an expected life of approximately 30 years

·   The current average debt service coverage ratio requirement is approximately 1.73 depending on tenant mix and quality

---

[29] Presuming other terms and conditions are approximately equal to the national average.
[30] *I anticipate these terms to be similar on the Effective Date, except for the interest rate.  Given the recent February 2018 increase in the Federal Funds target interest rate, which are not reflected in the interest rate cited herein, I expect the interest rate to be approximately 0.25% higher upon revised data being publicly available.  I reserve the right to amend these amounts and related findings in the report upon receipt of that information.*
[31] Presuming other terms and conditions are approximately equal to the national average.
[32] *I anticipate these terms to be similar on the Effective Date, except for the interest rate.  Given the recent February 2018 increase in the Federal Funds target interest rate, which are not reflected in the interest rate cited herein, I expect the interest rate to be approximately 0.25% higher upon revised data being publicly available.  I reserve the right to amend these amounts and related findings in the report upon receipt of that information.*



## RISK/RETURN RELATIONSHIP

The fundamental relationship between risk and return affects expected rates of return on every investment. Since lenders and equity investors are naturally risk averse they require a higher return for assuming a greater level of risk. As risk grows, required rates of return grow at an increasing rate. All other things equal, as a



borrower's loan to value increases its interest rate will rise in accordance with this risk and return principle. In their Till decision, the Justices noted that the discounting of the future payments to a secured creditor by the market rate of interest determines the value of a secured creditor's security interest.

**Property Discount Rates** Property discount rates are used by real estate appraisers to estimate the present value of the net cash flow from a real estate property. A property discount rate covers 100% of the capital structure of an investment.

In this case, the Properties are an office property type. It is one of the four core property types (residential apartments, industrial buildings and warehouses, office buildings and retail buildings) and holds less risk than the other core property types, and less risk than many other specialty property types (e.g., golf courses, hotels, restaurants, etc.).

This risk can be seen in the property's discount rate in the following chart, which is the rate investors use to apply to future projected cash flows to return its present value – a higher rate is an indicator of higher perceived risk. This chart compares the Property's general property type to several other real estate property types. Office properties are represented by the third column.





**Property Subtypes**  The office property type is comprised of several property subtypes, suburban office buildings, central business district (CBD) buildings, and medical office buildings.  The anticipated risk-based return from the suburban office building subtype like the Debtors' property is 10.18%; lower than general office average of 10.78% and is shown in the neighboring chart.  Among its peers in the office property type it generally holds less risk.

The industrial property type is comprised of several property subtypes, warehouses and distribution buildings, flex and R&D buildings, and Climate Controlled &

Manufacturing buildings.  The anticipated risk-based return from flex-space property type like the Debtors' property is 10.64%, higher than the general industrial average of 10.39% and is shown in the neighboring chart.  Among its peers in the flex-space property type it generally holds less risk.





**Relationship Between Interest Rates and Property Discount Rates**  Similar to property discount rates, mortgage discount rates (a/k/a interest rates) are used to find the present value of a series of loan payments.  A mortgage discount rate varies in accordance with the perceived risk.  As the loan to value ratio increases the mortgage discount rate grows in accordance with the increased risk ─ all other things equal, loans with low loan to value ratios have lower interest rates than loans with higher loan to value ratios. When the LTV reaches 100%, the mortgage discount rate and the property discount rate both cover the entire capital structure supporting the investment.

These two rates would be the same if not for the benefit to the lender of the rights conveyed in the mortgage; e.g., the lien provided to a mortgage holder in liquidation (reducing its required return compared to unsecured creditors and equity holders) and the unlimited return potential provided to the equity holder (increasing its potential return unlike most mortgage holders whose return is capped by the interest rate in their promissory note).  Based on my experience and my analysis of other market rates, a 100% LTV loan can be very closely estimated at 85% of the property discount rate.  The interest rate for a loan with a loan to value ratio falling between two known loan to values can be interpolated mathematically.  Of course, the rate needs to be adjusted for the unique characteristics of the Debtor, its property and the repayment plan.

_Suburban Office Buildings_

_**The current average discount rate is 10.18%**_ compared to the ten-year average discount rate of 9.94%, while the ten-year low was 9.15% and the ten-year high was 11.44%. In comparison, _the current average interest rate of 5.56%_ compared to



Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 53 of 182



the ten-year average interest rate of 5.53%, while the ten-year low was 4.60% and the ten-year high was 6.55%. (This compares to the Debtors' Plan interest rate of 5.75% for the Lender's secured claims.)

*Flex-Space Warehouse Buildings*

***The current average discount rate is 10.64%*** compared to the ten-year average discount rate of %, while the ten-year low was 9.59% and the ten-year high was 11.97%. In comparison, *t**he current average interest rate of 6.36%*** compared to the ten-year average interest rate of 6.23% while the ten-year low was 5.70% and the ten-year high was 7.17%. (This compares to the Debtors' Plan interest rate of 5.75% for the Lender's secured claims.)



### PLAN TERMS

The Plan contains twelve classes of claims. These claims and their proposed treatment are summarized on page 73.

The Debtors' Plan also includes a possible $305,000 as an equity contribution on the Plan's Effective Date, but the Plan fails to define under what circumstances this would occur.[33]

---

[33] The Plan states "Except as otherwise provided for in the Plan, payments to Creditors shall be from the regular business income of the Reorganized Debtors and from Cash available to the Debtors on the Effective Date. On the Effective Date, if needed to meet the obligations under the Plan, the holders of Equity Interests shall contribute up to $225,000 of new value on the Effective Date and another $80,000 if needed to meet the terms of the Plan."



**Administrative Claims.** The Plan does not acknowledge two administrative claims. The first claim is an administrative claim for the diminution in value of the real estate collateral securing the Lender's security interest. At the current time, the adequate protection payment for the decline in value is $1,060,000. The Plan also does not acknowledge an administrative claim for its unpaid adequate protection payments during the petition period. At the current time, the adequate protection payment arrearage is $122,000. The Plan contains no mechanism to retire either claim.

*As neither potential administrative claim has been reviewed by the Court, I have not modeled their effect on the Plan.*

**Lender's Treatment**. The Debtor and the Lender disagree over the proposed interest rate for repayment for its secured and unsecured classes as found in the Plan.

With respect to the Lender's Class 3A and 3B, the Plan proposes repayment of the Lender's Secured Claim with a loan maturing on July 1, 2025 (84 months). The loan is to be repaid through level payments of principal and interest of $50,871 and $24,769 per month over the 84 months of the Plan, respectively. The payments are calculated based on a thirty-year amortization and a 5.75% interest rate. The Plan requires no payment to these Classes on the Effective Date.

The Plan also seeks to pay off the Lender's Unsecured Claims Class 4A and 4B on the Effective Date with the same terms except at a 6.75% interest rate. The loan is to be repaid through level payments of principal and interest of $38,899 and $6,679 per month over the 84 months of the Plan, respectively. The payments are calculated based on a thirty-year amortization and a 6.75% interest rate. The Plan requires no payment to these Classes on the Effective Date.

Other terms in the Plan appear in the tables begin on page 73.

**Plan Working Capital**. As shown in the table on page 76, the Debtor as of its May 2018 financial statement held $181,512 in its operating accounts, $0 in real estate tax escrow accounts, $0 in insurance escrow accounts, $0 in security deposits, and $0 in other escrow accounts. (Of these amounts, all $181,512 constitutes cash collateral of the Lender.) Of this amount, $144,412 is attributed to ARP and $37,100 is attributed to POC.)

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 55 of 182



The total projected cash balance available to the Debtor for Plan payments, ongoing operations, etc. on the Effective Date is as high as $486,512 because the Debtors' Plan indicates the sponsors have agreed to put in up to $305,000 on the Effective Date.

Note, the Plan pays Class 6 $100,000 on the Effective Date, and Class 7A and 7B a total of $191,784 with thirty days of the Effective Date and begins paying most of the other Classes' monthly payments on or about the same date.

Also note, the Plan has no mechanism to retire the administrative claims.

### FINANCIAL ANALYSIS

I evaluated the future financial performance for each of the four properties retained in the Plan of the Debtors (Verano, Otoño, Conejos, and Tanoan) by reviewing and analyzing the general economic data affecting the Properties future performance; each property's historical financial information; monthly operating performance during the Petition Period; 2018 budgets by the Property Management; the data and analysis within the April 2018 CBRE appraisals including the existing property leases, market lease rates; the age and condition of the Properties; the Properties locations; expected changes in the operations; the cost of operating and maintaining the properties; the projected capital expenses of the Properties as evaluated within F3 Inc.'s Property Condition Reports (i.e., engineer's reports); the Debtor and Property management (NAI Maestros); my inspection of the Property, and my conversations with various agents of the Debtor and Lender.

I closely considered the appraisal opinions, which include a detailed analysis of the existing terms and conditions of the leases, of Stephen Wilson, MAI of CBRE-Albuquerque. The CBRE projection fully considers the impact of the lease expirations and turnovers, however I found the timing and cost of anticipated capital expenses required to maintain the property to be better estimated in the Property Condition Assessment of Jeffry Roden and Thomas Rothermich, P.E. of F3, Inc. Property

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 56 of 182



Consultants (e.g., the engineering report) which provided a detailed analysis of the anticipated future capital reserve requirements for the Properties.[34, 35, 36]

As I found the assumptions within the appraisal's cash flow projection to be reasonable and consistent with my view of each of properties' market position in the Albuquerque market, lease turnover and pricing I modified the CBRE cash flow to incorporate the capital cost projection of F3, Inc to form the TFC Projection. As shown in the following tables, the TFC Projection generates positive net operating income and underwritten net cash flow for the two Debtors contributing toward their ability to repay the Debtors' creditors.

### Projected Revenues and Expenses

In my opinion, these Properties have reached "stabilization" and, given proper management and properly funded expenses, will not likely experience any material "ups and downs" in the foreseeable Plan Term. Naturally, and particularly with Conejos and Tanoan, they will however experience monthly variations as tenants re-lease at different rental rates, terminate leases and space sits vacant awaiting release.

Market lease rates have had very modest increases over the last several years and have been essentially "flat" against inflation. The following analysis is based on the existing leases and anticipated new leases at the current market rates throughout the Plan term.

Each Property generates economic returns at different lease rates for based on the lease type (e.g., triple net versus full service), location, unique space, size, and tenant quality.

– Conejos and Tanoan - During the past few years, the Debtors' occupancy appears to have been roughly consistent with the past results – with some years and properties higher or lower generally as a function of vacancy rates. Generally, occupancy appears to be stabilized with no meaningful growth or decline

---

[34] F3, Inc. identified $0 of immediate repairs that need to be performed. These are detailed on page 94. F3, Inc. cites the anticipated capital cost of maintaining the building (roofs, parking lot maintenance, etc.) over the next ten-years are $1,101,743; this amount is in addition to routine repairs and maintenance costs. An annualized Replacement Reserve Worksheet prepared by F3, Inc. is included on page 92 and summarized in the table on page 99.

[35] Except for the paving allocation in the Otono property which I removed to avoid double counting – my understanding is this cost is paid through a fully funded property association.

[36] Details of the lease turnover and pricing analysis can be found in the appraisal reports and the capital replacement reserve analysis can be found in the Exhibits.



anticipated. Most of the space is leased at the Conejos and Tanoan properties and generating income.

- Otoño - The Otoño property is 100% leased.

- Verano - The Verano property is 100% leased.

**Repayment of Claims During the Plan Term**

Based on repayment terms of the Debtors' Plan and the claim balances as I have calculated based on the recent valuations and cash balances. Two scenarios are presented in the following charts – based on the Plan's interest rate and the TFC risk-based interest rate.



TACTICALFINANCIAL CONSULTING

**Repayment of the Class 3A and 4A Classes Due to POC During the Plan Term (Verano, Conejos and Otoño Properties)**

Class 3A and 4A consists of the secured and unsecured claims arising from the Verano, Conejos and Otoño properties.[37,38] The Plan Classes and repayment terms as provided in the Debtor's Plan are as follows:

### Scheduled Claims By Creditor

| Creditors/ Interest Holders | Member of Class | Allowed Claim | Creditor's Security Interest | Secured Claim | Unsecured Claim | Amort. Periods | Term | Interest Rate | Payment Frequency | |
|---|---|---|---|---|---|---|---|---|---|---|
| Admin. POC | Class 1A | $ 49,500 | $ - | $ - | $ 49,500 | $ - | | 0.00% | Single | |
| Admin. SOP/Academy | Class 1B | $ 49,500 | $ - | $ - | $ 49,500 | $ - | | 0.00% | Single | |
| Priority Unsecured | Class 2 | $ - | $ - | $ - | $ - | $ - | | 0.00% | | |
| Monty against POC Secured | Class 3A | $ 18,606,966 | $ 10,117,100 | $ 10,117,100 | $ 8,489,866 | $ 360 | 84 | 5.75% | Monthly | (1) |
| Monty against SOP/Academy Secured | Class 3B | $ 6,198,823 | $ 4,244,412 | $ 4,244,412 | $ 1,954,411 | $ 360 | 84 | 5.75% | Monthly | |
| Monty against POC Unsecured | Class 4A | $ 5,997,364 | $ - | $ - | $ 5,997,364 | $ 360 | 84 | 6.75% | Monthly | |
| Monty against SOP/Academy | Class 4B | $ 1,029,815 | $ - | $ - | $ 1,029,815 | $ 360 | 84 | 6.75% | Monthly | |
| Security Deposit | Class 5B | $ - | $ - | $ - | $ - | $ - | | 0.00% | Monthly | |
| Seavey against POC Unsecured | Class 6 | $ 1,751,409 | $ 500,000 | $ 500,000 | $ 1,251,409 | $ 16 | 46 | 5.00% | Monthly | |
| Unsecured Claims against POC | Class 7A | $ 138,014 | $ - | $ - | $ 138,014 | $ 1 | | 0.00% | Single | |
| Unsecured Claims against SOP/Academy | Class 7B | $ 53,769 | $ - | $ - | $ 53,769 | $ 1 | | 0.00% | Single | |
| Unsecured Insider Claims | Class 8 | $ 3,500,000 | $ - | $ - | $ 3,500,000 | $ - | | 0.00% | | |
| Allowed Equity Interests | Class 9 | $ - | $ - | $ - | $ - | $ - | | 0.00% | | |
| **Total Claims** | | **$ 37,375,160** | **$ 14,861,512** | **$ 14,861,512** | **$ 22,513,648** | | | | | |

Estimated Effective Date: 8/1/2018
(1) Amortizing balance for claim 3A=$8,717,100

---

[37] The Immediate Repair Items and Replacement Reserves (pages 58 and 58) as determined by F3, Inc. (engineering), the historical operating performance (page 58), the Debtor's 2018 budgeted operating budget (page 117), current Rent Roll of tenants (page 115), the ten-year income and expense estimation by CBRE (page 58), for the Conejos Property are provided in the Exhibits.

[38] The Immediate Repair Items and Replacement Reserves (pages 58 and 58) as determined by F3, Inc. (engineering), the historical operating performance (page 58), the Debtor's 2018 budgeted operating budget (page 106), current Rent Roll of tenants (page 105), the ten-year income and expense estimation by CBRE (page 58), for the Otoño Property are provided in the Exhibits.


TACTICALFINANCIAL
CONSULTING

## Scheduled Classes

| Classes | Type of Claim | Creditors/Interest Holders | Repayment Terms Description | Allowed Claim | 1111(b) Election |
|---|---|---|---|---:|---|
| Class 1A | Administrative | Admin. POC | Paid in full at effective date. | $ 49,500 | No |
| Class 1B | Administrative | Admin. SOP/Academy | Paid in full at effective date. | $ 49,500 | No |
| Class 2 | Unsecured | Priority Unsecured | | $ - | No |
| Class 3A | Secured | Monty against POC Secured | 84 month term, amortized over 30 years at 5.75% | $ 18,606,966 | No |
| Class 3B | Secured | Monty against SOP/Academy Secured | 84 month term, amortized over 30 years at 5.75% | $ 6,198,823 | No |
| Class 4A | Unsecured | Monty against POC Unsecured | 84 month term, amortized over 30 years at 6.75% | $ 5,997,364 | No |
| Class 4B | Unsecured | Monty against SOP/Academy | 84 month term, amortized over 30 years at 6.75% | $ 1,029,815 | No |
| Class 5B | Unsecured | Security Deposit | | $ - | No |
| Class 6 | Unsecured | Seavey against POC Unsecured | Interest only for 16 months at 5%; then traditional amort. 30 months at 5%. | $ 1,751,409 | No |
| Class 7A | Unsecured | Unsecured Claims against POC | Paid in full at effective date. | $ 138,014 | No |
| Class 7B | Unsecured | Unsecured Claims against SOP/Academy | Paid in full at effective date. | $ 53,769 | No |
| Class 8 | Insider Claims - Subordinated | Unsecured Insider Claims | | $ 3,500,000 | No |
| Class 9 | Interest Holder | Allowed Equity Interests | | $ - | No |
| **Total Claims** | | | | **$ 37,375,160** | |

Estimated Effective Date:                    8/1/2018



TACTICALFINANCIAL
CONSULTING

## *Debtor's Plan Terms and Interest Rates – POC Class 3A and 4A - Annualized*

Shown below are the annualized numbers for the Plan using the Plan interest rate.

### Debtor's Real Estate Cashflow Statement (Summarized by Plan Year)-POC Only

| | Prior 12 Mo.* | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-7 | Total Plan |
|---|---|---|---|---|---|---|---|---|
| Potential Gross Income | 1,505,393 | 1,188,085 | 1,325,507 | 1,354,524 | 1,362,653 | 1,363,721 | 2,729,901 | 9,324,390 |
| Less: Vacancy (and Collection Loss) | -505 | -3,080 | -3,242 | -3,307 | -3,469 | -3,574 | -7,412 | -24,083 |
| *Total Income* | 1,504,888 | 1,185,005 | 1,322,265 | 1,351,217 | 1,359,184 | 1,360,147 | 2,722,489 | 9,300,307 |
| Department Expense/Cost of Goods Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Effective Gross Income* | 1,504,888 | 1,185,005 | 1,322,265 | 1,351,217 | 1,359,184 | 1,360,147 | 2,722,489 | 9,300,307 |
| Plus: Ancillary Income & Expense Reimbursements | 204,042 | 222,827 | 266,230 | 272,782 | 275,743 | 276,180 | 553,672 | 1,867,434 |
| *Total Income* | 1,708,930 | 1,407,832 | 1,588,495 | 1,623,999 | 1,634,927 | 1,636,327 | 3,276,161 | 11,167,741 |
| Less: Operating Expenses | 570,324 | 428,265 | 487,006 | 489,453 | 468,531 | 468,946 | 939,182 | 3,281,384 |
| *Net Operating Income* | 1,138,606 | 979,566 | 1,101,489 | 1,134,546 | 1,166,396 | 1,167,381 | 2,336,979 | 7,886,357 |
| Less: Capital Expenses, Replacement Reserves, Leasing Costs and Management Fees | 57,824 | 59,029 | 88,504 | 115,115 | 137,913 | 187,706 | 343,288 | 931,557 |
| *Underwritten Net Cash Flow* | 1,080,782 | 920,537 | 1,012,984 | 1,019,431 | 1,028,482 | 979,675 | 1,993,691 | 6,954,800 |
| Less: Plan Payments of Lender's Debt Service | 902,000 | 610,448 | 610,448 | 610,448 | 610,448 | 610,448 | 8,999,470 | 12,051,708 |
| Less: Plan Payments of Other Creditors | 123,749 | 319,799 | 587,146 | 637,326 | 608,903 | 466,785 | 6,378,426 | 8,998,387 |
| *Equity Dividend/Cash Flow* | 55,034 | -9,710 | -184,609 | -228,343 | -190,868 | -97,558 | -13,384,206 | -14,095,294 |
| *Average Monthly Surplus/(Deficit)* | 4,586 | (809) | (15,384) | (19,029) | (15,906) | (8,130) | | |

\* - May include estimates in month(s) preceding effective date, where actual information is unavailable. Year 1 begins at Effective Date.



Shown below are the annualized numbers for the Plan using the TFC risk-based interest rate.

**Debtor's Real Estate Cashflow Statement (Summarized by Plan Year)-POC Only (TFC Risk-based Rates)**

| | Prior 12 Mo.* | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-7 | Total Plan |
|---|---|---|---|---|---|---|---|---|
| Potential Gross Income | 1,505,393 | 1,188,085 | 1,325,507 | 1,354,524 | 1,362,653 | 1,363,721 | 2,729,901 | 9,324,390 |
| Less: Vacancy (and Collection Loss) | -505 | -3,080 | -3,242 | -3,307 | -3,469 | -3,574 | -7,412 | -24,083 |
| Total Income | 1,504,888 | 1,185,005 | 1,322,265 | 1,351,217 | 1,359,184 | 1,360,147 | 2,722,489 | 9,300,307 |
| Department Expense/Cost of Goods Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Effective Gross Income | 1,504,888 | 1,185,005 | 1,322,265 | 1,351,217 | 1,359,184 | 1,360,147 | 2,722,489 | 9,300,307 |
| Plus: Ancillary Income & Expense Reimbursements | 204,042 | 222,827 | 266,230 | 272,782 | 275,743 | 276,180 | 553,672 | 1,867,434 |
| Total Income | 1,708,930 | 1,407,832 | 1,588,495 | 1,623,999 | 1,634,927 | 1,636,327 | 3,276,161 | 11,167,741 |
| Less: Operating Expenses | 570,324 | 428,265 | 487,006 | 489,453 | 468,531 | 468,946 | 939,182 | 3,281,384 |
| Net Operating Income | 1,138,606 | 979,566 | 1,101,489 | 1,134,546 | 1,166,396 | 1,167,381 | 2,336,979 | 7,886,357 |
| Less: Capital Expenses, Replacement Reserves, Leasing Costs and Management Fees | 57,824 | 59,029 | 88,504 | 115,115 | 137,913 | 187,706 | 343,288 | 931,557 |
| Underwritten Net Cash Flow | 1,080,782 | 920,537 | 1,012,984 | 1,019,431 | 1,028,482 | 979,675 | 1,993,691 | 6,954,800 |
| Less: Plan Payments of Lender's Debt Service | 902,000 | 898,720 | 898,720 | 898,720 | 898,720 | 898,720 | 10,027,327 | 14,520,928 |
| Less: Plan Payments of Other Creditors | 123,749 | 748,643 | 1,015,989 | 1,066,170 | 1,037,746 | 895,629 | 7,654,881 | 12,419,059 |
| Equity Dividend/Cash Flow | 55,034 | -726,826 | -901,725 | -945,459 | -907,984 | -814,674 | -15,688,518 | -19,985,187 |
| Average Monthly Surplus/(Deficit) | 4,586 | (60,569) | (75,144) | (78,788) | (75,665) | (67,890) | | |

* · May include estimates in month(s) preceding effective date, where actual information is unavailable. Year 1 begins at Effective Date.

POC Properties, LLC et al; Case No. 15-33291-SVK


TACTICALFINANCIAL
CONSULTING

*Debtor's Plan Terms and Interest Rates – POC Class 3A and 4A - Monthly*

Under the Debtor's Plan terms, the Debtor's cash in the POC becomes cash deficient in the first few months of the Plan.

| POC Only | 6/1/2018 | 7/1/2018 | 8/1/2018 | 9/1/2018 | 10/1/2018 | 11/1/2018 | 12/1/2018 |
|---|---|---|---|---|---|---|---|
| Potential Gross Income |  | $86,711 | $86,711 | $90,617 | $90,663 | $90,663 | $90,931 |
| Less: Vacancy (and Collection Loss) |  | -$252 | -$252 | -$252 | -$252 | -$252 | -$252 |
| Total Gross Income |  | $86,459 | $86,459 | $90,364 | $90,411 | $90,411 | $90,678 |
| Department Expense/Cost of Goods Sold |  | $0 | $0 | $0 | $0 | $0 | $0 |
| Effective Gross Income |  | $86,459 | $86,459 | $90,364 | $90,411 | $90,411 | $90,678 |
| Plus: Ancillary Income & Expense Reimbursements |  | $14,487 | $14,487 | $14,187 | $13,987 | $13,487 | $13,487 |
| Total Income |  | $100,946 | $100,946 | $104,552 | $104,398 | $103,898 | $104,166 |
| Less: Operating Expenses |  | $27,854 | $30,354 | $35,120 | $24,469 | $86,905 | $43,910 |
| Net Operating Income |  | $73,092 | $70,593 | $69,432 | $79,929 | $16,993 | $60,256 |
| Less: Capital Expenses, Replacement Reserves, Leasing Costs, & Mgmt. |  | $4,123 | $4,123 | $4,113 | $4,105 | $4,083 | $4,095 |
| Underwritten Net Cash Flow |  | $68,969 | $66,469 | $65,318 | $75,824 | $12,910 | $56,161 |
| Less: Plan Payments of Lender's Debt Service |  | $0 | $50,871 | $50,871 | $50,871 | $50,871 | $50,871 |
| Less: Plan Payments of Other Creditors |  | $100,000 | -$46,421 | -$39,435 | $40,565 | $40,565 | $40,565 |
| Cash Flow/Equity Dividend |  | -$31,031 | $62,019 | $53,882 | -$15,612 | -$78,526 | -$35,275 |
| Begginning Cash/Cum. Cash Flow | $37,099 | $6,068 | $68,087 | $121,969 | $106,357 | $27,831 | -$7,444 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 63 of 182



Under the TFC risk-base rate and other Plan terms, the Debtor's cash in the POC is more cash deficient in the first month of the Plan.

| POC Only-TFC Risk-based Rates | 6/1/2018 | 7/1/2018 | 8/1/2018 | 9/1/2018 | 10/1/2018 | 11/1/2018 | 12/1/2018 |
|---|---|---|---|---|---|---|---|
| Potential Gross Income | $86,291 | $86,711 | $86,711 | $90,617 | $90,663 | $90,663 | $90,931 |
| Less: Vacancy (and Collection Loss) | -$252 | -$252 | -$252 | -$252 | -$252 | -$252 | -$252 |
| Total Gross Income | $86,039 | $86,459 | $86,459 | $90,364 | $90,411 | $90,411 | $90,678 |
| Department Expense/Cost of Goods Sold | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Effective Gross Income | $86,039 | $86,459 | $86,459 | $90,364 | $90,411 | $90,411 | $90,678 |
| Plus: Ancillary Income & Expense Reimbursements | $14,487 | $14,487 | $14,487 | $14,187 | $13,987 | $13,487 | $13,487 |
| Total Income | $100,526 | $100,946 | $100,946 | $104,552 | $104,398 | $103,898 | $104,166 |
| Less: Operating Expenses | $24,263 | $27,854 | $30,354 | $35,120 | $24,469 | $86,905 | $43,910 |
| Net Operating Income | $76,263 | $73,092 | $70,593 | $69,432 | $79,929 | $16,993 | $60,256 |
| Less: Capital Expenses, Replacement Reserves, Leasing Costs, & Mgmt. | $4,123 | $4,123 | $4,123 | $4,113 | $4,105 | $4,083 | $4,095 |
| Underwritten Net Cash Flow | $72,140 | $68,969 | $66,469 | $65,318 | $75,824 | $12,910 | $56,161 |
| Less: Plan Payments of Lender's Debt Service | $62,300 | $0 | $74,893 | $74,893 | $74,893 | $74,893 | $74,893 |
| Less: Plan Payments of Other Creditors | $0 | $100,000 | -$10,684 | -$3,698 | $76,302 | $76,302 | $76,302 |
| Cash Flow/Equity Dividend | $9,840 | -$31,031 | $2,260 | -$5,877 | -$75,372 | -$138,286 | -$95,035 |
| Begginning Cash/Cum. Cash Flow | $37,099 | $6,068 | $8,327 | $2,450 | -$72,922 | -$211,208 | -$306,242 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 64 of 182



*Repayment of the Class 3B and 4B Classes Due to ARP During the Plan Term (Tanoan Property)*

Class 3B and 4B consists of the secured and unsecured claims arising from the Tanoan property. [39]

*Debtor's Plan Terms and Interest Rates – ARP 3B and 4B – Annualized*

Shown below are the annualized numbers for the Plan using the Plan interest rate.

### Debtor's Real Estate Cashflow Statement (Summarized by Plan Year)-SOP/Academy Only

| | Prior 12 Mo.* | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-7 | Total Plan |
|---|---|---|---|---|---|---|---|---|
| Potential Gross Income | 820,492 | 765,955 | 805,598 | 820,638 | 825,446 | 825,446 | 1,650,893 | 5,693,977 |
| Less: Vacancy (and Collection Loss) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total Income* | 820,492 | 765,955 | 805,598 | 820,638 | 825,446 | 825,446 | 1,650,893 | 5,693,977 |
| Department Expense/Cost of Goods Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Effective Gross Income* | 820,492 | 765,955 | 805,598 | 820,638 | 825,446 | 825,446 | 1,650,893 | 5,693,977 |
| Plus: Ancillary Income & Expense Reimbursements | 13,553 | 18,298 | 18,298 | 18,298 | 18,298 | 18,298 | 36,596 | 128,085 |
| *Total Income* | 834,045 | 784,252 | 823,896 | 838,936 | 843,744 | 843,744 | 1,687,489 | 5,822,062 |
| Less: Operating Expenses | 988,315 | 327,866 | 337,909 | 333,364 | 333,564 | 333,564 | 667,128 | 2,333,395 |
| *Net Operating Income* | -154,270 | 456,386 | 485,987 | 505,572 | 510,180 | 510,180 | 1,020,361 | 3,488,666 |
| Less: Capital Expenses, Replacement Reserves, Leasing Costs and Management Fees | 106,037 | 52,165 | 71,074 | 85,017 | 113,726 | 167,754 | 118,480 | 608,215 |
| *Underwritten Net Cash Flow* | -260,307 | 404,221 | 414,913 | 420,555 | 396,455 | 342,426 | 901,881 | 2,880,451 |
| Less: Plan Payments of Lender's Debt Service | 440,000 | 297,231 | 297,231 | 297,231 | 297,231 | 297,231 | 4,381,900 | 5,868,054 |
| Less: Plan Payments of Other Creditors | 16,684 | 133,921 | 80,152 | 80,152 | 80,152 | 80,152 | 1,095,248 | 1,549,778 |
| *Equity Dividend/Cash Flow* | -716,992 | -26,931 | 37,530 | 43,172 | 19,072 | -34,957 | -4,575,267 | -4,537,381 |
| Average Monthly Surplus/(Deficit) | (59,749) | (2,244) | 3,127 | 3,598 | 1,589 | (2,913) | | |

\* - May include estimates in month(s) preceding effective date, where actual information is unavailable. Year 1 begins at Effective Date.

---

[39] The Immediate Repair Items and Replacement Reserves (pages 58 and 58) as determined by F3, Inc. (engineering), the historical operating performance (page 58), the Debtor's 2018 budgeted operating budget (page 58), current Rent Roll of tenants (page 58), the ten-year income and expense estimation by CBRE (page 58), for the Tanoan Property are provided in the Exhibits.



Shown below are the annualized numbers for the Plan using the TFC risk-based interest rate.

**Debtor's Real Estate Cashflow Statement (Summarized by Plan Year)-SOP/Academy Only (TFC Risk-based Rates)**

| | Prior 12 Mo.* | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-7 | Total Plan |
|---|---|---|---|---|---|---|---|---|
| Potential Gross Income | 820,492 | 765,955 | 805,598 | 820,638 | 825,446 | 825,446 | 1,650,893 | 5,693,977 |
| Less: Vacancy (and Collection Loss) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total Income* | 820,492 | 765,955 | 805,598 | 820,638 | 825,446 | 825,446 | 1,650,893 | 5,693,977 |
| Department Expense/Cost of Goods Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Effective Gross Income* | 820,492 | 765,955 | 805,598 | 820,638 | 825,446 | 825,446 | 1,650,893 | 5,693,977 |
| Plus: Ancillary Income & Expense Reimbursements | 13,553 | 18,298 | 18,298 | 18,298 | 18,298 | 18,298 | 36,596 | 128,085 |
| *Total Income* | 834,045 | 784,252 | 823,896 | 838,936 | 843,744 | 843,744 | 1,687,489 | 5,822,062 |
| Less: Operating Expenses | 988,315 | 327,866 | 337,909 | 333,364 | 333,564 | 333,564 | 667,128 | 2,333,395 |
| *Net Operating Income* | -154,270 | 456,386 | 485,987 | 505,572 | 510,180 | 510,180 | 1,020,361 | 3,488,666 |
| Less: Capital Expenses, Replacement Reserves, Leasing Costs and Management Fees | 106,037 | 52,165 | 71,074 | 85,017 | 113,726 | 167,754 | 118,480 | 608,215 |
| *Underwritten Net Cash Flow* | -260,307 | 404,221 | 414,913 | 420,555 | 396,455 | 342,426 | 901,881 | 2,880,451 |
| Less: Plan Payments of Lender's Debt Service | 440,000 | 446,973 | 446,973 | 446,973 | 446,973 | 446,973 | 4,911,255 | 7,146,120 |
| Less: Plan Payments of Other Creditors | 16,684 | 210,026 | 156,257 | 156,257 | 156,257 | 156,257 | 1,320,445 | 2,155,500 |
| *Equity Dividend/Cash Flow* | -716,992 | -252,778 | -188,317 | -182,675 | -206,775 | -260,804 | -5,329,819 | -6,421,169 |
| *Average Monthly Surplus/(Deficit)* | (59,749) | (21,065) | (15,693) | (15,223) | (17,231) | (21,734) | | |

* - May include estimates in month(s) preceding effective date, where actual information is unavailable. Year 1 begins at Effective Date.



*Sensitivity Analysis / Breaking Point*

As shown below if the interest rate of Class 3B is raised by 2.25% to 8.0%, the estate runs out of cash in less than 18 months.

| SOP/Academy-Plan Rates +2.25% | 6/1/2018 | 7/1/2018 | 8/1/2018 | 9/1/2018 | 10/1/2018 | 11/1/2018 | 12/1/2018 | | | 11/1/2019 | 12/1/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Potential Gross Income | | $61,885 | $61,911 | $61,911 | $61,911 | $61,911 | $61,911 | | | $66,284 | $66,369 |
| Less: Vacancy (and Collection Loss) | | $0 | $0 | $0 | $0 | $0 | $0 | | | $0 | $0 |
| Total Gross Income | | $61,885 | $61,911 | $61,911 | $61,911 | $61,911 | $61,911 | | | $66,284 | $66,369 |
| Department Expense/Cost of Goods Sold | | $0 | $0 | $0 | $0 | $0 | $0 | | | $0 | $0 |
| Effective Gross Income | | $61,885 | $61,911 | $61,911 | $61,911 | $61,911 | $61,911 | | | $66,284 | $66,369 |
| Plus: Ancillary Income & Expense Reimbursements | | $1,525 | $1,525 | $1,525 | $1,525 | $1,525 | $1,525 | | | $1,525 | $1,525 |
| Total Income | | $63,410 | $63,436 | $63,436 | $63,436 | $63,436 | $63,436 | | | $67,809 | $67,894 |
| Less: Operating Expenses | | $27,380 | $23,355 | $32,329 | $21,705 | $17,155 | $73,423 | | | $19,247 | $76,082 |
| Net Operating Income | | $36,030 | $40,081 | $31,106 | $41,731 | $46,281 | -$9,988 | | | $48,562 | -$8,188 |
| Less: Capital Expenses, Replacement Reserves, Leasing Costs, & Mgmt. | | $4,075 | $4,076 | $4,076 | $4,076 | $4,076 | $4,076 | | | $4,802 | $4,807 |
| Underwritten Net Cash Flow | | $31,955 | $36,004 | $27,030 | $37,654 | $42,204 | -$14,064 | | | $43,760 | -$12,995 |
| Less: Plan Payments of Lender's Debt Service | | $0 | $31,144 | $31,144 | $31,144 | $31,144 | $31,144 | | | $31,144 | $31,144 |
| Less: Plan Payments of Other Creditors | | $0 | $62,055 | $8,286 | $8,286 | $8,286 | $8,286 | | | $8,286 | $8,286 |
| Cash Flow/Equity Dividend | | $31,955 | -$57,195 | -$12,400 | -$1,776 | $2,774 | -$53,494 | | | $4,330 | -$52,425 |
| Begginning Cash/Cum. Cash Flow | $144,411 | $176,366 | $119,171 | $106,771 | $104,995 | $107,769 | $54,275 | | | $49,791 | -$2,633 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 67 of 182


TACTICALFINANCIAL
CONSULTING

*Debtor's Plan Terms and TFC Interest Rates*

If the Class 3B and Class 4B is raised to the TFC risk adjusted rate of 10.00% and 15.00%, respectively the estate runs out of cash in Month Five of the Plan. The estate runs out of cash in less than 6 months of the Plan.

| SOP/Academy-TFC Risk-based Rates | 6/1/2018 | 7/1/2018 | 8/1/2018 | 9/1/2018 | 10/1/2018 | 11/1/2018 | 12/1/2018 | 1/1/2019 |
|---|---|---|---|---|---|---|---|---|
| Potential Gross Income | | $61,885 | $61,911 | $61,911 | $61,911 | $61,911 | $61,911 | $62,593 |
| Less: Vacancy (and Collection Loss) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Gross Income | | $61,885 | $61,911 | $61,911 | $61,911 | $61,911 | $61,911 | $62,593 |
| Department Expense/Cost of Goods Sold | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Effective Gross Income | | $61,885 | $61,911 | $61,911 | $61,911 | $61,911 | $61,911 | $62,593 |
| Plus: Ancillary Income & Expense Reimbursements | | $1,525 | $1,525 | $1,525 | $1,525 | $1,525 | $1,525 | $1,525 |
| Total Income | | $63,410 | $63,436 | $63,436 | $63,436 | $63,436 | $63,436 | $64,118 |
| Less: Operating Expenses | | $27,380 | $23,355 | $32,329 | $21,705 | $17,155 | $73,423 | $19,847 |
| Net Operating Income | | $36,030 | $40,081 | $31,106 | $41,731 | $46,281 | -$9,988 | $44,271 |
| Less: Capital Expenses, Replacement Reserves, Leasing Costs, & Mgmt. | | $4,075 | $4,076 | $4,076 | $4,076 | $4,076 | $4,076 | $4,129 |
| Underwritten Net Cash Flow | | $31,955 | $36,004 | $27,030 | $37,654 | $42,204 | -$14,064 | $40,141 |
| Less: Plan Payments of Lender's Debt Service | | $0 | $37,248 | $37,248 | $37,248 | $37,248 | $37,248 | $37,248 |
| Less: Plan Payments of Other Creditors | | $0 | $66,790 | $13,021 | $13,021 | $13,021 | $13,021 | $13,021 |
| Cash Flow/Equity Dividend | | $31,955 | -$68,034 | -$23,239 | -$12,615 | -$8,065 | -$64,333 | -$10,128 |
| Begginning Cash/Cum. Cash Flow | $144,411 | $176,366 | $108,332 | $85,093 | $72,478 | $64,413 | $80 | -$10,048 |

Case 15-33291-beh   Doc 467-6   Filed 06/20/18   Page 68 of 182



### Working Capital Adequacy

In businesses, such as this, I recommend the borrower hold two to three months of total expenses (plus accruals for taxes, insurance and capital items). I have used 2.5 months of payments as a baseline, however in the case of the POC Debtor and the ARP Debtor, both estates cannot sustain a cash balance through the Plan Term to provide the businesses with cash to operate its business, pay loan costs, and have capital necessary for property improvements, etc.

In addition, a Debtor should hold, or demonstrate the ability to borrow, sufficient cash to pay for expected tenant improvements and leasing commissions. The basic cash needs for these properties are:

- Tax Escrow — for upcoming real estate taxes — due May and December of each year

- Insurance Escrow — for upcoming property insurance

- Tenant Improvement Escrow — for renovating and demising space for tenant renewals or for new tenants

- Operating Expense Reserve — for smoothing the timing of lease receipts, vacancy and collection issues, upcoming leasing commissions, property management needs, basic repairs and maintenance

- Capital Expense Items — for long lived property items such as pavement, roofing, plumbing and light fixtures, etc.

The Debtors begin with barely adequate cash to provide for their ongoing expenses, however future operating cash flow is insufficient to cover the shortfalls arising from the Plan payments and the Debtors run out of cash.

The Debtors begin the Plan with a combined $181,512[40], but the cost of the properties operations, capital maintenance items and Plan payments consume cash at a faster rate than the properties operations are anticipated to produce it. The POC Debtor runs out of cash by in the first month of the Plan based on either the Plan interest rate or the TFC risk-based rate. The ARP Debtor runs out of cash by month 33 and month four at the Plan and TFC risk-based rate, respectively. Of note, the cash burn during the Petition

---

[40] If the outstanding adequate protection payment is made this amount is reduced to $181,641.



Period has been substantial so this projection does not represent a material change from the recent past operations.

### Loan to Value/ Balance Sheet Solvency

The following charts identifies the equity and loan to value ratios of the secured claims of the Lender at the end of the Plan Term and if the Debtors assets are greater than their liabilities.

**POC -** The Debtors have no equity in their businesses or properties at the beginning or end of the Plan Term. The secured loan to value entering into the Plan is 100% and the combined secured and unsecured claims are well over the value of the Lender's security interest.

At the end of the Plan Term, the secured loan is reduced to approximately 87%, however the secured and unsecured claims are 148% of the anticipated collateral value.

**ARP -** The Debtors have no equity in their businesses or properties at the beginning or end of the Plan Term. The secured loan to value entering into the Plan is 100% and the combined secured and unsecured claims are well over the value of the Lender's security interest.

At the end of the Plan Term, the secured loan is reduced to approximately 94%, however the combined secured and unsecured claim are 138% of the anticipated collateral value.

Since all claims must be repaid at the end of the Plan term, the Debtors are considered to be insolvent.


TACTICALFINANCIAL
CONSULTING

## Repayment of Remaining Claims at the End of the Plan Term

The following chart identifies if the Debtor can repay its debts as they come due at the end of the Plan Term.

The Debtors have no ability to sell or refinance their assets in an amount great enough to repay the outstanding claims at the end of the Plan Term. Collectively, the payoff shortfall is $6,255,571.

**Ability to Repay Outstanding Claims at the End of the Plan Term**

| Class | Property | Class 3A Outstandng Secured Claim Balance | Class 4A Outstandng Unsecured Claim Balance | Claim Payoff at End of Plan | Projected End of Plan Term Value | Debtor Equity Surplus (Deficit) |
|---|---|---|---|---|---|---|
| 3A | Otoño | | | - | 3,289,558 | 3,289,558 |
| 3A | Conejos | | | - | 5,411,698 | 5,411,698 |
| 3A | Verano | | | - | 274,930 | 274,930 |
| 3A | Masthead | | | n/a | n/a | - |
| Cash Securing Claims | | | | | - | - |
| **Total Value of Security** | | **$ 7,792,108** | **$ 5,453,080** | **$ 13,245,188** | **$ 8,976,186** | **$ (4,269,002)** |

**Total Claims Outstanding to Property Value**        **148%**



## Ability to Repay Outstanding Claims at the End of the Plan Term

| Class | Property | Class 3B Outstandng Secured Claim Balance | Class 4B Outstandng Unsecured Claim Balance | Claim Payoff at End of Plan | Projected End of Plan Term Value | Debtor Equity Surplus (Deficit) |
|---|---|---|---|---|---|---|
| 3B | Tanoan | | | - | 4,044,940 | 4,044,940 |
| | Cash Securing Claims | | | | - | - |
| **Total Value of Security** | | $ 3,794,028 | $ 936,355 | $ 4,730,383 | $ 4,044,940 | $ (685,443) |

**Total Claims Outstanding to Property Value**                                                    **117%**

| | Outstandng Secured Claim Balance | Outstandng Unsecured Claim Balance | Claim Payoff at End of Plan | Projected End of Plan Term Value | Debtor Equity Surplus (Deficit) |
|---|---|---|---|---|---|
| **Combined Total** | $ 11,586,136 | $ 6,389,435 | $ 17,975,571 | $ 13,021,126 | $ (4,954,445) |

**138%**

| | | |
|---|---|---|
| **Original Value of the Four Properties** | $ | 11,720,000 |
| **Payoff** | $ | 17,975,571 |
| **Necessary Rise in Value** | $ | 6,255,571 |

47 | P a g e



## RISK ASSESSMENT CONCLUSIONS

To evaluate the risk of the Debtors' Plan and its repayment ability, I conducted a thorough credit analysis of the Debtor and its Plan incorporating the time-honored "5 C's of Credit", a methodology often utilized by lenders to assess a borrower's risk characteristics and its loan request.  This analysis of the Debtor showed both positive and negative credit attributes.

- · *characte*r – meaning its reputation and relevant abilities – *rated as below average due to the Debtors' past lack of compliance with its creditor agreements*

- · *capacity* – meaning its ability to repay a loan – *rated as poor due to the lack of equity in the property at the Plans' inception, the lack of a significant cash holdings by the restructured entity and the expected net cash flow deficits after Plan payments*

- · *capital* – meaning its amount of capital invested – *rated as poor due to the lack of any equity in the Property*

- · *collateral* – meaning the type and value of the security for the loan –*rated as average to good due to with good location characteristics and in good physical condition, but in a tertiary market*

- · conditions – meaning the loan amount and terms influencing a lender's decision – *rated as poor due to due to the high loan to value and low debt service coverage ability*

With respect to The Lender's loans, I have also evaluated the Plan based on a set of real estate oriented credit risk principles:

The Debtor, its Property and its Plan conform to the following risk principles:

- · A property should be owned and managed by an experienced commercial real estate borrower and property manager.

    The property should be located in an area that allows it to attract and compete for tenants through its location, physical qualities and amenities.

    The loan should be structured so that it has some level of amortization or curtailment over its term (or fully amortizes).

    The life of the loan should be substantially shorter than the life of the property.

The Debtor, its Property and its Plan do not conform to the following risk principles:



·     The value of the collateral should be substantially higher than the loan amount. This provides a cushion in times of falling property values.

     The borrower or sponsor should have significant "hard" cash equity in the property. This provides an incentive to keep the loan current throughout the loan term and repay the loan at maturity

     When the market for the property allows, the loan maturity should be shorter than the leases of the tenants.

     A property should generate net cash flow that exceeds the loan payment by a sufficient margin to protect the lender from fluctuations in cash flow due to unexpected events;

     The Borrower should have adequate liquidity or sponsor support agreement with adequate reserves.

     The structure of the loan protects the property by requiring reserves for operating reserves, re-leasing and capital reserves.

     Loan needs to consider the comprehensive borrower leverage and cash flow as highly leveraged borrowers present greater risk.

## DETERMINATION OF MARKET EFFICIENCY

I sought to determine if an efficient market exists for a loan(s) to satisfy the Lender's Claims under the terms as described in the Debtors' Plan. The U.S. Supreme Court's Till vs. SCS Credit Corp. decision advised on how to determine interest rates in the presence or absence of an efficient market. By efficient, the Justices were referring to an active market for bankruptcy judges and practitioners to observe interest rates from active lenders.

Among the things I considered to determine efficiency is whether there exists an open, well-developed market of active lenders for a loan(s) matching the terms of the Plan to a similar borrower and property. My evaluation included factors that would likely be considered by lenders including the amount, type, and duration or term, and amortization of the loan as well as the type, quality, location, age and life expectancy of the collateral. The evaluation also considered the Debtors' unique risk characteristics, its Property, the proposed repayment terms for the claims, and the feasibility of the Plan with respect to the risk to the creditor.

In efficient markets, capital market participants determine the value of a loan by bidding the interest rate up or down thereby forming the market interest (discount)



rate. By doing so, market demand determines the value for the stream of payments promised by the borrower. For this reason, value is an economic concept, not an equitable or legal concept.

Most courts interpret the Till decision to consider the existence of an efficient market allowing interest rates to be observed is prima facie evidence of the appropriate rate of interest for repayment of creditor's claim.

### EFFICIENT MARKET EVALUATION

The Court makes clear that in the cases where an efficient market exists, i.e. active lenders for the restructured loan, that the observable market rate should be considered. After this investigation, I determined there is no observable market and therefore the market rate is not apparent, and further that no typically motivated, rational lender would be willing to make a loan consistent with the Plan Term to a similar borrower and property.

In my opinion, the Plan holds risk factors that raise the risk to a level unacceptable to the capital markets. Some of these risk factors can be seen in the following chart:



| Risk Factor | Reorganization Plan | Greater Northeast Area Market Availability |
|---|---|---|
| **Amount** | See Amounts Within Cover Letter | *Available* |
| **Loan Type** | Amortizing Term Loan | *Available* |
| **Loan Term** | 84 months | *Available* |
| **Amortization** | 360 months | *Available* |
| **Collateral (sub)Type** | Suburban Office Building & Flex-Space Warehouse | *Available* |
| **Asset Quality** | Class B, Speculative | *Available* |
| **Collateral Location** | Greater Northeast, Albuquerque, New Mexico | *Available* |
| **Collateral Age** | 13 and 32 Years | *Available* |
| **Collateral Life Expectancy** | Effective Date: 30 years Plan Maturity: 7 years | *Available* |
| **Investment Market Location** | Upper Tertiary | *Available* |
| **Loan to Value (%)** | 100% | *No Market* |
| **Debt Service Coverage Ratio** | Below Breakeven (less than 1.0) | *No Market* |
| **Other Plan Terms** | See Plan Description | *No Market* |

I believe no efficient market exists for a loan(s) to satisfy the Lender's Claims under the terms as described in the Debtors' Plan.

## THE APPROPRIATE RATE OF INTEREST AS REQUIRED BY THE BANKRUPTCY CODE AND IN TILL VS. SCS CREDIT CORP.

As a result of finding no efficient market, I have further considered the U.S. Supreme Court decision of Till vs. SCS Credit Corp. The Court rendered three opinions, including a limited plurality, whose meaning must be carefully parsed using of the Mark's principle.[41]

I have carefully studied the wording of the Supreme Court's Opinions. I have read transcripts and listened to the recordings of the hearing. I have read the briefs of the Appellee and the Plaintiff. I have had numerous conversations with the counsel who represented the Appellee. I have read numerous articles on the matter and reviewed several lower court decisions leading up to and following the Supreme Court's Till decision. I have written articles that have been published in professional journals and I have spoken numerous times to professional organizations on this issue.

---

[41] Marks v. United States, 430 U.S. 188 (1977), Supreme Court of the United States



The Opinions make clear that in the cases where an efficient market exists, i.e. active lenders for the restructured loan, that the observable market rate should be considered. The Opinions by Justice Stevens and Justice Thomas both note that in the absence of an observable market rate, calculating the rate can be achieved by taking a known rate of interest and adjusting for the risk factors of the Debtor. Justice Stevens preference was to start low and build up the rate. Justice Scalia's preference was to start at the contract rate and adjust. Justice Thomas, under his plain reading approach, does not side with any of the other Justices, but rather rejects both approaches and suggests the Plan should pay only the risk-free rate of interest. Justice Thomas also acknowledges that future payments under this payment scheme will not provide the creditor with its present value equivalent indicating that he believes the Code reads present value is only owed on a plan's effective date, not at a future date.

The Justices noted, at least five times in their plurality decision, the requirement to provide the present value to the secured creditor. Justice Thomas in his concurrence and the Dissent Opinion by Justice Scalia also referenced this need five or more times. Nowhere in any of the three Opinions is there a notation that instructs a court to ignore, revoke or limit the present value requirement of § 1129(b)(2)(A)(i)(II). The Court also repeatedly confirms that the rate of interest must provide a return to the creditor sufficient in amount to equal the present value of its security interest.

It is very clear that the Justices understood the relationship between the rate of interest paid to a secured creditor and its impact on the present value received by the creditor and that only if the plan provides for the correct interest rate will the Plan fully compensate the creditor for the risk of plan failure.

Some readers have interpreted the Court's wording to mean a Bankruptcy Court should artificially constrain the interest rate to a level where the Debtor can afford the Plan payments and/or generally to a level of the U.S. Prime Rate plus 1% to 3%. I believe this is perhaps the most misquoted point within the Opinions. It is my reading that the Supreme Court was not intending to artificially constrain the interest rate. In fact, Justice Scalia wrote in his dissent and referring to the plurality opinion of Justice Stevens "Finally, we agree that adequate compensation may sometimes require an "'eye-popping'" interest rate, and that, if the rate is too high for the plan to succeed, the appropriate course is not to reduce it to a more palatable level, but to refuse to confirm the plan." Perhaps more importantly, Justice Stevens wrote "We do not decide the



proper scale for the risk adjustment, as the issue is not before us."  This, along with the following quote within his Opinion of "Together with the cram down provision, this requirement obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood of default is so high as to necessitate an "eye-popping" interest rate, 301 F. 3d, at 593 (Rovner, J., dissenting), the plan probably should not be confirmed" makes it certain that eight of the nine justices clearly believed the interest rate should not be artificially constrained in order to confirm a plan.

It is inconsistent with the Bankruptcy Code, the Court's Opinions and counter-intuitive to financial theory and practice that the law or the Justices would require that as risk rises, the rate paid to the secured creditor would no longer rise, but rather be artificially constrained or possibly even reduced in order to make a plan work.  In doing so, such a rate constraint could force the unfortunate secured creditor to accept a lower rate from a borrower in bankruptcy than a lower risk borrower who is not in bankruptcy, but more importantly deny the creditor the opportunity to be repaid the value of its collateral.

As the Court noted, in many bankruptcy cases debtors are high risk as can be seen by the lack of exit financing.  Higher risk plans will typically require higher rates which may render a plan infeasible and not confirmable. [42]

Justice Stevens cited four risk factors, these "Till Risk Factors" have been specifically considered to determine the appropriate interest rate for the Debtor.  Each of these factors affects a debtor's ability to effectuate the Plan and repay the reorganized loan. They are:

·       *Circumstances of the Estate* refers to those unique risk characteristics of the Debtor

·       *Nature of the Security* refers to those risks that may impact a creditors security (Collateral) and a debtor's ability to use this property

---

[42] Justice Scalia, with whom the Chief Justice, Justice O'Connor, and Justice Kennedy join, dissenting. My areas of agreement with the plurality are substantial. We agree that, although all confirmed Chapter 13 plans have been deemed feasible by a bankruptcy judge, some nevertheless fail… We agree that any deferred payments to a secured creditor must fully com-pens ate it for the risk that such a failure will occur… ***Finally, we agree that adequate compensation may sometimes require an "'eye-popping'" interest rate, and that, if the rate is too high for the plan to succeed, the appropriate course is not to reduce it to a more palatable level, but to refuse to confirm the plan. See ante, at 14. {emphasis added}***



· *Duration of the Reorganization Plan* refers to those risks that may arise during the repayment plan and expose a creditor to repayment risk, and

· *Feasibility of the Reorganization Plan* refers to those risks that may affect a debtor's financial or operating performance, and likelihood for unforeseen reorganization or liquidation

### ESTIMATE OF APPROPRIATE INTEREST RATE, I.E., DISCOUNT RATE

Given the lack of an efficient market, I incorporated the "Till Risk Factors" into my analysis as described in the Till decision and then utilized the broadly accepted formula approach to determine the interest rate for the Debtor. I selected the U.S. Prime Rate as the base rate and then adjusted it for the Till Risk Factors.

When an efficient market does not exist to determine the rate of interest necessary for the secured creditor to receive the present value of its claim, the Court's Opinion suggests appropriate compensation for the risk taken can be determined by looking at comparable investments.

For most of the risk factors, I could extract evidence of the return found in the capital markets – I then compared this to, and considered, these with in my personal judgment – to make final adjustments for risk factors. To help explain this process, I have prepared the following chart displaying a summary of the formula approach used to calculate the appropriate rate of interest for the Debtor. The chart includes.

· *Average Borrower Rate:* The first numerical column is for an average borrower based on the average national capital market terms for loan to value, loan term and loan amortization for a suburban office building

· *Average Borrower Rate with Local Market Considerations*: The numerical second column is for the average borrower adjusted for local market terms and conditions for loan to value, loan term (duration), and loan amortization for a suburban office building

· *Adjustments for Risk of the Debtor, its Plan and Collateral:* The third through fifth numerical columns are the adjustments necessary to account for the risks factors of the Debtor, its Plan and its Property

· *Debtor's Rate of Interest:* The final column summarizes and totals the interest rate calculation



My formula approach, provided on page 56, 57, 58, and 59, produced risk adjusted interest rates for each Property. *The loan terms requested in the Debtors' Plan place a higher risk on the Lender resulting in a higher cost of borrowing. If not for these loan terms, the borrower's interest rate calculation would have equaled the cost of borrowing as shown in the second numerical column.*

*I believe that in order to return the present value of the Security Interest to the Lender for the restructured loan to the Debtor as described in the Plan (a 84-month loan term and a 360-month amortization) should have a fixed rate of interest of 9.75% for Otoño and Conejos (Class 3A) and 10.0% for Tanoan (Class 3B).*[43]

---

[43] Class 3A is based on the weighted dollar average of the interest rate of the three underlying claims.


TACTICALFINANCIAL
CONSULTING

## FORMULA APPROACH RESULTS FOR THE SECURED CLAIM – VERANO PROPERTY

| Risk Factors | Description / Rating | Capital Market | | Plan Risk | | | Risk-Based |
|---|---|---|---|---|---|---|---|
| | | National | Local | Property | Debtor | Terms | Plan Rate |
| **Base Rate** | *U.S. Prime Rate* | 4.75% | | *4.75%* | | | *4.75%* |
| **Circumstances of the Estate** | | | | | | | |
| Sponsor/Management Ability | *Rated: Average* | | | | 0.00% | | **0.00%** |
| Business/Industry Type | *Real Estate Investment/Operations* | 0.99% | | 0.99% | | | **0.99%** |
| | | *0.99%* | | *0.99%* | | | *0.99%* |
| **The Nature of the Security** | | | | | | | |
| Property Type | *Industrial* | 0.10% | | 0.10% | | | **0.10%** |
| Property Subtype | *R & D/Flex* | 0.52% | | 0.52% | | | **0.52%** |
| Property Quality Class | *Rated: B* | | | | | | **0.00%** |
| Investment Market Location and Local Market Conditions | *Upper Tertiary Investment Market, Average Local Market Conditions* | | 0.25% | 0.25% | | | **0.25%** |
| Local Location | *Rated: Average* | | | | | | **0.00%** |
| Loan Size | *Expanded Leverage by 37%* | | | | | 2.65% | **2.65%** |
| Distressed Publicity | *n/a* | | | | 0.00% | | **0.00%** |
| Atypical Loan Terms | *Lack of Typical Covenants/ Escrows* | | | | | 0.13% | **0.13%** |
| Credit Enhancement/Guaranty | *No Guaranty/Non-Recourse* | | | | | 0.25% | **0.25%** |
| | | *0.62%* | *0.25%* | *0.87%* | | *3.02%* | *3.89%* |
| **Duration of the Reorganization** | | | | | | | |
| Interest-only Period | *n/a* | | | | | | **0.00%** |
| Negative Amortization | *n/a* | | | | | | **0.00%** |
| Additional Amortization | *n/a* | | | | | | **0.00%** |
| Loan Term (Duration) | *Shortened by 0 months; Immaterial Difference* | | | | | | **0.00%** |
| Amortization Period | *Extended by 24 months; Immaterial Difference* | | | | | | **0.00%** |
| | | | | | | | *0.00%* |
| **Feasibility of the Plan** | | | | | | | |
| Likelihood of Default | *Lack of Substantial Cash Flow Toward Plan Payments* | | | | | *0.13%* | *0.13%* |
| | | **6.36%** | **6.61%** | **6.61%** | **0.00%** | **3.15%** | **9.76%** |

*Final Build-Up Rate, Rounded* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9.750%*

56 | P a g e


TACTICALFINANCIAL
CONSULTING

## FORMULA APPROACH RESULTS FOR THE SECURED CLAIM – CONEJOS PROPERTY

| Risk Factors | Description / Rating | Capital Market | | Plan Risk | | | Risk-Based |
|---|---|---|---|---|---|---|---|
| | | National | Local | Property | Debtor | Terms | Plan Rate |
| **Conejos - Formula Approach - Interest Rate Risk Calculation** | | | | | | | |
| **Base Rate** | *U.S. Prime Rate* | 4.75% | | *4.75%* | | | *4.75%* |
| **Circumstances of the Estate** | | | | | | | |
| Sponsor/Management Ability | *Rated: Average* | | | | 0.00% | | **0.00%** |
| Business/Industry Type | *Real Estate Investment/Operations* | 0.99% | | 0.99% | | | **0.99%** |
| | | *0.99%* | | *0.99%* | | | *0.99%* |
| **The Nature of the Security** | | | | | | | |
| Property Type | *Office* | -0.11% | | -0.11% | | | **-0.11%** |
| Property Subtype | *Suburban Office* | -0.07% | | -0.07% | | | **-0.07%** |
| Property Quality Class | *Rated: B* | | | | | | **0.00%** |
| Investment Market Location and Local Market Conditions | *Upper Tertiary Investment Market, Average Local Market Conditions* | | 0.25% | 0.25% | | | **0.25%** |
| Local Location | *Rated: Average* | | | | | | **0.00%** |
| Loan Size | *Expanded Leverage by 25%* | | | | | 3.06% | **3.06%** |
| Distressed Publicity | *n/a* | | | | 0.00% | | **0.00%** |
| Atypical Loan Terms | *Lack of Typical Covenants/ Escrows* | | | | | 0.13% | **0.13%** |
| Credit Enhancement/Guaranty | *No Guaranty/Non-Recourse* | | | | | 0.25% | **0.25%** |
| | | *-0.18%* | *0.25%* | *0.07%* | | *3.43%* | *3.50%* |
| **Duration of the Reorganization** | | | | | | | |
| Interest-only Period | *n/a* | | | | | | **0.00%** |
| Negative Amortization | *n/a* | | | | | | **0.00%** |
| Additional Amortization | *n/a* | | | | | | **0.00%** |
| Loan Term (Duration) | *Shortened by 0 months; Materially Different* | | | | | | **0.00%** |
| Amortization Period | *Extended by 24 months; Immaterial Difference* | | | | | | **0.00%** |
| | | | | | | | *0.00%* |
| **Feasibility of the Plan** | | | | | | | |
| Likelihood of Default | *Lack of Substantial Cash Flow Toward Plan Payments* | | | | | *0.50%* | **0.50%** |
| | | **5.56%** | **5.81%** | **5.81%** | **0.00%** | **3.93%** | **9.74%** |

*Final Build-Up Rate, Rounded* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *9.750%*

57 | P a g e



TACTICALFINANCIAL
CONSULTING

### FORMULA APPROACH RESULTS FOR THE SECURED CLAIM – OTOÑO PROPERTY

**Otono - Formula Approach - Interest Rate Risk Calculation**

| Risk Factors | Description / Rating | Capital Market | | Plan Risk | | | Risk-Based Plan Rate |
|---|---|---|---|---|---|---|---|
| | | National | Local | Property | Debtor | Terms | |
| **Base Rate** | *U.S. Prime Rate* | 4.75% | | **4.75%** | | | **4.75%** |
| **Circumstances of the Estate** | | | | | | | |
| Sponsor/Management Ability | *Rated: Average* | | | | 0.00% | | **0.00%** |
| Business/Industry Type | *Real Estate Investment/Operations* | 0.99% | | 0.99% | | | **0.99%** |
| | | **0.99%** | | **0.99%** | | | **0.99%** |
| **The Nature of the Security** | | | | | | | |
| Property Type | *Office* | -0.11% | | -0.11% | | | **-0.11%** |
| Property Subtype | *Suburban Office* | -0.07% | | -0.07% | | | **-0.07%** |
| Property Quality Class | *Rated: B* | | | | | | **0.00%** |
| Investment Market Location and Local Market Conditions | *Upper Tertiary Investment Market, Below Average Local Market Conditions* | | 0.25% | 0.25% | | | **0.25%** |
| Local Location | *Rated: Average* | | | | | | **0.00%** |
| Loan Size | *Expanded Leverage by 25%* | | | | | 3.06% | **3.06%** |
| Distressed Publicity | *n/a* | | | | 0.00% | | **0.00%** |
| Atypical Loan Terms | *Lack of Typical Covenants/ Escrows* | | | | | 0.13% | **0.13%** |
| Credit Enhancement/Guaranty | *No Guaranty/Non-Recourse* | | | | | 0.25% | **0.25%** |
| | | **-0.18%** | **0.25%** | **0.07%** | | **3.43%** | **3.50%** |
| **Duration of the Reorganization** | | | | | | | |
| Interest-only Period | *n/a* | | | | | | **0.00%** |
| Negative Amortization | *n/a* | | | | | | **0.00%** |
| Additional Amortization | *n/a* | | | | | | **0.00%** |
| Loan Term (Duration) | *Shortened by 0 months; Materially Different* | | | | | | **0.00%** |
| Amortization Period | *Extended by 24 months; Immaterial Difference* | | | | | | **0.00%** |
| | | | | | | | **0.00%** |
| **Feasibility of the Plan** | | | | | | | |
| Likelihood of Default | *Lack of Substantial Cash Flow Toward Plan Payments* | | | | | **0.50%** | **0.50%** |
| | | **5.56%** | **5.81%** | **5.81%** | **0.00%** | **3.93%** | **9.74%** |

*Final Build-Up Rate, Rounded* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **9.750%**



## FORMULA APPROACH RESULTS FOR THE SECURED CLAIM – TANOAN PROPERTY

### Tanoan - Formula Approach - Interest Rate Risk Calculation

| Risk Factors | Description / Rating | Capital Market | | Plan Risk | | | Risk-Based |
|---|---|---|---|---|---|---|---|
| | | National | Local | Property | Debtor | Terms | Plan Rate |
| **Base Rate** | *U.S. Prime Rate* | 4.75% | | **4.75%** | | | 4.75% |
| **Circumstances of the Estate** | | | | | | | |
| Sponsor/Management Ability | *Rated: Average* | | | | 0.00% | | 0.00% |
| Business/Industry Type | *Real Estate Investment/Operations* | 0.99% | | 0.99% | | | 0.99% |
| | | **0.99%** | | **0.99%** | | | **0.99%** |
| **The Nature of the Security** | | | | | | | |
| Property Type | *Office* | -0.11% | | -0.11% | | | -0.11% |
| Property Subtype | *Suburban Office* | -0.07% | | -0.07% | | | -0.07% |
| Property Quality Class | *Rated: B* | | | | | | 0.00% |
| Investment Market Location and Local Market Conditions | *Upper Tertiary Investment Market, Below Average Local Market Conditions* | | 0.25% | 0.25% | | | 0.25% |
| Local Location | *Rated: Average* | | | 0.25% | | | 0.25% |
| Loan Size | *Expanded Leverage by 25%* | | | | | 3.02% | 3.02% |
| Distressed Publicity | *n/a* | | | | 0.00% | | 0.00% |
| Atypical Loan Terms | *Lack of Typical Covenants* | | | | | 0.13% | 0.13% |
| Credit Enhancement/Guaranty | *No Guaranty/Non-Recourse* | | | | | 0.25% | 0.25% |
| | | **-0.18%** | **0.25%** | **0.32%** | | **3.39%** | **3.71%** |
| **Duration of the Reorganization** | | | | | | | |
| Interest-only Period | *n/a* | | | | | | 0.00% |
| Negative Amortization | *n/a* | | | | | | 0.00% |
| Additional Amortization | *n/a* | | | | | | 0.00% |
| Loan Term (Duration) | *Shortened by 0 months; Immaterial Difference* | | | | | | 0.00% |
| Amortization Period | *Extended by 24 months; Immaterial Difference* | | | | | | 0.00% |
| | | | | | | | **0.00%** |
| **Feasibility of the Plan** | | | | | | | |
| Likelihood of Default | *Lack of Substantial Cash Flow Toward Plan Payments* | | | | | 0.50% | 0.50% |
| | | **5.56%** | **5.81%** | **6.06%** | **0.00%** | **3.89%** | **9.95%** |

*Final Build-Up Rate, Rounded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .* **10.000%**



## FEASIBILITY STANDARD

The Bankruptcy Code requires the Debtor to present a Plan that is feasible. While the feasibility of a Plan of Reorganization is a fact intensive question, it is not a question of absolute assurance nor is it a guaranty of Plan performance, but rather one in which the Plan proponent must demonstrate a reasonable assurance that the plan can be achieved. The Plan proponent is obligated to provide a Plan based on valid assumptions that can be supported by facts and educated opinion, not a Plan based on speculative or random outcomes.

## FEASIBILITY CONDITIONS AND REQUIREMENTS

To determine if a Plan is feasible, I looked to a standard of "reasonable assurance of Plan performance" and that the Plan implementation is "not likely to be followed by an unanticipated financial reorganization or liquidation." I refer to these as the two Conditions of Feasibility.[44],[45]

To satisfy these conditions, the Debtor must be reasonably likely to meet the following three requirements:

· Provide the cash necessary to pay all ongoing claim payment obligations described in the Plan

· Maintain a sufficient level of cash throughout the Plan term to provide for the Property's operating and capital costs while maintaining a level of economic viability sufficient to make the Plan payments

· Provide the cash necessary to pay all the remaining claim payment obligations, if any, due at the end of the Plan term

---

[44] Among other things, the 11 U.S.C. §943 requires "the plan is in the best interests of creditors and is feasible" for a bankruptcy plan to be confirmed by a bankruptcy court. The feasibility requirement, located in 11 U.S.C. §1129(a)(11) states "The court shall confirm a plan only if all of the following requirements are met: …(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

[45] A Plan must also be considered in the context of the relevant bankruptcy code requirements. In the context of feasibility, all Plans are subject to §506 and §1129 and may also be subject to §1111(b). Code section 506 deals with the determination of the secured status of a creditor, §1129 deals with Plan confirmation requirements, and §1111 deals with claims and interests.

 

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 85 of 182



To form my opinion, as to the satisfaction of these Conditions and Requirements, I considered the following factors in determining whether the Plan is feasible:

· The (future) earning power of the business

· The adequacy of the (reorganized) capital structure

· The economic conditions of the business

· The efficiency and effectiveness of management in control of the business after confirmation

· The reasonableness and impact of the plan terms to the success of the plan

**FEASIBILITY ANALYSIS**

I looked to the following five factors to analyze the feasibility of the Debtors' Plan.

· The (future) earning power of the business

· The adequacy of the (reorganized) capital structure

· The economic conditions of the business

· The efficiency and effectiveness of management in control of the business after confirmation

· The reasonableness and impact of the Plan terms to the success of the Plan

**The (future) earning power of the business** – I examined the past performance of the Debtor by reviewing its financial statements. I reviewed the appraisal information to ascertain the businesses potential revenues and likely expenses. I prepared a projection of the likely result of the Debtors' future operations under its proposed Plan. I then compared the Debtors' projections and to my projection. Each of the Debtor's fails to be able to provide the level of earnings necessary to cover its required Plan payments during the Plan Term.

**The adequacy of the (reorganized) capital structure** – I examined the Debtors' restructured capital structure its assets, liabilities as well as its cash balance.

The capital structure includes substantial debt to the Lender and payments to other creditors requiring significant payment amounts under the Plan. The Plan retains large unsecured claims arising from the diminishment in value of the Properties at the time of



the Effective Date. Repayment is further complicated by the Debtors ceding a property to the Lender but retaining the full deficiency amount as an unsecured claim. The payments are too high for the cash flow generated by the remaining properties held by the Debtors. The Debtors hold no equity value in its business or the Property. Its restructured liabilities continue to exceed its tangible assets. If the Plan fails, and the Debtors' assets are liquidated the creditors will likely incur an additional loss.

As a part of its assets, the Debtor will begin the Effective Date with $181,512 of cash. Considering its upcoming payments and insufficient cash flow to cover Plan payments, the Debtors' assets are (as shown previously) currently cash deficient and there is no future cash contribution or reliable guarantor in the Plan to resolve this problem.

Given its remaining economic life the Property value may not appreciate by the end of the Plan Term; in fact, while appraisers make an educated analysis any increase is purely speculative as it was when the properties were purchased in 2007, and the Debtor has no provided no information to review about the Property's future value. The payoff at the end of the Plan Term is larger, 148%, than the current value of the Properties for POC and 117% for ARP, and 138% on a combined basis.

**The economic conditions of the business** – I examined the national and local economic conditions, including the local area conditions immediate to the Debtors' Property.

The current national economy appears to be sound, however the local economic conditions are weak, and no material changes are anticipated. The general real estate economic conditions are producing lease rental rates that are insufficient for the Debtor to generate substantial rental rate growth in new leases. Moreover, the Debtor has most of its space leased and "locked in" at lease rates with current tenants. The Debtor cannot reach the amounts necessary to pay the Plan payments without a very large growth in revenue because the properties income is largely fixed their existing leases that are largely at market rates.

**The efficiency and effectiveness of management in control of the business after confirmation** – I examined the Debtor's ability to attract and retain capable management.

Current property management (Debbie Harms) appears to be doing a good and capable job. The ability to locate a substitute management company/team capable (good) of managing this type of property is relatively straightforward with many well qualified



management companies competing for these opportunities. The Debtor can easily alter its management structure if necessary.

However, the properties' management struggles to be effective in procuring new leases due to the Debtors inability to pay for any large tenant improvements or demising at the properties.

**The reasonableness and impact of the Plan terms to the success of the Plan** – I examined the Plan terms to determine if the Debtor could reasonably be expected to make the Plan payments and effectuate a successful Plan.

When the reasonably expected cash flow of the Property is compared to the Plan's payment obligations ─ either at the Plan interest rates, the prevailing national or local interest rates, or the TFC risk-based rates, the Property's cash flow is insufficient to pay the ongoing Plan obligations.

The Plan attempts to retire too much debt for the cash flow that its Properties can produce. The result is a failure in the Debtors' ability to make the required payments, accumulate or hold adequate cash.

In comparison to its obligations, the business's earning potential is limited by the existing lease contracts with no "cushion" to offer reasonable assurance of the Plan payment obligations.

## FEASIBILITY CONCLUSION

To determine if the Plan meets the two Conditions of Feasibility, it must satisfy the following three requirements.

·   Provide the cash necessary to pay all the ongoing claim payment obligations described in the Plan

·   Maintain a sufficient level of cash throughout the Plan term to provide for the Property's operating and capital costs while maintaining a level of economic viability sufficient to make the Plan payments

·   Provide the cash necessary to pay all the remaining claim payment obligations, if any, due at the end of the Plan term

Regarding Condition One, that *the Plan not be followed by an unanticipated financial reorganization or liquidation*, I believe the Plan does not meet this requirement because:



· I believe the Debtor will run out of cash early in the Plan Term, around month one (or Month Five based on the Debtor's interest rate) and will be unable to pay its Plan obligations. See charts beginning on page 33.

· Even if the Debtor could somehow make its Plan payments, the Debtor may be incapable of paying the outstanding balance of the Lender's claim from the proceeds of a refinance or sale of the property. See chart on page 45.

Regarding Condition Two, that *the Plan must offer a reasonable assurance of success and be workable,* I also believe the Plan does not meet this requirement. Under no scenario – including the Debtors' own Plan's interest rate, the national and local interest rates, or my risk-based interest rate – does the Debtor demonstrate the ability to pay the Plan payments and maintain reasonable (or any) cash balances.

This Plan simply does not work because:

· the market does not provide lease rates high enough to meet the required revenues

· the Debtors do not hold enough cash to cover the Property and the Plan costs

· the Debtors' net cash flow is too low, and the Debtor subsequently runs out of cash

**The Plan seems destined to fail. It does not meet either Condition and in my opinion, it is not feasible.**

### PRESENT VALUE OF THE PLAN PAYMENTS AND, FROM A FINANCIAL PERSPECTIVE, IS THE PLAN COMPLIANT WITH 11 U.S.C. § 1129(B)(2)(A)(I)(II)?

11 U.S.C. § 1129(b)(2)(A)(i)(II) requires "that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property".

The interest rate determines the amount of interest paid in conjunction with the return of the lender's principal. Together these payments are discounted back at the interest (discount) rate to determine the present value of the stream of payments.

In the case of a restructured loan, if the interest rate is set too low the value of the future payments is lower and the loan will not retain the present value of the secured creditor's security interest. If this is the case, the Plan is not compliant with the present value requirement of 11 U.S.C. § 1129(b)(2)(A)(i)(II) because the present value provided



to the secured creditor is less than the present value of its security interest in its collateral. An interest rate set higher is allowable as the allowable rate as the applicable portion of the Code reads "at least the allowed amount…".

I have prepared the mathematical analysis to determine the value of the payment stream provided to the Lender from the Plan. In accordance with 11 U.S.C. § 1129(b)(2)(A)(i)(II), I have utilized the Lender's Secured Claim amounts as the required present value from the payment stream. I discounted the payment stream proposed by the Plan by the risk adjusted rates that I found for the Plan including adjustments for the unique risk factors of the Debtors, the Plan and the Properties.

In total, the Plan undercompensates the Lender by $4,923,159.

The detailed mathematics of this conclusion are provided in the Exhibits beginning on page 97.



**EXHIBITS**



Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 91 of 182



## ANALYSIS ASSUMPTIONS

*To evaluate the Plan, except as otherwise noted within this Report, the following list of assumptions have been made. A substantial change to these assumptions may impact the Opinions expressed herein. Unless specifically stated herein, I have undertaken no independent verification of these issues nor have I formed an opinion of the singular, combined or overall effect of these assumptions.*

Where available, I have relied upon the commentary, Property descriptions, financial statements, projections provided within the reorganization documents, appraisal report(s), engineering reports, etc. to be accurate. Unless otherwise noted in this Report, I have assumed them to be accurate in all respects and that the financial information contained therein has been normalized and presented properly

The Debtor has "clean title" to all the assets described in the appraisal reports and Disclosure Statement and the legal title to such assets matches the descriptions found in the reorganization documents

Each party described in the Plan providing any action, document, investment, management, support, etc. holds the willingness and ability to provide, perform, or cause the same as described in the Plan

Except as otherwise described in the Plan, all current liens will continue throughout the Plan term and any guaranties will provide a meaningful credit enhancement to the restructured loan

All costs necessary to implement the Plan, including related to the closing of the new loans to secure claims will be absorbed within the cost of the bankruptcy proceedings

All existing or new contracts, equipment, intellectual property, leases, property or supplier, cash purchases or financed purchases as required for the Debtors' ongoing administration and operations as described in the Plan will remain in place or, if necessary, be replaced under similar terms and conditions at the same or a negligible change in cost

Interest rates and terms in the capital markets and as cited in this Report will not vary materially between now and the Effective Date of the Plan

Any amounts in the projection or budgets provided by the Debtor, its management or professionals are an accurate reflection of the Debtors' belief of its future performance



The bank account statements provided by the Debtor and in any monthly operating report are an accurate reflection of the Debtors' transactions for the periods they represent and the Petition Period

Unless otherwise noted, the Plan intends to amend the terms of the debt (i.e., the promissory note) but the not the terms of the mortgage or liens that are currently in place

Unless otherwise noted, all administrative expenses will be paid upon the Effective Date of the Plan and will not increase by my more than the estimate included herein between the time of this Report's preparation and the Effective Date

Unless otherwise noted, all real estate taxes have been paid for the periods prior to Effective Date

The cash account balances, accounts payable and accounts receivable balances of the Debtor will not vary materially between the date of this Report's preparation and the Effective Date

Unless otherwise note, the Lender holds a lien superior to tenants, all other deposits, customers, etc. on any cash, security deposits, receivables, trust accounts or escrows, etc. (if any), and each is segregated and not otherwise available for use for the Debtor's operating and claim repayment expenses

The estimated Effective Date of the Plan in this analysis is July 1, 2018

I have estimated the Debtor's outstanding and remaining professional fees for this case at $99,999 and assumed they will be paid in the final month of the Plan.

I have assumed the Debtors ' sponsors are capable and will invest the any cash contribution discussed within the  Plan on the Effective Date.

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 93 of 182



TACTICALFINANCIAL
CONSULTING

## PLAN DESCRIPTION OF CLAIMS AND CLASSES

### ARTICLE II
### CLASSIFICATION OF CLAIMS AND INTERESTS

The Plan classifies the Claims against the Debtors as follows:

2.1    Class 1 shall consist of all Administrative Expenses.

2.2    Class 2 shall consist of all Allowed Priority Unsecured Claims.

2.3A   Class 3A shall consist of the Allowed Secured Claims of Monty against POC.

2.3B   Class 3B shall consist of the Allowed Secured Claims of Monty against SOP/Academy.

2.4A   Class 4A shall consist of the Allowed Unsecured Claims of Monty against POC.

2.4B   Class 4B shall consist of the Allowed Unsecured Claims of Monty against SOP/Academy.

2.5A   Class 5A shall consist of the Allowed Claims of the Security Deposit Claimants against POC.

2.5A   Class 5B shall consist of the Allowed Claims of the Security Deposit Claimants against SOP/Academy.

2.6    Class 6 shall consist of the Allowed Unsecured Claim of Seavey against POC.

2.7A   Class 7A shall consist of the Allowed Unsecured Claims against POC that are not included in any other Class.

2.7B   Class 7B shall consist of the Allowed Unsecured Claims against SOP/Academy that are not included in any other Class.

2.8    Class 8 shall consist of Allowed Unsecured Insider Claims against POC or SOP/Academy.

2.9    Class 9 shall consist of Allowed Equity Interests in POC or SOP/Academy.

### ARTICLE III
### TREATMENT OF CLAIMS AND INTERESTS

The Classes of Claims are being treated as follows:

3.1    *Class 1: Administrative Expenses.* Administrative Expenses in Class 1 are unimpaired under the Plan and shall be paid (i) in full in Cash on or before the Effective Date, (ii) upon such other terms as may be agreed to in writing by the holder of any Allowed Expense in Class 1 and the Debtors, or (iii) if such expense is allowed after the Effective Date, as soon as such expense is allowed. Administrative Expenses incurred in the ordinary course of business by the Debtors after the Petition Date shall be paid in the ordinary course. An Administrative Expense for which notice of intent to assert the Administrative Expense was required to be filed by an order of the Bankruptcy Court and was not filed shall not be paid, and such Administrative Expense shall be forever discharged and barred, and subject to injunctive relief provided for by §§ 1141 and 524 of the Code.

3.2    *Class 2: Allowed Priority Unsecured Claims.* The Allowed Priority Unsecured Claims in Class 2

6



are unimpaired under the Plan. The Allowed Priority Unsecured Claims will be paid in full on the Effective Date, unless otherwise agreed by the holder of a Claim in Class 2.

**3.3A** *Class 3A: Allowed Secured Claims of Monty against POC.*

    **(a)** *Impairment.* The Allowed Secured Claim of Monty against POC is impaired.

    **(b)** *Amount.* Monty's total Allowed Secured Claim against POC is deemed to be $12,444,880 unless another amount is determined in the New Mexico State Court Proceedings. Until such determination, the deemed amount shall be used as the amount of the Allowed Secured Claim; the provisions of Section 4.2 do not apply to Monty's Claims.

    **(c)** *Retention of Liens.* Monty shall retain its Liens on its Collateral to secure the Debtors' and Reorganized Debtors' obligations to Monty on its Allowed Secured Claim pursuant to the Plan.

    **(d)** *Treatment and Satisfaction of Allowed Secured Claim.*

        **(i)** *Sale or Transfer of Collateral in Partial Satisfaction of Allowed Secured Claim.* POC shall transfer the Masthead Property to Monty, or its designee, on or as soon as reasonably possible after the Effective Date by quitclaim deed (or its equivalent). Monty's Allowed Secured Claim shall be satisfied in the amount of $1,945,000 in consideration of the transfer, unless the Court determines the fair market value of the property to be a different amount. Alternatively, POC may sell the Masthead Property to a third-party that results in at least $1,945,000 being received and applied to Monty's Allowed Secured Claim. Monty may credit bid its debt in an amount more than any bona fide offer that POC receives.

        **(ii)** *Application of Adequate Protection Payments.* The Adequate Protection Payments made by POC shall be applied first to the Allowed Unsecured Claim of Monty in Class 4A and then to the Allowed Secured Claim of Monty in Class 3A to the extent the payments do not pay the Allowed Unsecured Claim of Monty in full.

        **(iii)** [Intentionally left blank.]

        **(iv)** *Monthly Installments.* The remaining balance of Monty's Allowed Secured Claim shall be paid by the Reorganized Debtor (POC) commencing on the 10th day of the first month after the Effective Date in equal monthly installments of principal with fixed interest at the rate of 5.75% per annum amortized over 360 months with the entire amount paid in full 30 days after the due date of the 84th payment on the a final payment due. The balance of Monty's Allowed Secured Claim may be paid in full at any time without penalty; there are no pre-payment penalties.

    **(e)** *Release of Monty's Liens.* Monty shall release its Lien on a piece of Collateral in the event the balance of the amount of its Allowed Secured Claim allocated to such Collateral is paid in full. The amounts allocated to each piece of Collateral as of the Effective Date, before the application of the Adequate Protection Payments and Other Available Cash, are $4,460,000, $5,722,880 and $510,500 to the Conejos, Otoño and Verano Properties, respectively. The payments on the Effective Date shall be allocated between properties by taking the payments made and multiplying them by the proportionate amount of cash generated by each property to the entire cash generated by POC, unless the Court determines a different amount in the Confirmation Order.

**3.3B** *Class 3B: Allowed Secured Claims of Monty against SOP/Academy.*

    **(a)** *Impairment.* The Allowed Secured Claim of Monty against SOP/Academy is impaired.

    **(b)** *Amount.* Monty's total Allowed Secured Claim against SOP/Academy is deemed to be $4,704,161 unless another amount is determined in the New Mexico State Court Proceedings. Until such determination, the deemed amount shall be used as the amount of the Allowed Secured Claim; the provisions of Section 4.2 do not apply to Monty's Claims.

7



(c)    *Retention of Liens.*  Monty shall retain its Liens on its Collateral to secure the Debtors' and Reorganized Debtors' obligations to Monty on its Allowed Secured Claim pursuant to the Plan.

(d)    *Treatment and Satisfaction of Allowed Secured Claim.*

(i)    *Application of Adequate Protection Payments.*    The Adequate Protection Payments made by SOP/Academy shall be applied first to the Allowed Unsecured Claim of Monty in Class 4B and then to the Allowed Secured Claim of Monty in Class 3B to the extent the payments do not pay the Allowed Unsecured Claim of Monty in full.

(ii)    [Intentionally left blank.]

(iii)    *Monthly Installments.*    The remaining balances of Monty's Allowed Secured Claim shall be paid by the Reorganized Debtors (SOP/Academy) commencing on the 10th day of the first month after the Effective Date in equal monthly installments of principal with fixed interest at the rate of 5.75% per annum amortized over 360 months with the entire amount paid in full 30 days after the due date of the 84th payment on the a final payment due.  The balance of Monty's Allowed Secured Claim may be paid in full at any time without penalty; there are no pre-payment penalties.

(e)    *Release of Monty's Liens.*  Monty shall release its Lien on its Collateral in the event the balance of the amount of its Allowed Secured Claim is paid in full.

### 3.4A    *Class 4A: Allowed Unsecured Claim of Monty Against POC.*

(a)    *Amount.*  Monty's total Allowed Unsecured Claim against POC is deemed to be $7,828,505 based upon the Court's decision on the Debtors' motion to estimate Monty's Claim. This amount shall be used unless another amount is determined in the New Mexico State Court Proceedings. Until such determination, the deemed amount shall be used as the amount of the Allowed Unsecured Claim; the provisions of Section 4.2 do not apply to Monty's Claims. After the determination of Monty's Claim, the Allowed Claim shall be in the amount determined by a final, non-appealable order. Application of the payments made shall be adjusted from the Effective Date for the actual amount of the Allowed Claim.

(b)    *Retention of Liens.*  Monty shall not retain any of its Liens to secure any obligations of the Debtor and Reorganized Debtor to Monty on its Allowed Unsecured Claim pursuant to the Plan.

(e)    *Treatment and Satisfaction of Allowed Unsecured Claim.*

(i)    *Application of Adequate Protection Payments.*  The Adequate Protection Payments made by POC shall be applied first to the Allowed Unsecured Claim of Monty in Class 4A and then to the Allowed Secured Claim of Monty in Class 3A to the extent the payments do not pay the Allowed Unsecured Claim of Monty in full.

(ii)    [Intentionally left blank.]

(iii)    *Monthly Installments.*    The remaining balance of Monty's Allowed Unsecured Claim (if any) shall be paid by the Reorganized Debtor (POC) commencing on the 10th day of the first month after the Effective Date in equal monthly installments of principal with fixed interest at the rate of 6.75% per annum amortized over 360 months with the entire amount paid in full 30 days after the due date of the 84th payment on the a final payment due.  The entire amount of Monty's Allowed Unsecured Claim may be paid in full at any time without penalty; there are no pre-payment penalties.

### 3.4B    *Class 4B: Allowed Unsecured Claim of Monty Against SOP/Academy.*

(a)    *Amount.*  Monty's total Allowed Unsecured Claim against SOP/Academy is deemed to be $2,355,438 based upon the Court's decision on the Debtors' motion to estimate Monty's Claim. This amount shall be used unless another amount is determined in the New Mexico State Court Proceedings. Until such determination, the

8



deemed amount shall be used as the amount of the Allowed Unsecured Claim; the provisions of Section 4.2 do not apply to Monty's Claims. After the determination of Monty's Claim, the Allowed Claim shall be in the amount determined by a final, non-appealable order. Application of the payments made shall be adjusted from the Effective Date for the actual amount of the Allowed Claim.

(b)        *Retention of Liens.* Monty shall not retain any of its Liens to secure any obligations of the Debtors' and Reorganized Debtors' obligations to Monty on its Allowed Unsecured Claim pursuant to the Plan.

(c)        *Treatment and Satisfaction of Allowed Unsecured Claim.*

(i)        *Application of Adequate Protection Payments.*    The Adequate Protection Payments made by SOP/Academy shall be applied against the Allowed Unsecured Claim of Monty.

(ii)        [Intentionally left blank.]

(iii)        *Monthly Installments.*    The remaining balances of Monty's Allowed Unsecured Claim shall be paid by the Reorganized Debtors (SOP/Academy) commencing on the 10th day of the first month after the Effective Date in equal monthly installments of principal with fixed interest at the rate of 6.75% per annum amortized over 360 months with the entire amount paid in full 30 days after the due date of the 84th payment on the a final payment due. The entire amount of Monty's Allowed Unsecured Claim may be paid in full at any time without penalty; there are no pre-payment penalties.

**3.5A**    *Class 5A: Security Deposit Claims of POC.*    The Security Deposit Claims against POC are unimpaired by the Plan. The Reorganized Debtors (POC) will honor its obligations under the Claims pursuant to the agreements existing on the Petition Date. If an unexpired lease is rejected, any amount due on the Claim after any setoffs will be paid pursuant to the applicable agreement on the later of the Effective Date, when the Claims of the Creditor are resolved or as required by the agreement.

**3.5B**    *Class 5B: Security Deposit Claims of SOP/Academy.*    The Security Deposit Claims against SOP/Academy are unimpaired by the Plan. The Reorganized Debtors (SOP/Academy) will honor its obligations under the Claims pursuant to the agreements existing on the Petition Date.

**3.6**    *Class 6: Allowed Unsecured Claim of Seavey against POC.*    The Allowed amount of Seavey's Allowed Unsecured Claim shall be paid (i) $100,000 on the Effective Date, (ii) interest only at the rate of 5% per annum for 16 months after the Effective Date, and (iii) then commencing on the 10th day of the 17th month after the Effective Date it will be paid in equal monthly installments of interest at the rate of 5% per annum and principal amortized over 30 months. The lease of the Verano Property to Insiteworks, PC, a New Mexico professional corporation, is assumed as of the Effective Date. Insiteworks, PC's 5-year sublease commencing June 1, 2016 with Precision Survey is ratified and approved by POC. Subject to Section 3.11, the satisfaction of Seavey's Allowed Claim as provided in this Section 3.6 results in the release of any co-obligators and guarantors to Seavey's Claim. As of the Effective Date, all guarantors of Seavey's Claim shall execute an instrument reaffirming their guaranties and recognizing that Seavey is forbearing from exercising it rights against the guarantors pursuant to the terms of the Plan.

**3.7A**    *Class 7A: Allowed Unsecured Claims.*    Allowed Unsecured Claims in Class 7A shall be paid by POC in full, without interest, within 30 days of the Effective Date.

**3.7B**    *Class 7B: Allowed Unsecured Claims.*    Allowed Unsecured Claims in Class 7B shall be paid by SOP/Academy in full, without interest, within 30 days of the Effective Date.

**3.8**    *Class 8: Allowed Unsecured Insider Claims.*    Allowed Claims in Class 8 are impaired and shall consist of the Allowed Unsecured Insider Claims. Allowed Claims in Class 8 shall retain any interest they may have against the Debtors. Class 8 Insider Claims shall be subordinated to Classes 7A and 7B, and will only paid as the Reorganized Debtors can afford to do so without reasonably jeopardizing their ability to fulfill the terms of the Plan.

**3.9**    *Class 9: Equity Interests in the Debtors.*    The Interests in the Debtors in Class 9 are unimpaired and unaffected under the Plan. They shall retain their Interests.

9



## SCHEDULED CLAIMS AND CLAIM TREATMENTS

- Administrative Claims for the Debtors' Legal Counsel have been estimated at $99,999 and paid in the 120 month of the Plan.
- The Administrative Claim for the diminution in value of the Lender's security interest in its collateral has not been scheduled.
- The remaining claims are scheduled in the following chart.

### Scheduled Claims By Creditor

| Creditors/ Interest Holders | Member of Class | Allowed Claim | Creditor's Security Interest | Secured Claim | Unsecured Claim | Amort. Periods | Term | Interest Rate | Payment Frequency |
|---|---|---|---|---|---|---|---|---|---|
| Administrative | Class 1 | $ 99,999 | $ - | $ - | $ 99,999 | | | 0.00% | Single |
| Priority Unsecured | Class 2 | $ - | $ - | $ - | $ - | | | 0.00% | Monthly |
| Monty against POC Secured | Class 3A | $ 18,606,966 | $ 10,174,665 | $ 10,174,665 | $ 8,432,301 | | | 4.75% | Monthly |
| Monty against SOP/Academy Secured | Class 3B | $ 6,198,823 | $ 3,721,976 | $ 3,721,976 | $ 2,476,847 | 360 | 120 | 4.75% | Monthly |
| Monty against POC Unsecured | Class 4A | $ 6,068,888 | $ - | $ - | $ 6,068,888 | | | 5.00% | Monthly |
| Monty against SOP/Academy | Class 4B | $ 1,485,087 | $ - | $ - | $ 1,485,087 | 360 | 120 | 5.00% | Monthly |
| Security Deposit | Class 5A | $ - | $ - | $ - | $ - | - | | 0.00% | Monthly |
| Security Deposit | Class 5B | $ - | $ - | $ - | $ - | - | | 0.00% | Monthly |
| Seavey against POC Unsecured | Class 6 | $ 1,751,409 | $ 245,000 | $ 245,000 | $ 1,506,409 | 72 | | 0.00% | Annual |
| Unsecured Claims against POC | Class 7A | $ 95,892 | $ - | $ - | $ 95,892 | 1 | | 0.00% | Single |
| Unsecured Claims against SOP/Academy | Class 7B | $ 95,892 | $ - | $ - | $ 95,892 | 1 | | 0.00% | Single |
| Unsecured Insider Claims | Class 8 | $ 3,500,000 | $ - | $ - | $ 3,500,000 | - | | 0.00% | Monthly |
| Allowed Equity Interests | Class 9 | $ - | $ - | $ - | $ - | - | | 0.00% | Monthly |
| **Total Claims** | | **$ 37,902,955** | **$ 14,141,641** | **$ 14,141,641** | **$ 23,761,314** | | | | |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 98 of 182


TACTICALFINANCIAL
CONSULTING

**DEBTORS' SCHEDULED CLAIMS FOR SOP / ARP ESTATE – TANOAN PROPERTY**

The Plan schedules the following Classes at the following terms.

### Scheduled Classes

| Classes | Type of Claim | Creditors/Interest Holders | Repayment Terms Description | Allowed Claim | 1111(b) Election |
|---------|---------------|----------------------------|----------------------------|--------------:|------------------|
| Class 1A | Administrative | Admin. POC | Paid in full at effective date. | $ 49,500 | No |
| Class 1B | Administrative | Admin. SOP/Academy | Paid in full at effective date. | $ 49,500 | No |
| Class 2 | Unsecured | Priority Unsecured | | $ - | No |
| Class 3A | Secured | Monty against POC Secured | 84 month term, amortized over 30 years at 5.75% | $ 18,606,966 | No |
| Class 3B | Secured | Monty against SOP/Academy Secured | 84 month term, amortized over 30 years at 5.75% | $ 6,198,823 | No |
| Class 4A | Unsecured | Monty against POC Unsecured | 84 month term, amortized over 30 years at 6.75% | $ 5,997,364 | No |
| Class 4B | Unsecured | Monty against SOP/Academy | 84 month term, amortized over 30 years at 6.75% | $ 1,029,815 | No |
| Class 5B | Unsecured | Security Deposit | | $ - | No |
| Class 6 | Unsecured | Seavey against POC Unsecured | Interest only for 16 months at 5%; then traditional amort. 30 months at 5%. | $ 1,751,409 | No |
| Class 7A | Unsecured | Unsecured Claims against POC | Paid in full at effective date. | $ 138,014 | No |
| Class 7B | Unsecured | Unsecured Claims against SOP/Academy | Paid in full at effective date. | $ 53,769 | No |
| Class 8 | Insider Claims - Subordinated | Unsecured Insider Claims | | $ 3,500,000 | No |
| Class 9 | Interest Holder | Allowed Equity Interests | | $ - | No |

| **Total Claims** | | | | **$ 37,375,160** | |

Estimated Effective Date:        8/1/2018



## REPAYMENT TERMS AND CONDITIONS FOR CLASS 3A AND 3B

| SECURITY INSTRUMENTS / SPECIAL PAYMENT PROVISIONS | |
|---|---|
| ☑ Mortgage/Deed of Trust | ☐ UCC Filing on Deposit Accounts |
| ☐ UCC Blanket Filing | ☑ Environmental Indemnity |
| ☐ Lockbox for Collected Revenues | ☐ Additional Principal Amortization |

| Default Provisions | |
|---|---|
| ☑ Payment Default | |
| Non-Payment Default | ☐ Single Purpose Borrowing Entity |
| | ☑ Change of Ownership |
| | ☐ Change In Material Conditions Clause |
| | ☐ Management Company Approval |
| | ☐ Minimum Sales Clause |
| | ☐ Minimum Cash Flow Clause |
| | ☐ Other Non-Payment Default Provisions |

| Real Estate Tax Escrow Account | |
|---|---|
| ☐ Required | ☐ Lender Lien on Segregated Account |
| | ☐ Lender Holds Fund |
| Funding Level on Effective Date: | ☑ No Funding |
| | ☐ Partial Funded |
| | ☐ Fully Funded |

| Insurance Escrow Account | |
|---|---|
| ☐ Required | ☐ Lender Lien on Segregated Account |
| | ☐ Lender Holds Fund |
| Funding Level on Effective Date: | ☑ No Funding |
| | ☐ Partial Funded |
| | ☐ Fully Funded |

| Replacement Reserve Escrow Account | |
|---|---|
| ☐ Required | ☐ Lender Lien on Segregated Account |
| | ☐ Lender Holds Fund |
| Funding Level on Effective Date: | ☑ No Funding |
| | ☐ Partial Funded |
| | ☐ Fully Funded |

| Tenant Improvement / Property Improvement Plan Reserve Escrow Account | |
|---|---|
| ☐ Required | ☐ Lender Lien on Segregated Account |
| | ☐ Lender Holds Fund |
| Funding Level on Effective Date: | ☑ No Funding |
| | ☐ Partial Funded |
| | ☐ Fully Funded |

| Defeasance and Yield Maintenance | |
|---|---|
| ☐ Defeasance | ☐ Prepayment Premium |
| ☐ Lockout Prepayment Clause | ☐ Minimal Interest Clause |

| Secondary Repayment Source / Additional Financial Support | |
|---|---|
| ☐ Additional Collateral | ☐ Letter of Credit |
| ☐ Financial Guaranty | ☐ Performance Guaranty |
| ☐ Cash Support Agreement from Parent Company / Stockholder | |

| Special Default & Turnover Remedies | |
|---|---|
| ☐ Deed in Lieu Held Upon Default | ☐ Court Turnover Order Upon Default |



## OPERATING ACCOUNT BALANCE CALCULATIONS

| | | Existing Accounts | | Cash Collateral of Lender | | Effective Date Contributions | Cash for Plan Payments and Operating Capital | | Notes / Source |
|---|---|---|---|---|---|---|---|---|---|
| Account Type/Name | Acct. No. | Current Balance | Estimated Additional Cash Buildup / Depletion to Effective Date | Lien? | Amount | | Available | Amount | |
| **Operating, Deposit and Investment Accounts** | | | | | | | | | |
| Pre-Petition | | $ - | $ - | | $ - | n/a | | $ - | |
| DIP General/business | | $ - | $ - | | $ - | n/a | | $ - | |
| DIP Payroll/Tax | | $ - | $ - | | $ - | n/a | | $ - | |
| Other (incl cash) | | $ - | $ - | | $ - | n/a | | $ - | |
| Operating Account | | $ 181,511.47 | $ - | Yes | $ 181,511.47 | n/a | Yes | $ 181,511.47 | |
| Operating Account | | $ - | $ - | | $ - | n/a | | $ - | |
| Money Market Account(s) | | $ - | $ - | | $ - | n/a | | $ - | |
| Total Operating Accounts | | $ 181,511.47 | $ - | | $ 181,511.47 | n/a | | $ 181,511.47 | |
| | | | | | | | | | |
| Investment Account(s) | | $ - | $ - | | $ - | n/a | | $ - | |
| Total Investment Accounts | | $ - | $ - | | $ - | n/a | | $ - | |
| **Total Operating and Investment Accounts** | | **$ 181,511.47** | **$ -** | | **$ 181,511.47** | **n/a** | | **$ 181,511.47** | |
| | | | | | | | | | |
| **Non-Operating Accounts** | | | | | | | | | |
| Real Estate Tax Account(s) | | $ - | | | $ - | n/a | | $ - | |
| *Total Real Estate Tax Accounts* | | $ - | $ - | | $ - | n/a | | $ - | |
| | | | | | | | | | |
| Insurance Escrow Account(s) | | $ - | | | $ - | n/a | | $ - | |
| *Total Insurance Accounts* | | $ - | $ - | | $ - | n/a | | $ - | |
| | | | | | | | | | |
| Replacement Reserves, Tenant Improvement and/or PIP Account(s) | | $ - | $ - | | $ - | n/a | | $ - | |
| *Total Improvement Account(s)* | | $ - | $ - | | $ - | n/a | | $ - | |
| | | | | | | | | | |
| Security Deposits | | $ - | $ - | | $ - | n/a | | $ - | |
| *Total Security Deposit Account* | | $ - | $ - | | $ - | | | $ - | |
| | | | | | | | | | |
| Escrow Accounts - Other | | $ - | $ - | | $ - | n/a | | $ - | |
| *Total Other Escrows* | | $ - | $ - | | $ - | | | $ - | |
| **Total Other Accounts** | | **$ -** | **$ -** | | **$ -** | **n/a** | | **$ -** | |
| | | | | | | | | | |
| **Plan Contributions** | | | | | | | | | |
| Plan Contribution: Cash | | | n/a | | n/a | $ - | | $ - | |
| Plan Contribution: Other | | $ - | n/a | | n/a | $ - | | $ - | |
| **Total Plan Contributions** | | **$ -** | **n/a** | | **n/a** | **$ -** | | **$ -** | |
| | | | | | | | | | |
| **Total Cash Balance** | | **$ 181,511.47** | **$ -** | | **$ 181,511.47** | **$ -** | | **$ 181,511.47** | |

Cash Available for Plan Payments and Operating Capital; Reserve Account Balances



## REAL ESTATE TAXES

**All Properties Combined**

### Real Estate Tax Liens

| Tax Year | 2016 | 2017 | 2018 |
|---|---|---|---|
| Status | Paid in Full | Paid in Full | Inchoate Lien |
| Amount Taxed | $ 166,336 | $ 165,942 | $ 174,377 |
| Amount Paid to Date | $ 166,336 | $ 165,942 | $ - |
| **Amount Owed, Net** | **$ -** | **$ -** | **$ 174,377** |
| Amount Under Appeal | $ - | $ - | $ - |
| Date Due | | | 1/2 due April 10, and November 10 |
| Lastest Pay Date w/o Penalty | | | 1/2 due May 10, and November 10 |
| Date of Lien | | | |
| **Amount Of Lien** | **$ -** | **$ -** | **$ -** |

**All Properties Combined**

### Real Estate Tax Accruals / Payments

| Tax Year | 2016 | 2017 | 2018 |
|---|---|---|---|
| Status | Paid | Paid | Upcoming Payment |
| Amount Taxed | | | |
| Amount Paid to Date | $ - | $ - | $ - |
| **Amount Owed, Net** | **$ -** | **$ -** | **$ -** |
| Amount Under Appeal | | | |
| Date Due | | | 1/2 due April 10, and November 10 |
| Date Lien Becomes Foreclosable | | | Three years |



## LENDER'S CLAIM CALCULATION

### *From the Order Estimating Allowed Claims*

Including the estimated punitive damages results in the following estimated claim amounts:

| Proof of Claim | Claim Amount | Compensatory Damages | Punitive Damages | Estimated Claim Amount |
|---|---|---|---|---|
| POC Properties Claim No. 8 | 20,273,384.98 | (1,110,946) | (555,473) | 18,606,965.98 |
| SOP Academy Claim No. 1 | 7,059,598.16 | (344,310) | (172,155) | 6,543,133.16 |
| Academy Road Partners Claim No. 9 | 7,059,598.16 | (229,540) | (114,770) | 6,715,288.16 |

Since Monty has overlapping claims against SOP and Academy on the same note, the

duplication is eliminated as follows:

| | |
|---|---|
| Claim Amount | 7,059,598.16 |
| Compensatory Damages | (573,850) |
| Punitive Damages | (286,925) |
| Net Claim Amount | $6,198,823.16 |

IT IS THEREFORE ORDERED: for purposes of voting to accept or reject the plan and



IN THE MATTERS OF POC PROPERTIES, LLC, et al., [1]
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN
Case No. : 15-33291-svk

ADDENDUM TO PROOF OF CLAIM FILED ON BEHALF OF MONTY TITLING TRUST 1
AND AGAINST POC PROPERTIES LLC

## ITEMIZED STATEMENT - POC PROPERTIES LLC

**Loan # 11491**

| | |
|---|---|
| Principal | $7,785,515.54 |
| Interest | $2,486,207.53 |
| Late Fees | $40,679.32 |

(PER DIEM: $1,719.30)

| | |
|---|---|
| **Total** | **$10,312,402.39** |

**Loan # 11492**

| | |
|---|---|
| Principal | $4,893,752.64 |
| Interest | $1,609,901.88 |
| Late Fees | $25,569.88 |

(PER DIEM: $1,080.70)

| | |
|---|---|
| **Total** | **$6,529,224.40** |

**Loan # 11493**

| | |
|---|---|
| Principal | $2,508,292.60 |
| Interest | $908,841.56 |
| Late Fees | $15,224.03 |

(PER DIEM: $609.65)

| | |
|---|---|
| **Total** | **$3,432,358.19** |

| | |
|---|---|
| **TOTAL PROOF OF CLAIM** | **$20,273,384.98** |

---

[1] Jointly administered with SOP Academy, LLC (Case No. 15-33292-svk) and Academy Road Partners, LLC (Case No. 15-33293-svk).

WHD/12527036.1



IN THE MATTERS OF POC PROPERTIES, LLC, et al., [1]
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN
Case No. : 15-33291-svk

ADDENDUM TO PROOF OF CLAIM FILED ON BEHALF OF BY MONTY
TITLING TRUST 1 AND AGAINST ACADEMY ROAD PARTNERS, LLC

### ITEMIZED STATEMENT – ACADEMY ROAD PARTNERS, LLC

#### Loan # 11711

| | |
|---|---|
| Principal | $5,126,955.43 |
| Interest | $1,900,443.78 |
| Late Fees | $32,200.20 |
| Escrow Balance | (1.25) |

(PER DIEM: $1,274.62)

**Total Proof of Claim**      $7,059,598.16

---

[1] Jointly administered with SOP Academy, LLC (Case No. 15-33292-svk) and Academy Road Partners, LLC (Case No. 15-33293-svk).

WHD/12532025.1



## PETITION PERIOD PAYMENTS — ADEQUATE PROTECTION PAYMENTS

| SOP Academy LLC Date Received | Payment Received | POC Properties Date Received | Payment Received | Amount Received | Recast Based on Final Secured Claim Amount | Recast Based on Final Secured Claim Amount |
|---|---|---|---|---|---|---|
| | | | | | 27.06% | 72.94% |
| 3/17/2016 | $40,000.00 | 3/17/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 4/18/2016 | $40,000.00 | 4/18/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 5/16/2016 | $40,000.00 | 5/16/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 6/16/2016 | $40,000.00 | 6/16/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 7/11/2016 | $40,000.00 | 7/11/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 8/10/2016 | $40,000.00 | 8/10/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 9/9/2016 | $40,000.00 | 9/9/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 10/12/2016 | $40,000.00 | 10/12/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 11/9/2016 | $40,000.00 | 11/9/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 12/12/2016 | $40,000.00 | 12/7/2016 | $1,097.33 | $41,097.33 | $11,120.09 | $29,977.24 |
| 1/12/2017 | $40,000.00 | 12/12/2016 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 2/10/2017 | $40,000.00 | 1/12/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 3/9/2017 | $40,000.00 | 2/10/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 4/6/2017 | $40,000.00 | 3/9/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 5/12/2017 | $40,000.00 | 4/6/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 6/7/2017 | $40,000.00 | 5/12/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 7/7/2017 | $40,000.00 | 6/7/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 8/15/2017 | $40,000.00 | 7/7/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 9/13/2017 | $40,000.00 | 8/15/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 10/10/2017 | $40,000.00 | 9/13/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 11/13/2017 | $40,000.00 | 10/10/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 12/11/2017 | $40,000.00 | 11/13/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 1/17/2018 | $40,000.00 | 12/11/2017 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 2/14/2018 | $40,000.00 | 1/25/2018 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 3/12/2018 | $40,000.00 | 3/1/2018 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 4/6/2018 | $40,000.00 | 3/23/2018 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| 5/10/2018 | $40,000.00 | 5/4/2018 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| | | 5/23/2018 | $82,000.00 | $82,000.00 | $22,187.50 | $59,812.50 |
| 6/15/2018 | $40,000.00 | 6/15/2018 | $82,000.00 | $122,000.00 | $33,010.67 | $88,989.33 |
| | $1,120,000.00 | | $2,297,097.33 | $3,417,097.33 | $924,595.97 | $2,492,502.36 |
| | | | | | | |
| Secured Claim - POC (Prior to Give Back) | | | | 9,570,000 | 72.94% | |
| Secured Claim - ARP | | | | 3,550,000 | 27.06% | |
| Total | | | | 13,120,000 | | |


TACTICALFINANCIAL
CONSULTING

## OFFICE SECTOR REPORTS

# Office First Glance

Pre-Release Analysis of Fourth Quarter 2017 Reis Findings in the Office Sector

## 2017 Quarter 4



Victor Calanog PhD
Chief Economist &
Senior Vice President

New York — January 15, 2018

### A Minor Increase in Vacancies for 2017

The national vacancy rate for the office sector ended the year at 16.4%, registering a 20 basis point year-over-year increase. Vacancies stayed flat in the latter half of the year, with net absorption balancing out supply additions. The annual amount for new construction, coming in at 39 million square feet, is only slightly higher than the prior year's 36.8 million square feet. Reis recorded 7.3 million square feet of new construction in the fourth quarter, with net absorption coming in at 5.5 million square feet.



Office Net Absorption and Vacancy

Office sector fundamentals have basically been flat for the last two years, with vacancies moored in the mid-16s.

### Rent Growth Has Been Steady but Unspectacular

Asking and effective rents both rose at 0.6% in the fourth quarter, which represents a slight acceleration relative to the prior two quarters — when rent growth slowed down to between 0.3 to 0.4%. With asking and effective rent growth both coming in at 1.8% for all of 2017, the office sector just marked its slowest year for rent increases since the recovery began in 2011. Asking and effective rent growth appear to have peaked in 2015; at 3.4% and 3.6%, respectively. In retrospect, 2015 was the year that followed peak hiring in the current economic cycle: the US economy created 250,000 jobs per month, on average, in 2014, a figure that steadily declined to 171,000 jobs per month in 2017. Perhaps not coincidentally, the multifamily sector also notched its strongest rent growth figures in 2015, before experiencing a marked slowdown.

The apartment sector's struggles, however, emanate from a completely different dynamic relative to the office sector.

Vacancies for the office sector never dipped below its long run average, spurring a few years of strong supply growth as developers rushed to take advantage of tight occupancies and robust rent growth. The office sector's vacancy rate peaked at 17.6% in late 2010, before gradually descending — for the office sector's vacancies to have declined by only 120 basis points in seven years may well be the very definition of "slow going."

Office Effective Rent Growth

### Market Highlights

The increase in the national vacancy rate was driven by some metros that saw a relatively large rise in vacancy (the top five metros for vacancy increases are San Jose, Lexington, New Orleans, Nashville and Seattle). The sharpest declines in vacancy were seen in Buffalo, Memphis, Orlando, Tacoma and Providence.

Tampa topped the list for highest effective rent growth (1.7%), followed by San Francisco, Orange County, Memphis and Omaha — all of which saw an increase of 1.3% or more in the

### Fourth Quarter 2017 Market Performance
Improving Fundamentals / Flat or Declining Fundamentals

| | Absorption | | Occupancy | | Effective Rent | |
|---|---|---|---|---|---|---|
| Q4 2017 | 48 + | 34 | 35↑ | 47 | 73↑ | 9 |
| Q3 2017 | 48 + | 34 | 34↑ | 48 | 70↑ | 12 |
| Q2 2017 | 48 + | 34 | 31↑ | 51 | 69↑ | 13 |
| Q1 2017 | 43 + | 39 | 31↑ | 51 | 68↑ | 14 |
| Q4 2016 | 62 + | 20 | 50↑ | 32 | 72↑ | 10 |

Figures are based on 82 metro markets.

quarter. There were nine metros that posted either flat or declining effective rents, down slightly relative to the last few periods. The steepest declines were posted by Knoxville, Long Island, Wichita, Tucson and Syracuse. The annual growth statistics put Charlotte, San Antonio, Seattle, Columbia and Raleigh-Durham at the top of the effective rent growth charts with growth rates of 3.9% to 4.6% for the year. These rent growth rankings only loosely mirror office employment growth trends that show Raleigh-Durham, Atlanta, Lexington,

Case 15-33291-beh     Doc 467-6     Filed 06/20/18     Page 107 of 182


TACTICALFINANCIAL
CONSULTING

Las Vegas and Dallas as the top five metros for year-over-year office employment growth, although Charlotte is in the top 10.

While only four metros show a year-over-year decline in rent — Long Island, Providence, Hartford and Wichita — 11 metros had a year-over-year decline in office jobs led by Fairfield County, Tucson, Knoxville, Rochester and Memphis.

### Office Outlook

Several projects were delayed to 2018, suggesting that there may be a relative spike in new construction this year relative to previous periods. Given lackluster demand, we may see vacancies rise even more over the next two years unless office leasing really picks up.



Businesses may feel renewed confidence as the recently passed Tax Bill should return more profits to businesses' bottom lines. This could foster more robust leasing activity.

If this happens, rent growth will likely increase as well, but given typical timings of when leases are signed, we may not see any impact on office fundamentals until late 2018 or so.

Copyright © 2018 Reis Inc.





# Office First Glance

Pre-Release Analysis of First Quarter 2018 Reis Findings in the Office Sector

# 2018
## Quarter 1



Victor Calanog PhD
Chief Economist &
Senior Vice President

New York — April 13, 2018

## Office Occupancies Weaken

The national vacancy rate for the office sector rose by 10 basis points in the first quarter of 2018, ending the period at 16.5%.



Fundamentals have been mostly flat for the last six quarters, but vacancies appear to be creeping upwards. The national vacancy rate is now back to a level last seen two and a half years ago, in late 2015.

## Recovery Arrested

Construction has been modest, with only 11.2 million SF coming online in the first quarter. Net absorption was weak, at 6.1 million SF — barely half the construction figure for the period. Net absorption figures were not out of line with quarterly comparables from the last year or so. The quarterly average net absorption figure for 2016 and 2017 was only 6.6 million SF. As such, the vacancy rate has slowly risen, from a low of 16.2% in the fourth quarter of 2016 to its current 16.5%.

## But What Kind of a Recovery Has It Been?

It has, however, not been much of a recovery to speak of. The national vacancy rate reached its cyclical peak in the last downturn when it hit 17.6% in late 2010. That means that the vacancy rate took a full six years (by 2016Q4) to decline by a mere 140 basis points, before beginning to rise again. During more robust periods, the national office market can manage that kind of vacancy decline in a single year.

## Rents Continue to Crawl Upwards

Asking and effective rents rose by 0.8% and 0.9% in the first quarter, respectively. To the sector's credit, rents have risen every single quarter at the national level since the recovery began seven years ago. Furthermore, asking and effective rent growth appear to have accelerated this period: for the entirety of 2017, asking and effective rents (both) only grew by 1.8%. It is too early, however, to conclude that there is any kind of trend in a rent growth "spike" (I am doing "air quotes" with my hands as I write this). Still, the modest increase in asking and effective rents is welcome, especially in light of the slow, upward



creep in national vacancies. Perhaps there is some hope for optimism for the office sector yet, even as employers continue to optimize their employee per square foot ratio.

Net absorption increased for 44 out of Reis's primary 82 metro markets. With national vacancies rising, only 29 markets posted an improvement in occupancy, with the rest remaining flat or declining. Again, consistent with the theme of mixed results, 76 out of 82 markets posted an increase in effective rents, the highest number in this quarterly breakdown in at least a year.



| First Quarter 2018 Market Performance Improving Fundamentals / Flat or Declining Fundamentals | | | | | |
|---|---|---|---|---|---|
| | Absorption | | Occupancy | | Effective Rent |
| Q1 2018 | 44 + | 38 | 29↑ | 53 | 76↑ | 6 |
| Q4 2017 | 51 + | 31 | 32↑ | 50 | 74↑ | 8 |
| Q3 2017 | 48 + | 34 | 33↑ | 49 | 70↑ | 12 |
| Q2 2017 | 46 + | 36 | 31↑ | 51 | 71↑ | 11 |
| Q1 2017 | 42 + | 40 | 32↑ | 50 | 68↑ | 14 |

Figures are based on 82 metro markets.

## Market Highlights

Given generally flat fundamentals, the gap between the "haves" and the "have-nots" — office markets that are thriving and those that are not — remains apparent. Metros that saw the highest increase in vacancy include Charleston, Tucson, New Haven, Oklahoma City and Houston. Metros that had the sharpest decline in vacancy include Palm Beach, San Jose, Cincinnati, New York and Fort Lauderdale. Only three

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 109 of 182



metros saw an effective rent decline: Norfolk/Hampton Roads, Fairfield County and New Haven, all of which saw a decline of 0.2% to 0.3%. Metros that saw the highest effective rent growth were Charlotte, Oakland, Boston, San Francisco and Kansas City — all of which had a quarterly growth rate of 1.4% or higher. The metros that show the highest year-over-year effective rent growth include Charlotte, Boston, Orange County, San Francisco and Seattle.

New York City once again had the lowest vacancy rate at 8.3%, dropping 0.4% from the prior quarter. New York's average effective rent increased 1.3% in the quarter, ranking it in the top 10. For the year, New York's effective rent has increased only 1.6% as landlords have had to compete with the expected construction underway. No new buildings came online in the city in the first quarter but more than 5 million square feet is expected to open this year.

### Office Outlook

Despite equity market volatility in recent weeks, overall economic indicators suggest that US GDP growth may well be higher than last year's 2.3%. Year-to-date monthly job growth has seesawed, but on average, has remained positive. With that said, faster economic growth is unlikely to benefit the office sector in a disproportionately positive way, given recent trends. Where there is new construction, it



is mostly for build to suit or owner occupied buildings — we have little to no record of truly greenfield (no preleasing; no tenant commitments) market rate multitenant office projects being approved for financing in the last five years. Rent growth is likely to remain positive and creep upwards, but vacancies are likely to bounce around in a relatively elevated level for the near term.

Copyright © 2018 Reis Inc.



## INDUSTRIAL SECTOR REPORTS

# Industrial First Glance

## 2018 Quarter 1

Pre-Release Analysis of First Quarter 2018 Reis Findings in the Industrial Sector



Barbara Byrne Denham
Senior Economist

New York — April 13, 2018

### Hibernating?

The industrial sector slowed somewhat in the first quarter as net absorption fell to its lowest level in more than three years. Construction remained relatively strong, however. The combination of these two measures pushed the Warehouse/Distribution vacancy rate up to 9.1% from 9.0% at the end of 2017. This was the first quarter to see an uptick in vacancy since 2010. In Flex/R&D space, the vacancy rate climbed 10 basis points to 9.8% as net absorption dropped considerably while construction held steady. Despite the rare occupancy setback, both subcategories saw modest rent growth in the quarter.

It would be easy to blame these lackluster results on the bad weather in much of the country, but most of these markets are on the West Coast or in the South. Nevertheless, the industry remains poised to benefit from continued growth in e-commerce. The statistics should bounce back in the second or third quarters.

### Warehouse and Distribution



Construction in the Warehouse/Distribution market fell to 26.4 million SF in the first quarter from 35.5 million SF in the fourth quarter of 2017. Yet it was higher than the first quarter of 2017, 25.6 million SF. Net absorption was 20.4 million SF, much lower than the previous quarter's 32.3 million SF and the 31.6 million SF recorded in the first quarter of 2017. In fact, this quarter was the lowest net absorption since 2014.

As a result, the vacancy rate increased ten basis points to 9.1% from 9.0% at the end of the year. Both the market and effective rent increased a modest 0.5% in the quarter, the lowest growth rates since 2013. The gap between the market and effective rent, that nets out landlord concessions, widened slightly to 8.8% from 8.7% in the previous quarter. The market rent climbed 3.6% over the year, while the effective rent climbed 4.0%.

Once again, five of the largest metros accounted for the bulk of activity, including 57% of the new construction and one-third of the occupancy growth. For completions rankings, the top five metros were: San Bernardino/Riverside (5.5 million SF), Atlanta (4.9 million SF), Dallas (2.3 million SF), Los Angeles (1.4 million SF) and Central NJ (1.1 million SF). Much of this space is pre-leased, but less than recorded in previous quarters. For example, net absorption in San Bernardino/Riverside was only 2.6 million in the quarter, while that in Atlanta was only 657,000 SF. Chicago had strong net absorption with 1.9 million SF. Dallas, Memphis and Kansas City round out the top five with levels near 1.2 million SF. Other metros with the biggest drops in vacancy include Sacramento, Jacksonville, Memphis, Denver, and Fort Worth. Besides San Bernardino-Riverside and Atlanta, metros that saw increases in vacancy include Austin, Portland and Fort Lauderdale. That said, nine metros recorded negative net absorption in the quarter.



Industrial Effective Rent Growth

| Number of Metros with Improving/Flat or Declining Fundamentals Combined Warehouse/Distribution and Flex/R&D | | | | | | |
|---|---|---|---|---|---|---|
| | Absorption | | Occupancy | | Effective Rent | |
| Q1 2018 | 38 + | 9 | 21↑ | 26 | 44↑ | 3 |
| Q4 2017 | 40 + | 7 | 25↑ | 22 | 47↑ | 0 |
| Q3 2017 | 43 + | 4 | 31↑ | 16 | 47↑ | 0 |
| Q2 2017 | 43 + | 4 | 33↑ | 14 | 47↑ | 0 |
| Q1 2017 | 45 + | 2 | 33↑ | 14 | 47↑ | 0 |
| Figures are based on 47 metro markets per subsector. | | | | | | |

Despite the overall weak performance, no metro posted a decline in market or effective rent. However, three metros

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 111 of 182


saw no change in market rent and eight had flat effective rents. Those with the lowest market rent growth were Tampa-St. Petersburg, Pittsburgh, San Diego, San Francisco and Baltimore. Those that saw the strongest market rent growth rates were Oakland, Portland, Jacksonville, Fort Worth and Los Angeles.

### Flex/R&D

Construction in Flex/R&D soared in the quarter to 1.3 million SF from a mere 60,000 SF in the fourth quarter of 2017. One year ago, construction was also high at 1.5 million SF, although there is no general trend of slower construction in the first quarter as there tends to be in other sectors. Net absorption for Flex space was 365,000 SF, down from 1.6 million SF in the fourth quarter and 3.7 million



Flex/R&D Vacancy and Net Absorption

SF in the first quarter of 2017. Net absorption frequently moves in step with new completions, but this quarter it fell far lower which pushed the vacancy rate to 9.8% from 9.7% in the fourth quarter.

Both market and effective rent growth was weak at 0.4% over the previous quarter. Rent growth had averaged in the 0.8% to 0.9% range for the prior two years. For the year, the average market rent grew 2.9%, while the effective rent increased 3.3%. The gap between market and effective rent fell from 11.4% to 11% over the year.

Eight metros saw new completions in the first quarter, led by Phoenix, Northern NJ, San Diego, Fort Lauderdale and Raleigh-Durham that added 100,000 to 478,000 SF. Most of these metros saw strong net absorption as well, but the top metros also included San Jose, Minneapolis and Palm Beach — which saw the sharpest drop in vacancy — along with Denver, Jacksonville and Sacramento. Metro's that saw the highest growth in Flex/R&D vacancy were Fort Worth, Austin, Pittsburgh, Phoenix and Indianapolis. Indeed, 21 of 47 metros posted negative net absorption in the quarter, up from 20 metros in the fourth quarter of 2017 and 14 metros a year ago.

Unlike the Warehouse/Distribution space, two metros — Atlanta and Central NJ — posted a small rent decline in the quarter of -0.2% and -0.1%, respectively. Another six saw no change including Chicago, Austin, Baltimore and Northern NJ. The metros that saw the largest effective rent growth were Cincinnati, Columbus, Detroit, San Jose and Charlotte that had growth of 1.0% to 1.2% in the quarter. These mixed results suggest that there is no geographic trend in the numbers.

### Outlook

The slight setback in the numbers was indeed a surprise, but it should be recognized as a soft warning sign that the market may be getting ahead of itself. Warehouse/Distribution construction has been robust and it is expected to maintain the same pace in 2018 while Flex/R&D construction could nearly double compared to last year.

With that said, every market indicator that impacts the industrial sector remained strong in the first quarter. Recent retail sales data from the Census bureau showed that e-commerce sales climbed 10.3% in 2017 over 2016 and early 2018 data shows growth of 12% over 2017. Non-store retail sales accounted for 14% of all retail sales in January, according to the Census, up from 13% a year ago.

The most recent report from the Institute for Supply Management showed that the purchasing managers' index (PMI) was 59.3% in March, the same as it was in December but lower than the high of 60.8% recorded in February. Any index above 50 represents an expansion in manufacturing.

Aggregate trade has jumped in recent months due to gains in both imports and exports. For the December to February period, exports in goods climbed 7.1% over the same period in 2016 while imports climbed 9.5%. This has had a positive impact on the Industrial sector as well as the overall economy. Finally, employment in warehouse and storage, a proxy for Industrial, increased by 5,200 jobs in the quarter and by 35,400 jobs since March of 2017, a growth rate of 3.6%.

These indicators are reassuring that the Industrial sector is poised for further growth in 2018, but this assumes that the recent tariffs and trade war talk will not escalate. The biggest driver for this sector should be the improved economies in Asia and Europe, which will continue to drive up trade, as well as the higher discretionary income and the higher retained profits delivered by the new tax rates. In short, demand should hold steady, but the key indicator will be construction. Developers, investors and lenders are advised to do their due diligence and consider all the data before pulling the trigger on any spec development.

Copyright © 2018 Reis Inc.



## DEFAULT PROBABILITY BASED ON DEBT SERVICE COVERAGE AND LOAN TO VALUE RATIOS

FitchRatings      Structured Finance





Reprinted from FitchRatings, Structured Finance, Commercial Mortgage Criteria Report

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 113 of 182



## CURRENT U.S. TREASURY YIELD CURVE AND INTEREST RATES

U.S. Treasury rates can be used to determine the difference in interest cost between two loans with different maturities. Since they are considered to hold no default risk, the difference in the interest rates of two U.S. Treasury instruments with different maturities equals the real rate of return on money and the expected inflation for the additional borrowing period. By plotting the current U.S. Treasury Bond rates, one can see the changes in cost of borrowing over time. The following chart presents the current U.S. Treasury yield curve.



| Maturity | 1 Yr | 2 Yr | 3 Yr | 5 Yr | 7 Yr | 10 Yr | 20 Yr | 30 Yr |
|---|---|---|---|---|---|---|---|---|
| 6/1/2018 | 2.28% | 2.47% | 2.61% | 2.74% | 2.85% | 2.89% | 2.96% | 3.04% |

Source: U.S. Treasury Department — (Note x-axis (maturity) is not to scale)

| Maturity | 1 Mo | 3 Mo | 6 Mo |
|---|---|---|---|
| 6/1/2018 | 1.740% | 1.920% | 2.100% |

| 1 Yr Tbill | 2 Yr Tbill | 3 Yr Tbill | 4 Yr Tbill | 5 Yr Tbill | 6 Yr Tbill | 7 Yr Tbill | 8 Yr Tbill | 9 Yr Tbill | 10 Yr Tbill |
|---|---|---|---|---|---|---|---|---|---|
| 2.280% | 2.470% | 2.610% | 2.675% | 2.740% | 2.795% | 2.850% | 2.863% | 2.877% | 2.890% |

| 11 Yr Tbill | 12 Yr Tbill | 13 Yr Tbill | 14 Yr Tbill | 15 Yr Tbill | 16 Yr Tbill | 17 Yr Tbill | 18 Yr Tbill | 19 Yr Tbill | 20 Yr Tbill |
|---|---|---|---|---|---|---|---|---|---|
| 2.897% | 2.904% | 2.911% | 2.918% | 2.925% | 2.932% | 2.939% | 2.946% | 2.953% | 2.960% |

| 21 Yr Tbill | 22 Yr Tbill | 23 Yr Tbill | 24 Yr Tbill | 25 Yr Tbill | 26 Yr Tbill | 27 Yr Tbill | 28 Yr Tbill | 29 Yr Tbill | 30 Yr Tbill |
|---|---|---|---|---|---|---|---|---|---|
| 2.968% | 2.976% | 2.984% | 2.992% | 3.000% | 3.008% | 3.016% | 3.024% | 3.032% | 3.040% |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 114 of 182



## MARKET INTEREST RATES

Lenders offset higher risks with higher potential earnings, i.e., an increased interest rate.  An interest rate higher than the market average is a reflection of the perception of greater risk.  An interest rate that is lower than the market average reflects a perception of lower risk.  The size of the "spread" over the base rate reflects the perceived risk.

**Interest Rate**
*Last Ten Years*

*Source: RealtyRates*

The ten-year historical average Interest Rate was:

- Core Properties:        5.45%
- Office (All Types):     5.60%

  ***Suburban Office Buildings:***        ***5.53%***

**Interest Rate**
*Last Ten Years*

*Source: RealtyRates*

The ten-year historical average Interest Rate was:

- Core Properties:        5.45%
- Industrial (All Types):  5.43%

  . ***Flex and R&D Space:***        ***6.23%***

**Interest Rate**
*Last Six Quarters*

*Source: RealtyRates*

The current quarter's Interest Rate is:

- Core Properties:        5.74%
. Office (All Types):     5.63%

  . ***Suburban Office Buildings:***        ***5.56%***

**Interest Rate**
*Last Six Quarters*

*Source: RealtyRates*

The current quarter's Interest Rate is:

- Core Properties:        5.74%
. Industrial (All Types):  5.84%

  . ***Flex and R&D Space:***        ***6.36%***

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 115 of 182



## LOAN TO VALUE RATIO

Lenders may require greater levels of equity to offset against a borrower's default and collection risk. When a lender perceives higher risk, it can safeguard against this risk by reducing the initial loan amount in comparison to a property's value, thereby raising the amount of required equity.

**Loan to Value**
*Last Ten Years*

Core Properties — Office (All Types)

The ten-year historical average for Loan to Value Ratio was:
- Core Properties: 71.22%
- Office (All Types): 70.69%

*Suburban Office Buildings:* **73.30%**

Source: RealtyRates

**Loan to Value**
*Last Ten Years*

Core Properties — Industrial (All Types) — Flex and R&D Space

The ten-year historical average for Loan to Value Ratio was:
- Core Properties: 71.22%
- Industrial (All Types): 70.13%
- *Flex and R&D Space:* **61.28%**

Source: RealtyRates

**Loan to Value**
*Last Six Quarters*

Core Properties — Office (All Types) — Suburban Office Buildings

The current quarter's Loan to Value Ratio is:
- Core Properties: 71.63%
- Office (All Types): 72.50%
- *Suburban Office Buildings:* **75.00%**

Source: RealtyRates

**Loan to Value**
*Last Six Quarters*

Core Properties — Industrial (All Types) — Flex and R&D Space

The current quarter's Loan to Value Ratio is:
- Core Properties: 71.63%
- Industrial (All Types): 70.20%
- *Flex and R&D Space:* **63.00%**

Source: RealtyRates

91 | P a g e



## LOAN AMORTIZATION

Lenders may require shorter periods of amortization to offset against the possibility of a borrower's default that may result from long-term operational and financial volatility. When a lender perceives higher risk, it can safeguard against this risk by requiring a shorter period of amortization to reduce debt more quickly.



The ten-year historical average Amortization Period was:

- Core Properties: 25.69
- Office (All Types): 27.50
- *Suburban Office Buildings:* **25.50**

The ten-year historical average Amortization Period was:

- Core Properties: 25.69
- Industrial (All Types): 24.35
- *Flex and R&D Space:* **20.50**

The current quarter's Amortization Period is:

- Core Properties: 26.50
- Office (All Types): 30.00
- *Suburban Office Buildings:* **28.00**



The current quarter's Amortization Period is:

- Core Properties: 26.50
- Industrial (All Types): 25.00
- *Flex and R&D Space:* **23.00**

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 117 of 182



## DEBT SERVICE COVERAGE RATIO

Lenders may require a higher ratio of cash flow to the required loan payments to offset against the possibility of a borrower's default caused by a property's cash flow volatility. When a lender perceives a higher risk, it can safeguard against the risk by requiring a higher debt service coverage ratio thereby limiting its advance rate for the loan.



The ten-year historical average Debt Service Coverage Ratio was:

- Core Properties: 1.50
- Office (All Types): 1.65
- **Suburban Office Buildings:** **1.53**

The current quarter's Debt Service Coverage Ratio is:

- Core Properties: 1.48
- Office (All Types): 1.65
- **Suburban Office Buildings:** **1.53**



The ten-year historical average Debt Service Coverage Ratio was:

- Core Properties: 1.50
- Industrial (All Types): 1.49
- **Flex and R&D Space:** **1.74**

The current quarter's Debt Service Coverage Ratio is:

- Core Properties: 1.48
- Industrial (All Types): 1.46
- **Flex and R&D Space:** **1.73**

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 118 of 182



## DISCOUNT RATES

Discount rates measure the rate of return on the initial investment. A higher discount rate evidences the desire for a higher return from investors and the perception of greater risk. The discount rates of core properties, office and suburban office buildings are compared in the following charts.



The ten-year historical average Discount Rate was:

- Core Properties: 10.25%
- Office (All Types): 10.52%
- *Suburban Office Buildings:* **9.94%**

The current quarter's Discount Rate is:

- Core Properties: 10.59%
- Office (All Types): 10.78%
- *Suburban Office Buildings:* **10.18%**



The ten-year historical average Discount Rate was:

- Core Properties: 10.25%
- Industrial (All Types): 10.09%
- *Flex and R&D Space:* **10.40%**

The current quarter's Discount Rate is:

- Core Properties: 10.59%
- Industrial (All Types): 10.39%
- *Flex and R&D Space:* **10.64%**



## REAL ESTATE EQUITY DIVIDEND RATES

The Equity Dividend Rate is the percentage of cash flow remaining after all operating expenses, capital expenses and debt service. This reflects only the current payment portion of the equity investment and no additional return that might be provided through property appreciation.



The ten-year historical average for Equity Dividend Rate was:
- Core Properties:          12.54%

- Office (All Types):       12.45%

- *Suburban Office Buildings:*       *11.06%*



The ten-year historical average for Equity Dividend Rate was:
- Core Properties:          12.54%

- Industrial (All Types):   12.60%

- *Flex and R&D Space:*       *11.79%*



The current quarter's Equity Dividend Rate is:
- Core Properties:          12.38%

- Office (All Types):       12.22%

- *Suburban Office Buildings:*       *10.84%*



The current quarter's Equity Dividend Rate is:
- Core Properties:          12.38%

- Industrial (All Types):   12.37%

- *Flex and R&D Space:*       *11.56%*

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 120 of 182



**REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) – SUMMARY TOTALS FOR VERANO, OTOÑO, CONEJOS AND TANOAN PROPERTIES**

### Capital Improvements Budget - F3, Inc. Engineering Report

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Otono** | $7,756 | $8,309 | $47,977 | $8,729 | $58,232 | $9,171 | $8,995 | $128,693 | $9,450 | $9,686 | $9,928 |
| **Conejos** | $6,400 | $6,919 | $28,051 | $34,192 | $106,406 | $81,178 | $82,803 | $32,154 | $7,798 | $8,430 | $8,193 |
| **Verano** | $1,000 | $11,275 | $1,051 | $6,838 | $1,104 | $1,131 | $38,850 | $1,189 | $1,218 | $1,249 | $1,280 |
| **Tanoan** | $8,000 | $13,684 | $15,612 | $14,377 | $175,736 | $15,104 | $9,278 | $24,024 | $9,747 | $59,947 | $10,241 |
|  | $23,156 | $40,187 | $92,691 | $64,136 | $341,478 | $106,584 | $139,926 | $186,060 | $28,213 | $79,312 | $29,642 |

| **Total** | | | | | | | | | | $1,101,743 | |



## PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES — CLASS 3A

1129 Present Value Analysis

| | |
|---|---|
| **Plan Rate of Interest** | **5.750%** |
| **Average Market Rate of Interest Rate** | **5.800%** |
| **Risk Based Rate of Interest** | **9.750%** |

### 1129 Present Value Analysis: Monty against POC Secured - (Class 3A)

| | | Plan Terms | | |
|---|---|---|---|---|
| | Loan Amount | Interest Rate | Amortization (Years) | Term (Months) |
| | $ 8,717,100 | 5.750% | 30 | 84 |

| **Plan Terms and Payments** | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Monthly Payments | | $610,448 | $610,448 | $610,448 | $610,448 | $610,448 | $ 8,999,470 |
| Balloon Payment | | | | | | | |
| Total Annual Payment | | $610,448 | $610,448 | $610,448 | $610,448 | $610,448 | $8,999,470 |

| **Plan Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $610,448 | $610,448 | $610,448 | $610,448 | $610,448 | $8,999,470 |
| | | x | x | x | x | x | x |
| **Discount Rate for 5.750%** | | 0.969538 | 0.915488 | 0.864451 | 0.816259 | 0.770754 | 0.674473 |
| Present Value | | $591,852 | $558,857 | $527,702 | $498,283 | $470,505 | $6,069,900 |
| **Total Value** | $ 8,717,100 | | | | | | |

| **National Average Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payments | | $610,448 | $610,448 | $610,448 | $610,448 | $610,448 | $8,999,470 |
| | | x | x | x | x | x | x |
| **Discount Rate for 5.800%** | | 0.969279 | 0.914788 | 0.863360 | 0.814824 | 0.769016 | 0.672174 |
| Present Value | | $591,694 | $558,430 | $527,036 | $497,407 | $469,444 | $6,049,213 |
| **Total Value** | $ 8,693,224 | | | | | | |

| **Risk Adjusted Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $610,448 | $610,448 | $610,448 | $610,448 | $610,448 | $ 8,999,470 |
| | | x | x | x | x | x | x |
| **Discount Rate for 9.750%** | | 0.949131 | 0.861298 | 0.781593 | 0.709264 | 0.643629 | 0.513571 |
| Present Value | | $579,394 | $525,777 | $477,122 | $432,969 | $392,902 | $4,621,864 |
| **Total Value** | $ 7,030,028 | | | | | | |

| | National Average Interest Rate | Risk Adjusted Value |
|---|---|---|
| **1129 Present Value Requirement** | $8,717,100 | $8,717,100 |
| **Present Value at Risk Adjusted Rate** | $ 8,693,224 | $ 7,030,028 |
| **Difference** | $23,876 | $1,687,072 |


TACTICALFINANCIAL
CONSULTING

## PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES – CLASS 3B

1129 Present Value Analysis

| | |
|---|---|
| **Plan Rate of Interest** | **5.750%** |
| **Average Market Rate of Interest Rate** | **6.600%** |
| **Risk Based Rate of Interest** | **10.000%** |

### 1129 Present Value Analysis: Monty against SOP/Academy Secured - (Class 3B)

| | | Plan Terms | | |
|---|---|---|---|---|
| | | | Amortization | Term |
| | **Loan Amount** | **Interest Rate** | **(Years)** | **(Months)** |
| | $ 4,244,412 | 5.750% | 30 | 84 |

| Plan Terms and Payments | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Monthly Payments | | $297,231 | $297,231 | $297,231 | $297,231 | $297,231 | $ 4,381,900 |
| Balloon Payment | | | | | | | |
| Total Annual Payment | | $297,231 | $297,231 | $297,231 | $297,231 | $297,231 | $4,381,900 |

| Plan Interest Rate | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $297,231 | $297,231 | $297,231 | $297,231 | $297,231 | $4,381,900 |
| | | x | x | x | x | x | x |
| Discount Rate for 5.750% | | 0.969538 | 0.915488 | 0.864451 | 0.816259 | 0.770754 | 0.674473 |
| Present Value | | $288,177 | $272,111 | $256,941 | $242,617 | $229,092 | $2,955,473 |
| Total Value | $ 4,244,412 | | | | | | |

| National Average Interest Rate | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payments | | $297,231 | $297,231 | $297,231 | $297,231 | $297,231 | $4,381,900 |
| | | x | x | x | x | x | x |
| Discount Rate for 6.600% | | 0.965149 | 0.903669 | 0.846106 | 0.792209 | 0.741745 | 0.636458 |
| Present Value | | $286,872 | $268,598 | $251,489 | $235,469 | $220,470 | $2,788,895 |
| Total Value | $ 4,051,793 | | | | | | |

| Risk Adjusted Interest Rate | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $297,231 | $297,231 | $297,231 | $297,231 | $297,231 | $ 4,381,900 |
| | | x | x | x | x | x | x |
| Discount Rate for 10.000% | | 0.947876 | 0.858029 | 0.776698 | 0.703077 | 0.636434 | 0.504916 |
| Present Value | | $281,738 | $255,033 | $230,859 | $208,976 | $189,168 | $2,212,492 |
| Total Value | $ 3,378,266 | | | | | | |

| | National Average Interest Rate | Risk Adjusted Value |
|---|---|---|
| **1129 Present Value Requirement** | $4,244,412 | $4,244,412 |
| **Present Value at Risk Adjusted Rate** | $ 4,051,793 | $ 3,378,266 |
| **Difference** | $192,619 | $866,146 |


TACTICALFINANCIAL
CONSULTING

## PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES — CLASS 3A AND 3B COMBINED

| 1129 Present Value Analysis | Class 3A | Class 3B | Weighted Avg |
|---|---|---|---|
| **Plan Rate of Interest** | **5.750%** | **5.750%** | **5.750%** |
| **Average Market Rate of Interest Rate** | **5.800%** | **6.600%** | **6.062%** |
| **Risk Based Rate of Interest** | **9.750%** | **10.000%** | **9.832%** |
| Loan Amount | $ 8,717,100 | $ 4,244,412 | $ 12,961,512 |
| Amort (Years) | 30 | 30 | 30 |
| Term (Months) | 84 | 84 | 84 |

### 1129 Present Value Analysis - Combined

| | | Plan Terms Combined | | |
|---|---|---|---|---|
| | Loan Amount | Interest Rate (Wt. Avg.) | Amortization (Years) | Term (Months) |
| | $ 12,961,512 | 5.750% | 30 | 84 |

| **Plan Terms and Payments** | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Monthly Payments | | $907,678 | $907,678 | $907,678 | $907,678 | $907,678 | $13,381,370 |
| Total Annual Payment | | $907,678 | $907,678 | $907,678 | $907,678 | $907,678 | $13,381,370 |

| **Plan Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $907,678 | $907,678 | $907,678 | $907,678 | $907,678 | $13,381,370 |
| | | x | x | x | x | x | x |
| **Discount Rate for 5.750%** | | 0.969538 | 0.915488 | 0.864451 | 0.816259 | 0.770754 | 0.674473 |
| Present Value | | $880,029 | $830,969 | $784,643 | $740,901 | $699,597 | $9,025,373 |
| **Total Value** | $ 12,961,512 | | | | | | |

| **National Average Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payments | | $907,678 | $907,678 | $907,678 | $907,678 | $907,678 | $13,381,370 |
| | | x | x | x | x | x | x |
| **Discount Rate for 6.062%** | | 0.967927 | 0.911147 | 0.857710 | 0.807418 | 0.760086 | 0.660479 |
| Present Value | | $878,566 | $827,029 | $778,525 | $732,876 | $689,913 | $8,838,108 |
| **Total Value** | $ 12,745,017 | | | | | | |

| **Risk Adjusted Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $907,678 | $907,678 | $907,678 | $907,678 | $907,678 | ########## |
| | | x | x | x | x | x | x |
| **Discount Rate for 9.832%** | | 0.948720 | 0.860227 | 0.779990 | 0.707238 | 0.641273 | 0.510737 |
| Present Value | | $861,132 | $780,810 | $707,980 | $641,945 | $582,069 | $6,834,357 |
| **Total Value** | $ 10,408,293 | | | | | | |

| | National Average Interest Rate | Risk Adjusted Value |
|---|---|---|
| **1129 Present Value Requirement** | $12,961,512 | $12,961,512 |
| **Present Value at Risk Adjusted Rate** | $ 12,745,017 | $10,408,293 |
| **Difference** | $216,495 | $2,553,219 |


TACTICALFINANCIAL CONSULTING

## PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES — CLASS 4A

1129 Present Value Analysis

| | |
|---|---|
| **Plan Rate of Interest** | **6.750%** |
| **Average Market Rate of Interest Rate** | **10.800%** |
| **Risk Based Rate of Interest** | **14.750%** |

### 1129 Present Value Analysis: Monty against POC Unsecured - (Class 4A)

| | Loan Amount | Interest Rate | **Plan Terms** Amortization (Years) | Term (Months) |
|---|---|---|---|---|
| | $ 5,997,364 | 6.750% | 30 | 84 |

| Plan Terms and Payments | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Monthly Payments | | $466,785 | $466,785 | $466,785 | $466,785 | $466,785 | $ 6,378,426 |
| Balloon Payment | | | | | | | |
| Total Annual Payment | | $466,785 | $466,785 | $466,785 | $466,785 | $466,785 | $6,378,426 |

| Plan Interest Rate | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $466,785 | $466,785 | $466,785 | $466,785 | $466,785 | $6,378,426 |
| | | x | x | x | x | x | x |
| Discount Rate for 6.750% | | 0.964377 | 0.901601 | 0.842911 | 0.788041 | 0.736743 | 0.630429 |
| Present Value | | $450,157 | $420,854 | $393,458 | $367,846 | $343,901 | $4,021,147 |
| **Total Value** | $ 5,997,364 | | | | | | |

| National Average Interest Rate | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payments | | $466,785 | $466,785 | $466,785 | $466,785 | $466,785 | $6,378,426 |
| | | x | x | x | x | x | x |
| Discount Rate for 10.800% | | 0.943876 | 0.847659 | 0.761250 | 0.683649 | 0.613959 | 0.478763 |
| Present Value | | $440,588 | $395,675 | $355,340 | $319,117 | $286,587 | $3,053,751 |
| **Total Value** | $ 4,851,059 | | | | | | |

| Risk Adjusted Interest Rate | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $466,785 | $466,785 | $466,785 | $466,785 | $466,785 | $ 6,378,426 |
| | | x | x | x | x | x | x |
| Discount Rate for 14.750% | | 0.924484 | 0.798420 | 0.689546 | 0.595519 | 0.514313 | 0.366492 |
| Present Value | | $431,536 | $372,691 | $321,870 | $277,980 | $240,074 | $2,337,642 |
| **Total Value** | $ 3,981,792 | | | | | | |

| | National Average Interest Rate | Risk Adjusted Value |
|---|---|---|
| **1129 Present Value Requirement** | $5,997,364 | $5,997,364 |
| **Present Value at Risk Adjusted Rate** | $ 4,851,059 | $ 3,981,792 |
| **Difference** | $1,146,305 | $2,015,572 |



## PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES — CLASS 4B

1129 Present Value Analysis

| | |
|---|---|
| **Plan Rate of Interest** | 6.750% |
| **Average Market Rate of Interest Rate** | 10.800% |
| **Risk Based Rate of Interest** | 15.000% |

### 1129 Present Value Analysis: Monty against SOP/Academy - (Class 4B)

| | | Plan Terms | | |
|---|---|---|---|---|
| | Loan Amount | Interest Rate | Amortization (Years) | Term (Months) |
| | $ 1,029,815 | 6.750% | 30 | 84 |

| **Plan Terms and Payments** | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Monthly Payments | | $80,152 | $80,152 | $80,152 | $80,152 | $80,152 | $ 1,095,248 |
| Balloon Payment | | | | | | | |
| Total Annual Payment | | $80,152 | $80,152 | $80,152 | $80,152 | $80,152 | $1,095,248 |

| **Plan Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $80,152 | $80,152 | $80,152 | $80,152 | $80,152 | $1,095,248 |
| | | x | x | x | x | x | x |
| **Discount Rate for 6.750%** | | 0.964377 | 0.901601 | 0.842911 | 0.788041 | 0.736743 | 0.630429 |
| Present Value | | $77,297 | $72,265 | $67,561 | $63,163 | $59,052 | $690,476 |
| **Total Value** | $ 1,029,815 | | | | | | |

| **National Average Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payments | | $80,152 | $80,152 | $80,152 | $80,152 | $80,152 | $1,095,248 |
| | | x | x | x | x | x | x |
| **Discount Rate for 10.800%** | | 0.943876 | 0.847659 | 0.761250 | 0.683649 | 0.613959 | 0.478763 |
| Present Value | | $75,654 | $67,942 | $61,016 | $54,796 | $49,210 | $524,364 |
| **Total Value** | $ 832,981 | | | | | | |

| **Risk Adjusted Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $80,152 | $80,152 | $80,152 | $80,152 | $80,152 | $ 1,095,248 |
| | | x | x | x | x | x | x |
| **Discount Rate for 15.000%** | | 0.923276 | 0.795410 | 0.685253 | 0.590351 | 0.508593 | 0.360360 |
| Present Value | | $74,003 | $63,754 | $54,925 | $47,318 | $40,765 | $394,683 |
| **Total Value** | $ 675,447 | | | | | | |

| | National Average Interest Rate | Risk Adjusted Value |
|---|---|---|
| **1129 Present Value Requirement** | $1,029,815 | $1,029,815 |
| **Present Value at Risk Adjusted Rate** | $ 832,981 | $ 675,447 |
| **Difference** | $196,834 | $354,368 |



## PRESENT VALUE OF PLAN AT PLAN, AVERAGE MARKET AND TFC RISK ADJUSTED INTEREST RATES — CLASS 4A AND 4B COMBINED

| 1129 Present Value Analysis | Class 4A | Class 4B | Weighted Avg |
|---|---|---|---|
| **Plan Rate of Interest** | **6.750%** | **6.750%** | **6.750%** |
| **Average Market Rate of Interest Rate** | **10.800%** | **10.800%** | **10.800%** |
| **Risk Based Rate of Interest** | **14.750%** | **15.000%** | **14.787%** |
| Loan Amount | $ 5,997,364 | $ 1,029,815 | $ 7,027,179 |
| Amort (Years) | 30 | 30 | 30 |
| Term (Months) | 84 | 84 | 84 |

### 1129 Present Value Analysis - Combined

| | Loan Amount | Plan Terms Combined | | |
|---|---|---|---|---|
| | | Interest Rate (Wt. Avg.) | Amortization (Years) | Term (Months) |
| | $ 7,027,179 | 6.750% | 30 | 84 |

| **Plan Terms and Payments** | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Monthly Payments | | $546,938 | $546,938 | $546,938 | $546,938 | $546,938 | $7,473,674 |
| Total Annual Payment | | $546,938 | $546,938 | $546,938 | $546,938 | $546,938 | $7,473,674 |

| **Plan Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $546,938 | $546,938 | $546,938 | $546,938 | $546,938 | $7,473,674 |
| | | x | x | x | x | x | x |
| **Discount Rate for 6.750%** | | 0.964377 | 0.901601 | 0.842911 | 0.788041 | 0.736743 | 0.630429 |
| Present Value | | $527,454 | $493,120 | $461,020 | $431,009 | $402,953 | $4,711,623 |
| **Total Value** | $ 7,027,179 | | | | | | |

| **National Average Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payments | | $764,016 | $764,016 | $764,016 | $764,016 | $764,016 | $10,760,326 |
| | | x | x | x | x | x | x |
| **Discount Rate for 10.800%** | | 0.675695 | 0.606815 | 0.544957 | 0.489405 | 0.439516 | 0.332528 |
| Present Value | | $516,242 | $463,617 | $416,356 | $373,913 | $335,797 | $3,578,115 |
| **Total Value** | $ 5,684,040 | | | | | | |

| **Risk Adjusted Interest Rate** | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Years 6-10 |
|---|---|---|---|---|---|---|---|
| Total Annual Payment | | $546,938 | $546,938 | $546,938 | $546,938 | $546,938 | $ 7,473,674 |
| | | x | x | x | x | x | x |
| **Discount Rate for 14.787%** | | 0.924307 | 0.797979 | 0.688917 | 0.594762 | 0.513475 | 0.365593 |
| Present Value | | $505,538 | $436,445 | $376,795 | $325,298 | $280,839 | $2,732,325 |
| **Total Value** | $ 4,657,239 | | | | | | |

| | National Average Interest Rate | Risk Adjusted Value |
|---|---|---|
| **1129 Present Value Requirement** | $7,027,179 | $7,027,179 |
| **Present Value at Risk Adjusted Rate** | $ 5,684,040 | $ 4,657,239 |
| **Difference** | $1,343,139 | $2,369,940 |



## VERANO PROPERTY – PROPERTY PHOTOGRAPHS

*Front View of Property*


TACTICALFINANCIAL
CONSULTING

## VERANO PROPERTY – IMMEDIATE REPAIR ITEMS – F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) - MARCH 29, 2018

**Physical Needs Assessment**
Table 1 - Opinion of Life Safety, Immediate and Short-Term Probable Cost Estimates

**Verano Office/Warehouse Building**
f3, inc. Project
March 29, 2018

| | |
|---|---|
| Assessment Date: | March 21, 2018 |
| Site acreage: | 0.3099 |
| Age(s): | 13 |
| Total Usable SF: | 5,514 |
| Buildings: | 1 |
| Units: | NA |
| Parking Spaces: | 4 |

| | |
|---|---|
| Life Safety Total: | $0 |
| Immediate Total: | $0 |
| Short Term Total: | $0 |
| Grand Total: | $0 |

**Life Safety Issues:** Items that may impact the health or safety of residents, employees or visitors

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Life Safety Issues Noted | | | $0 | $0 | |
| | | | **Total** | **$0** | |

**Immediate Repair Items:** Recommend completion within 6 months

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Immediate Repair Items Noted | | | | | |
| | | | **Total** | **$0** | |

**Short-Term Items:** Non-recurring capital items with recommended completion within 24 months

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Short Term Items Noted | | | | $0 | |
| | | | **Total** | **$0** | |

**Items of Note:** Non-life safety items less than $2,500 to address (costs not included)

| Item | Brief Description |
|---|---|
| None | |
| | |


TACTICALFINANCIAL
CONSULTING

## VERANO PROPERTY – REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT)–MARCH 29, 2018

**Physical Needs Assessment**
TABLE 2 - Replacement Reserve Cost Estimate

**Pabellon Office Building**
f3, Inc. Project
March 29, 2018

| | | | |
|---|---|---|---|
| Assessment Date: | March 21, 2018 | Total Reserves: | $0.75 |
| Age: | 18 | | |
| Total Leasable SF: | 13,896 | | |
| Buildings: | 1 | | |
| Stories: | 1 | | |
| Units: | NA | | |
| Parking Spaces: | 111 | | |
| Interior Stairways/Hallways?: | No | | |
| Covered Common Breezeways?: | No | | |
| Roof Age: | 18 | | |
| Roof Structures: | Flat | | |

| Item | EUL | Total Quantity | Unit | Unit Cost | Total Cost | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Site Components** | | | | | | | | | | | | | | | | | |
| Seal and Stripe Parking | NA | NA | | | | | | | | | | | | | | | |
| **Architectural Components** | | | | | | | | | | | | | | | | | |
| Power wash and paint building exterior | 10 years | 1 | EA | 5,000.00 | 5,000 | | | | 5,000 | | | | | | | | |
| Replace Building Roof | 20 years | 5,000 | SF | 6.50 | 32,500 | | | | | | | 32,500 | | | | | |
| **Mechanical / Electrical / Plumbing Components** | | | | | | | | | | | | | | | | | |
| HVAC Service | Yearly | 12 | EA | 1,000 | 12,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Water heater replacement | 15 years | 1 | EA | 350 | 350 | | | | 350 | | | | | | | | |
| **Interior** | | | | | | | | | | | | | | | | | |
| Common Area Refurbishment | 10 years | 1 | Allow | 10000.00 | | | 10,000 | | | | | | | | | | |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Uninflated** | | | | | $49,850 | $1,000 | $11,000 | $1,000 | $6,350 | $1,000 | $1,000 | $33,500 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Annual Inflation Factor @ 2.5% | | | | | | 100.00% | 102.50% | 105.06% | 107.69% | 110.38% | 113.14% | 115.97% | 118.87% | 121.84% | 124.89% | 128.01% | 131.21% |
| **Total, Inflated @ 2.5%** | | | | | $67,497 | $1,000 | $11,275 | $1,051 | $6,838 | $1,104 | $1,131 | $38,850 | $1,189 | $1,218 | $1,249 | $1,280 | $1,312 |
| Cumulative Total | | | | | | $1,000 | $12,275 | $13,326 | $20,164 | $21,268 | $22,399 | $61,249 | $62,438 | $63,656 | $64,905 | $66,185 | $67,497 |

| | |
|---|---|
| **Average Annual Cost Per SF 12 Years (uninflated)** | $0.75 |
| **Average Annual Cost Per SF 12 Years (inflated)** | $1.02 |



**VERANO PROPERTY – DEBTORS' OPERATING HISTORY**

| Year-Occupancy | 2016 | | 2017 | | Budget 2018 | | CBRE Estimate 93.0% | |
|---|---|---|---|---|---|---|---|---|
| | Total | $/SF | Total | $/SF | Total | $/SF | Total [2] | $/SF |
| **Expenses** | | | | | | | | |
| Real Estate Taxes | $3,515 | $0.64 | $3,519 | $0.64 | $1,847 | $0.34 | $3,519 | $0.64 |
| Property Insurance | 3,978 | 0.72 | 3,906 | 0.71 | 2,051 | 0.37 | 1,985 | 0.36 |
| Gas | 1,162 | 0.21 | 307 | 0.06 | 450 | 0.08 | 1,103 | 0.20 |
| Electricity | 2,836 | 0.51 | 1,541 | 0.28 | 1,200 | 0.22 | 2,757 | 0.50 |
| Water & Sewer | 605 | 0.11 | 485 | 0.09 | 490 | 0.09 | 551 | 0.10 |
| Trash Removal | 896 | 0.16 | 697 | 0.13 | 780 | 0.14 | 882 | 0.16 |
| Building Maintenance | 539 | 0.10 | 267 | 0.05 | 970 | 0.18 | 3,033 | 0.55 |
| Common Area Maintenance | 1,518 | 0.28 | 1,518 | 0.28 | 1,518 | 0.28 | 1,544 | 0.28 |
| Management Fee [1] | 3,900 | 0.71 | 3,905 | 0.71 | 1,290 | 0.23 | 1,746 | 0.32 |
| Operating Expenses | $18,949 | $3.44 | $16,144 | $2.93 | $10,596 | $1.92 | $17,120 | $3.10 |

² (Some revenue categories may reflect net figures)

Source: Operating statements


TACTICALFINANCIAL
CONSULTING

## VERANO PROPERTY – RENT ROLL

### RENT ROLL ANALYSIS

| Suite No. | Tenant | Tenant Type | Lease Start | Lease Expiration | Term (Mos.) | Size (GBA) SF | % Total | Mkt Rent $/SF/Yr. | Expense Basis | Contract Rent $/SF/Yr. | $/Yr. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | Engineered Environments | Warehouse | May-18 | Apr-20 | 24 | 5,040 | 91.4% | $6.00 | NNN | $6.00 | $30,240 |
| 102 | Previous Owner | Warehouse | Jul-07 | Jun-27 | 240 | 474 | 8.6% | $6.00 | None | $0.00 | $0 |
| Occupied Subtotals | | | | | | 5,514 | 100.0% | $6.00 | | $5.48 | $30,240 |
| Property Totals - Contract Rent | | | | | | 5,514 | 100.0% | | | $5.48 | $30,240 |
| Property Totals - Market Rent | | | | | | 5,514 | 100.0% | $6.00 | | | |

Compiled by CBRE

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 132 of 182


## VERANO PROPERTY – DEBTORS' 2018 BUDGET

**9210 SAN MATEO**
**BUDGET - 2018**

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | |
| Warehouse - Vacant | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **TOTAL INCOME** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **EXPENSES** | | | | | | | | | | | | | |
| PROPERTY TAXES (1/2) | | | | | | | | | | | 1,847.25 | | 1,847.25 |
| INSURANCE (1/2) | | | | | | | | 2,050.52 | | | | | 2,050.52 |
| ASSOC.DUES - VERANO PLAZA OA | 126.51 | 126.51 | 126.51 | 126.51 | 126.51 | 126.51 | 126.51 | 126.51 | 126.51 | 126.51 | 126.51 | 126.51 | 1,518.12 |
| R/M - EXTERIOR BUILDING | | | | 100.00 | | | | | 100.00 | | | | 200.00 |
| R/M - HVAC CONTRACT | | | 285.00 | | | | | | | 285.00 | | | 570.00 |
| R/M - PLUMBING | | | | 100.00 | | | | | 100.00 | | | | 200.00 |
| UTILITIES - ELECTRIC | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 1,200.00 |
| UTILITIES - GAS | 50.00 | 50.00 | 50.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 50.00 | 50.00 | 50.00 | 450.00 |
| UTILITIES - WATER/SEWER | 30.00 | 30.00 | 30.00 | 40.00 | 50.00 | 60.00 | 60.00 | 50.00 | 40.00 | 40.00 | 30.00 | 30.00 | 490.00 |
| UTILITIES - REFUSE | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 65.00 | 780.00 |
| MANAGEMENT FEE | 107.50 | 107.50 | 107.50 | 107.50 | 107.50 | 107.50 | 107.50 | 107.50 | 107.50 | 107.50 | 107.50 | 107.50 | 1,290.00 |
| **TOTAL EXPENSES** | 479.01 | 479.01 | 764.01 | 664.01 | 474.01 | 484.01 | 484.01 | 2,724.53 | 749.01 | 489.01 | 2,326.26 | 479.01 | 10,595.89 |
| **NET OPERATING INCOME** | (479.01) | (479.01) | (764.01) | (664.01) | (474.01) | (484.01) | (484.01) | (2,724.53) | (749.01) | (489.01) | (2,326.26) | (479.01) | (10,595.89) |
| **CASHFLOW (NEGATIVE)** | (479.01) | (479.01) | (764.01) | (664.01) | (474.01) | (484.01) | (484.01) | (2,724.53) | (749.01) | (489.01) | (2,326.26) | (479.01) | (10,595.89) |
| CUMULATIVE CASHFLOW (NEGATIVE) | (479.01) | (958.02) | (1,722.03) | (2,386.04) | (2,860.05) | (3,344.06) | (3,828.07) | (6,552.60) | (7,301.61) | (7,790.62) | (10,116.88) | (10,595.89) | |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 133 of 182



## VERANO PROPERTY – TEN-YEAR CASH FLOW PROJECTION OF CBRE

Schedule Of Prospective Cash Flow
In Inflated Dollars for the Fiscal Year Beginning 5/1/2018

| For the Years Ending | Year 1 Apr-2019 | Year 2 Apr-2020 | Year 3 Apr-2021 | Year 4 Apr-2022 | Year 5 Apr-2023 | Year 6 Apr-2024 | Year 7 Apr-2025 | Year 8 Apr-2026 | Year 9 Apr-2027 | Year 10 Apr-2028 | Year 11 Apr-2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $27,720 | $30,240 | $30,240 | $32,371 | $33,461 | $34,465 | $35,026 | $36,034 | $37,115 | $40,383 | $42,436 |
| Scheduled Base Rental Revenue | 27,720 | 30,240 | 30,240 | 32,371 | 33,461 | 34,465 | 35,026 | 36,034 | 37,115 | 40,383 | 42,436 |
| **Expense Reimbursement Revenue** | | | | | | | | | | | |
| Real Estate Taxes | 3,217 | 3,297 | 3,379 | 3,464 | 3,551 | 3,640 | 3,731 | 3,824 | 3,920 | 4,302 | 4,505 |
| Property Insurance | 1,815 | 1,860 | 1,907 | 1,954 | 2,003 | 2,053 | 2,104 | 2,157 | 2,211 | 2,426 | 2,541 |
| Gas | 1,008 | 1,033 | 1,060 | 1,086 | 1,113 | 1,141 | 1,169 | 1,198 | 1,228 | 1,348 | 1,412 |
| Electricity | 2,520 | 2,583 | 2,648 | 2,714 | 2,782 | 2,852 | 2,923 | 2,996 | 3,071 | 3,371 | 3,529 |
| Water & Sewer | 504 | 517 | 530 | 543 | 556 | 570 | 585 | 599 | 614 | 675 | 706 |
| Trash Removal | 807 | 827 | 847 | 869 | 890 | 912 | 935 | 959 | 983 | 1,078 | 1,129 |
| Building Maintenance | 2,772 | 2,842 | 2,913 | 2,986 | 3,060 | 3,137 | 3,215 | 3,295 | 3,378 | 3,707 | 3,883 |
| Common Area Maintenance | 1,411 | 1,447 | 1,483 | 1,520 | 1,558 | 1,597 | 1,637 | 1,678 | 1,720 | 1,888 | 1,977 |
| Management Fee | 1,481 | 1,573 | 1,600 | 1,663 | 1,724 | 1,769 | 1,810 | 1,857 | 1,931 | 2,213 | 2,401 |
| Total Reimbursement Revenue | 15,535 | 15,979 | 16,367 | 16,799 | 17,237 | 17,671 | 18,109 | 18,563 | 19,056 | 21,008 | 22,083 |
| Total Potential Gross Revenue | 43,255 | 46,219 | 46,607 | 49,170 | 50,698 | 52,136 | 53,135 | 54,597 | 56,171 | 61,391 | 64,519 |
| General Vacancy | (3,028) | (3,235) | (3,262) | (3,442) | (3,549) | (3,650) | (3,719) | (3,822) | (3,932) | (4,297) | (4,516) |
| Effective Gross Revenue | 40,227 | 42,984 | 43,345 | 45,728 | 47,149 | 48,486 | 49,416 | 50,775 | 52,239 | 57,094 | 60,003 |
| **Operating Expenses** | | | | | | | | | | | |
| Real Estate Taxes | 3,519 | 3,607 | 3,697 | 3,790 | 3,884 | 3,981 | 4,081 | 4,183 | 4,288 | 4,395 | 4,505 |
| Property Insurance | 1,985 | 2,035 | 2,086 | 2,138 | 2,191 | 2,246 | 2,302 | 2,360 | 2,419 | 2,479 | 2,541 |
| Gas | 1,103 | 1,130 | 1,159 | 1,188 | 1,217 | 1,248 | 1,279 | 1,311 | 1,344 | 1,377 | 1,412 |
| Electricity | 2,757 | 2,826 | 2,897 | 2,969 | 3,043 | 3,119 | 3,197 | 3,277 | 3,359 | 3,443 | 3,529 |
| Water & Sewer | 551 | 565 | 579 | 594 | 609 | 624 | 639 | 655 | 672 | 689 | 706 |
| Trash Removal | 882 | 904 | 927 | 950 | 974 | 998 | 1,023 | 1,049 | 1,075 | 1,102 | 1,129 |
| Building Maintenance | 3,033 | 3,109 | 3,186 | 3,266 | 3,348 | 3,431 | 3,517 | 3,605 | 3,695 | 3,787 | 3,882 |
| Common Area Maintenance | 1,544 | 1,583 | 1,622 | 1,663 | 1,704 | 1,747 | 1,790 | 1,835 | 1,881 | 1,928 | 1,976 |
| Management Fee | 1,609 | 1,719 | 1,734 | 1,829 | 1,886 | 1,939 | 1,977 | 2,031 | 2,090 | 2,284 | 2,400 |
| Total Operating Expenses | 16,983 | 17,478 | 17,887 | 18,387 | 18,856 | 19,333 | 19,805 | 20,306 | 20,823 | 21,484 | 22,080 |
| Net Operating Income | 23,244 | 25,506 | 25,458 | 27,341 | 28,293 | 29,153 | 29,611 | 30,469 | 31,416 | 35,610 | 37,923 |
| **Leasing & Capital Costs** | | | | | | | | | | | |
| Leasing Commissions | | | | 3,775 | | | | 4,065 | | | 4,789 | |
| Total Leasing & Capital Costs | | | | 3,775 | | | | 4,065 | | | 4,789 | |
| Cash Flow Before Debt Service & Taxes | $23,244 | $25,506 | $25,458 | $23,566 | $28,293 | $29,153 | $25,546 | $30,469 | $31,416 | $30,821 | $37,923 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 134 of 182


## VERANO PROPERTY – CASH FLOWS AND PROJECTED RESALE VALUES

Income Capitalization Approach

Verano Office Warehouse
9210 San Diego
Albuquerque, NM 87113

Schedule Of Prospective Cash Flow
In Inflated Dollars for the Fiscal Year Beginning 5/1/2018

| For the Years Ending | Year 1 Apr-2019 | Year 2 Apr-2020 | Year 3 Apr-2021 | Year 4 Apr-2022 | Year 5 Apr-2023 | Year 6 Apr-2024 | Year 7 Apr-2025 | Year 8 Apr-2026 | Year 9 Apr-2027 | Year 10 Apr-2028 | Year 11 Apr-2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $27,720 | $30,240 | $30,240 | $32,371 | $33,461 | $34,485 | $35,026 | $36,034 | $37,115 | $40,383 | $42,436 |
| Scheduled Base Rental Revenue | 27,720 | 30,240 | 30,240 | 32,371 | 33,461 | 34,485 | 35,026 | 36,034 | 37,115 | 40,383 | 42,436 |
| **Expense Reimbursement Revenue** | | | | | | | | | | | |
| Real Estate Taxes | 3,217 | 3,297 | 3,379 | 3,464 | 3,551 | 3,640 | 3,731 | 3,824 | 3,920 | 4,302 | 4,505 |
| Property Insurance | 1,815 | 1,865 | 1,907 | 1,954 | 2,003 | 2,053 | 2,104 | 2,157 | 2,211 | 2,426 | 2,541 |
| Gas | 1,008 | 1,033 | 1,060 | 1,086 | 1,113 | 1,141 | 1,169 | 1,196 | 1,228 | 1,348 | 1,412 |
| Electricity | 2,520 | 2,585 | 2,646 | 2,714 | 2,782 | 2,852 | 2,923 | 2,996 | 3,071 | 3,371 | 3,529 |
| Water & Sewer | 504 | 517 | 530 | 543 | 556 | 570 | 585 | 599 | 614 | 675 | 708 |
| Trash Removal | 807 | 821 | 847 | 869 | 890 | 912 | 935 | 959 | 983 | 1,078 | 1,129 |
| Building Maintenance | 2,772 | 2,842 | 2,913 | 2,986 | 3,060 | 3,137 | 3,215 | 3,295 | 3,378 | 3,707 | 3,883 |
| Common Area Maintenance | 1,411 | 1,447 | 1,483 | 1,520 | 1,558 | 1,597 | 1,637 | 1,678 | 1,720 | 1,888 | 1,977 |
| Management Fee | 1,481 | 1,573 | 1,600 | 1,663 | 1,724 | 1,769 | 1,810 | 1,857 | 1,931 | 2,213 | 2,401 |
| Total Reimbursement Revenue | 15,535 | 15,878 | 16,367 | 16,799 | 17,237 | 17,671 | 18,109 | 18,583 | 19,056 | 21,008 | 22,083 |
| Total Potential Gross Revenue | 43,255 | 46,218 | 46,607 | 49,170 | 50,698 | 52,156 | 53,135 | 54,597 | 56,171 | 61,391 | 64,519 |
| General Vacancy | (3,028) | (3,233) | (3,262) | (3,442) | (3,549) | (3,650) | (3,719) | (3,822) | (3,932) | (4,297) | (4,516) |
| Effective Gross Revenue | 40,227 | 42,984 | 43,345 | 45,728 | 47,149 | 48,486 | 49,416 | 50,775 | 52,239 | 57,094 | 60,003 |
| **Operating Expenses** | | | | | | | | | | | |
| Real Estate Taxes | 3,519 | 3,607 | 3,697 | 3,790 | 3,884 | 3,981 | 4,081 | 4,183 | 4,288 | 4,395 | 4,505 |
| Property Insurance | 1,985 | 2,035 | 2,086 | 2,138 | 2,191 | 2,246 | 2,302 | 2,360 | 2,419 | 2,479 | 2,541 |
| Gas | 1,103 | 1,130 | 1,159 | 1,188 | 1,217 | 1,248 | 1,279 | 1,311 | 1,344 | 1,377 | 1,412 |
| Electricity | 2,757 | 2,826 | 2,897 | 2,969 | 3,043 | 3,119 | 3,197 | 3,277 | 3,359 | 3,443 | 3,529 |
| Water & Sewer | 551 | 565 | 579 | 594 | 609 | 624 | 639 | 655 | 672 | 689 | 708 |
| Trash Removal | 882 | 904 | 927 | 950 | 974 | 998 | 1,023 | 1,049 | 1,075 | 1,102 | 1,129 |
| Building Maintenance | 3,033 | 3,109 | 3,186 | 3,266 | 3,348 | 3,431 | 3,517 | 3,605 | 3,695 | 3,787 | 3,882 |
| Common Area Maintenance | 1,544 | 1,583 | 1,622 | 1,663 | 1,706 | 1,747 | 1,790 | 1,835 | 1,881 | 1,928 | 1,976 |
| Management Fee | 1,609 | 1,719 | 1,734 | 1,829 | 1,688 | 1,938 | 1,977 | 2,031 | 2,090 | 2,284 | 2,400 |
| Total Operating Expenses | 16,983 | 17,478 | 17,887 | 18,387 | 18,858 | 19,333 | 19,805 | 20,306 | 20,823 | 21,484 | 22,066 |
| Net Operating Income | 23,244 | 25,506 | 25,458 | 27,341 | 28,293 | 29,153 | 29,611 | 30,469 | 31,416 | 35,610 | 37,923 |
| **Leasing & Capital Costs** | | | | | | | | | | | |
| Leasing Commissions | | | | 3,775 | | | | 4,085 | | 4,789 | |
| Total Leasing & Capital Costs | | | | 3,775 | | | | 4,085 | | 4,789 | |
| Cash Flow Before Debt Service & Taxes | $23,244 | $25,506 | $25,458 | $23,566 | $28,293 | $29,153 | $25,548 | $30,469 | $31,416 | $30,821 | $37,923 |

49

CBRE

$ 283,432.56

← 3% →

$ 274,930

10.75 R Cap rate

3% Cost of Sales

7% Market Vacancy

© 2018 CBRE, Inc.



## OTOÑO PROPERTY – PROPERTY PHOTOGRAPHS

*Front View of Property*



Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 136 of 182



*Entrance*

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 137 of 182


TACTICALFINANCIAL
CONSULTING

*Lobby*



*Typical Office*



*Board Room*



*Parking Garage*



113 | P a g e



## OTOÑO PROPERTY –IMMEDIATE REPAIR ITEMS – F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) - MARCH  28, 2018



### Physical Needs Assessment
#### Table 1 - Opinion of Life Safety, Immediate and Short-Term Probable Cost Estimates

### Otono Office Building
f3, inc. Project
March 26, 2018

| | | |
|---|---|---|
| Assessment Date: | March 21, 2018 | |
| Site acreage: | 1.69 Acres | |
| Age(s): | 13 | |
| Total Usable SF: | 28,384 | |
| Buildings: | 1 | |
| Units: | NA | |
| Parking Spaces: | 113 | |

| | |
|---|---|
| Life Safety Total: | $0 |
| Immediate Total: | $0 |
| Short Term Total: | $0 |
| Grand Total: | $0 |

**Life Safety Issues:** Items that may impact the health or safety of residents, employees or visitors

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Life Safety Issues Noted | | | $0 | $0 | |
| | | | Total | $0 | |

**Immediate Repair Items:** Recommend completion within 6 months

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Immediate Repair Issues Noted | | | | $0 | |
| | | | Total | $0 | |

**Short-Term Items:** Non-recurring capital items with recommended completion within 24 months

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Short Term Items Noted | | | | $0 | |
| | | | Total | $0 | |

**Items of Note:** Non-life safety items less than $2,500 to address (costs not included)

| Item | Brief Description |
|---|---|
| None | |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 139 of 182



## OTOÑO PROPERTY –REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT)–MARCH 28, 2018



**Physical Needs Assessment**
TABLE 2 - Multifamily Replacement Reserve Cost Estimate

**Otono Office Building**
f3, inc. Project
March 26, 2018

| | |
|---|---|
| Assessment Date: | March 21, 2018 |
| Age: | 13 |
| Total Leasable SF: | 28,384 |
| Buildings: | 1 |
| Stories: | 2 |
| Units: | NA |
| Parking Spaces: | 113 |
| Interior Stairways/Hallways?: | Yes |
| Covered Common Breezeways?: | No |
| Roof Age: | 13 |
| Roof Structures: | with small pitched section |

**Total Reserves:** $0.81

| Item | EUL | Total Quantity | Unit | Unit Cost | Total Cost | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Site Components** | | | | | | | | | | | | | | | | | |
| Seal and Stripe Parking | 5 years | 79,100 | SF | 0.20 | 15,820 | | | 7,910 | | | | | 7,910 | | | | |
| **Architectural Components** | | | | | | | | | | | | | | | | | |
| Power wash and paint building exterior | 10 years | 1 | EA | 30,000.00 | 30,000 | | | | | 30,000 | | | | | | | |
| Replace Building Roof | 20 years | 14,192 | SF | 6.50 | 92,248 | | | | | | | | 92,248 | | | | |
| **Mechanical / Electrical / Plumbing Components** | | | | | | | | | | | | | | | | | |
| HVAC Service | Yearly | 12 | EA | 3,272 | 39,264 | 3,272 | 3,272 | 3,272 | 3,272 | 3,272 | 3,272 | 3,272 | 3,272 | 3,272 | 3,272 | 3,272 | 3,272 |
| Elevator Service | Yearly | 12 | EA | 4,484 | 53,808 | 4,484 | 4,484 | 4,484 | 4,484 | 4,484 | 4,484 | 4,484 | 4,484 | 4,484 | 4,484 | 4,484 | 4,484 |
| Water heater replacement | 15 years | 4 | EA | 350 | 1,400 | | | 350 | | 350 | | 350 | | 350 | | | |
| **Interior** | | | | | | | | | | | | | | | | | |
| Common Area Refurbishment | 10 years | 1 | Allow | 45000.00 | 45,000 | | | | | 45,000 | | | | | | | |

| | Total Cost | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Uninflated | $277,540 | $7,756 | $8,106 | $45,666 | $8,106 | $52,756 | $8,106 | $7,756 | $108,264 | $7,756 | $7,756 | $7,756 | $7,756 |
| Annual Inflation Factor @ 2.5% | | 100.00% | 102.50% | 105.06% | 107.69% | 110.38% | 113.14% | 115.97% | 118.87% | 121.84% | 124.89% | 128.01% | 131.21% |
| Total Inflated @ 2.5% | $317,103 | $7,756 | $8,309 | $47,977 | $8,729 | $58,232 | $9,171 | $8,995 | $128,693 | $9,450 | $9,686 | $9,928 | $10,177 |
| Cumulative Total | | $7,756 | $16,065 | $64,041 | $72,771 | $131,003 | $140,174 | $149,169 | $277,862 | $287,312 | $296,998 | $306,927 | $317,103 |

| | |
|---|---|
| Average Annual Cost Per SF 12 Years (uninflated) | $0.81 |
| Average Annual Cost Per SF 12 Years (inflated) | $0.93 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 140 of 182



TACTICALFINANCIAL
CONSULTING

## OTOÑO PROPERTY –DEBTORS' OPERATING HISTORY

| | | OPERATING HISTORY | | | | | | | | | | | | | | | CBRE Estimate | | 100.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year-Occupancy | 2015 | | | 2016 | | | 2017 | | | 2015 Budget | | | | | | | | | |
| | Total | % EGI | $/SF | Total | % EGI | $/SF | Total | % EGI | $/SF | Total | % EGI | $/SF | | | | Total² | % EGI | $/SF | |
| Income | | | | | | | | | | | | | | | | | | | |
| Net Rental Income | $697,660 | 98.6% | $24.58 | $736,643 | 100.0% | $25.95 | $712,455 | 100.0% | $25.10 | $695,819 | 100.0% | $24.51 | | | | $567,650 | 100.0% | $20.00 | |
| Expense Reimbursements | 9,983 | 1.4% | 0.35 | - | 0.0% | - | - | 0.0% | - | - | 0.0% | - | | | | - | 0.0% | - | |
| Effective Gross Income | $707,643 | 100.0% | $24.93 | $736,643 | 100.0% | $25.95 | $712,455 | 100.0% | $25.10 | $695,819 | 100.0% | $24.51 | | | | $567,650 | 100.0% | $20.00 | |
| Expenses | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | $15,971 | 2.3% | $0.56 | $30,653 | 4.2% | $1.08 | $47,651 | 6.7% | $1.68 | $25,017 | 3.6% | $0.88 | | | | $47,652 | 8.4% | $1.68 | |
| Property Insurance | 6,342 | 0.9% | 0.22 | 6,198 | 0.8% | 0.22 | 6,304 | 0.9% | 0.22 | 3,509 | 0.5% | 0.12 | | | | 6,244 | 1.1% | 0.22 | |
| Gas | 3,469 | 0.5% | 0.12 | 3,949 | 0.5% | 0.14 | 2,750 | 0.4% | 0.10 | 3,050 | 0.4% | 0.11 | | | | 3,408 | 0.6% | 0.12 | |
| Electricity | 68,475 | 9.7% | 2.41 | 70,802 | 9.6% | 2.49 | 58,059 | 8.1% | 2.05 | 57,500 | 8.2% | 2.02 | | | | 59,608 | 10.5% | 2.10 | |
| Water & Sewer | 2,304 | 0.3% | 0.08 | 3,030 | 0.4% | 0.11 | 1,897 | 0.3% | 0.07 | 2,195 | 0.3% | 0.08 | | | | 2,838 | 0.5% | 0.10 | |
| Trash Removal | 3,223 | 0.5% | 0.11 | 3,825 | 0.5% | 0.13 | 3,241 | 0.5% | 0.11 | 3,204 | 0.5% | 0.11 | | | | 3,122 | 0.6% | 0.11 | |
| Repairs & Maintenance | 40,375 | 5.7% | 1.42 | 43,165 | 5.9% | 1.52 | 29,565 | 4.2% | 1.05 | 8,672 | 1.2% | 0.31 | | | | 31,222 | 5.5% | 1.10 | |
| Common Area Maintenance | 21,950 | 3.1% | 0.77 | 30,653 | 4.2% | 1.08 | 33,172 | 4.7% | 1.17 | 36,922 | 5.3% | 1.30 | | | | 36,599 | 6.5% | 1.30 | |
| Management Fee¹ | 7,447 | 1.1% | 0.26 | 7,465 | 1.0% | 0.26 | 7,475 | 1.0% | 0.26 | 11,810 | 1.7% | 0.41 | | | | 7,782 | 1.4% | 0.27 | |
| Reserves for Replacement | 20,436 | 2.9% | 0.72 | 20,436 | 2.8% | 0.72 | 20,436 | 2.9% | 0.72 | 20,436 | 2.9% | 0.72 | | | | 20,436 | 3.6% | 0.72 | |
| Operating Expenses | $189,971 | 26.8% | $6.69 | $219,973 | 29.9% | $7.75 | $210,551 | 29.6% | $7.43 | $171,745 | 24.7% | $6.05 | | | | $219,210 | 38.6% | $7.72 | |
| Net Operating Income | $517,672 | 73.2% | $18.24 | $516,670 | 70.1% | $18.20 | $501,904 | 70.4% | $17.67 | $524,074 | 75.3% | $18.46 | | | | $348,470 | 61.4% | $12.28 | |

¹ (Mgmt typically analyzed as a % of EGI) — 1.1% / 1.0% / 1.0% / 1.7% / 1.4%

Reserves for replacement added by CBRE

² (Some revenue categories may reflect net figures)

Source: Operating statements


TACTICALFINANCIAL
CONSULTING

## OTOÑO PROPERTY –RENT ROLL

Blumenthal – LANB & BOKF – Dana          Occupied Square Footage Report                     03-28-2018       Page 1

**4900        OTONO**

| Unit | Unit Class | Tenant | Name | Expire Date | Sq Ft | Percent of Property | Current Rent/Dues | $/Sq Ft |
|------|-----------|--------|------|-------------|-------|---------------------|-------------------|---------|
| 4900 | Office | NMGB | NM GAMING CONTROL BOARD | 04-30-2024 | 24,829 | 79.14 % | 50,975.73 | 24.637 |
| 4900-B | Office | NM RACING | NM RACING COMMISSION | 04-30-2025 | 3,555 | 11.33 % | 5,718.63 | 19.303 |

| | | | **4900 Property Totals:** | | **28,384** | | **56,694.36** | |


TACTICAL FINANCIAL
CONSULTING

## OTOÑO PROPERTY –DEBTORS' 2018 BUDGET

**BUDGET FOR 2018**

**4900 ALAMEDA NE**

| | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | |
| BASE RENT - NMGCB | $ 50,975.73 | $ 50,975.73 | $ 50,975.73 | $ 50,975.73 | $ 50,975.73 | $ 50,975.73 | $ 50,975.73 | $ 50,975.73 | $ 54,812.61 | $ 54,812.61 | $ 54,812.61 | $ 54,812.61 | 627,056.28 |
| BASE RENT - RACING COMM. | $ 5,718.63 | $ 5,718.63 | $ 5,718.63 | $ 5,718.63 | $ 5,718.63 | $ 5,718.63 | $ 5,718.63 | $ 5,718.63 | $ 5,718.63 | $ 5,764.93 | $ 5,764.93 | $ 5,764.93 | 68,762.46 |
| **TOTAL INCOME** | $ 56,694.36 | $ 56,694.36 | $ 56,694.36 | $ 56,694.36 | $ 56,694.36 | $ 56,694.36 | $ 56,694.36 | $ 56,694.36 | $ 60,531.24 | $ 60,577.54 | $ 60,577.54 | $ 60,577.54 | 695,818.74 |
| **EXPENSES** | | | | | | | | | | | | | |
| PROPERTY TAXES | | | | | | | | | | | | $ 25,016.65 | 25,016.65 |
| INSURANCE | | | | | | | | $ 3,309.47 | | | | | 3,309.47 |
| ASSOC.DUES - OTONO PLAZA OA | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | $ 1,968.19 | 23,618.28 |
| JANITORIAL | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | $ 592.00 | 7,104.00 |
| ELEVATOR - PHONE LINE | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | $ 143.00 | 1,716.00 |
| ELEVATOR - MAINT.CONTRACT/RPRS | | | $ 1,121.00 | | | $ 1,121.00 | | | $ 1,121.00 | | | $ 1,121.00 | 4,484.00 |
| R/M - ROOF | | | | $ 250.00 | | | | | | $ 250.00 | | | 500.00 |
| R/M - HVAC CONTRACT/REPAIRS | | | $ 818.00 | | | $ 818.00 | | | $ 818.00 | | | $ 818.00 | 3,272.00 |
| R/M - EXTERIOR BUILDING | | | | | $ 500.00 | | | | | | | | 500.00 |
| R/M - GENERATOR SERVICE/INSPECTION | | | | $ 400.00 | | | | | | $ 400.00 | | | 800.00 |
| R/M - FIRE INSPECTIONS/EXTINGUISHERS/REPAIRS | | | | $ 800.00 | | | | | $ 800.00 | | | | 1,600.00 |
| R/M - INTERIOR BUILDING | $ 250.00 | | | $ 250.00 | | | $ 250.00 | | | $ 250.00 | | | 1,000.00 |
| R/M - PLUMBING | | $ 250.00 | | | $ 250.00 | | | | $ 250.00 | | $ 250.00 | | 1,000.00 |
| UTILITIES - ELECTRIC | $ 3,500.00 | $ 3,600.00 | $ 3,700.00 | $ 3,800.00 | $ 4,500.00 | $ 5,000.00 | $ 7,000.00 | $ 7,000.00 | $ 6,500.00 | $ 5,500.00 | $ 3,700.00 | $ 3,500.00 | 57,300.00 |
| UTILITIES - GAS | $ 700.00 | $ 500.00 | $ 300.00 | $ 200.00 | $ 100.00 | $ 60.00 | $ 60.00 | $ 60.00 | $ 100.00 | $ 200.00 | $ 300.00 | $ 500.00 | 3,080.00 |
| UTILITIES - WATER/SEWER | $ 125.00 | $ 150.00 | $ 175.00 | $ 200.00 | $ 200.00 | $ 250.00 | $ 250.00 | $ 200.00 | $ 200.00 | $ 175.00 | $ 150.00 | $ 120.00 | 2,195.00 |
| UTILITIES - REFUSE | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | $ 267.00 | 3,204.00 |
| MANAGEMENT FEE | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | $ 967.50 | 11,610.00 |
| **TOTAL EXPENSES** | $ 8,512.69 | $ 8,437.69 | $ 10,061.69 | $ 9,337.69 | $ 9,487.69 | $ 11,136.69 | $ 11,497.69 | $ 15,557.16 | $ 12,676.69 | $ 10,712.69 | $ 8,337.69 | $ 35,013.34 | 151,309.40 |
| **NET OPERATING INCOME** | $ 48,181.67 | $ 48,256.67 | $ 46,642.67 | $ 48,356.67 | $ 47,206.67 | $ 45,507.67 | $ 45,196.67 | $ 41,137.20 | $ 47,854.55 | $ 49,864.85 | $ 52,239.85 | $ 25,564.20 | 544,508.34 |
| **CASHFLOW (NEGATIVE)** | $ 48,181.67 | $ 48,256.67 | $ 46,642.67 | $ 48,356.67 | $ 47,206.67 | $ 45,507.67 | $ 45,196.67 | $ 41,137.20 | $ 47,854.55 | $ 49,864.85 | $ 52,239.85 | $ 25,564.20 | 544,508.34 |
| **CUMULATIVE CASHFLOW (NEGATIVE)** | $ 48,181.67 | $ 96,438.34 | $ 143,081.01 | $ 189,937.68 | $ 237,144.35 | $ 282,652.02 | $ 327,848.69 | $ 368,985.89 | $ 416,840.44 | $ 466,705.29 | $ 518,945.14 | $ 544,509.34 | |

| TENANTS | SQ. FT. | ANNUAL RENT | OP.EXP. | RENT/SF | OPEX/SF | EXPIRATION |
|---|---|---|---|---|---|---|
| NMGCB | 24,829 | $627,056.28 | $ - | $25.25 | $ - | 4/30/2024 |
| RACING COMM. | 3,556 | $69,179.16 | $ - | $19.46 | $ - | 9/30/2026 |

Case 15-33291-beh     Doc 467-6     Filed 06/20/18     Page 143 of 182



## OTOÑO PROPERTY –TEN-YEAR CASH FLOW PROJECTION OF CBRE

Otono
4900 Alameda NE
Albuquerque, NM 87109

Schedule Of Prospective Cash Flow
In Inflated Dollars for the Fiscal Year Beginning 4/1/2018

| For the Years Ending | Year 1 Mar-2019 | Year 2 Mar-2020 | Year 3 Mar-2021 | Year 4 Mar-2022 | Year 5 Mar-2023 | Year 6 Mar-2024 | Year 7 Mar-2025 | Year 8 Mar-2026 | Year 9 Mar-2027 | Year 10 Mar-2028 | Year 11 Mar-2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $707,468 | $727,213 | $747,380 | $749,742 | $750,336 | $750,942 | $656,921 | $659,416 | $660,397 | $660,397 | $660,397 |
| Absorption & Turnover Vacancy | | | | | | | (143,970) | (21,129) | | | |
| Base Rent Abatements | | | | | | | (71,985) | (10,564) | | | |
| Scheduled Base Rental Revenue | 707,468 | 727,213 | 747,380 | 749,742 | 750,336 | 750,942 | 440,966 | 627,723 | 660,397 | 660,397 | 660,397 |
| Total Potential Gross Revenue | 707,468 | 727,213 | 747,380 | 749,742 | 750,336 | 750,942 | 440,966 | 627,723 | 660,397 | 660,397 | 660,397 |
| Effective Gross Revenue | 707,468 | 727,213 | 747,380 | 749,742 | 750,336 | 750,942 | 440,966 | 627,723 | 660,397 | 660,397 | 660,397 |
| **Operating Expenses** | | | | | | | | | | | |
| Real Estate Taxes | 47,648 | 49,077 | 50,550 | 52,066 | 53,628 | 55,237 | 56,894 | 58,601 | 60,359 | 62,170 | 64,035 |
| Insurance | 6,244 | 6,432 | 6,625 | 6,824 | 7,028 | 7,239 | 7,456 | 7,680 | 7,910 | 8,148 | 8,392 |
| Gas | 3,405 | 3,508 | 3,514 | 3,722 | 3,834 | 3,949 | 4,067 | 4,189 | 4,315 | 4,444 | 4,577 |
| Electricity | 58,606 | 61,395 | 63,236 | 65,134 | 67,088 | 69,100 | 71,173 | 73,308 | 75,508 | 77,773 | 80,106 |
| Water & Sewer | 2,838 | 2,924 | 3,011 | 3,102 | 3,195 | 3,290 | 3,389 | 3,491 | 3,596 | 3,703 | 3,815 |
| Trash Removal | 3,122 | 3,216 | 3,312 | 3,412 | 3,514 | 3,620 | 3,728 | 3,840 | 3,955 | 4,074 | 4,196 |
| Repairs and Maintenance | 31,222 | 32,159 | 33,124 | 34,118 | 35,141 | 36,195 | 37,281 | 38,400 | 39,552 | 40,738 | 41,960 |
| Common Area Maintenance | 36,899 | 38,006 | 39,146 | 40,321 | 41,530 | 42,776 | 44,060 | 45,381 | 46,743 | 48,145 | 49,589 |
| Management | 7,782 | 7,999 | 8,221 | 8,247 | 8,254 | 8,260 | 4,851 | 6,905 | 7,264 | 7,264 | 7,264 |
| Reserves for Replacement | 20,436 | 20,947 | 21,471 | 22,008 | 22,558 | 23,122 | 23,700 | 24,293 | 24,900 | 25,522 | 26,160 |
| Total Operating Expenses | 219,203 | 225,663 | 232,310 | 238,954 | 245,770 | 252,788 | 256,599 | 266,088 | 274,102 | 281,981 | 290,094 |
| Net Operating Income | 488,265 | 501,550 | 515,070 | 510,788 | 504,566 | 498,154 | 184,367 | 361,635 | 386,295 | 378,416 | 370,303 |
| **Leasing & Capital Costs** | | | | | | | | | | | |
| Tenant Improvements | | | | | | | 179,963 | 26,411 | | | |
| Leasing Commissions | | | | | | | 224,054 | 32,882 | | | |
| Total Leasing & Capital Costs | | | | | | | 404,017 | 59,293 | | | |
| Cash Flow Before Debt Service & Taxes | $488,265 | $501,550 | $515,070 | $510,788 | $504,566 | $498,154 | ($219,650) | $302,342 | $386,295 | $378,416 | $370,303 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 144 of 182


TACTICAL FINANCIAL
CONSULTING

## OTOÑO PROPERTY – CASH FLOWS AND PROJECTED RESALE VALUES

### DISCOUNTED CASH FLOW ANALYSIS

Otono
4900 Alameda NE
Albuquerque, NM 87109

Schedule Of Prospective Cash Flow
In Inflated Dollars for the Fiscal Year Beginning 4/1/2018

| For the Years Ending | Year 1 Mar-2019 | Year 2 Mar-2020 | Year 3 Mar-2021 | Year 4 Mar-2022 | Year 5 Mar-2023 | Year 6 Mar-2024 | Year 7 Mar-2025 | Year 8 Mar-2026 | Year 9 Mar-2027 | Year 10 Mar-2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| Potential Gross Revenue | | | | | | | | | | |
| Base Rental Revenue | $707,468 | $727,213 | $747,380 | $769,742 | $750,338 | $750,942 | $858,621 | $859,418 | $880,397 | $880,397 |
| Absorption & Turnover Vacancy | | | | | | | (143,670) | (21,129) | | |
| Base Rent Abatements | | | | | | | (71,865) | (10,564) | | |
| Scheduled Base Rental Revenue | 707,468 | 727,213 | 747,380 | 769,742 | 750,338 | 750,942 | 440,560 | 827,723 | 880,397 | 880,397 |
| Expense Reimbursement Revenue | | | | | | | | | | |
| Real Estate Taxes | | 1,441 | 2,924 | 4,406 | 5,931 | 7,503 | 1,855 | 109 | 1,583 | 3,382 |
| Insurance | | 188 | 383 | 577 | 777 | 983 | 217 | 14 | 207 | 440 |
| Gas | | 103 | 209 | 315 | 424 | 538 | 119 | 8 | 113 | 240 |
| Electricity | | 1,803 | 3,656 | 5,512 | 7,419 | 9,366 | 2,071 | 138 | 1,980 | 4,206 |
| Water & Sewer | | 86 | 174 | 263 | 353 | 447 | 98 | 6 | 94 | 200 |
| Trash Removal | | 95 | 192 | 289 | 389 | 492 | 109 | 7 | 104 | 221 |
| Repairs and Maintenance | | 944 | 1,918 | 2,888 | 3,886 | 4,916 | 1,085 | 71 | 1,037 | 2,203 |
| Common Area Maintenance | | 1,118 | 2,285 | 3,412 | 4,580 | 5,810 | 1,282 | 84 | 1,226 | 2,603 |
| Management | | 337 | 484 | 715 | 943 | 1,188 | 144 | 13 | 192 | 401 |
| Total Reimbursement Revenue | | 6,014 | 12,205 | 18,377 | 24,714 | 31,241 | 6,780 | 448 | 6,536 | 13,876 |
| Total Potential Gross Revenue | 707,468 | 733,227 | 759,585 | 788,119 | 775,050 | 782,183 | 447,740 | 828,171 | 886,933 | 874,273 |
| Effective Gross Revenue | 707,468 | 733,227 | 759,585 | 788,119 | 775,050 | 782,183 | 447,740 | 828,171 | 886,933 | 874,273 |
| Operating Expenses | | | | | | | | | | |
| Real Estate Taxes | 47,648 | 49,077 | 50,550 | 52,066 | 53,628 | 55,237 | 56,894 | 58,601 | 60,359 | 62,170 |
| Insurance | 6,244 | 6,432 | 6,625 | 6,824 | 7,028 | 7,239 | 7,456 | 7,680 | 7,910 | 8,148 |
| Gas | 3,406 | 3,508 | 3,614 | 3,722 | 3,834 | 3,949 | 4,067 | 4,189 | 4,315 | 4,444 |
| Electricity | 59,606 | 61,395 | 63,236 | 65,134 | 67,088 | 69,100 | 71,173 | 73,308 | 75,508 | 77,773 |
| Water & Sewer | 2,838 | 2,924 | 3,011 | 3,102 | 3,195 | 3,290 | 3,389 | 3,491 | 3,596 | 3,705 |
| Trash Removal | 3,122 | 3,216 | 3,312 | 3,412 | 3,514 | 3,620 | 3,728 | 3,840 | 3,955 | 4,074 |
| Repairs and Maintenance | 31,222 | 32,159 | 33,124 | 34,118 | 35,141 | 36,195 | 37,281 | 38,400 | 39,552 | 40,738 |
| Common Area Maintenance | 36,899 | 38,008 | 39,148 | 40,321 | 41,530 | 42,776 | 44,060 | 45,381 | 46,743 | 48,145 |
| Management | 7,782 | 8,085 | 8,355 | 8,449 | 8,526 | 8,604 | 4,805 | 8,910 | 7,336 | 7,417 |
| Reserves for Replacement | 20,438 | 20,947 | 21,471 | 22,008 | 22,558 | 23,122 | 23,700 | 24,293 | 24,900 | 25,522 |
| Total Operating Expenses | 219,203 | 225,729 | 232,444 | 239,156 | 246,042 | 253,132 | 256,873 | 266,093 | 274,174 | 282,134 |
| Net Operating Income | 488,265 | 507,498 | 527,141 | 526,963 | 529,008 | 529,051 | 191,073 | 562,078 | 592,759 | 592,139 |
| Leasing & Capital Costs | | | | | | | | | | |
| Tenant Improvements | | | | | | | 179,963 | 26,411 | | |
| Leasing Commissions | | | | | | | 224,054 | 32,882 | | |
| Total Leasing & Capital Costs | | | | | | | 404,017 | 59,293 | | |
| Cash Flow Before Debt Service & Taxes | $488,265 | $507,498 | $527,141 | $526,963 | $529,008 | $529,051 | ($212,944) | $502,785 | $592,759 | $592,139 |

564,952

57,732

6289

+1364
256,057

152,40 95

NOI = $313,695

50

CBRE

3,391,296
<550?  9.25 R Cap Rate
$3,289,558
3% Cost of Sales
15% Market Vacancy

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 145 of 182



## CONEJOS PROPERTY – PROPERTY PHOTOGRAPHS

*Front View of Property*

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 146 of 182



*Entrance*

![Entrance sign photograph showing Conejos Office Park monument sign with tenant listings: Grand Canyon University, New Horizons Computer Learning Centers, Dixon Scholl Carrillo P.A. Attorneys at Law, LANB, address 6700]



*Interior of Property Grounds*

*Tenant Buildout*





*Tenant Buildout*

*Demising to Make Available Rental Space*





Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 148 of 182



**CONEJOS PROPERTY – IMMEDIATE REPAIR ITEMS –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) –MARCH 28, 2018**



### Physical Needs Assessment
Table 1 - Opinion of Life Safety, Immediate and Short-Term Probable Cost Estimates

**Conejos Office Park**
f3, inc. Project
March 28, 2018

| | | | | |
|---|---|---|---|---|
| Assessment Date: | March 21, 2018 | | Life Safety Total: | $0 |
| Site acreage: | 4.33 | | Immediate Total: | $0 |
| Age(s): | 22 | | Short Term Total: | $0 |
| Total Usable SF: | 48,287 | | Grand Total: | $0 |
| Buildings: | 5 | | | |
| Units: | NA | | | |
| Parking Spaces: | 290 | | | |

**Life Safety Issues:** Items that may impact the health or safety of residents, employees or visitors

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Life Safety Issues Noted | | | $0 | $0 | |
| | | | Total | $0 | |

**Immediate Repair Items:** Recommend completion within 6 months

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Immediate Repair Issues Noted | | | | $0 | |
| | | | Total | $0 | |

**Short-Term Items:** Non-recurring capital items with recommended completion within 24 months

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Short Term Items Noted | | | | $0 | |
| | | | Total | $0 | |

**Items of Note:** Non-life safety items less than $2,500 to address (costs not included)

| Item | Brief Description |
|---|---|
| None | |
| | |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 149 of 182



## CONEJOS PROPERTY – REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) –MARCH 28, 2018



**Physical Needs Assessment**
*TABLE 2 - Replacement Reserve Cost Estimate*

**Conejos Office Park**
*f3, inc. Project*
*March 28, 2018*

| | | | | |
|---|---|---|---|---|
| Assessment Date: | March 21, 2018 | | Total Reserves: | $0.63 |
| Age: | 22 | | | |
| Total Leasable SF: | 48,287 | | | |
| Buildings: | 5 | | | |
| Stories: | 1 | | | |
| Units: | NA | | | |
| Parking Spaces: | 290 | | | |
| Interior Stairways/Hallways?: | Yes | | | |
| Covered Common Breezeways?: | No | | | |
| Roof Age: | 43.235 | | | |
| Roof Structures: | Flat | | | |

| Item | EUL | Total Quantity | Unit | Unit Cost | Total Cost | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Site Components** | | | | | | | | | | | | | | | | | |
| Seal and Stripe Parking | 5 years | 203,000 | SF | 0.20 | 40,600 | | | 20,300 | | | | | 20,300 | | | | |
| **Architectural Components** | | | | | | | | | | | | | | | | | |
| Power wash and paint building exterior | 10 years | 1 | EA | 25,000.00 | 25,000 | | | | | 25,000 | | | | | | | |
| Replace Building Roof | 20 years | 30,000 | SF | 6.50 | 195,000 | | | | | | 65,000 | 65,000 | 65,000 | | | | |
| **Mechanical / Electrical / Plumbing Components** | | | | | | | | | | | | | | | | | |
| HVAC Service | Yearly | 12 | EA | 6,400 | 76,800 | 6,400 | 6,400 | 6,400 | 6,400 | 6,400 | 6,400 | 6,400 | 6,400 | 6,400 | 6,400 | 6,400 | 6,400 |
| Water heater replacement | 15 years | 5 | EA | 350 | 1,750 | | 350 | | 350 | | 350 | | 350 | | 350 | | |
| **Interior** | | | | | | | | | | | | | | | | | |
| Common Area Refurbishment | 10 years | 1 | Allow | 25000.00 | 25,000 | | | | | 25,000 | | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Uninflated** | $364,150 | $6,400 | $6,750 | $26,700 | $31,750 | $96,400 | $71,750 | $71,400 | $27,050 | $6,400 | $6,750 | $6,400 | $6,400 |
| Annual Inflation Factor @ 2.5% | | 100.00% | 102.50% | 105.06% | 107.69% | 110.38% | 113.14% | 115.97% | 118.87% | 121.84% | 124.89% | 128.01% | 131.21% |
| **Total, Inflated @ 2.5%** | $410,920 | $6,400 | $6,919 | $28,051 | $34,192 | $106,406 | $81,178 | $82,803 | $32,154 | $7,798 | $8,430 | $8,193 | $8,397 |
| Cumulative Total | | $6,400 | $13,319 | $41,370 | $75,561 | $181,968 | $263,146 | $345,948 | $378,103 | $385,900 | $394,330 | $402,523 | $410,920 |

| | |
|---|---|
| **Average Annual Cost Per SF 12 Years (uninflated)** | $0.63 |
| **Average Annual Cost Per SF 12 Years (inflated)** | $0.71 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 150 of 182



## CONEJOS PROPERTY – DEBTORS' OPERATING HISTORY

### OPERATING HISTORY

| Year-Occupancy | 2016 | 96.0% | | 2017 | 96.0% | | 2018 Budget | 96.0% | | CBRE Estimate | 86.0% | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | % EGI | $/SF | Total | % EGI | $/SF | Total | % EGI | $/SF | Total [2] | % EGI | $/SF |
| **Income** | | | | | | | | | | | | |
| Net Rental Income | $474,073 | 62.7% | $9.82 | $539,699 | 65.5% | $11.18 | $465,122 | 69.4% | $9.63 | $501,709 | 66.9% | $10.39 |
| Other Income | 8,910 | 1.2% | 0.18 | - | 0.0% | - | - | 0.0% | - | - | 0.0% | - |
| Expense Reimbursements | 272,764 | 36.1% | 5.65 | 284,476 | 34.5% | 5.89 | 205,266 | 30.6% | 4.25 | 247,796 | 33.1% | 5.13 |
| Effective Gross Income | $755,748 | 100.0% | $15.65 | $824,176 | 100.0% | $17.07 | $670,388 | 100.0% | $13.88 | $749,505 | 100.0% | $15.52 |
| **Expenses** | | | | | | | | | | | | |
| Real Estate Taxes | $65,149 | 8.6% | $1.35 | $65,210 | 7.9% | $1.35 | $68,470 | 10.2% | $1.42 | $66,840 | 8.9% | $1.38 |
| Property Insurance | 6,952 | 0.9% | 0.14 | 6,840 | 0.8% | 0.14 | 7,182 | 1.1% | 0.15 | 6,929 | 0.9% | 0.14 |
| Gas | 4,011 | 0.5% | 0.08 | 3,353 | 0.4% | 0.07 | 3,350 | 0.5% | 0.07 | 3,465 | 0.5% | 0.07 |
| Electricity | 79,908 | 10.6% | 1.65 | 58,801 | 7.1% | 1.22 | 70,500 | 10.5% | 1.46 | 74,241 | 9.9% | 1.54 |
| Water & Sewer | 9,738 | 1.3% | 0.20 | 9,038 | 1.1% | 0.19 | 9,325 | 1.4% | 0.19 | 9,899 | 1.3% | 0.21 |
| Trash Removal | 6,251 | 0.8% | 0.13 | 6,797 | 0.8% | 0.14 | 6,900 | 1.0% | 0.14 | 6,929 | 0.9% | 0.14 |
| General Operating | 3,864 | 0.5% | 0.08 | 4,599 | 0.6% | 0.10 | 2,196 | 0.3% | 0.05 | 3,960 | 0.5% | 0.08 |
| Repairs & Maintenance | 82,833 | 11.0% | 1.72 | 109,670 | 13.3% | 2.27 | 69,770 | 10.4% | 1.44 | 86,615 | 11.6% | 1.79 |
| Management Fee [1] | 32,350 | 4.3% | 0.67 | 35,403 | 4.3% | 0.73 | 37,190 | 5.5% | 0.77 | 32,229 | 4.3% | 0.67 |
| Reserves for Replacement | 31,181 | 4.1% | 0.65 | 31,181 | 3.8% | 0.65 | 31,181 | 4.7% | 0.65 | 31,181 | 4.2% | 0.65 |
| Operating Expenses | $322,235 | 42.6% | $6.67 | $330,890 | 40.1% | $6.85 | $306,064 | 45.7% | $6.34 | $322,288 | 43.0% | $6.67 |
| **Net Operating Income** | $433,512 | 57.4% | $8.98 | $493,285 | 59.9% | $10.22 | $364,324 | 54.3% | $7.54 | $427,216 | 57.0% | $8.85 |
| [1] (Mgmt. typically analyzed as a % of EGI) | 4.3% | | | 4.3% | | | 5.5% | | | 4.3% | | |
| Annualized Amounts Represent _____ | | | | | | | | | [2] (Some revenue categories may reflect net figures) | | | |

Source: Operating statements



## CONEJOS PROPERTY – CASH FLOWS AND PROJECTED RESALE VALUES

### AS IS DISCOUNTED CASH FLOW ANALYSIS

Conejos
8700 Jefferson Street
Albuquerque, NM

Schedule Of Prospective Cash Flow
In Inflated Dollars for the Fiscal Year Beginning 4/1/2018

| For the Years Ending | Year 1 Mar-2019 | Year 2 Mar-2020 | Year 3 Mar-2021 | Year 4 Mar-2022 | Year 5 Mar-2023 | Year 6 Mar-2024 | Year 7 Mar-2025 | Year 8 Mar-2026 | Year 9 Mar-2027 | Year 10 Mar-2028 | Year 11 Mar-2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $577,831 | $583,382 | $594,161 | $508,649 | $567,531 | $602,624 | $630,490 | $642,131 | $652,583 | $662,816 | $677,595 |
| Absorption & Turnover Vacancy | (199,726) | | | | | | | | | | |
| Scheduled Base Rental Revenue | 377,925 | 583,382 | 594,161 | 608,649 | 567,531 | 602,624 | 630,490 | 642,131 | 652,583 | 662,816 | 677,595 |
| **Expense Reimbursement Revenue** | | | | | | | | | | | |
| Taxes | 43,488 | 66,510 | 66,874 | 68,785 | 71,757 | 73,734 | 75,524 | 77,513 | 79,453 | 81,438 | 83,473 |
| Property Insurance | 4,506 | 6,866 | 8,931 | 7,129 | 7,440 | 7,643 | 7,840 | 8,035 | 8,237 | 8,443 | 8,654 |
| Gas | 2,254 | 3,448 | 3,488 | 3,585 | 3,720 | 3,822 | 3,919 | 4,018 | 4,118 | 4,219 | 4,326 |
| Electricity | 8,347 | 39,727 | 45,849 | 58,541 | 77,241 | 81,485 | 83,968 | 86,096 | 88,251 | 90,456 | 92,717 |
| Water & Sewer | 847 | 5,268 | 6,113 | 7,936 | 10,796 | 10,886 | 11,206 | 11,480 | 11,767 | 12,062 | 12,363 |
| Trash Removal | 593 | 3,709 | 4,276 | 5,556 | 7,200 | 7,605 | 7,840 | 8,035 | 8,237 | 8,443 | 8,654 |
| General Operating | 2,576 | 3,609 | 3,962 | 4,073 | 4,252 | 4,368 | 4,480 | 4,592 | 4,707 | 4,824 | 4,944 |
| Repairs & Maintenance | 56,351 | 86,160 | 86,656 | 89,106 | 93,001 | 95,547 | 97,997 | 100,447 | 102,856 | 105,531 | 108,172 |
| Management Fees | 16,861 | 32,059 | 32,204 | 33,807 | 34,990 | 38,058 | 37,521 | 38,298 | 39,040 | 39,773 | 40,707 |
| Total Reimbursement Revenue | 133,846 | 247,796 | 258,327 | 276,484 | 309,878 | 321,138 | 330,419 | 338,514 | 346,766 | 355,169 | 364,010 |
| Grand Canyon Lease | 57,346 | | | | | | | | | | |
| Grand Canyon Opex | 19,715 | | | | | | | | | | |
| Total Potential Gross Revenue | 588,811 | 831,178 | 850,488 | 886,133 | 897,509 | 923,762 | 950,883 | 980,645 | 999,351 | 1,017,805 | 1,041,805 |
| General Vacancy | | (81,673) | (83,163) | (85,211) | (82,268) | (84,367) | (86,285) | (89,898) | (91,362) | (92,766) | (94,863) |
| Effective Gross Revenue | 588,811 | 749,505 | 767,315 | 802,922 | 815,241 | 839,395 | 872,620 | 890,747 | 907,989 | 925,039 | 946,742 |
| **Operating Expenses** | | | | | | | | | | | |
| Taxes | 85,210 | 88,640 | 68,511 | 70,224 | 71,880 | 73,779 | 75,624 | 77,514 | 79,452 | 81,438 | 83,474 |
| Property Insurance | 6,785 | 6,929 | 7,102 | 7,280 | 7,462 | 7,649 | 7,840 | 8,038 | 8,237 | 8,443 | 8,654 |
| Gas | 3,380 | 3,485 | 3,551 | 3,640 | 3,731 | 3,824 | 3,920 | 4,018 | 4,118 | 4,221 | 4,327 |
| Electricity | 72,431 | 74,241 | 76,097 | 78,000 | 79,950 | 81,948 | 83,997 | 86,097 | 88,250 | 90,456 | 92,717 |
| Water & Sewer | 9,657 | 9,899 | 10,146 | 10,400 | 10,660 | 10,926 | 11,200 | 11,480 | 11,767 | 12,061 | 12,362 |
| Trash Removal | 6,790 | 6,929 | 7,102 | 7,280 | 7,462 | 7,649 | 7,840 | 8,038 | 8,237 | 8,443 | 8,654 |
| General Operating | 3,863 | 3,960 | 4,059 | 4,160 | 4,264 | 4,371 | 4,480 | 4,592 | 4,707 | 4,824 | 4,945 |
| Repairs & Maintenance | 84,503 | 86,615 | 88,780 | 91,000 | 93,275 | 95,607 | 97,997 | 100,447 | 102,958 | 105,532 | 108,170 |
| Management Fees | 25,319 | 32,229 | 32,665 | 34,526 | 36,055 | 36,094 | 37,523 | 38,302 | 39,044 | 39,777 | 40,710 |
| Reserves for Replacement | 30,421 | 31,161 | 31,661 | 32,760 | 33,879 | 34,418 | 35,279 | 36,161 | 37,065 | 37,991 | 38,941 |
| Total Operating Expenses | 305,303 | 332,288 | 330,304 | 339,270 | 347,416 | 356,265 | 365,700 | 374,683 | 383,835 | 393,186 | 403,854 |
| Net Operating Income | 280,508 | 427,217 | 437,011 | 463,652 | 467,823 | 483,130 | 506,920 | $404,085 | 524,154 | 531,853 | 542,788 |
| **Leasing & Capital Costs** | | | | | | | | | | | |
| Tenant Improvements | 703,455 | 13,804 | 18,884 | 35,734 | | 23,191 | 11,997 | 19,102 | 40,430 | | 78,239 |
| Leasing Commissions | 139,544 | 6,711 | 15,462 | 22,726 | | 21,239 | 10,988 | 17,484 | 37,028 | | 71,823 |
| Total Leasing & Capital Costs | 842,999 | 20,315 | 32,346 | 58,460 | | 44,430 | 22,985 | 36,586 | 77,458 | | 149,882 |
| Cash Flow Before Debt Service & Taxes | ($562,491) | $406,902 | $404,665 | $365,192 | $467,823 | $438,700 | $483,935 | $479,498 | $446,566 | $531,853 | $393,896 |

5,579,070
(3%)
9.25 R Cap Rate
$5,411,698   3% Cost of Sales

50

CBRE

CBRE, Inc.


TACTICAL FINANCIAL
CONSULTING

## CONEJOS PROPERTY – RENT ROLL

**6700       CONEJOS OFFICE PARK**

| Unit | Unit Class | Tenant | Name | Expire Date | Sq Ft | Percent of Property | Current Rent/Dues | $/Sq Ft |
|------|-----------|--------|------|-------------|-------|---------------------|-------------------|---------|
| A | Office | WESTERN | WESTERN REFINING | 02-28-2022 | 10,105 | 20.94 % | 13,128.08 | 15.590 |
| A-1 | Office | LANB | LOS ALAMOS NATL BANK | 08-31-2019 | 2,280 | 4.72 % | 2,283.80 | 12.020 |
| B-1 | Office | DIXON | DIXON, SCHOLL & BAILEY PA | 11-30-2020 | 6,428 | 13.32 % | 4,821.00 | 9.000 |
| B-2 | Office | ANTECH | ANTECH DIAGNOSTICS, INC. | 05-31-2023 | 1,636 | 3.39 % | 1,329.25 | 9.750 |
| C-1 | Office | JOHNSON | JOHNSON&NELSON | 08-31-2017 | 975 | 2.02 % | 952.75 | 11.726 |
| C-2 | Office | PROPERTY | PROPERTY PRO LLC | 04-30-2019 | 883 | 1.83 % | 780.64 | 10.609 |
| C-3 | Office | KIEHNE | KIEHNE WEALTH & RETIREMENT | 12-31-2018 | 1,618 | 3.35 % | 1,573.51 | 11.670 |
| D-1 | Office | LANB | LOS ALAMOS NATL BANK | 03-31-2018 | 4,945 | 10.25 % | 4,640.06 | 11.260 |
| D-2 | Office | GRAND | GRAND CANYON | 05-31-2018 | 16,249 | 33.67 % | 28,672.71 | 21.175 |
| E | Office | MTN VIEW | MOUNTAIN VIEW THERAPY SERVICES | 04-30-2022 | 3,168 | 6.56 % | 2,772.00 | 10.500 |

|  | 6700 Property Totals: | 48,287 |  | 60,953.80 |
|--|----------------------|--------|--|-----------|

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 153 of 182



TACTICALFINANCIAL
CONSULTING

## CONEJOS PROPERTY – DEBTORS' 2018 BUDGET

CONEJOS OFFICE PARK
BUDGET FOR 2018

| | LEASE END DATE | BLDG | SF FT | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | | | | |
| RENT - WESTERN REFINING | 2/28/2022 | A | 10,105 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 13,128.06 | 157,536.96 |
| RENT - LAND | 8/31/2019 | A-1 | 2,280 | 2,283.80 | 2,283.80 | 2,283.80 | 2,283.80 | 2,283.80 | 2,283.80 | 2,283.80 | 2,283.80 | 2,352.20 | 2,352.20 | 2,352.20 | 2,352.20 | 27,679.20 |
| RENT - DIXON | 11/30/2020 | B-1 | 6,428 | 4,821.00 | 4,821.00 | 4,821.00 | 4,821.00 | 4,821.00 | 4,821.00 | 4,821.00 | 4,821.00 | 4,821.00 | 4,821.00 | 4,821.00 | 5,088.83 | 58,119.83 |
| RENT - B-2 VACANT | | B-2 | 1,636 | 2,217.00 | 2,217.00 | 2,217.00 | | | | | | | | | | 15,566.75 |
| RENT - JOHNSON & NELSON | 8/31/2019 | C-1 | 975 | 952.75 | 952.75 | 952.75 | 952.75 | 952.75 | 952.75 | 952.75 | 952.75 | 952.75 | 952.75 | 952.75 | 952.75 | 11,433.00 |
| RENT - PROPERTY PRO, LLC | 4/30/2019 | C-2 | 883 | 780.64 | 780.64 | 780.64 | 780.64 | 780.64 | 780.64 | 780.64 | 780.64 | 780.64 | 780.64 | 780.64 | 780.64 | 9,367.68 |
| RENT - KIEHNE WEALTH | 12/31/2020 | C-3 | 1,618 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 1,573.51 | 18,882.12 |
| RENT - LAND | 12/31/2022 | D-1 | 4,945 | 4,640.06 | 4,640.06 | 4,640.06 | | | | | | | | | | 13,920.18 |
| RENT - GRAND CANYON UNIVERSITY | 7/31/2018 | D-2 | 16,209 | 16,208.37 | 16,208.37 | 28,672.71 | 28,672.71 | 28,672.71 | | | | | | | | 116,434.87 |
| RENT - MT VIEW THERAPY | 4/30/2022 | E | 3,168 | 2,772.00 | 2,772.00 | 2,772.00 | 2,772.00 | 2,838.00 | 2,838.00 | 2,838.00 | 2,838.00 | 2,838.00 | 2,838.00 | 2,838.00 | 2,838.00 | 33,792.00 |
| | | | 48,287 | | | | | | $ 27,707.03 | $ 27,707.03 | $ 27,707.03 | $ 27,775.43 | $ 27,775.43 | $ 27,775.43 | $ 28,043.26 | |
| UTILITIES - REIMBURSEMENT | | | | 3,500.00 | 3,500.00 | 3,800.00 | 4,000.00 | 4,200.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,200.00 | 4,000.00 | 3,500.00 | 3,500.00 | 47,700.00 |
| OP EXP - WESTERN REFINING | | A | 4.00 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 3,199.88 | 38,398.56 |
| OP EXP - LAND | | A-1 | 4.00 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 1,062.80 | 12,753.60 |
| OP EXP - DIXON | | B-1 | 4.00 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 2,035.51 | 24,426.12 |
| OP EXP - NEW TENANT | | B-2 | 4.00 | | | | | | 545.42 | 545.42 | 545.42 | 545.42 | 545.42 | 545.42 | 545.42 | 3,815.94 |
| OP EXP - JOHNSON & NELSON | | C-1 | 4.00 | | | | | | | | | | | | | |
| OP EXP - PROPERTY PRO, LLC | | C-2 | 4.00 | 287.40 | 287.40 | 287.40 | 287.40 | 287.40 | 287.40 | 287.40 | 287.40 | 287.40 | 287.40 | 287.40 | 287.40 | 3,448.80 |
| OP EXP - KIEHNE WEALTH | | C-3 | 4.00 | 526.63 | 526.63 | 526.63 | 526.63 | 526.63 | 526.63 | 526.63 | 526.63 | 526.63 | 526.63 | 526.63 | 526.63 | 6,319.56 |
| OP EXP - LAND | | D-1 | 4.00 | 2,237.37 | 2,237.37 | 2,237.37 | | | | | | | | | | 6,712.11 |
| OP EXP - GRAND CANYON UN - BASE YR MIN | | D-2 | 7.25 | 9,857.73 | 9,857.73 | 9,857.73 | 9,857.73 | 9,857.73 | | | | | | | | 49,288.65 |
| OP EXP - MT VIEW THERAPY | | E | 4.00 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 1,031.13 | 12,373.56 |
| **TOTAL INCOME** | | | | 73,115.66 | 73,115.66 | 85,890.88 | 76,965.57 | 77,251.57 | 60,695.83 | 60,695.83 | 60,695.83 | 68,442.63 | 68,343.63 | 67,743.63 | 68,379.38 | 678,566.49 |
| | | | | | | | | | | | | | | | | |
| **EXPENSES** | | | | | | | | | | | | | | | | |
| PROPERTY TAXES | | | | | | | | | | | | | | 68,470.37 | | 68,470.37 |
| INSURANCE | | | | | | | | | | | | 7,161.74 | | | | 7,161.74 |
| FIRE ALARM SYSTEM - MONITORING | | | | 43.00 | 43.00 | 43.00 | 43.00 | 43.00 | 43.00 | 43.00 | 43.00 | 43.00 | 43.00 | 43.00 | 43.00 | 516.00 |
| R/M - FIRE SYSTEM | | | | | | | 300.00 | | | | | | 450.00 | | | 750.00 |
| R/M - GROUNDS MAINTENANCE | | | | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12,000.00 |
| R/M - LANDSCAPE CHANGES | | | | | | 1,000.00 | 500.00 | 5,000.00 | 500.00 | 2,000.00 | 1,250.00 | 1,500.00 | 500.00 | | | 12,250.00 |
| R/M - IRRIGATION | | | | | | | 500.00 | | 500.00 | | 500.00 | | | | | 1,500.00 |
| R/M - SNOW REMOVAL | | | | 500.00 | 250.00 | | | | | | | | | 250.00 | 500.00 | 1,500.00 |
| R/M - ROOF | | | | 500.00 | | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 600.00 | 500.00 | | 5,100.00 |
| R/M - BUILDING EXTERIOR | | | | | 500.00 | | | 11,500.00 | 1,000.00 | | 500.00 | 1,000.00 | 500.00 | 500.00 | | 17,500.00 |
| R/M - HVAC MAINTENANCE CONTRACT | | | | 1,610.00 | | | 1,610.00 | | | | 1,610.00 | | 1,610.00 | | | 6,440.00 |
| R/M - WINDOWS | | | | | | | 915.00 | | | | | | 915.00 | | | 1,830.00 |
| R/M - PLUMBING/BACKFLOW | | | | | | 500.00 | | 500.00 | | | | | 500.00 | | | 1,500.00 |
| R/M - TRI-WATER SYSTEM | | | | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 425.00 | 5,100.00 |
| R/M - PEST CONTROL | | | | | | 200.00 | 100.00 | | 200.00 | | 200.00 | | 100.00 | | | 800.00 |
| R/M - PARKING LOT | | | | | | 500.00 | | 500.00 | | 500.00 | | | | | | 1,500.00 |
| R/M - LIGHTS | | | | | 400.00 | | 400.00 | | 400.00 | | 400.00 | | 400.00 | | | 2,000.00 |
| MANAGEMENT FEE | | | | 3,143.97 | 3,143.97 | 3,692.84 | 3,310.38 | 3,321.82 | 2,950.00 | 2,950.00 | 2,950.00 | 2,943.06 | 2,934.46 | 2,912.96 | 2,936.01 | 37,189.80 |
| UTILITIES - PHONE FOR FIRE SYSTEM | | | | 140.00 | 140.00 | 140.00 | 140.00 | 140.00 | 140.00 | 140.00 | 140.00 | 140.00 | 140.00 | 140.00 | 140.00 | 1,680.00 |
| UTILITIES - GAS | | | | 800.00 | 500.00 | 400.00 | 300.00 | 150.00 | 50.00 | 50.00 | 50.00 | 50.00 | 150.00 | 400.00 | 800.00 | 3,900.00 |
| UTILITIES - ELEC (SOME TENANT REIMBURSED) | | | | 5,000.00 | 5,000.00 | 5,500.00 | 5,500.00 | 6,000.00 | 6,500.00 | 7,500.00 | 7,000.00 | 6,500.00 | 6,000.00 | 5,000.00 | 5,000.00 | 70,500.00 |
| UTILITIES - REFUSE | | | | 575.00 | 575.00 | 575.00 | 575.00 | 575.00 | 575.00 | 575.00 | 575.00 | 575.00 | 575.00 | 575.00 | 575.00 | 6,900.00 |
| UTILITIES - WATER/SEWER | | | | 400.00 | 450.00 | 450.00 | 450.00 | 575.00 | 850.00 | 1,300.00 | 1,500.00 | 1,700.00 | 600.00 | 450.00 | 400.00 | 9,325.00 |
| **TOTAL EXPENSES** | | | | 13,936.97 | 13,026.97 | 14,825.84 | 17,668.30 | 30,129.88 | 15,723.89 | 10,993.89 | 17,433.89 | 25,873.61 | 95,277.43 | 21,166.25 | 11,259.51 | 274,663.91 |
| | | | | | | | | | | | | | | | | |
| **NET OPERATING INCOME** | | | | 59,178.69 | 61,088.69 | 71,054.15 | 59,317.19 | 47,121.75 | 53,871.74 | 49,643.74 | 51,171.74 | 43,279.02 | 55,866.15 | (41,433.73) | 55,763.38 | 393,225.76 |
| | | | | | | | | | | | | | | | | |
| CASHFLOW (NEGATIVE) | | | | 59,178.69 | 61,088.69 | 71,054.15 | 59,317.19 | 47,121.75 | 53,871.74 | 49,643.74 | 51,171.74 | 43,279.02 | 55,866.15 | (41,433.73) | 55,763.38 | 393,225.76 |
| CUMULATIVE CASHFLOW (NEGATIVE) | | | | 59,178.69 | 138,267.37 | 191,321.53 | 258,638.72 | 297,760.48 | 359,634.21 | 400,247.95 | 451,421.69 | 494,793.56 | 546,659.66 | 533,335.94 | 589,999.32 | |


TACTICALFINANCIAL
CONSULTING

## CONEJOS PROPERTY – TEN-YEAR CASH FLOW PROJECTION OF CBRE

Conejos
6700 Jefferson Street
Albuquerque, NM

Schedule Of Prospective Cash Flow
In Inflated Dollars as of 4/1/2019

| For the Years Ending | Year 1 Mar-2020 | Year 2 Mar-2021 | Year 3 Mar-2022 | Year 4 Mar-2023 | Year 5 Mar-2024 | Year 6 Mar-2025 | Year 7 Mar-2026 | Year 8 Mar-2027 | Year 9 Mar-2028 | Year 10 Mar-2029 | Year 11 Mar-2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $583,382 | $594,161 | $608,649 | $587,631 | $602,624 | $630,466 | $642,131 | $652,583 | $662,616 | $677,595 | $720,553 |
| Absorption & Turnover Vacancy | | | | | | | | | | | |
| Scheduled Base Rental Revenue | 583,382 | 594,161 | 608,649 | 587,631 | 602,624 | 630,466 | 642,131 | 652,583 | 662,616 | 677,595 | 720,553 |
| **Expense Reimbursement Revenue** | | | | | | | | | | | |
| Taxes | 66,510 | 66,874 | 68,765 | 71,767 | 73,734 | 75,624 | 77,513 | 79,453 | 81,438 | 83,473 | 85,561 |
| Property Insurance | 6,896 | 6,931 | 7,129 | 7,440 | 7,643 | 7,840 | 8,035 | 8,237 | 8,443 | 8,654 | 8,870 |
| Gas | 3,448 | 3,468 | 3,565 | 3,720 | 3,822 | 3,919 | 4,018 | 4,118 | 4,219 | 4,326 | 4,434 |
| Electricity | 39,737 | 45,849 | 59,541 | 77,241 | 81,485 | 83,998 | 86,096 | 88,251 | 90,456 | 92,717 | 95,034 |
| Water & Sewer | 5,299 | 6,113 | 7,938 | 10,298 | 10,866 | 11,200 | 11,480 | 11,767 | 12,062 | 12,363 | 12,672 |
| Trash Removal | 3,709 | 4,278 | 5,558 | 7,209 | 7,605 | 7,840 | 8,035 | 8,237 | 8,443 | 8,654 | 8,870 |
| General Operating | 3,939 | 3,962 | 4,073 | 4,252 | 4,368 | 4,480 | 4,592 | 4,707 | 4,824 | 4,944 | 5,070 |
| Repairs & Maintenance | 86,189 | 86,658 | 89,108 | 93,001 | 95,547 | 97,997 | 100,447 | 102,958 | 105,531 | 108,172 | 110,875 |
| Management Fees | 32,069 | 32,204 | 33,807 | 34,950 | 36,068 | 37,521 | 38,298 | 39,040 | 39,773 | 40,707 | 42,730 |
| Total Reimbursement Revenue | 247,796 | 256,337 | 279,484 | 309,878 | 321,138 | 330,419 | 338,514 | 346,768 | 355,189 | 364,010 | 374,116 |
| Grand Canyon Lease | | | | | | | | | | | |
| Grand Canyon Opex | | | | | | | | | | | |
| Total Potential Gross Revenue | 831,178 | 850,498 | 888,133 | 897,509 | 923,762 | 960,885 | 980,645 | 999,351 | 1,017,805 | 1,041,605 | 1,094,669 |
| General Vacancy | (81,673) | (83,183) | (85,211) | (82,268) | (84,367) | (88,265) | (89,898) | (91,362) | (92,766) | (94,863) | (100,877) |
| Effective Gross Revenue | 749,505 | 767,315 | 802,922 | 815,241 | 839,395 | 872,620 | 890,747 | 907,989 | 925,039 | 946,742 | 993,792 |
| **Operating Expenses** | | | | | | | | | | | |
| Taxes | 66,840 | 68,511 | 70,224 | 71,980 | 73,779 | 75,624 | 77,514 | 79,452 | 81,438 | 83,474 | 85,561 |
| Property Insurance | 6,929 | 7,102 | 7,280 | 7,462 | 7,649 | 7,840 | 8,036 | 8,237 | 8,443 | 8,654 | 8,870 |
| Gas | 3,465 | 3,551 | 3,640 | 3,731 | 3,824 | 3,920 | 4,018 | 4,118 | 4,221 | 4,327 | 4,435 |
| Electricity | 74,241 | 76,097 | 78,000 | 79,950 | 81,948 | 83,997 | 86,097 | 88,250 | 90,456 | 92,717 | 95,035 |
| Water & Sewer | 9,899 | 10,146 | 10,400 | 10,660 | 10,926 | 11,200 | 11,480 | 11,767 | 12,061 | 12,362 | 12,671 |
| Trash Removal | 6,929 | 7,102 | 7,280 | 7,462 | 7,649 | 7,840 | 8,036 | 8,237 | 8,443 | 8,654 | 8,870 |
| General Operating | 3,960 | 4,059 | 4,160 | 4,264 | 4,371 | 4,480 | 4,592 | 4,707 | 4,824 | 4,945 | 5,069 |
| Repairs & Maintenance | 86,615 | 88,780 | 91,000 | 93,275 | 95,607 | 97,997 | 100,447 | 102,958 | 105,532 | 108,170 | 110,874 |
| Management Fees | 32,229 | 32,995 | 34,526 | 35,055 | 36,094 | 37,523 | 38,302 | 39,044 | 39,777 | 40,710 | 42,733 |
| Reserves for Replacement | 31,181 | 31,961 | 32,760 | 33,579 | 34,418 | 35,279 | 36,161 | 37,065 | 37,991 | 38,941 | 39,915 |
| Total Operating Expenses | 322,288 | 330,304 | 339,270 | 347,418 | 356,265 | 365,700 | 374,683 | 383,835 | 393,186 | 402,954 | 414,033 |
| Net Operating Income | 427,217 | 437,011 | 463,652 | 467,823 | 483,130 | 506,920 | 516,064 | 524,154 | 531,853 | 543,788 | 579,759 |
| **Leasing & Capital Costs** | | | | | | | | | | | |
| Tenant Improvements | 10,604 | 16,884 | 35,734 | | 23,191 | 11,997 | 19,102 | 40,430 | | 78,239 | 13,573 |
| Leasing Commissions | 9,711 | 15,462 | 32,726 | | 21,239 | 10,988 | 17,494 | 37,026 | | 71,653 | 12,431 |
| Total Leasing & Capital Costs | 20,315 | 32,346 | 68,460 | | 44,430 | 22,985 | 36,596 | 77,456 | | 149,892 | 26,004 |
| Cash Flow Before Debt Service & Taxes | $406,902 | $404,665 | $395,192 | $467,823 | $438,700 | $483,935 | $479,468 | $446,698 | $531,853 | $393,896 | $553,755 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 155 of 182



### TANOAN PROPERTY – PROPERTY PHOTOGRAPHS – ACADEMY A/K/A/ TANOAN PROPERTY

*Front View of Property*

![Front view photograph of the Tanoan property showing a multi-story office building with Coldwell Banker Legacy signage, a "got space - Debbie Harms, CCIM, SIOR" sign, and "TANOAN" lettering on a wall.]



*Entrance – Academy a/k/a/ Tanoan Property*

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 157 of 182

Exhibits



*Exterior*



*Exterior / Bank Drive Thru*



*Interior*



*Fitness Room*



Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 158 of 182



## TANOAN PROPERTY – IMMEDIATE REPAIR ITEMS –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) – ACADEMY A/KA/ MARCH 28, 2018



**Physical Needs Assessment**
Table 1 - Opinion of Life Safety, Immediate and Short-Term Probable Cost Estimates

**Tanoan Office Plaza**
f3, inc. Project
March 27, 2018

| | | | |
|---|---|---|---|
| Assessment Date: | March 21, 2018 | Life Safety Total: | $0 |
| Site acreage: | 3.168 | Immediate Total: | $0 |
| Age(s): | 13 | Short Term Total: | $0 |
| Total Usable SF: | 49,021 | Grand Total: | $0 |
| Buildings: | 1 | | |
| Units: | NA | | |
| Parking Spaces: | 196 | | |

**Life Safety Issues:** Items that may impact the health or safety of residents, employees or visitors

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Life Safety Issues Noted | | | $0 | $0 | |
| | | | Total | $0 | |

**Immediate Repair Items:** Recommend completion within 6 months

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Immediate Repair Issues Noted | | | | $0 | |
| | | | Total | $0 | |

**Short-Term Items:** Non-recurring capital items with recommended completion within 24 months

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| No Short Term Items Noted | | | | $0 | |
| | | | Total | $0 | |

**Items of Note:** Non-life safety items less than $2,500 to address (costs not included)

| Item | Brief Description |
|---|---|
| None | |
| | |



## TANOAN PROPERTY – REPLACEMENT RESERVES –F3, INC.. PROPERTY CONDITION ASSESSMENT (ENGINEER'S REPORT) – ACADEMY A/KA/ TANOAN PROPERTY – MARCH 28, 2018



**Physical Needs Assessment**
TABLE 2 - Replacement Reserve Cost Estimate

**Tanoan Office Plaza**
f3, Inc. Project
March 27, 2018

| | |
|---|---|
| Assessment Date: | March 21, 2018 |
| Age: | 13 |
| Total Leasable SF: | 49,021 |
| Buildings: | 1 |
| Stories: | 3 |
| Units: | NA |
| Parking Spaces: | 196 |
| Interior Stairways/Hallways?: | Yes |
| Covered Common Breezeways?: | No |
| Roof Age: | 15 |
| Roof Structures: | Flat |

**Total Reserves:** $0.55

| Item | EUL | Total Quantity | Unit | Unit Cost | Total Cost | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Site Components** | | | | | | | | | | | | | | | | | |
| Seal and Stripe Parking | 5 years | 68,600 | SF | 0.20 | 13,720 | | | 6,860 | | | | | 6,860 | | | | |
| **Architectural Components** | | | | | | | | | | | | | | | | | |
| Power wash and paint building exterior | 10 years | 1 | EA | 35,000.00 | 35,000 | | | 35,000 | | | | | | | | | |
| Replace Building Roof | 20 years | 16,340 | SF | 6.50 | 106,210 | | | | | 106,210 | | | | | | | |
| **Mechanical / Electrical / Plumbing Components** | | | | | | | | | | | | | | | | | |
| HVAC Service | Yearly | 12 | EA | 4,000 | 48,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| Elevator Service | Yearly | 12 | EA | 4,000 | 48,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| HVAC Replacement | 15 years | 5 | EA | 5,000 | 25,000 | | | 5,000 | | 5,000 | | | 5,000 | | 5,000 | | |
| Water heater replacement | 15 years | 4 | EA | 350 | 1,400 | | 350 | | 350 | | 350 | | 350 | | | | |
| **Interior** | | | | | | | | | | | | | | | | | |
| Common Area Refurbishment | 10 years | 1 | Allow | 45000.00 | 45,000 | | | | | 45,000 | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Total Uninflated** | | | $322,330 | $8,000 | $13,350 | $49,860 | $13,350 | $159,210 | $13,350 | $8,000 | $20,210 | $8,000 | $13,000 | $8,000 | $8,000 |
| Annual Inflation Factor @ 2.5% | | | | 100.00% | 102.50% | 105.06% | 107.69% | 110.38% | 113.14% | 115.97% | 118.87% | 121.84% | 124.89% | 128.01% | 131.21% |
| **Total, Inflated @ 2.5%** | | | $359,305 | $8,000 | $13,684 | $52,383 | $14,377 | $175,736 | $15,104 | $9,278 | $24,024 | $9,747 | $16,236 | $10,241 | $10,497 |
| Cumulative Total | | | | $8,000 | $21,684 | $74,067 | $88,443 | $264,179 | $279,283 | $288,561 | $312,585 | $322,332 | $338,568 | $348,808 | $359,305 |

| | |
|---|---|
| **Average Annual Cost Per SF 12 Years (uninflated)** | $0.55 |
| **Average Annual Cost Per SF 12 Years (inflated)** | $0.61 |


TACTICALFINANCIAL
CONSULTING

## TANOAN PROPERTY – DEBTORS' OPERATING HISTORY

### OPERATING HISTORY

| Year-Occupancy | 2015 | | | 2016 | | | 2017 | | | 2018 Budget | | | CBRE Estimate | 95.0% | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | % EGI | $/SF | Total | % EGI | $/SF | Total | % EGI | $/SF | Total | % EGI | $/SF | Total[2] | % EGI | $/SF |
| **Income** | | | | | | | | | | | | | | | |
| Net Rental Income | $833,265 | 95.2% | $17.31 | $815,444 | 92.3% | $16.94 | $868,270 | 93.4% | $18.04 | $710,950 | 97.5% | $14.77 | $729,053 | 97.1% | $15.15 |
| Other Income | 1,164 | 0.1% | 0.02 | 7,216 | 0.8% | 0.15 | 1,552 | 0.2% | 0.03 | - | 0.0% | - | 1,500 | 0.2% | 0.03 |
| Expense Reimbursements | 41,223 | 4.7% | 0.86 | 60,717 | 6.9% | 1.26 | 59,908 | 6.4% | 1.24 | 18,298 | 2.5% | 0.38 | 20,065 | 2.7% | 0.42 |
| Effective Gross Income | $875,652 | 100.0% | $18.19 | $883,377 | 100.0% | $18.36 | $929,730 | 100.0% | $19.32 | $729,248 | 100.0% | $15.15 | $750,618 | 100.0% | $15.60 |
| **Expenses** | | | | | | | | | | | | | | | |
| Real Estate Taxes | $109,027 | 12.5% | $2.27 | $53,034 | 6.0% | $1.10 | $53,213 | 5.7% | $1.11 | $55,873 | 7.7% | $1.16 | $53,084 | 7.1% | $1.10 |
| Property Insurance | 6,003 | 0.7% | 0.12 | 6,057 | 0.7% | 0.13 | 6,542 | 0.7% | 0.14 | 6,869 | 0.9% | 0.14 | 6,738 | 0.9% | 0.14 |
| Electricity | 89,420 | 10.2% | 1.86 | 117,533 | 13.3% | 2.44 | 114,397 | 12.3% | 2.38 | 118,000 | 16.2% | 2.45 | 115,505 | 15.4% | 2.40 |
| Water & Sewer | 20,395 | 2.3% | 0.42 | 22,105 | 2.5% | 0.46 | 22,529 | 2.4% | 0.47 | 24,000 | 3.3% | 0.50 | 24,064 | 3.2% | 0.50 |
| Trash Removal | 3,446 | 0.4% | 0.07 | 3,972 | 0.4% | 0.08 | 3,790 | 0.4% | 0.08 | 4,140 | 0.6% | 0.09 | 4,331 | 0.6% | 0.09 |
| General Operating | 8,384 | 1.0% | 0.17 | 2,883 | 0.3% | 0.06 | 2,663 | 0.3% | 0.06 | 6,429 | 0.9% | 0.13 | 6,257 | 0.8% | 0.13 |
| Repairs & Maintenance | 63,405 | 7.2% | 1.32 | 82,458 | 9.3% | 1.71 | 89,553 | 9.6% | 1.86 | 48,539 | 6.7% | 1.01 | 86,629 | 11.5% | 1.80 |
| Janitorial | 40,158 | 4.6% | 0.83 | 55,560 | 6.3% | 1.15 | 56,264 | 6.1% | 1.17 | 60,996 | 8.4% | 1.27 | 57,752 | 7.7% | 1.20 |
| Management Fee [1] | 33,258 | 3.8% | 0.69 | 37,696 | 4.3% | 0.78 | 40,083 | 4.3% | 0.83 | 39,137 | 5.4% | 0.81 | 32,277 | 4.3% | 0.67 |
| Reserves for Replacement | 26,470 | 3.0% | 0.55 | 26,470 | 3.0% | 0.55 | 26,470 | 2.8% | 0.55 | 26,470 | 3.6% | 0.55 | 26,470 | 3.5% | 0.55 |
| Operating Expenses | $399,967 | 45.7% | $8.31 | $407,768 | 46.2% | $8.47 | $415,505 | 44.7% | $8.63 | $390,454 | 53.5% | $8.11 | $413,105 | 55.0% | $8.58 |
| **Net Operating Income** | $475,685 | 54.3% | $9.88 | $475,609 | 53.8% | $9.88 | $514,225 | 55.3% | $10.68 | $338,794 | 46.5% | $7.04 | $337,513 | 45.0% | $7.01 |
| [1] (Mgmt. typically analyzed as a % of EGI) | 3.8% | | | 4.3% | | | 4.3% | | | 5.4% | | | 4.3% | | |
| Reserves for replacement added by CBRE | | | | | | | | | | [2] (Some revenue categories may reflect net figures) | | | | | |

Source: Operating statements



## TANOAN PROPERTY – RENT ROLL

**10400    ACADEMY**

| Unit | Unit Class | Tenant | Name | Expire Date | Sq Ft | Percent of Property | Current Rent/Dues | $/Sq Ft |
|---|---|---|---|---|---|---|---|---|
| 111 | Office | LEGACY | LEGACY MORTGAGE | 12-31-2020 | 570 | 1.23 % | 788.46 | 16.599 |
| 140 | Office | LIND | LAW OFFICES DUANE LIND LLC | 05-31-2020 | 755 | 1.63 % | 1,067.76 | 16.971 |
| 150 | Office | FFCU | FIRST FINANCIAL CREDIT UNION | 05-31-2023 | 2,879 | 6.22 % | 4,318.50 | 18.000 |
| 200 | Office | REVO | REVO LAW FIRM PA | 01-31-2020 | 2,000 | 4.32 % | 2,720.92 | 16.326 |
| 204 | Office | MRI | MGMT RECRUITERS OF THE SANDIAS | 12-31-2019 | 3,435 | 7.42 % | 4,000.00 | 13.974 |
| 210 | Office | | Vacant | | 2,148 | 4.64 % | | .000 |
| 230 | Office | CLINICAL | NATIONAL CLINICAL TECHNOLOGIES | 05-31-2018 | 2,730 | 5.90 % | 3,435.25 | 15.100 |
| 235 | Office | | Vacant | | 683 | 1.48 % | | .000 |
| 240 | Office | G SPA | LISA GELINAS | 12-31-2018 | 975 | 2.11 % | 1,381.25 | 17.000 |
| 245 | Office | PLATINUM | PLATINUM ELITE PROCESSING, LLC | 02-28-2019 | 1,400 | 3.03 % | 1,788.94 | 15.334 |
| 300 | Office | | Vacant | | 766 | 1.66 % | | .000 |
| 305 | Office | CB TECH | CB TECHNOLOGIES, INC | 12-31-2019 | 1,631 | 3.52 % | 2,275.25 | 16.740 |
| 310 | Office | FRYE | FRYE LAW FIRM PC | 12-31-2018 | 2,309 | 4.99 % | 3,640.52 | 18.920 |
| 340 | Office | ENVOY | ENVOY MORTGAGE | 05-31-2019 | 1,863 | 4.03 % | 2,558.52 | 16.480 |
| 345 | Office | Archibeque | ARCHIBEQUE LAW FIRM, LLC | 06-30-2019 | 2,095 | 4.53 % | 2,793.33 | 16.000 |
| 350 | Office | GIDDENS | LAW OFFICE OF GEORGE D GIDDENS | 01-31-2024 | 5,259 | 11.36 % | 8,098.86 | 18.480 |
| 360 | Office | BENNETT | CHARLES BENNETT | 07-31-2021 | 599 | 1.29 % | 848.33 | 16.995 |
| 390 | Office | COTTONWOOD | COTTONWOOD VISION CARE, LLC | 11-30-2021 | 2,000 | 4.32 % | 2,746.67 | 16.480 |
| 100-130 | Office | CB LEGACY | COLDWELL BANKER LEGACY | 06-30-2022 | 8,511 | 18.39 % | 11,752.27 | 16.570 |
| 120-250 | Office | CB LEGACY | COLDWELL BANKER LEGACY | 12-31-2020 | 3,977 | 8.59 % | 4,874.34 | 14.708 |
| MISC | Office | | Vacant | | 2,436 | 5.26 % | | .000 |
| ROOF | Mixed-use | | Vacant | | 0 | | | .000 |

**10400 Property Totals:    49,021          59,089.17**

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 162 of 182



## TANOAN PROPERTY – DEBTORS' 2018 BUDGET

| TANOAN OFFICE PLAZA | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10400 ACADEMY ROAD NE | | | | | | | | | | | | | | | | |
| BUDGET - 2018 | | | | | | | | | | | | | | | | |
| | LEASE END DATE | UNIT | SQ.FOOTAGE | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | TOTAL |
| INCOME | | | | | | | | | | | | | | | | |
| RENT - COLDWELL BANKER | 6/30/2022 | 100 | 5,285 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 7,297.70 | $ 87,572.40 |
| RENT - COLDWELL BANKER | 6/30/2022 | 100-A | 497 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 686.27 | $ 8,235.24 |
| RENT - COLDWELL BANKER | 6/30/2022 | 110 | 1,782 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 2,460.65 | $ 29,527.80 |
| RENT - LEGACY MORTGAGE | 12/31/2020 | 111 | 570 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 788.46 | $ 9,461.52 |
| RENT - COLDWELL BANKER | 12/31/2020 | 120 | 1,207 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 1,666.67 | $ 20,000.04 |
| RENT - COLDWELL BANKER | 6/30/2022 | 130 | 947 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 1,307.65 | $ 15,691.80 |
| RENT - LIND LAW OFFICE | 5/31/2020 | 140 | 812 | $ 1,067.76 | $ 1,067.76 | $ 1,067.76 | $ 1,067.76 | $ 1,067.76 | $ 1,094.45 | $ 1,094.45 | $ 1,094.45 | $ 1,094.45 | $ 1,094.45 | $ 1,094.45 | $ 1,094.45 | $ 12,999.95 |
| RENT - FIRST FINANCIAL CU | 5/31/2023 | 150 | 2,633 | $ 4,318.50 | $ 4,318.50 | $ 4,318.50 | $ 4,318.50 | $ 4,318.50 | $ 4,448.06 | $ 4,448.06 | $ 4,448.06 | $ 4,448.06 | $ 4,448.06 | $ 4,448.06 | $ 4,448.06 | $ 52,728.92 |
| RENT - REVO LAW FIRM | 2/28/2019 | 200 | 2,011 | $ 2,641.67 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 2,720.92 | $ 32,571.79 |
| RENT - MANAGEMENT RECRUITERS | 12/31/2019 | 204 | 3,567 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 48,000.00 |
| RENT - VACANT | | 210 | 2,148 | $ - | | | | | | | | | | | | $ - |
| RENT - COLDWELL BANKER | 12/31/2020 | 220 | 660 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 952.78 | $ 11,433.36 |
| RENT - NATIONAL CLINICAL TECH | 5/31/2018 | 230 | 2,850 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 3,435.25 | $ 41,223.00 |
| RENT - VACANT | | 235 | 663 | $ - | | | | | | | | | | | | $ - |
| RENT - LISA GELINAS | 12/31/2020 | 240 | 1,030 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 1,381.25 | $ 16,575.00 |
| RENT - PLATINUM ELITE | 2/28/2019 | 245 | 1,496 | $ 1,736.83 | $ 1,736.83 | $ 1,788.94 | $ 1,788.94 | $ 1,788.94 | $ 1,788.94 | $ 1,788.94 | $ 1,788.94 | $ 1,788.94 | $ 1,788.94 | $ 1,788.94 | $ 1,788.94 | $ 21,363.06 |
| RENT - COLDWELL BANKER | 12/31/2020 | 250 | 1,633 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 2,254.90 | $ 27,058.80 |
| RENT - VACANT | | 2-STOR | 325 | $ - | | | | | | | | | | | | $ - |
| RENT - VACANT | | 300 | 766 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| RENT - CB TECHNOLOGIES | 12/31/2019 | 305 | 1,756 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 2,275.25 | $ 27,303.00 |
| RENT - FRYE LAW | 12/31/2019 | 310 | 3,059 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 3,640.52 | $ 43,686.24 |
| RENT - ENVOY MORTGAGE | 5/31/2019 | 340 | 1,888 | $ 2,558.52 | $ 2,558.52 | $ 2,558.52 | $ 2,558.52 | $ 2,558.52 | $ 2,635.28 | $ 2,635.28 | $ 2,635.28 | $ 2,635.28 | $ 2,635.28 | $ 2,635.28 | $ 2,635.28 | $ 31,239.56 |
| RENT - ARCHIBEQUE LAW | 6/30/2019 | 345 | 2,181 | $ 2,793.33 | $ 2,793.33 | $ 2,793.33 | $ 2,793.33 | $ 2,793.33 | $ 2,793.33 | $ 2,880.63 | $ 2,880.63 | $ 2,880.63 | $ 2,880.63 | $ 2,880.63 | $ 2,880.63 | $ 34,043.76 |
| RENT - GIDDENS LAW | 1/31/2024 | 350 | 5,295 | $ 7,879.74 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 8,098.86 | $ 96,967.20 |
| RENT - CHARLES BENNETT | 7/31/2021 | 360 | 645 | $ 848.33 | $ 848.33 | $ 848.33 | $ 848.33 | $ 848.33 | $ 848.33 | $ 848.33 | $ 873.78 | $ 873.78 | $ 873.78 | $ 873.78 | $ 873.78 | $ 10,307.21 |
| RENT - COTTONWOOD VISION CARE | 11/30/2021 | 390 | 2,281 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 2,746.67 | $ 32,960.04 |
| RENT - VACANT | | 3-STOR | 122 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | 48,575 | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| OP.EXP - COLDWELL BANKER 100-100a-110-130 | 7.00 stop | | | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 628.01 | $ 7,536.12 |
| OP.EXP - COLDWELL BANKER 120-220-250 | 7.00 stop | | | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 260.47 | $ 3,125.64 |
| OP.EXP - LEGACY | | | | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 42.06 | $ 504.72 |
| OP.EXP - FFCU | | | | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 18.10 | $ 217.20 |
| OP.EXP - NATIONAL CLINICAL | | | | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 196.89 | $ 2,362.68 |
| OP.EXP - PLATINUM ELITE | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| OP.EXP - ENVOY | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| OP.EXP - ARCHIBEQUE | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| OP.EXP - GIDDENS | | | | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 379.29 | $ 4,551.48 |
| OP.EXP - BENNETT | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| OP.EXP - COTTONWOOD VISION | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | |
| STORAGE - VACANT | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | |
| **TOTAL INCOME** | | | **97,150** | **$ 60,263.52** | **$ 68,561.89** | **$ 60,614.88** | **$ 60,614.00** | **$ 60,614.00** | **$ 60,847.01** | **$ 60,934.21** | **$ 60,959.76** | **$ 60,959.76** | **$ 60,959.76** | **$ 60,959.76** | **$ 60,959.76** | **$ 729,247.53** |
| | | | | | | | | | | | | | | | | |
| EXPENSES | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| PROPERTY TAXES | | | | | | | | | | | | | | | $ 55,873.14 | $ 55,873.14 |
| INSURANCE - PROPERTY | | | | | | | | | | | | | $ 6,869.10 | | | $ 6,869.10 |
| JANITORIAL | | | | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 4,333.00 | $ 51,996.00 |
| JANITORIAL - PAPER SUPPLIES | | | | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 6,000.00 |
| JANITORIAL - WINDOW CLEANING | | | | | | | $ 1,500.00 | | | | | $ 1,500.00 | | | | $ 3,000.00 |
| R/M - GROUNDS | | | | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 1,330.00 | $ 15,960.00 |
| R/M - LANDSCAPE CHANGES | | | | | | | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | | | | $ 3,000.00 |
| R/M - IRRIGATION | | | | | | | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | | | | $ 3,000.00 |
| R/M - SNOW REMOVAL | | | | $ 1,000.00 | $ 500.00 | | | | | | | | | $ 500.00 | $ 1,000.00 | $ 3,000.00 |
| R/M - PARKING LOT/SIDEWALK | | | | | | | $ 500.00 | | $ 250.00 | | $ 250.00 | | | | | $ 1,000.00 |
| R/M - PEST CONTROL | | | | $ 45.00 | $ 45.00 | $ 100.00 | $ 45.00 | $ 45.00 | $ 100.00 | $ 45.00 | $ 45.00 | $ 100.00 | $ 45.00 | $ 45.00 | $ 140.00 | $ 800.00 |
| R/M - HVAC | | | | $ 1,250.00 | | | $ 1,250.00 | | $ 250.00 | $ 1,250.00 | $ 250.00 | | $ 1,250.00 | | | $ 5,500.00 |
| R/M - LIGHTING | | | | $ 250.00 | | | $ 250.00 | | | $ 250.00 | | | $ 250.00 | | | $ 1,000.00 |
| R/M - INTERIOR (TENANT ALLOWANCE) | | | | | | | | | | | | | | | | $ - |
| R/M - INTERIOR BUILDING | | | | $ 110.00 | $ 110.00 | $ 500.00 | $ 110.00 | $ 110.00 | $ 400.00 | $ 110.00 | $ 110.00 | $ 110.00 | $ 110.00 | $ 110.00 | $ 110.00 | $ 2,000.00 |
| R/M - EXTERIOR BUILDING | | | | | | $ 500.00 | | $ 1,000.00 | | $ 500.00 | | $ 1,000.00 | | | $ 1,000.00 | $ 4,000.00 |
| R/M - PLUMBING | | | | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 6,000.00 |
| R/M - ROOF | | | | | | $ 500.00 | | | $ 500.00 | | | $ 500.00 | | | | $ 1,500.00 |
| ELEVATOR MAINTENANCE/RPR/INSP | | | | $ 750.00 | | | $ 750.00 | | | $ 750.00 | | | $ 750.00 | | | $ 3,000.00 |
| PHONES ELEVATOR/SECURITY | | | | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 3,000.00 |
| SECURITY SYSTEM/FIRE MONITORING | | | | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 1,800.00 |
| FIRE ALARM SYSTEM - TESTING/R/M / BACKFLOW | | | | | | | | | | $ 475.00 | | $ 50.00 | | | | $ 525.00 |
| UTILITIES - REFUSE | | | | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 345.00 | $ 4,140.00 |
| UTILITIES - WATER/SEWER | | | | $ 800.00 | $ 700.00 | $ 600.00 | $ 1,800.00 | $ 2,200.00 | $ 2,600.00 | $ 3,500.00 | $ 3,200.00 | $ 3,200.00 | $ 2,800.00 | $ 1,500.00 | $ 800.00 | $ 24,000.00 |
| UTILITIES - ELECTRIC | | | | $ 8,000.00 | $ 8,500.00 | $ 10,000.00 | $ 11,500.00 | $ 11,500.00 | $ 11,500.00 | $ 12,000.00 | $ 11,000.00 | $ 10,500.00 | $ 9,000.00 | $ 7,500.00 | $ 7,000.00 | $ 118,000.00 |
| UTILITIES - INTERNET FOR ACCESS CONTROL | | | | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 92.00 | $ 1,104.00 |
| MANAGEMENT FEE | | | | $ 3,209.16 | $ 3,256.20 | $ 3,258.00 | $ 3,258.00 | $ 3,258.00 | $ 3,270.83 | $ 3,275.22 | $ 3,276.59 | $ 3,276.59 | $ 3,276.59 | $ 3,276.59 | $ 3,276.59 | $ 39,197.05 |
| **TOTAL EXPENSES** | | | | **$ 22,744.16** | **$ 29,610.20** | **$ 23,258.88** | **$ 29,463.00** | **$ 26,613.00** | **$ 27,570.53** | **$ 30,655.33** | **$ 26,631.59** | **$ 35,605.69** | **$ 24,981.59** | **$ 20,431.59** | **$ 76,699.73** | **$ 365,254.29** |
| | | | | | | | | | | | | | | | | |
| **NET OPERATING INCOME** | | | | **$ 37,519.36** | **$ 38,951.69** | **$ 37,356.00** | **$ 31,151.00** | **$ 34,001.00** | **$ 33,276.48** | **$ 30,279.89** | **$ 34,328.17** | **$ 25,354.07** | **$ 35,978.17** | **$ 40,528.17** | **$ (15,739.97)** | **$ 363,993.24** |
| | | | | | | | | | | | | | | | | |
| MORTGAGE - PRINCIPAL | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| MORTGAGE - INTEREST | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| MORTGAGE - TAXES | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| MORTGAGE - INSURANCE | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| MORTGAGE - TI RESERVE | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | |
| **CASHFLOW** | | | | **$ 37,519.36** | **$ 38,951.69** | **$ 37,356.00** | **$ 31,151.00** | **$ 34,001.00** | **$ 33,276.48** | **$ 30,279.89** | **$ 34,328.17** | **$ 25,354.07** | **$ 35,978.17** | **$ 40,528.17** | **$ (15,739.97)** | **$ 363,993.24** |
| **CUMULATIVE CASHFLOW** | | | | **$ 37,519.36** | **$ 77,471.04** | **$ 114,827.84** | **$ 145,978.84** | **$ 179,979.84** | **$ 213,255.53** | **$ 243,534.61** | **$ 277,862.78** | **$ 303,216.85** | **$ 339,195.02** | **$ 379,723.20** | **$ 363,983.24** | |



## TANOAN PROPERTY – TEN-YEAR CASH FLOW PROJECTION OF CBRE

Academy Office
10400 Academy Road
Albuquerque, NM 87111

Schedule Of Prospective Cash Flow
In Inflated Dollars for the Fiscal Year Beginning 4/1/2018

| For the Years Ending | Year 1 Mar-2019 | Year 2 Mar-2020 | Year 3 Mar-2021 | Year 4 Mar-2022 | Year 5 Mar-2023 | Year 6 Mar-2024 | Year 7 Mar-2025 | Year 8 Mar-2026 | Year 9 Mar-2027 | Year 10 Mar-2028 | Year 11 Mar-2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $772,118 | $800,500 | $829,269 | $853,492 | $869,565 | $876,392 | $888,758 | $911,176 | $935,843 | $960,672 | $983,881 |
| Absorption & Turnover Vacancy | (11,120) | | | | | | | | | | |
| Scheduled Base Rental Revenue | 760,998 | 800,500 | 829,269 | 853,492 | 869,565 | 876,392 | 888,758 | 911,176 | 935,843 | 960,672 | 983,881 |
| Expense Reimbursement Revenue | 24,002 | 31,691 | 37,154 | 41,156 | 38,425 | 32,590 | 21,270 | 22,701 | 28,285 | 32,700 | 31,535 |
| Other Income | 1,500 | 1,538 | 1,576 | 1,615 | 1,656 | 1,697 | 1,740 | 1,783 | 1,828 | 1,873 | 1,920 |
| Total Potential Gross Revenue | 786,500 | 833,729 | 867,999 | 896,263 | 909,646 | 910,679 | 911,768 | 935,660 | 965,956 | 995,245 | 1,017,336 |
| General Vacancy | (27,486) | (40,025) | (41,463) | (42,675) | (43,478) | (43,820) | (44,438) | (45,559) | (46,792) | (48,034) | (49,194) |
| Effective Gross Revenue | 759,014 | 793,704 | 826,536 | 853,588 | 866,168 | 866,859 | 867,330 | 890,101 | 919,164 | 947,211 | 968,142 |
| **Operating Expenses** | | | | | | | | | | | |
| Real Estate Taxes | 53,084 | 54,411 | 55,771 | 57,166 | 58,595 | 60,060 | 61,561 | 63,100 | 64,678 | 66,295 | 67,952 |
| Property Insurance | 6,738 | 6,906 | 7,079 | 7,256 | 7,437 | 7,623 | 7,814 | 8,009 | 8,209 | 8,415 | 8,625 |
| Electricity | 115,505 | 118,392 | 121,352 | 124,386 | 127,496 | 130,683 | 133,950 | 137,299 | 140,731 | 144,250 | 147,856 |
| Water & Sewer | 24,063 | 24,665 | 25,282 | 25,914 | 26,562 | 27,226 | 27,906 | 28,604 | 29,319 | 30,052 | 30,803 |
| Trash Removal | 4,331 | 4,440 | 4,551 | 4,664 | 4,781 | 4,901 | 5,023 | 5,149 | 5,277 | 5,409 | 5,545 |
| Repairs and Maintenance | 86,629 | 88,794 | 91,014 | 93,290 | 95,622 | 98,012 | 100,463 | 102,974 | 105,549 | 108,187 | 110,892 |
| Janitorial | 57,752 | 59,196 | 60,676 | 62,193 | 63,748 | 65,342 | 66,975 | 68,649 | 70,366 | 72,125 | 73,928 |
| Management | 32,638 | 34,129 | 35,541 | 36,704 | 37,245 | 37,275 | 37,295 | 38,274 | 39,524 | 40,730 | 41,630 |
| Reserves for Replacement | 26,470 | 27,132 | 27,810 | 28,505 | 29,218 | 29,948 | 30,697 | 31,464 | 32,251 | 33,057 | 33,884 |
| Total Operating Expenses | 407,210 | 418,065 | 429,076 | 440,078 | 450,704 | 461,070 | 471,684 | 483,522 | 495,904 | 508,520 | 521,115 |
| Net Operating Income | 351,804 | 375,639 | 397,460 | 413,510 | 415,464 | 405,789 | 395,646 | 406,579 | 423,260 | 438,691 | 447,027 |
| **Leasing & Capital Costs** | | | | | | | | | | | |
| Tenant Improvements | 22,461 | 15,158 | 10,034 | 866 | 11,743 | 27,581 | 17,151 | 11,352 | 979 | 13,286 | 31,207 |
| Leasing Commissions | 38,307 | 38,630 | 25,570 | 2,206 | 29,926 | 70,288 | 43,706 | 28,929 | 2,496 | 33,859 | 79,525 |
| Total Leasing & Capital Costs | 60,768 | 53,788 | 35,604 | 3,072 | 41,669 | 97,869 | 60,857 | 40,281 | 3,475 | 47,145 | 110,732 |
| Cash Flow Before Debt Service & Taxes | $291,036 | $321,851 | $361,856 | $410,438 | $373,795 | $307,920 | $334,789 | $366,298 | $419,785 | $391,546 | $336,295 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 164 of 182



## TANOAN PROPERTY – CASH FLOWS AND PROJECTED RESALE VALUES

## DISCOUNTED CASH FLOW ANALYSIS

Academy Office
10400 Academy Road
Albuquerque, NM 87111

Schedule Of Prospective Cash Flow
In Inflated Dollars for the Fiscal Year Beginning 4/1/2018

| For the Years Ending | Year 1 Mar-2019 | Year 2 Mar-2020 | Year 3 Mar-2021 | Year 4 Mar-2022 | Year 5 Mar-2023 | Year 6 Mar-2024 | Year 7 Mar-2025 | Year 8 Mar-2026 | Year 9 Mar-2027 | Year 10 Mar-2028 | Year 11 Mar-2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Potential Gross Revenue** | | | | | | | | | | | |
| Base Rental Revenue | $772,118 | $802,500 | $829,289 | $853,492 | $869,565 | $876,392 | $888,759 | $911,176 | $935,843 | $960,672 | $983,681 |
| Absorption & Turnover Vacancy | (11,120) | | | | | | | | | | |
| Scheduled Base Rental Revenue | 760,998 | 800,500 | 829,289 | 853,492 | 869,565 | 876,392 | 888,759 | 911,176 | 935,843 | 960,672 | 983,681 |
| Expense Reimbursement Revenue | 24,002 | 31,691 | 37,154 | 41,196 | 38,425 | 32,590 | 21,270 | 22,701 | 28,285 | 32,700 | 31,535 |
| Other Income | 1,500 | 1,538 | 1,576 | 1,615 | 1,656 | 1,697 | 1,740 | 1,783 | 1,826 | 1,873 | 1,920 |
| **Total Potential Gross Revenue** | 788,500 | 833,729 | 867,929 | 896,263 | 909,646 | 910,679 | 911,766 | 935,660 | 965,956 | 995,245 | 1,017,336 |
| General Vacancy | (27,486) | (40,025) | (41,483) | (42,675) | (43,478) | (43,820) | (44,436) | (45,559) | (46,782) | (48,034) | (49,194) |
| **Effective Gross Revenue** | 756,014 | 793,704 | 826,536 | 853,588 | 866,168 | 866,659 | 867,330 | 890,101 | 919,184 | 947,211 | 968,142 |
| **Operating Expenses** | | | | | | | | | | | |
| Real Estate Taxes | 53,064 | 54,411 | 55,771 | 57,166 | 58,595 | 60,080 | 61,581 | 63,100 | 64,678 | 66,295 | 67,952 |
| Property Insurance | 6,738 | 6,906 | 7,079 | 7,256 | 7,437 | 7,623 | 7,814 | 8,009 | 8,209 | 8,415 | 8,625 |
| Electricity | 115,505 | 118,392 | 121,352 | 124,386 | 127,496 | 130,683 | 133,950 | 137,299 | 140,731 | 144,250 | 147,856 |
| Water & Sewer | 24,063 | 24,665 | 25,282 | 25,914 | 26,562 | 27,226 | 27,906 | 28,604 | 29,319 | 30,052 | 30,803 |
| Trash Removal | 4,331 | 4,440 | 4,551 | 4,664 | 4,781 | 4,901 | 5,023 | 5,149 | 5,277 | 5,409 | 5,545 |
| Repairs and Maintenance | 86,629 | 88,794 | 91,014 | 93,290 | 95,622 | 98,012 | 100,463 | 102,974 | 105,549 | 108,187 | 110,892 |
| Janitorial | 57,752 | 59,196 | 60,676 | 62,193 | 63,746 | 65,342 | 66,975 | 68,649 | 70,366 | 72,125 | 73,928 |
| Management | 32,636 | 34,129 | 35,541 | 36,704 | 37,245 | 37,275 | 37,265 | 38,274 | 39,524 | 40,730 | 41,630 |
| Reserves for Replacement | 26,470 | 27,132 | 27,810 | 28,505 | 29,218 | 29,948 | 30,697 | 31,464 | 32,251 | 33,057 | 33,884 |
| **Total Operating Expenses** | 407,210 | 418,065 | 429,076 | 440,078 | 450,704 | 461,070 | 471,664 | 483,522 | 495,604 | 508,020 | 521,115 |
| **Net Operating Income** | 351,804 | 375,639 | 397,460 | 413,510 | 415,464 | 405,789 | 395,646 | 406,579 | 423,280 | 438,891 | 447,027 |
| **Leasing & Capital Costs** | | | | | | | | | | | |
| Tenant Improvements | 22,461 | 15,158 | 10,034 | 866 | 11,743 | 27,581 | 17,151 | 11,352 | 979 | 13,288 | 31,207 |
| Leasing Commissions | 38,307 | 38,630 | 25,570 | 2,206 | 29,636 | 70,288 | 43,706 | 28,929 | 2,496 | 33,859 | 79,525 |
| **Total Leasing & Capital Costs** | 60,768 | 53,788 | 35,604 | 3,072 | 41,569 | 97,869 | 60,857 | 40,281 | 3,475 | 47,145 | 110,732 |
| **Cash Flow Before Debt Service & Taxes** | $291,036 | $321,851 | $361,856 | $410,438 | $373,795 | $307,920 | $334,789 | $366,298 | $419,785 | $391,546 | $336,295 |

4,170,041
(3%)
$4,044,940

9.75% R Cap rate
3% Cost of Sales

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 165 of 182



## CONSULTANT'S BIOGRAPHY

Franklind Lea, CIRA

**President, Managing Member**

**Tactical Financial Consulting, LLC**



Franklind Lea is the President of Tactical Financial Consulting. During his 30 years of education and professional experience in complex business and financial matters, Mr. Lea has developed broad experience and expertise in commercial finance, insolvency, real estate, real estate finance and valuation.

His experiences encompass business and project evaluation, damage claims & lost profits, debt and equity structuring, feasibility analysis, financial analysis, investment management, lending and leasing, and valuation. He is also a nationally recognized expert in the areas of bankruptcy, financial restructuring, insolvency and workouts and is one of only approximately 1,000 individuals in the United States designated as a Certified Insolvency and Restructuring Advisor by the Association of Insolvency and Restructuring Advisors.

## Experience

Mr. Lea has been a financial consultant since late 2005 when he formed Tactical Financial. Since the creation of Tactical Financial, Mr. Lea has served as a financial advisor to debtor companies, investors, lenders and secured creditors, plaintiffs and defendants, unsecured creditors' committees, and law firms. As an advisor, he has provided due diligence services and financial consulting as well as litigation consulting and expert testimony for a number of matters related to asset disposition, damage claims, financial feasibility, financing, reasonable business conduct, and specialized bankruptcy and insolvency issues such as Till interest rates, the 1111(b) election, indubitable equivalent, and 1129 confirmation requirements. Within these roles he has participated in over 200 court hearings and provided testimony through affidavits, depositions and direct examination within the courtroom.

Prior to forming Tactical Financial, Mr. Lea was a senior lender at Textron Financial Corporation for 11 years where he focused on specialty real estate lending and large account workouts for real estate, equipment leasing and commercial lending. During his tenure at Textron Financial, he held several senior roles within its specialty lending divisions and risk management department. He completed approximately 50 multi-million dollar specialty loan transactions and conducted several multi-year complex workouts and financial restructurings.

His other professional experiences include roles as a commercial real estate appraiser with national and regional appraisal firms and various positions at First Florida Bank, including Vice President of Commercial Lending and Regional Commercial Credit Manager.

Collectively, his experiences include direct lending of approximately $500 million to businesses and commercial real estate ventures and credit review and approval of approximately $1.5 billion. He has also led numerous workouts and financial restructurings saving debtors and/or

141 | P a g e



creditors hundreds of millions of dollars of potential losses while working with companies with market capitalization ranging from $1 million to in excess of $1 billion.

## Education

Mr. Lea graduated with a Bachelor of Science degree in Management from Florida State University in 1986, a Master of Business Administration from Florida State University in 1987 and a Master's Degree in Real Estate and Urban Analysis from the University of Florida in 1994.

## Specialized Education

Mr. Lea completed formal credit training through the First Florida Bank Commercial Credit Training Program (a 120-hour training course focusing on commercial credit for commercial loans) achieving the bank's highest score of record on the program's exit exam. He also completed the First Florida Bank Commercial Loan Associate Program, a one-year training course focusing on all aspects of commercial credit and lending.

In 1994 he was granted credit for completion of all coursework required by The Appraisal Institute: for the MAI designation through a joint education program with the University of Florida and separately completed the Uniform Standards of Professional Appraisal Practice and Report Writing and Valuation Analysis. He has also completed the Florida Real Estate Associate License Course, the ASTM Phase I Environmental Assessment Course, and attended the Florida Environmental Permitting Summer School.

Since 2002, he has completed in excess of 1,000 hours of continuing education and is routinely asked to speak at professional seminars on topics related to finance, real estate and insolvency.

## Past & Present Professional Activities, Certifications, Memberships and Qualifications

American Bankruptcy Institute Member, 1999 to present
American Bankruptcy Institute,
> Member of the Board of Directors, 2015 to present
> Member of the Board of Director's, Education Committee, 2015 to present
> Member of the Board of Director's, Nominating Committee, 2015, 2016
> Asset Sales Committee, Co-Chair 2014, 2015, 2016
> Financial Advisors and Investment Banking Committee, Committee Co-Chair 2012, 2013
> Financial Advisors and Investment Banking Committee, Education Director 2010, 2011
> Alexander L. Paskay Seminar on Bankruptcy Law & Practice Advisory Board Member, 2010-2015
> Appraisal Institute, Affiliate Member
> Association of Insolvency and Restructuring Advisors, 2004 to present
> Certified Insolvency and Restructuring Advisor, Awarded 2005
> CFA Institute, Affiliate Member
> National Funding Association/Commercial Finance Association
> Turnaround Management Association, 2005 to present

## Expert Testimony Experience (Last Five Years), Trial and Deposition Testimony



In re: Marsh Hawk Golf Club, LLC (a/k/a Ford's Colony Country Club); U.S. Bankruptcy Court, Eastern District of Virginia (Newport News), Chapter 11 Case No. 10-50632, Judge Stephen C. St. John; February 2011 (Trial)

In re: Smithville Crossing, LLC; U.S. Bankruptcy Court, Eastern District of North Carolina (Raleigh), Chapter 11 Case No. 11-02573, Judge J. Rich Leonard; August 2011 (Trial)

In re: CABI SMA Tower I, LLLP; U.S. Bankruptcy Court, Southern District of Florida (Miami), Chapter 11 Case No. 10-49009, Judge A. Jay Cristol, May 2012 (Deposition)

In re: Waterford Hotel, Inc.; U.S. Bankruptcy Court, Eastern District of Michigan (Detroit), Chapter 11 Case No. 11-54788; Judge Thomas J. Tucker, July 2012 (Trial)

In re: Tarpon Lakeside Development, Inc.; (a/k/a Tarpon Lake Resort Hotel); U.S. Bankruptcy Court, Middle District of Florida (Tampa), Chapter 11 Case No. 11-17475, Judge Rodney May, September 2012 (Trial)

In re: Treasure Coast Hospitality, LLC. (a/k/a Holiday Inn Express & Suites – Port St. Lucie); U.S. Bankruptcy Court, Middle District of Florida (Jacksonville), Chapter 11 Case No. 11-00253, Judge Paul Glenn; November 2012 (Trial)

In re: Burcam Capital II, LLC (a/k/a 510 Glenwood); U.S. Bankruptcy Court, Eastern District of North Carolina (Raleigh), Chapter 11 Case 12-04729; Judge J. Rich Leonard; January 2013 (Trial)

In re: Ohana Group, LLC; U.S. Bankruptcy Court, Western District of Washington, Chapter 11 Case 12-21904; Judge Marc Barreca; November 2013 (Affidavit)

In re: West Airport Palms Business Park. LLC; U.S. Bankruptcy Court, Southern District of Florida (Miami), Chapter 11 Case 13-25728; Judge Robert Mark; March 2014 (Deposition and Trial)

In re: Azzan Bin Abdulla Al Ghurair ("Plaintiff") vs Georgi ZacZac, Sr. et al; Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County, Florida; Case No. #: 12-13796 CA-40; September 2014 (Deposition and Affidavit)

In re: Capital Road, LLC (Plaintiff) vs. RMP Enterprises, LLC et al; Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County, Florida; Case No. #: 14-14381 CA-40; August 2015 (Deposition)

In re: Curatus Trust Company (Mauritius) Limited, (Plaintiff) vs. American Leisure Group, Ltd., et al (Defendant), Circuit Court of the Ninth Judicial District In and For Orange County, Florida; Case No. 2011-CA-001201-O; December 2015 (Deposition)

**Presentations and Publications (Last Ten Years)**

*Speaker,* December 2017, American Bankruptcy Institute's Winter Leadership Conference, *"How Experts Lie With Statistics"*

*Speaker,* October 2016, American Bankruptcy Institute's Midwestern Bankruptcy Institute & Professional Development Workshop, *"The 1111(b) Election: What it is and Why You Should Care"*



*Speaker,* April 2016, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice, *"Chapter 11 Cramdown Issues: The Pros and Cons of the 1111b Election"*

*Speaker,* December 2015, Thirty-fifth Annual Seminar, Mississippi Bankruptcy Conference, "Its All About That 'Till"

*Moderator and Speaker,* December 2015, American Bankruptcy Institute's Winter Leadership Conference, *"Perfecting the Pitch"*

*Publication,* Their Voices Boomed Un-Till We Could Hear Them No More; American Bankruptcy Institute Journal, Volume XXXIIV / November 2015

*Speaker,* July 2015, American Bankruptcy Institute, Southeast Bankruptcy Workshop "It's All About That 'Till"

*Speaker*, April 2015 Central Florida Bankruptcy Association Annual Seminar, "*Real Estate Feasibility: Rates, Ratios and Reasonableness*"

*Speaker,* March 2015, Bankruptcy Battleground West Conference, *"The World of SARE Cases"*

*Moderator and Speaker,* December 2014, American Bankruptcy Institute's Winter Leadership Conference, *"Till, Ten Years Later"*

*Speaker,* October 2014, American Bankruptcy Institute's Midwestern Bankruptcy Institute & Professional Development Workshop, *"Getting Bang for Your Buck When Engaging Financial Advisors and Expert Witnesses"*

*Speaker, June* 2014, American Bankruptcy Institute Webinar Presentation, "*The §1111(b) Election: Advanced Mathematics and Strategies"*

*Speaker*, April 2014 Central Florida Bankruptcy Association Annual Seminar, "*I Want My Money Back: 1111b and Other Cramdown Issues*"

*Publication,* Why Till Works; American Bankruptcy Institute Newsletter l, Volume 11, Num. 1/ April 2014

*Speaker,* March 2014, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice, *"Understanding the* §1111(b) Election*"*

*Speaker,* March 2014, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice, *"Business Session Part I: A Potpourri of Current Problems in Restructuring"*

*Publication,* Remembering How We Got to Till; American Bankruptcy Institute Journal, Volume XXXIII / January 2014

*Publication (Reprinted),* De-Complicating the §1111(b)(2) Election: There Is No Such Thing as an Undersecured Claim in a Cramdown; Best of the ABI: The Year in Business Bankruptcy (Book), American Bankruptcy Institute, December 2013

*Speaker,* August 2013, Jacksonville Bankruptcy Bar Association Annual Seminar, *"Facts, Fantasies and Findings of Fact"*



*Moderator and Speaker, July* 2013, American Bankruptcy Institute Webinar Presentation, "*The §1111(b) Election, Plan Feasibility and Cramdown Issues*"

*Moderator and Speaker,* April 2013, American Bankruptcy Institute Annual Spring Meeting, "*The §1111(b) Election, Plan Feasibility and Cramdown Issues*"

*Speaker,* March 2013, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice, *"Feasibility: Facts, Fantasies and Findings – Part I"*

*Speaker,* March 2013, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice, *"Feasibility: Facts, Fantasies and Findings – Part II"*

*Speaker,* March 2013, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice, "We Can Go 'Round and 'Round about That…"

*Publication,* De-Complicating the §1111(b)(2) Election: There Is No Such Thing as an Undersecured Claim in a Cramdown; Financial Advisors and Investment Banking Committee, American Bankruptcy Institute Committee Newsletter, Volume 10, Number 1 / February 2013

*Speaker,* October 2012, Alston & Bird LLP 2012 CMBS Servicing Symposium, *"Chapter 11: Cramdown"*

*Moderator,* March 2012, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice, *"DIP Financing: Is it Back, and if So, Who is Playing and On What Terms?"*

*Speaker*, December 2011, American Bankruptcy Institute Winter Leadership Conference, *"Why Is There Never a Single Answer for the Cost of Capital or Value in Bankruptcy Proceedings?"*

*Speaker,* December 2011, American Bankruptcy Institute Winter Leadership Conference, *"Fundamentals of Finance that All Insolvency Professionals Should Understand"*

*Speaker,* November 2011, Association for Insolvency and Restructuring Advisors, *"Expert Witness Advanced Training Program: Phase I"*

*Speaker,* March 2011, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice, *"Bankruptcy Litigation Tips for Trying a Real Estate Valuation, and Fraudulent-Transfer Actions"*

*Moderator,* December 2010 American Bankruptcy Institute Winter Leadership Conference, *"Out of the Frying Pan and into the Fryer: Today's Restaurant Industry and the Challenges Ahead in Surviving the Decay of Everything a Sector Needs to Stay Viable"*

*Speaker,* June 2010, Association for Insolvency and Restructuring Advisors Annual Conference, *"AIRA Court on the Beach"*

*Speaker,* April 2010, American Bankruptcy Institute Annual Spring Meeting, "Small Business Bankruptcies: Getting Them through the Process"



*Speaker,* March 2010 Turnaround Management Association (Carolinas Area Chapter), *"Riding the Rapids of Commercial Real Estate"*

*Speaker,* September 2009, American Bankruptcy Institute Southwest Bankruptcy Conference, *"Around Chapter 11 in 80 Days for Rapid Reorganizations or Liquidation"*

*Speaker,* June 2009 Association for Insolvency and Restructuring Advisors Annual Bankruptcy and Restructuring Conference, *"Recessions and their Effects on the Small and Middle Market"*

*Speaker,* June 2007, Association for Insolvency and Restructuring Advisors Annual Bankruptcy and Restructuring Conference, *"Small Lender Session"*

**Continuing Education**

2018 American Bankruptcy Institute, Annual Spring Meeting

2018, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice

2017 American Bankruptcy Institute's Winter Leadership Conference

2017 American Bankruptcy Institute, VALCON 2017: Emerging Valuation Issues in Bankruptcy and Beyond

2017, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice

2016 American Bankruptcy Institute, American Bankruptcy Institute's Midwestern Bankruptcy Institute & Professional Development Workshop

2016 American Bankruptcy Institute, Annual Spring Meeting

2016, Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice

2015 Thirty-Fifth Annual Seminar, Mississippi Bankruptcy Conference

2015 American Bankruptcy Institute's Winter Leadership Conference

2015 American Bankruptcy Institute, Southeast Bankruptcy Workshop

2015 Turnaround Management Association, Southeast Regional Conference

2015 Alston & Bird LLP, 2013 CMBS Servicing Symposium

2015 Turnaround Management Association, Southeast Regional Conference

2015 Central Florida Bankruptcy Association Annual Seminar

2015 American Bankruptcy Institute, Annual Spring Meeting

2015 American Bankruptcy Institute Bankruptcy Battleground West Conference

2015 Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice



2014 American Bankruptcy Institute Winter Leadership Meeting

2014 American Bankruptcy Institute, American Bankruptcy Institute's Midwestern Bankruptcy Institute & Professional Development Workshop

2014 National Conference of Bankruptcy Judges

2014 Central Florida Bankruptcy Association Annual Seminar

2014 American Bankruptcy Institute, Annual Spring Meeting

2014 Southeastern Bankruptcy Law Institute, Seminar on Bankruptcy Law and Rules

2014 Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice

2013 American Bankruptcy Institute Winter Leadership Meeting

2013 National Conference of Bankruptcy Judges

2013 Alston & Bird LLP, 2013 CMBS Servicing Symposium

2013 France Media, Commercial Real Estate Investment & Finance Conference

2013 Crittenden Real Estate Finance Conference

2013 Jacksonville Bankruptcy Bar Association Annual Seminar

2013 American Bankruptcy Institute, Southeast Bankruptcy Workshop

2013 American Bankruptcy Institute, Annual Spring Meeting

2013 Southeastern Bankruptcy Law Institute, Seminar on Bankruptcy Law and Rules

2013 Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice

2012 American Bankruptcy Institute Winter Leadership Meeting

2012 National Conference of Bankruptcy Judges

2012 Alston & Bird LLP, 2012 CMBS Servicing Symposium

2012 IWIRC-AIRA, Radlax: What Will the Supreme Court Decide and How Will We Cram Down From Here?

2012 American Bankruptcy Institute Annual Spring Meeting

2012 Southeastern Bankruptcy Law Institute, Seminar on Bankruptcy Law and Rules

2012 Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice

2011 National Conference of Bankruptcy Judges

2011 France Media, Commercial Real Estate Investment & Finance for 2012



2011 American Bankruptcy Institute Annual Spring Meeting

2011 Stetson University and American Bankruptcy Institute's Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice

2010 American Bankruptcy Institute Winter Leadership Conference

2010 AIRA Annual Conference (Association for Insolvency and Restructuring Advisors)

2010 American Bankruptcy Institute Annual Spring Meeting

2010 TMA Charlotte March Meeting

2010 Stetson University and American Bankruptcy Institute Judge Alexander L. Paskay Seminar on Bankruptcy Law and Practice

2010 American Bankruptcy Institute Caribbean Bankruptcy Conference

2009 American Bankruptcy Institute Winter Leadership Conference

2009 National Conference of Bankruptcy Judges

2009 American Bankruptcy Institute Southwest Bankruptcy Conference

2009 American Bankruptcy Institute Southeast Bankruptcy Workshop

2009 AIRA Annual Bankruptcy and Restructuring Conference (Association for Insolvency and Restructuring Advisors)

2009 Southern Bankruptcy Law Institute Seminar

2009 American Bankruptcy Institute Annual Spring Meeting

2009 TMA Distressed Investing Conference

2008 National Conference of Bankruptcy Judges

2008 American Bankruptcy Institute Southwest Bankruptcy Conference

2008 American Bankruptcy Institute Southeast Bankruptcy Workshop

2008 IMN Distressed Real Estate Conference

2008 American Bankruptcy Institute Annual Spring

2007 American Bankruptcy Institute Southwest Bankruptcy Conference

2007 AIRA Annual Bankruptcy and Restructuring Conference (Association for Insolvency and Restructuring Advisors)

2007 American Bankruptcy Institute Annual Spring Meeting

2006 American Bankruptcy Institute Winter Leadership Conference

2006 National Conference of Bankruptcy Judges

2006 American Bankruptcy Institute Complex Financial Restructuring Program



2006 American Bankruptcy Institute Southeast Bankruptcy Workshop

2006 American Bankruptcy Institute Annual Spring Meeting

2005 American Bankruptcy Institute Winter Leadership Conference

2005 Bankruptcy Accounting, Reporting and Taxes ((Association for Insolvency and Restructuring Advisors)

2005 National Conference of Bankruptcy Judges

2005 American Bankruptcy Institute Southwest Bankruptcy Conference

2005 Bankruptcy Plan Development (Association for Insolvency and Restructuring Advisors)

2005 Bankruptcy Nuts and Bolts Course

2005 American Bankruptcy Institute Annual Spring Meeting

2005 Managing Turnaround and Bankruptcy Cases (Association for Insolvency and Restructuring Advisors)

2004 Chapter 11 Finance (American Conference Institute)

2004 American Bankruptcy Institute Southwest Bankruptcy Conference

2003 American Bankruptcy Institute Southwest Bankruptcy Conference

2002 ALI-ABA Fundamentals of Bankruptcy Law (American Law Institute/American Bar Association)

2001 Commercial Loan Workouts (Executive Enterprise Institute)

2001 Commercial Bankruptcy Workshop (Executive Enterprise Institute)

2001 The Workouts and Restructuring Course (Fulcrum Information Services)

2001 Southeastern Bankruptcy Law Institute Annual Seminar on Bankruptcy Law and Rules

1998 Effective Negotiating (Karrass)

1996 Environmental Permitting Summer School (Florida Department of Environmental Protection and the Florida Environmental Assessors Association)

1995 Environmental Site Assessments for Commercial Real Estate Course - Phase I Site Assessment and Transaction Screening/ASTM E 1527 & E 1528 (American Society of Testing and Materials)

1994 Georgia Survey Issues: Recognition and Remediation (National Business Institute, Inc.)

1994 Resolving Property Line Problems (National Business Institute Seminar)

1994 USPAP - Uniform Standards of Professional Appraisal Practice - Standards 410 & 420 (The Appraisal Institute)

1990 Florida Real Estate Sales License Course (certified Florida Real Estate Commission course)


TACTICALFINANCIAL
CONSULTING

1989 Loan Documentation (Business Training and Consulting Company)

1989 Commercial Loans to Businesses (Robert Morris & Associates)

1988 Commercial Analysis for Lenders (Financial Proformas, Inc.)

1988 Understanding Business Cash Flow (Robert Morris & Associates)

1988 Financial Accounting (Robert Morris & Associates)

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 175 of 182

 TACTICALFINANCIAL CONSULTING

## AMERICAN BANKRUPTCY INSTITUTE JOURNAL ARTICLE –JANUARY 2014

# Turnaround Topics

### BY FRANKLIND LEA

# Remembering How We Got to *Till*

## *You Name the Price, I'll Name the Terms*

Before the U.S. Supreme Court's *Till v. SCS Credit Corp.*[1] decision in 2004, there was considerable debate about the methodology used to determine the appropriate rate of interest to be paid to secured creditors in bankruptcy cramdown cases. The underlying cause for this debate was the requirement by § 1129 of the Bankruptcy Code that a plan be "fair and equitable." Although the case is considered an "interest rate case," at its forefront was the condition in § 1129(b)(2)(A)(II) that the secured creditor receive the present value of the secured creditor's security interest in its collateral.[2]

In *Till*, the Supreme Court was presented with four methods commonly used to determine interest rates by the bankruptcy courts and was asked to choose from among these methodologies. Ultimately, the Court reviewed the matter and strongly encouraged, if not directed, the use of the formula approach to determine the interest rate for bankruptcy plans. Unfortunately, due in part to the opinion's murky wording and the fact that *Till* was a chapter 13 case, the debate continues over the proper methodology for determining interest rates in chapter 11 cases. In retrospect, perhaps a better question to ask the Supreme Court might have been how one should test a debtor's plan for conformity for return-

ing the present value of the secured creditor's claim, rather than how to formulate the interest rate.

The value of a creditor's collateral to be repaid by debtors to creditors in cramdown cases will likely always be a contentious issue. When the parties are not able to agree to a value of a creditor's collateral included in a reorganization plan, parties routinely seek that determination through the bankruptcy courts. The court-determined value then becomes the value that a debtor must repay through the remaining plan terms. As such, in the confirmation of a bankruptcy case, the subtitle of this article, "You Name the Price, I'll Name the Terms" can take on real meaning.

The argument over whether a plan is fair and equitable often focuses on the interest rate rather than the Bankruptcy Code's present value requirements and other claim-repayment terms. Present value is a well-founded financial concept based on a mathematical computation, not a legal or equitable determination. It is calculated by combining the timing and amount of future payment(s) and discounting these at a "rate" that compensates the creditor for the use of its money over time and the risks of debtor default.[3] The same discounting process can be used to determine other values, but only one that uses a rate that reflects the time value of money and the pricing risk meet the definition of present value.



**Franklind Lea**
*Tactical Financial Consulting; Atlanta*

Franklind Lea, CIRA, is president of Tactical Financial Consulting, a nationally oriented Atlanta firm that provides financial consulting and related services, as well as expert witness testimony.

1  *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).
2  Section 1129(b)(2)(A)(II) mandates "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property."

3  The rate can go by a number of different names, including discount rate, mortgage discount rate, internal rate of return and, most commonly, interest rate.

### Chart 1: Schools of Thought

| School of Thought: Prime Plus 1 to 3 Percent (Say Prime Plus 2 Percent) | | | | |
|---|---|---|---|---|
| Year | 1 | 2 | 3 | 4 | 5 |
| Annual Payment | $363,703 | $363,703 | $363,703 | $363,703 | $363,703 |
| Balloon Payment | $0 | $0 | $0 | $0 | $4,437,988 |
| Total Payment | $363,703 | $363,703 | $363,703 | $363,703 | $4,801,691 |

| School of Thought: Make the Plan Work (Say 7.25 Percent) | | | | |
|---|---|---|---|---|
| Year | 1 | 2 | 3 | 4 | 5 |
| Annual Payment | $438,760 | $438,760 | $438,760 | $438,760 | $438,760 |
| Balloon Payment | $0 | $0 | $0 | $0 | $4,559,258 |
| Total Payment | $438,760 | $438,760 | $438,760 | $438,760 | $4,998,018 |

| School of Thought: Risk-Oriented Rate | | | | |
|---|---|---|---|---|
| Year | 1 | 2 | 3 | 4 | 5 |
| Annual Payment | $519,378 | $519,378 | $519,378 | $519,378 | $519,378 |
| Balloon Payment | $0 | $0 | $0 | $0 | $4,657,899 |
| Total Payment | $519,378 | $519,378 | $519,378 | $519,378 | $5,177,277 |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 176 of 182


TACTICALFINANCIAL
CONSULTING

Neither the Code nor the *Till* opinion suggests that the present-value formula be altered from its normal usage in the financial community for use in bankruptcy cases. In fact, in *Till*, the justices go to great lengths to express their intention of protecting the Code's requirement that the creditor receive the present value of its collateral interest, as they mention the present-value concept numerous times throughout the opinion.[4] The most direct of all of these is in footnote 4, in which Justice John Paul Stevens stated that "we use the term 'present value' to refer to the value as of the effective date of the bankruptcy plan."[5] Equally telling is the substantial discussion at the *Till* hearing before the justices when the term "present value" is used nine times and the concept is discussed at length, with neither party arguing that the concept or calculation process of present value should be adjusted.[6]

Due in large part to the imprecise wording in the Supreme Court's opinion, the outcome of *Till* appears to be the development of three different interpretations or "schools of thought" for determining the interest rate. These include the "prime plus 1 to 3 percent interest rate," the "find an interest rate that makes the plan (feasibly) work," and the "determine an interest rate that reflects the risk to the secured creditor." Until this area of the law is further refined, restructuring professionals and their clients will continue to debate this issue.

In some bankruptcy cases, some or all of these schools of thought may overlap and coincide to agree on a single interest rate. In many cases, however, they do not, and each one creates its own unique interest rate. As an example, the three interpretations of *Till* may allow for each of these three conclusions: (1) a rate in the range of prime plus 1 to 3 percent, say prime plus 2 percent (currently 5.25 percent); (2) a rate of 7.25 percent that makes the plan work; and (3) an interest rate of 9.25 percent that compensates the creditor for the time value of money and the risk that it will incur in the plan. To provide the present value, however, as required by its common-use definition as described by both § 1129 and the *Till* opinion, the interest rate must compensate the secured creditor for the risks that it is anticipated to experience from the plan repayment terms.

In addition to our interest rates, assume that the value of the secured creditor's interest in its collateral is $5 million, and that the plan has a five-year term and a 25-year amortization. Also assume that the debtor has $525,000 of cash flow available to service the debt in the first year of the plan, and that in order to prove feasibility, the bankruptcy court has required the debtor to show that its first year of cash flow will provide a 1.20 debt service coverage (DSCR). Using the parameters of these three schools of thought, Chart 1 shows some payment scenarios that can be generated.

4  See *Till*, 541 U.S. at 469, 472, 476 and 483 (discussing concept of present value).
5  See *Id*. at 439, n.4.
6  See Transcript of Oral Argument, *Till v. SCS Credit Corp.*, 541 U.S. 465 (2005) (No. 02-1016), available at www.supremecourt.gov/oral_arguments/argument_transcripts.aspx.

The examples in Chart 2 provide that at the interest rates of 5.25 percent and 7.25 percent, the plan has sufficient cash flow to meet a DSCR of at least 1.20. Therefore, the first two schools of thought provide a feasible outcome. Chart 2 also shows, however, that at the higher risk-oriented rate, the DSCR is only 1.01 and plan feasibility fails to occur.

Therefore, if the court were to approve a rate of 7.25 percent (or lower), feasibility will be assured. This approval will set annual plan payments of $438,760, with a balloon payment of $4,559,258 due in the fifth year. However, in addition to proving feasibility for a plan's confirmation, the Code also specifically requires — and *Till* confirms — the need for the plan to provide to the secured creditor its $5 million of present value. As a result, the plan must be further scrutinized to assure its compliance with providing the present value back to the secured creditor. This can be done by taking the proposed payment stream that is feasible (generated at the 7.25 percent interest rate) and discounting this payment stream by the risk-oriented interest rate of 9.25 percent (*see* Chart 3).

The discounted plan payments generate a present value of $4,625,065. In this instance, the amount paid to the secured creditor is $374,935 less than the required present value of its $5 million security interest in the debtor's collateral. Since the plan does not provide at least $5 million of value to the secured creditor, the plan does not meet the Bankruptcy Code requirement of § 1129(b)(2)(A)(II) as required for plan confirmation. Further, if the payment stream shown in Chart 1 for the "Prime Plus 2 Percent" (*i.e.*, 5.25 percent) had been used instead of the 7.25 percent interest rate payment stream, the resulting amount would have been even lower, creating an even greater deficit in the present value paid to the creditor.

In instances in which the risk-oriented interest rate rises above the rates generated from the other schools of thought, plan confirmation cannot be achieved without additional value being paid to the secured creditor. In order to ascertain when these situations might occur, bankruptcy judges need to rely on evidence proffered by attorneys who are well versed in present-value analysis, coupled with knowledgeable expert witnesses who are equally well versed in pricing risk. abi

### Chart 2: Plan Feasibility

|  | 5.25 Percent | 7.25 Percent | 9.25 Percent |
|---|---|---|---|
| Cash Flow - Year 1 | $525,000 | $525,000 | $525,000 |
| Annual Payment | $363,703 | $438,760 | $519,378 |
| Debt Service Coverage Ratio | 1.44 | 1.20 | 1.01 |
| Required DSCR for Feasibility | 1.20 | 1.20 | 1.20 |
| Feasibility Test | Pass | Pass | Fail |

### Chart 3: School of Thought: Make the Plan Work (Say 7.25 Percent)

| Year | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Annual Payment | $438,760 | $438,760 | $438,760 | $438,760 | $438,760 |
| Balloon Payment | $0 | $0 | $0 | $0 | $4,559,258 |
| Total Payment | $438,760 | $438,760 | $438,760 | $438,760 | $4,998,018 |
| Discount Factor of 9.25 Percent | 0.91533 | 0.83783 | 0.76689 | 0.70196 | 0.64253 |
|  | $401,611 | $367,607 | $336,482 | $307,993 | $3,211,372 |
| Present Value | $4,625,065 |  |  |  |  |

Copyright 2014      American Bankruptcy Institute.
Please contact ABI at (703) 739-0800 for reprint permission.

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 177 of 182


**AMERICAN BANKRUPTCY INSTITUTE JOURNAL ARTICLE – NOVEMBER 2015**



## AMERICAN BANKRUPTCY INSTITUTE
# JOURNAL
### The Essential Resource for Today's Busy Insolvency Professional



## Feature

BY FRANKLIND LEA, LEAH FIORENZA MCNEILL AND MARK STINGLEY

# Their Voices Boomed Un-*Till* We Could Hear Them No More

*Oyez, Oyez, Oyez. The giants on the hill had been summoned to quell our bickering, and so their voices boomed across the lands. Yet we could not hear their message clearly or perhaps we did not hear it at all. At first we thought we may have understood, yet those of us who had stood as one to listen had heard distinctly different tales. As the giants retreated, they left behind a trove of pages divided into three. For the giants did not speak in unison, and so our bickering began again.*



**Franklind Lea**
*Tactical Financial
Consulting; Atlanta*



**Leah Fiorenza McNeill**
*Bryan Cave LLP; Atlanta*

Since the Supreme Court's holding in *Till*, the commonplace notion is that *Till* requires the use of the "prime-plus" formula approach when determining the cramdown interest rate. However, the authors of this article believe that because there was no majority opinion in *Till*, the proper approach to determining the cramdown interest rate remains in the hands of various circuit courts around the nation.

For those caught in the debate of the appropriate rate of interest in a cramdown case, the argument started long before the giants were consulted in 2004.[1] Prior to *Till*, many questions arose around the nation in both consumer and commercial reorganization cases, and various methodologies and opinions were utilized and argued. *Till* presented some of those questions to the U.S. Supreme Court. The parties in *Till* sought to know whether the secured creditor was entitled to the indubitable equivalent of its pre-petition loan's interest rate, if the loan's contract rate should be used as the presumptive rate, and what a creditor should be compensated for within its interest rate.

The Supreme Court answered with three distinct opinions. Justice John Paul Stevens wrote the plural-ity opinion and was joined by three other justices.[2] Justice Antonin Scalia dissented and was joined by three other justices.[3] Justice Clarence Thomas concurred with the result but not the reasoning of Justice Stevens. Therefore, his concurrence created the oddity of a plurality decision, since no single opinion could explain the reasoning of the majority of the justices.

## Plurality: A Lack of Harmony In *Till*

When no single opinion reflects the majority view, we look within the various opinions to find the reasoning and conclusions that the opinions have in common. Only where the reasoning is in majority do we have an opinion to rely upon. As is common with plurality opinions, understanding and interpreting a Supreme Court's plurality gives rise to several unique — some correct, some incorrect — interpretations of the opinions among practitioners. *Till* is certainly no exception.

There is no doubt that the Court's issuance of multiple nonconcurring or partially concurring decisions has left many practitioners scratching their heads and trying to figure out what portions of the opinions were binding and what were mere *dicta*. While the issuance of concurring opinions and the related *dicta* can greatly increase our understanding of the Court's views and rationale, it can also lead to more confusion because these opinions often lack clear direction on important issues.

Untangling plurality opinions can be a difficult task, leaving everyone uncertain as to a case's actual precedential value. Although plurality decisions remain a source of confusion, the Supreme Court attempted to provide guidance in 1977 in *Marks v. United States*[4]: "When a fragmented Court decides

---

1  *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).
2  Justices David Souter, Ruth Bader Ginsburg and Stephen Breyer.
3  Justices William Rehnquist, Sandra Day O'Connor and Anthony Kennedy.
4  430 U.S. 188 (1977).

*66 Canal Center Plaza, Suite 600 • Alexandria, VA 22314 • (703) 739-0800 • Fax (703) 739-1060 • www.abi.org*

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 178 of 182


a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'[5] Simply put, lower courts must examine all of the concurring opinions that form the majority ruling on each issue raised, then determine the narrowest, most restrictive commonality among those opinions. Only the portions of the opinions that "overlap" are binding on the lower courts, and the remainder becomes *dicta* with no precedential value.

Although *Marks* added clarity on interpreting Supreme Court plurality decisions, uncertainty still exists, as the Court often issues opinions with little or no effort to clarify their agreements and disagreements. This leaves it to practitioners and lower courts to wade through the myriad thoughts provided in their opinions.

### The Three Melodies in *Till*

*Till* started in bankruptcy court as a chapter 13 plan that crammed down on the secured lender an interest rate accounting for, among other things, inflation costs and the risk of nonpayment posed by the borrowers. The result was that the plan's rate was much lower than the parties' pre-petition contract rate.[6] The secured creditor appealed, and the district court reversed, relying on evidence that a "subprime" lender could make new loans at a much higher interest rate. The debtors appealed, and the Seventh Circuit endorsed a modified version of the district court's approach. Upon further appeal, the Supreme Court granted *certiorari*.

In 2004, Justice Stevens announced the ruling of the Supreme Court, which was accompanied by the three opinions authored by Justices Stevens, Thomas, and Scalia. Because Justice Thomas concurred with the result, but not the reasoning, of Justice Stevens's opinion, the Seventh Circuit's decision was reversed and Justice Scalia's opinion, which was fairly consistent with the goals of Justice Stevens, simply became another interesting dissent.

Justice Stevens supported the "prime-plus" formula approach to determining interest rates. The rate, Justice Stevens noted, begins with the prime rate and includes such factors as "opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default."[7] Justice Scalia disagreed only with Justice Stevens's use of the prime-plus formula approach to compute cramdown interest rates because Justice Scalia believed that this approach would "systematically undercompensate secured creditors for the true risks of default."[8] Instead, Justice Scalia advocated for using the contract interest rate absent any other evidence that such rate is too high.

Both Justices Stevens and Scalia cite their belief that the cramdown rate should be specific to the risk inherent in the debtor's plan and not an attempt to make the creditor whole based on its past or present circumstances.[9] They also both noted (repeatedly) that plan payments made to a creditor over time must be worth at least the value of the creditor's interest in its collateral on the plan's effective date.

In contrast, Justice Thomas's opinion is that the Bankruptcy Code "*does not require a debtor-specific risk adjustment* that would put secured creditors in the same position as if they had made another loan."[10] Justice Thomas acknowledged that a "promise of future payments is worth less than an immediate payment" of the same amount due, at least in part, to the risk of nonpayment,[11] but he argues that this is irrelevant because the statute does not ask the court to value the promise to distribute property under the plan in the *future*. Rather, Justice Thomas noted, the court should ensure that the value of the property to be distributed under the plan *at the time* of the plan's effective date is not less than the amount of the secured creditor's claim. His reasoning is based partly on the Supreme Court's opinion in *Associates Commercial Corp. v. Rash*,[12] which posited that the creditor is already receiving the benefit of the higher going-concern value rather than a lower liquidation value.

As a result, Justice Thomas took no such stance on whether to begin with a concededly lower formula-approach rate or the more likely higher contract rate. To the contrary, he merely noted in his belief that the plain meaning of the Bankruptcy Code does not require any risk adjustment. He stated that there is no reason to look beyond the "risk free" rate, as the Code does not require compensation for time or risk after a plan has been implemented.[13]

Under the Supreme Court's direction in *Marks*, we believe that this dispels the commonplace notion that the Court requires the use of the formula approach or any particular starting rate in a formula approach calculation. Rather, due to the Court's lack of a majority on this approach, its opinion provides no guidance on methodology and places this issue back into the hands of the various circuit courts around the nation.

The same analysis is true with respect to the evidentiary burden. Justice Stevens wrote that



**Mark Stingley**
*Bryan Cave LLP*
*Kansas City, Mo.*

*Franklind Lea is president of Tactical Financial Consulting in Atlanta. Leah Fiorenza McNeil is an associate with Bryan Cave LLP in Atlanta. Mark Stingley is global head of Bryan Cave's Bankruptcy, Restructuring and Creditors' Rights Client Service Group. Mr. Lea and Mr. Stingley both serve on ABI's Board of Directors.*

5   *Id.* at 193 (citation omitted).
6   541 U.S. at 471.
7   *Id.* at 479.
8   *Id.* at 492.

9   As Justice Scalia stated in his opinion, his dispute with Justice Stevens's opinion was "over what procedure [would] more often produce accurate estimates of the appropriate interest rate. The plurality would use the prime lending rate ... and require the judge in every case to determine an amount by which to increase it... I would instead adopt the contract rate ... as a presumption that the bankruptcy judge could revise on motion of either party." *Id.* 491-92.
10  *Id.* at 486 (emphasis added).
11  *Id.* at 485.
12  520 U.S. 953 (1997).
13  Justice Thomas stated that his analysis of the statute was "not to say that a debtor's risk of nonpayment can *never* be a factor in determining the value of the property to be distributed." *Till*, 541 U.S. at 488 (emphasis added). However, his opinion is rather vague as to the circumstances under which a risk-adjustment to the interest rate might occur, but he goes on to state that "accounting for the risk of nonpayment in that case is not equivalent to reading a risk-adjustment requirement into the statute, as in the case of a note; [rather,] the risk of nonpayment is part of the value of the note itself." *Id.* at 489. Although we do not appear to have the full benefit of his thinking on this issue, we understand his ultimate conclusion that the statute calls for no risk-adjustment.



the primary evidentiary burden should lie with the creditor, "who [is] likely to have readier access to any information absent from the debtor's [pre-confirmation] filing."[14] (Although it is mere *dicta*, Justice Scalia indicated that the bankruptcy court could hold a hearing upon motion of either party, but does not directly cite an evidentiary obligation on behalf of either party.) Justice Thomas was silent on the issue of evidentiary burden, and since there was no concurrence on this issue, the issue again reverts back into the hands of the circuit courts. Similarly, in one of the most celebrated and debated footnotes in bankruptcy jurisprudence, Justice Stevens's footnote 14 indicates that at least a portion of the Justices focused on the case's potential application to chapter 11 cases.

> [T]here is no readily apparent Chapter 13 "cram down market rate of interest": Because every cramdown loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cramdown lenders. Interestingly, the same is *not* true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession. Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce.[15]

Meanwhile, Justice Thomas is absolutely silent as to applicability of *Till* to chapter 11 cases. Indeed, he fails to mention chapter 11 or cite a single chapter 11 case in his opinion. Thus, footnote 14 is *dicta* in all respects, as it appears only in the opinion of four Justices with no concurring opinion. Once again, *Till* cannot provide the bond so often sought between itself and chapter 11, leaving practitioners with reservations about the applicability of *Till* to chapter 11.

Footnote 14 also provides practitioners with another often-quoted observation. The footnote states that if an efficient market exists for loans to a chapter 11 debtor, it "might make sense to look at that rate."[16] This observation has caused a plethora of courts to adopt this procedure in chapter 11 confirmation to determine the cramdown interest rate.[17] Since Justice Thomas does not discuss chapter 11 cases, any reliance on that quote is based merely on the nonbinding *dicta* of Justice Stevens.

## A Familiar Old Song

Many bankruptcy courts have begun to acknowledge these and other shortcomings within *Till*, and have taken a more retrospective perspective. Based on similar interpretations to ours in this article, some courts have courageously forged ahead, claiming that *Till* is not precedent and instead relying on pre-*Till* circuit precedent.

For example, in *In re MPM Silicones LLC*[18] and *In re Couture Hotels Corp.*,[19] both judges relied on prior circuit court cases in addition to, or instead of, *Till*. The results

reached were vastly, if not startlingly, different. In *MPM*, a Second Circuit case that cites *In re Valenti*[20] for support, Hon. Robert D. Drain (U.S. Bankruptcy Court (S.D.N.Y.); White Plains) generally strips away most of the risk-adjustment in the cramdown interest rate, while in *Couture*, a Fifth Circuit case that cites *In re Texas Grand Prairie Hotel Realty LLC*[21] for support, Hon. Barbara J. Houser (U.S. Bankruptcy Court (N.D. Tex.); Dallas) seeks to specifically identify and compensate the creditor for the risks in the debtor's plan.

These two recent cases show how courts have indicated that chapter 11 does not require slavish devotion to *Till*, returning us to the pre-2004 debates and inconsistencies among the circuit courts. For instance, in *Grand Prairie*, the Fifth Circuit noted that while many courts have applied the formula approach cited in *Till* by Justice Stevens, they have done so because they were persuaded by the reasoning, not because they considered *Till* binding.[22] Similarly, in its "rejection" of *Till* in *MPM*, the district court affirmed the bankruptcy court's decision that rejected the market approach in chapter 11 cases by relying on *Valenti*, a pre-*Till* chapter 13 case in which the Second Circuit had rejected the market rate approach as support.[23]

> *Although we stood as one to listen and we hung on every word, as we read their troves of pages, we returned to being divided as we had been before the giants had spoken.* abi

*Reprinted with permission from the ABI Journal, Vol. XXXIV, No. 11, November 2015.*

*The American Bankruptcy Institute is a multi-disciplinary, non-partisan organization devoted to bankruptcy issues. ABI has more than 12,000 members, representing all facets of the insolvency field. For more information, visit abi.org.*

14 *Id.* at 479.
15 *Id.* at 476 n.14 (internal citations omitted).
16 *Id.*
17 *See, e.g., In re Am. HomePatient Inc.*, 420 F.3d 559, 568 (6th Cir. 2005) (holding that "the market rate should be applied in Chapter 11 cases where there exists an efficient market," and the formula approach should be used only where no such market exists); *In re 20 Bayard Views LLC*, 445 B.R. 83, 107-08 (Bankr. E.D.N.Y. 2011) (same); *In re Bashas' Inc.*, 437 B.R. 874, 920 (Bankr. D. Ariz. 2010); *In re Prussia Assocs.*, 322 B.R. 572, 588-89 (Bankr. E.D. Pa. 2005).
18 531 B.R. 321 (S.D.N.Y. 2015).
19 No. 14-34874-BJH, 2015 WL 5176859 (Bankr. N.D. Tex. Sept. 2, 2015).

20 105 F.3d 55 (2d Cir. 1997). The authors note that Judge Drain misquoted *Till* as favorably citing *Valenti*, when only four Justices spoke favorably through Justice Stevens, four Justices spoke unfavorably through Justice Scalia, and one (Justice Thomas) does not cite *Valenti* at all. *Id.* at 69 (citing *Till*, 541 U.S. 465). The authors believe that constitutes a "draw" with respect to the Supreme Court's view on *Valenti*.
21 710 F.3d 324 (5th Cir. 2013).
22 *Id.* at 331. In fact, in *Grand Prairie*'s affirming the bankruptcy court, it flatly rejected a necessary reliance on the formula approach, because "[w]e do not suggest that the prime plus formula is the only — or even the optimal — method for calculating the Chapter 11 cramdown rate." *Id.* at 337.
23 *MPM*, 531 B.R. at 334 (citing *Valenti*, 105 F.3d 55). As to *Till*'s footnote 14, the district court stated that footnote 14 "can fairly be read to suggest ... that a court may want to consider market rates in the Chapter 11 context." *Id.* at 333.

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 180 of 182



## PROPERTY SUBTYPE DISCOUNT RATES FOR OFFICE BUILDINGS





## CHANGES MADE FROM ORIGINAL REPORT ISSUANCE

| Page(s) | Change | Reason |
|---|---|---|
| xiii, 4th Pgh. | Deleted "no efficient market to exist for repayment of Class/ claim amount" | Redundant language |
| xiv, top of page | Changed sentence reading "national rate of 5.43% for this type of property and the approximate local rate of 5.75%. This also leads me to conclude that the Plan's proposed 4.75% interest rate is below both the national average interest rate and the local risk-based market rate for this type of property." To "national rate of 5.56% and 6.36% for these types of properties and the approximate local rates of 5.80% and 6.60%. This also leads me to conclude that the Plan's proposed 5.75% interest rate is similar to both the national average interest rates and the local risk-based market rates for these types of property prior to any atypical risk adjustment factors." | Clarification. Updated national and local rates to be consistent throughout opinion. Plan interest rate updated for new plan. |
| xvii | Changed "Secured" to "Unsecured" in the final line of each bullet point | Typographical or update error. |
| xviii, 2nd Pgh. | Changed "one percent" to "2.25%" and "thirty-three" to "less than eighteen" to be consistent with financial analysis within report | Typographical or update error. |
| xviii, 2nd Pgh. | Changed $15,608,621 to $17,975,571; changed $14,032,948 to "$13,021,126 from an Effective Date value of $9,570,000; add words "during the Plan Term" to clarify sentence | Clarification. Typographical or update error. |
| xx, 2nd Pgh. | Added words "by retaining the lease" to last full line | Clarification. |
| xx | Deleted hanging letter "I" on last bullet point on page | Typographical error. |
| P. 27 | Missing chart for Office Type Discount Rates. Placed on final page of report to avoid repagination | Typographical or update error. |
| P. 30, 4th Pgh. | Changed 2028 to 2025 to be consistent with Debtors revised Plan and parenthetical | Typographical or update error. |
| P. 43 | Changed Four to Five in description to be consistent with the chart's result | Typographical or update error. |
| P.44 and 45 | Changed 117% to 138% to reference correct number in Exhibit on page | Typographical or update error. |
| P.44 & 62, first line | Changed $216,641 to $181,512 to be consistent throughout report. Changed "two properties" to "a property" to reflect Debtors new Plan | Typographical or update error. |
| P.46 & P. 47 | Changed column title from "Projected Effective Date Collateral Value to "Projected End of Plan Term Value" | Clarification. |
| P. 51 | In Risk Factor chart, changed Amount description under Reorganization Plan to "See Cover Letter Summary"; Added "Flex-Space Warehouse" to Collateral (sub)Type | Typographical or update error. |
| P.55, last Pgh. | Changed interest rate from 9.50% and 9.75% to 9.75% and 10.0% to be consistent with Opinion conclusions and following charts | Typographical or update error. |
| P.62, 3rd Pgh. | Changed 119% to 148% and 97% to 138% to be consistent with analysis and exhibit; added "138% on a combined basis" to clarify. | Typographical or update error. |
| P.64 | Changed "Month 33" to "or Month 5" | Typographical or update error. |
| P.73 | Changed chart to match chart on pg. 34 and reflect Debtors new Plan | Typographical or update error. |
| P.74 | Changed chart to match chart on pg. 35 Debtors new Plan | Typographical or update error. |
| P.76. | Changed chart to reflect latest information used in report and analysis. | Typographical or update error. |

Case 15-33291-beh    Doc 467-6    Filed 06/20/18    Page 182 of 182